UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FILED

JUL 2 5 2008

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

IN RE: WILLIAM A. WHITE.

UNITED STATES OF AMERICA, et al.,

                                    Plaintiffs,

and

ANNETTE REDDICK, ETC.,                    Civil Action No. 2:07cv342
et al.,

                    Intervening Plaintiffs,

v.

JOHN CROCKETT HENRY, ETC.,
et al.,

                                    Defendants.

## OPINION AND ORDER

At issue before the Court is Intervening Plaintiffs' Motion
for Sanctions and for Issuance of a Rule to Show Cause to William
"Bill" A. White (collectively, "the Motion for Sanctions"), filed
on February 27, 2008 (Document No. 44).  The substance of the
Motion for Sanctions arises from certain postings on the internet
by William "Bill" A. White ("White"), a non-party, directed to an
attorney who issued subpoenas seeking to discover any connection
between White and the defendant named in the underlying litigation.
This non-dispositive motion was referred to the undersigned United

States Magistrate Judge on March 4, 2008.[1]  Though the underlying litigation has now been settled between the parties, the Court retains jurisdiction over the instant motion.  Dunn v. Gill, 990 F.2d 348, 350 (7th Cir. 1993) (district court retained jurisdiction over underlying motion for sanctions after voluntary dismissal of action) (citing Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 395-96 (1990) (federal court may consider collateral issues, including sanctions motion, after underlying action is no longer pending)). After presiding over an initial hearing on February 28, 2008, the undersigned convened an evidentiary hearing on April 2, 2008 and conducted a number of telephonic status conferences before and after that date.  These matters have been fully briefed and argued by all interested parties, and by the non-party, and are ready for decision by the Court.  Based on the totality of the record, and for the reasons expressed herein, the Court FINDS that the postings by White do not constitute a "true threat" of harm under the applicable case law, and DENIES the instant Motion for Sanctions.[2]

---

[1]The provisions of 28 U.S.C. § 636(b)(1)(A), Fed. R. Civ. P. 72(a), and Local Civil Rule 72 govern the disposition of this matter.

[2]The Court is advised White filed for bankruptcy protection in the United States District Court for the Eastern District of Virginia, Roanoke Division, in June, 2008, and he apparently has asserted the position that the "automatic stay" provisions of 11 U.S.C. § 362 would apply to such proceedings as the instant Motion for Sanctions.  This assertion is without merit.  See America Online, Inc. v. CN Products, 272 B.R. 897, 881 (E.D. Va. 2002) (J. Ellis) (recognizing "an exception to the operation of the automatic stay" in addressing matters related to "contumacious behavior.")

The Court recognizes that White's views, as expressed in his postings and related commentary, are patently racist and, consequently, wholly repugnant and deeply offensive to the Court. White seeks to call attention to himself and his hateful beliefs by thrusting himself into race-related disputes of which he becomes aware from internet media reports.  Seated at his computer, at a safe remove from the actual conflict, he strikes out randomly with inflammatory rhetoric, targeting individuals whom he has never met. The record is replete with examples of such conduct.  Nevertheless, on the instant facts, White's postings do not reach the level of proscribable commentary, and are not sanctionable.

## I. BACKGROUND

The vexing issue presented in this matter is the extent to which the Court should sanction or enjoin a non-party for repeatedly publishing on various internet websites certain personal information of counsel participating in the underlying litigation - in a manner and context that has been characterized by counsel as threatening and harassing and undertaken with the intent to intimidate - in retaliation against the issuance of subpoenas by counsel directed to certain communications by the non-party, but

---

(citations omitted); see also In re Rook, 102 B.R. 490, 495 (Bankr. E.D. Va. 1989) (automatic stay provisions of bankruptcy law do not apply to contempt proceeding brought to vindicate the authority of the court).  This Court concludes that the bankruptcy filing by White does not prohibit the instant ruling on the Motion for Sanctions.

that the non-party contends is a permissible exercise of his First Amendment right to express his views and involves only the publication of lawfully-obtained and publicly-available information.

## A. Brief Summary

To summarize briefly, White, a non-party, injected himself into the underlying litigation when, on May 23, 2007, he sent an arguably-intimidating letter ("the May 2007 letter") to a number of individuals who later intervened as plaintiffs in a civil action brought by the United States of America, in which violations of the Fair Housing Act were alleged against the named defendants, Dr. John Crockett Henry ("Henry") and his company, Henry LLC of Virginia Beach ("Henry LLC").[3]  In the May 2007 letter, which was addressed to "Whiny Section 8 Nigger" and was laced with racial epithets and arguably threatening language,[4] White disavowed

---

[3]The Court notes that neither Henry nor Henry LLC are directly involved in the instant Motion for Sanctions, and there appears to be no dispute that Henry is the owner of Henry LLC. Accordingly, the Court will generally refer to the named defendants collectively as "Henry" unless the context of such usage requires otherwise.

[4]The Court recognizes the vile and despicable nature of the racial epithets used by White to communicate his message of hatred; the Court will repeat such words in this opinion and order only as required to establish the proper context for White's communications.  As such, the text of the May 2007 letter is as follows:

> May 23, 2007
> Whiny Section 8 Nigger
> 15 ½ St Apartments
> Virginia Beach, VA

4

knowing Henry but White expressed his awareness of and discontent with the underlying dispute.   Although White, a self-professed white supremacist who publishes on and maintains various internet

---

Re: Your complaint against Henry LLC

Dear Nigger Tenant:

I read today of your complaint against James Crockett Henry and Henry LLC.  I do not know Mr [sic] Henry, but I do know your type of slum nigger, and I wanted you to know that your actions have not been missed by the white community.

For too long, niggers like you have been allowed to get one over on the white man.  You won't work.  You won't produce. You breed and eat and turn the world around you into a filthy hole, but you won't do anything to earn or deserve the life you live. Niggers like you are nothing new.  All of Africa behaves like you do – with the difference that, there, there is no white man to exploit, only brutal niggers [sic] dictators to give the lot of you the kind of government you deserve.

You may get one over on your landlord this time, and you may not.  But know that the white community has noticed you, and we know that you are and will never be anything other than a dirty parasite – and that our patience with you and the government that coddles you runs thin.

Sincerely,

/s/

Bill White, Commander
American National Socialist Workers' Party
PO Box 8601
Roanoke, VA 24014

websites and blogs,[5] has no apparent connection to the subject
matter or principals in the underlying litigation, his
determination to involve himself in the litigation led counsel for
Intervening Plaintiffs to issue several subpoenas[6] directed to the
discovery of evidence of communications between White and Henry,
and their respective business affiliates or organizations. White,
by counsel, sought properly to quash the subpoenas, discussed
infra.  In addition, after the subpoenas had been issued, White
allegedly authored certain electronic postings in which he voiced
his complaints over the issuance of subpoenas through various
messages that arguably threatened the safety of counsel.  Among the
bad acts alleged in the Motion for Sanctions is that White's

---

[5]White refers to himself as the "Commander" of the "American
National Socialist Worker's Party" (ANSWP), which purports to be a
neo-nazi white activist group headquartered in White's hometown of
Roanoke, Virginia.  White also appears to be the owner and operator
of the other entities that were the subject of subpoenas, see infra
note 6.

[6]It appears that on or about January 30, 2008, subpoenas were
issued to the following persons and entities: William "Bill" A.
White (the subpoena also commanded White to appear for a discovery
deposition on March 3, 2008); White Politics, LLC c/o William
"Bill" A. White; American National Socialist Workers' Party, LLC,
c/o William "Bill" A. White; National Socialist Movement of
Roanoke, LLC, c/o William "Bill" A. White; and White Homes and
Land, LLC, c/o William "Bill" A. White.  Also, on or about January
17, 2008, a subpoena was issued to YAHOO! INC. ("the Yahoo!
subpoena"), a resident of Northern Virginia within this Court's
jurisdiction, to discover information regarding White's various
email accounts.  Only the Yahoo! subpoena was issued out of this
Court, see infra.  The remaining subpoenas were issued out of the
Western District Virginia as they were directed to White and his
various Roanoke-based business entities.

electronic postings revealed certain personal information pertaining to counsel, including his name, home address, telephone number and the name of his spouse, and that White invited his followers and the readers of his postings to contact counsel and express their displeasure over the subpoenas. Counsel for Intervening Plaintiffs swiftly moved for sanctions and other penalties against White, which led to other postings by White, and which in turn led to additional pleas for sanctions by counsel for Intervening Plaintiffs, and so on. Though the underlying litigation between Intervening Plaintiffs and Henry and between Plaintiff and Henry has now been settled, the Court retains jurisdiction over the instant Motion for Sanctions.

### B. Procedural Background

The underlying litigation giving rise to the instant Motion for Sanctions is a dispute in which the United States of America ("the United States" or "Plaintiff") brought suit for alleged violations of the Fair Housing Act, and other state and federal statutes, based on discriminatory housing practices at an apartment complex owned by Henry LLC and managed by Henry. The suit arose out of a number of fair housing complaints filed by five (5) residents of the apartment complex, and their minor children, between August, 2006 and February, 2007, alleging discriminatory

and harassing treatment instigated by Henry and Henry LLC.[7]  After investigating the complaints, the United States filed suit against Henry and Henry LLC on behalf of the resident-complainants on July 25, 2007.  On August 23, 2007, the resident-complainants moved to intervene as plaintiffs; that motion was granted by Order entered October 1, 2007 (Document No. 23), naming as plaintiffs Annette Reddick, Tasha Reddick, Tiese Mitchell, Crystal Lewis, and Arlene Carter, and their minor children R.C., Z.C., J.J., J.M., and J.M. (collectively, "Intervening Plaintiffs").

Two months prior to the initiation of the instant litigation, on or about May 23, 2007, White sent the May 2007 letter to the individual Intervening Plaintiffs.  The letter also included the May 2007 issue of the <u>National Socialist</u>, the Journal of the American National Socialist Workers Party,[8] which ostensibly is owned, operated and/or published by White, as its "Commander." According to news reports, officials from the Commonwealth's Attorney for the City of Virginia Beach were made aware of the

---

[7]This included allegations that Henry: imposed "quiet time" on black residents, but not white residents; referred to children of black residents as "monkeys" and "niggers"; told the resident-complainants that they could only have children of a certain sex living with them; and entered the apartments of black residents when they were not at home and without justification or the residents' consent.

[8]The Court notes that the magazine's cover is adorned with a Nazi swastika and includes blatant anti-Jewish and anti-African American commentary; the editorials and articles in the magazine are similar in nature.

8

letter, but declined to take any action against White.[9]  In the May 2007 letter, see supra note 4, White stated, "I read today of your complaint against [Henry]" and that "I do not know [Dr.] Henry," which suggested that White could have learned about the underlying HUD complaint through the news media coverage.[10]  Near that same time, White apparently began posting commentary on various internet blogs and websites that he frequented and/or maintained expressing his views of the substance of the complaints against Henry.[11]  As a result of White's decision to involve himself in the events that led to the underlying litigation, counsel for Intervening Plaintiffs, including Kevin W. Mottley of Troutman Sanders LLP, issued approximately five (5) subpoenas to White and his various business interests, see supra note 6, seeking to investigate the

---

[9]As reported by White on his web blog at Overthrow.com, on May 26, 2007, at 12:50 a.m., "[City of Virginia Beach ]Commonwealth's Attorney Harvey Bryant said there are no state statutes covering letters that do not contain a direct threat of bodily harm or a conspiracy to incite a racial insurrection." White's commentary in connection with this posting is particularly troubling, yet characteristic of his viewpoint: "No, I didn't threaten these Negroes [by sending the May 2007 letter,] nor did I discourage them from pursuing their 'civil rights.' I just followed an old Southern maxim, showed the spooks some haints, and let them go crazy with their imagination and tall tales. LOL."

[10]Accounts of the May 2007 letter and the ensuing investigation by the Virginia Beach Commonwealth's Attorney were reported in The Virginian Pilot, on or about May 26, 2007.  See supra note 9.

[11]See infra.

possibility of a relationship between White and Henry.[12]   In addition, the Yahoo! subpoena was issued, seeking to discover White's various electronic communications.

On January 22, 2008, the Court entered a mutually-agreed protective order governing certain confidential documents that contained private information of the parties.   White, a non-party, was not a signatory to the protective order.

On February 11, 2008, White, by counsel, timely moved to quash the subpoenas and for a protective order ("the motion to quash"). The motion to quash, filed on February 11, 2008, addressed all of the subpoenas issued to White and his business entities as well as the Yahoo! subpoena.   On that same date, White amended his motion to quash ("the amended motion to quash"), again directed to all of the various subpoenas, correcting an attached exhibit.   On February 19, 2008, Intervening Plaintiffs moved to compel, seeking an order requiring the production of documents and for White to appear for a deposition on March 3, 2008.[13]   On February 27, 2008, White again

---

[12]The Court notes that at the time the subpoenas were issued, in January 2008, the discovery deposition of Henry had not been scheduled, thus counsel had not taken the opportunity to inquire directly of Henry regarding any connection with White.   The Court has not been provided an explanation for the nearly eight-month delay between the mailing of the May 2007 letter and the issuance of the instant subpoenas in January 2008.

[13]While the proceedings were being scheduled and counsel were negotiating among themselves, White apparently continued to post messages on the various internet websites and blogs, see infra; those postings and their aftermath led the Court to issue this opinion and order.

amended his motion to quash ("the second amended motion to quash"), restricting its scope to cover only the Yahoo! subpoena since that subpoena was the only one of the group issued out of this Court.[14] Correspondence provided to the Court showed that counsel attempted unsuccessfully to reach agreement on the scope of the subpoenas, which ultimately led to a hearing being scheduled for February 28, 2008.[15]

On February 21, 2008, the parties to the underlying litigation jointly moved for an extension of the non-expert discovery cutoff, which was granted by the Court's order of February 22, 2008, extending the cutoff until March 26, 2008.

On February 27, 2008, Intervening Plaintiffs filed the instant Motion for Sanctions based on an internet posting by White, from February 22, 2008, at approximately 3:55 p.m., in which White revealed certain personal information pertaining to counsel for Intervening Plaintiffs, including that attorney's name, home address, telephone number and the name of his spouse. That posting also directed the readers of White's postings not to contact

---

[14]The Court's order of February 28, 2008, interpreted the second amended motion to quash, and White's argument at the hearing on that date, as his withdrawal of any objection posed in this Court to any of the subpoenas other than the Yahoo! subpoena.

[15]White's deposition, scheduled for March 3, 2008, did not occur. Apparently, counsel for the parties were present and prepared to conduct the deposition, but the parties were unable to resolve their dispute over the scope of the subpoenas and the related discovery deposition, thus the deposition did not go forward on that date.

counsel (and his wife) to express displeasure over the subpoenas, but it was arguably designed to invite White's followers to do just that.[16]   Counsel for Intervening Plaintiffs first learned of that posting on February 23, 2008, after receiving information from an unnamed person at a group called "Citizens Against Hate," purportedly a watchdog organization which apparently monitors hate crimes and hate speech.[17]

The Court conducted a hearing on White's second amended motion to quash on February 28, 2008.   The scope of the hearing was limited to the Yahoo! subpoena, and, as reflected in the Court's February 28, 2008 Order, the Court denied the second amended motion to quash and further denied the motion to compel since counsel for White and for Intervening Plaintiffs agreed at the hearing that the scope of the Yahoo! subpoena had been significantly restricted by operation of law.[18]   The Court invited limited argument as to the

---

[16]The posting was placed on the Vanguard News Network Forum at http://vnnforum.com/showthread.php?t=67317.   The Court notes that this posting was later removed by White on or about February 28, 2008.   See infra.

[17]In response to that posting, counsel noticed the Motion for Sanctions for the same date as the February 28, 2008, hearing on the disputed subpoenas, but the matter was not formally heard on that date since it was not yet ripe.

[18]At the February 28, 2008, hearing, counsel for Intervening Plaintiffs substantially narrowed the scope of the Yahoo! subpoena based upon a federal statute restricting the production of electronic communications by an internet service provider.   On the basis of that representation, counsel for White essentially withdrew his objection to the Yahoo! subpoena, which led to the Court denying both the motion to compel and the second amended

12

basis for the Motion for Sanctions, which included an overview of the allegedly threatening postings by White and the actions taken by Mottley and the law firm of Troutman Sanders as a result of the postings. However, because White had not been afforded sufficient time to reply to the motion, the Court established a briefing schedule and set the matter for an evidentiary hearing on April 2, 2008, to consider the Motion for Sanctions.

On March 25, 2008, the parties to the underlying litigation again jointly moved for an extension of the non-expert discovery cutoff, which was granted by agreed order of March 26, 2008, extending the cutoff until April 15, 2008.[19]  All other deadlines remained, including the jury trial date of May 19, 2008, before United States District Judge Rebecca Beach Smith, which was set at the Rule 16(b) scheduling conference.

The evidentiary hearing was conducted on April 2, 2008.  The evidence presented to the Court included 27 exhibits presented by

---

motion to quash.   Apparently, however, Yahoo! has never been compelled to respond to the subpoena.
     White maintains that Intervening Plaintiffs violated the law by the issuance of the Yahoo! subpoena in the first instance.  He has posted information in his various internet blogs expressing his intention to file suit against counsel for Intervening Plaintiffs, and the law firm of Troutman Sanders, for the issuance of that subpoena.   White further posted that counsel for Intervening Plaintiffs tried to "settle" the subpoena dispute by offering White a "release," which White maintains he refused to accept.  The Court expresses no opinion on the efficacy of these contentions, none of which have any bearing on the Court's findings herein.

[19]The Court notes that as of the date of this extension, the discovery deposition of Henry had not occurred.

Intervening Plaintiffs and another four (4) exhibits presented by Plaintiff.[20]   White appeared and testified at the hearing, and he was questioned about the various exhibits.  Also testifying at the hearing was Kevin W. Mottley ("Mottley"), counsel for Intervening Plaintiffs, who was the subject of the various internet postings by White, and Dr. Dardick, a court-appointed computer forensics expert.[21]   The Court took the matter under advisement.  On the following day, April 3, 2008, the Court conducted a telephone conference where the interested litigants (Intervening Plaintiffs, Plaintiff and White) were directed to order and share the expenses of a transcript of the evidentiary hearing.[22]

---

[20]Pursuant to the Court's order of April 3, 2008, the Court filed under seal Intervening Plaintiffs' Exhibits 1, 2 and 7 and United States' Exhibits 1-4 that were found to contain personal identifiers of counsel, counsel's family and/or the individual intervening plaintiffs in the underlying litigation, the release of which would contravene the protective order.

[21]The Court notes that Dr. Dardick was appointed by United States Magistrate Judge Michael F. Urbanski, Western District of Virginia, Roanoke Division, to serve in connection with that Court's pending decision regarding the discovery disputes over the other subpoenas that were issued out of the Western District of Virginia.  Civil Action No. 7:08mc003.  At the instant evidentiary hearing, Dr. Dardick testified regarding his examination of certain computer equipment surrendered by White in compliance with those subpoenas.  It appears to the Court that the discovery disputes in the Western District are ongoing and have survived the settlement of the underlying litigation in this Court.  Nevertheless, insofar as only the Yahoo! subpoena was issued out of this Court, and there remains no live challenge to that subpoena, the Court notes that the results of Dr. Dardick's forensics investigation are not directly relevant to the instant Motion for Sanctions.

[22]That transcript was received by the Court on April 15, 2008 and filed on May 23, 2008.

On April 4, 2008, the Court conducted an emergency telephone conference after receiving a telephone call from all counsel (except for Henry's counsel) regarding another posting by White made on April 3, 2008, at 9:54 a.m.  In that posting,[23] White again published not only personal information relating to Mottley, lead counsel for Intervening Plaintiffs, but also relating to Lori K. Wagner ("Wagner"),[24] lead counsel for Plaintiff.  By order dated April 4, 2008, the Court ordered an expedited briefing schedule regarding the impact of the latest posting on the Court's pending ruling on the Motion for Sanctions, and the Court heard arguments of counsel on that issue during a telephone conference on April 11, 2008.  Counsel for all the litigants and White participated in the telephone conference on April 11, 2008.[25]  Intervening Plaintiffs

---

[23]http://12.107.40.66/lsn/news.asp?articleID=10655.  See infra.

[24]During the emergency telephone conference, Wagner advised the Court that the address published in that posting was not her own, but apparently belonged to another Lori K. Wagner.  Six days later, April 9, 2008, at 8:26 a.m., White amended his posting and provided another address for Wagner; that posting was not provided to the Court by the litigants, but the Court became aware of the posting by other means.

[25]Prior to the telephone conference, the Court was advised that the underlying litigation between Intervening Plaintiffs and Henry had been settled by agreement.  Counsel for Intervening Plaintiffs confirmed this information during the telephone conference and reported that an appropriate dismissal order was being circulated. Counsel for Plaintiff declined to comment specifically on the settlement posture other than to confirm that settlement discussions with Henry were underway.  As of April 11, 2008, counsel for Henry indicated Henry had not yet been deposed, and counsel did not anticipate that Henry would be deposed.

By telephone call to the Court on April 14, 2008, counsel for

15

cited 47 U.S.C. § 223,[26] which criminalizes the use of a telephone or other telecommunications device to "annoy, abuse, threaten, or harass any person," and argued that White's posting would encourage or induce others to use the telephone to harass Mottley and/or Wagner in contravention of that statute.   Though Intervening Plaintiffs presented evidence, _infra_, that Mottley received two

---

Plaintiff and counsel for Henry advised the Court that the underlying litigation between Plaintiff and Henry had been settled, subject to Department of Justice approval of the agreed-upon consent decree.

[26]That statute, states, in relevant part:
Whoever-
     (1) in interstate or foreign communications-
     . . .
          (C) makes a telephone call or utilizes a telecommunications device, whether or not conversation or communication ensues, without disclosing his identity and with intent to annoy, abuse, threaten, or harass any person at the called number or who receives the communications;
          (D) makes or causes the telephone of another repeatedly or continuously to ring, with intent to harass any person at the called number; or
          (E) makes repeated telephone calls or repeatedly initiates communication with a telecommunications device, during which conversation or communication ensues, solely to harass any person at the called number or who receives the communication; or
     (2) knowingly permits any telecommunications facility under his control to be used for any activity prohibited by paragraph (1) with the intent that it be used for such activity,
shall be fined under Title 18 or imprisoned not more than two years, or both.

47 U.S.C. § 223(a).

late-night telephone calls from an unknown individual who asked to speak to his wife, there is no evidence tying those calls to any actions taken by White, and there is nothing before the Court, or of which the Court is aware, that would implicate this statute in the present circumstances.  Plaintiff cited 18 U.S.C. § 119,[27] which concerns the protection of certain individuals from the publication of "restricted personal information," but did not argue as to its

---

[27]That statute, as implemented by the Court Security Improvement Act of 2007, PL 110-177, 2008 HR 660, 28 U.S.C. § 1 et seq., amended 18 U.S.C. § 119, adding the following (in relevant part):

> Whoever knowingly makes restricted personal information about a covered person, or a member of the immediate family of that covered person, publicly available–
>> (1) with the intent to threaten, intimidate, or incite the commission of a crime of violence against that covered person, or a member of the immediate family of that covered person; or
>> (2) with the intent and knowledge that the restricted personal information will be used to threaten, intimidate, or facilitate the commission of a crime of violence against that covered person, or a member of the immediate family of that covered person,
> shall be fined under this title, imprisoned not more than five years, or both.

18 U.S.C. § 119(a).  Significantly, that statute defines the term "restricted personal information," with respect to an individual, as "the Social Security number, the home address, home phone number, mobile phone number, personal email, or home fax number of, and identifiable to, that individual," 18 U.S.C. § 119(b)(1), and defines the term "covered person" as, "a grand or petit juror, witness, or other officer in or of, any court of the United States, or an officer who may be, or was, serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate," 18 U.S.C. § 119(b)(2)(B).

application to the instant case.[28] On the instant facts, the Court does not find any application of this statute, which appears generally to have been intended to protect court personnel involved in active court proceedings.

On April 15, 2008, in contemplation of a pending settlement, the remaining parties to the underlying litigation, Plaintiff and Henry, jointly moved for an extension of the non-expert discovery cutoff, which was granted by the Court's agreed order of April 16, 2008, extending the applicable discovery cutoff until April 30, 2008.

On April 18, 2008, U.S. District Judge Smith entered the consent order dismissing with prejudice the complaint filed by Intervening Plaintiffs on account of the compromise and settlement reached between Henry and Intervening Plaintiffs, as memorialized in the April 2, 2008, Settlement Agreement and Release of Claims. On May 13, 2008, U.S. District Judge Smith entered the consent decree enjoining Henry from engaging in certain conduct regarding the rental of housing and dismissing with prejudice the complaint filed by Plaintiff on account of the compromise and settlement reached between Henry and Plaintiff, as memorialized in the May 13,

---

[28]During the telephone conference, the Court gave counsel for Intervening Plaintiffs leave to file a motion to supplement the record, and the Court gave counsel for White leave to file a motion to seal certain documents. For good cause shown, the Court granted Intervening Plaintiffs' motion to supplement the record (Document No. 79) and White's motion to seal (Document No. 80) in Orders dated, April 14, 2008 and April 18, 2008, respectively.

2008, Consent Decree. The entry of those orders does not prevent the Court from considering the instant Motion for sanctions. See Cooter & Gell, 496 U.S. at 395-96 (federal court may consider collateral issues, including sanctions motion, after underlying action is no longer pending).

### C. The Postings at Issue

At issue here are a number of communications authored by White that have been published at various websites on the Internet. Of the approximately ten individual postings relevant here, infra, four are of particular concern as they contain or refer to the personal identifying information of counsel. Each of these is related to and derived from an initial posting on February 22, 2008, in which White apparently first published the personal information of counsel for Intervening Plaintiffs. In those postings, see infra, White published the personal information of attorney Kevin W. Mottley ("Mottley"), counsel for Intervening Plaintiffs, including his home address, home telephone number, and the name of his wife.[29] Subsequently, White also published similar personal information of Lori K. Wagner ("Wagner"), lead counsel for Plaintiff. There does not appear to be any dispute that White authored the various postings; at least he has never raised the issue. There also is little question that White has some degree of

---

[29]Excerpts of this and the other relevant postings, in redacted form, are provided infra.

19

control over and/or access to the websites where the information was posted.  Instead, rather than arguing that the postings were not his own words, or that he cannot control their publication and distribution, White has argued that the <u>content</u> of the postings is not threatening, that he did not intend to intimidate counsel by the postings, and that the postings were merely an expression of his First Amendment rights to criticize counsel and the underlying litigation.  Moreover, White argued that his publication of the personal identifying information of Mottley (and later Wagner), which he asserts was lawfully obtained from publicly-available sources, is not unlawful.

### 1. The February 22, 2008, Postings

#### a) Yahoo! Groups Posting, February 22, 2008, at 12:44 a.m.[30]

In the first posting of which the Court is aware, White made reference to "this subpoena lawsuit," and stated that, "[t]his idiot Motley [sic] has barked up the wrong tree and didn't even take the time to do some basic research into who I was and what my companies are and who owns them besides me, etc [sic], when he filed [the subpoenas], and so he's hit the tar baby and is going to be brought to that nasty awakening real son [sic.]"  White further stated that, "it is becoming more clear to me that the motivation [for the subpoenas] here is not to actually discover anything about

---

[30] http://groups.yahoo.com/group/nsmamerica/message/7237 (accessed on February 22, 2008).

what happened with Norfolk, but to harass me because this guy doesn't like me calling a nigger a nigger." Though this posting appears to have preceded the Vanguard News Network Forum posting of the same date and at issue here, infra, the record suggests that counsel may not have been aware of White's postings on the Yahoo! Groups web site until after the Vanguard posting that was published almost 14 hours later.

b) **Vanguard News Network Forum, February 22, 2008, at 3:35 p.m.**[31]

The initial objectionable posting, the catalyst for the current dispute, is provided in its entirety to provide a context for the subsequent postings and the court proceedings. In that posting, published by White using the title, "ANSWP COMMANDER," White stated:

Legal Help: Do Not Contact Whiny Section 8 Niggers

Comrades:

In case anyone needed to be told, and I realize all of you do not.

No one associated with the ANSWP is to contact anyone involved in the subpoena litigation against us while we are involved in defending these subpoenas. After we are done with our legal dispute, they are open game, but while we are involved in this legal dispute, there is to be nothing done that would cause someone to have valid

---

[31]http://vnnforum.com/showthread.php?t=67317 (accessed on February 22, 2008). The Court notes that this posting did not contain a specific time stamp, thus the time of publication is approximate. However, it stands to reason that this posting was issued near the time of an identical posting made on the Yahoo! Groups website, which contained the time stamp of 3:35 p.m. See infra note 32.

reason to further investigate our records.

No one is to contact this attorney, Kevin W [sic] Mottley, partner at Troutman Sander [sic], or his wife, Patricia P [sic] Mottley. You are not to go by their home at . . ., or call them at . . . . Do not send them "hate fliers" or nooses. Do not call and record them and place those phone calls on YouTube. Do not open credit cards in their name [sic], empty their bank accounts by internet, hack their emails, or otherwise invade their privacy or misuse their social security numbers. I would tell you which social security numbers not to misuse, but I cannot publish such information in this forum, but don't misuse them anyway. None of that.

I know they are wasting thousand [sic] of dollars of our money, but we can be patient and deal with them legally.

Further, do not contact any of the Negroes involved in this case. Because I do not know what Negroes are involved in this case and they are not willing to provide us with a list of them so we can determine whether or not we have any information relevant to them, I cannot tell you what Negroes not to contact. However, I would assume anyone that seemed involved in the case should be left alone. I have a mailing list that reads "Whiny Section 8 Nigger" for several addresses, but I am told that is not their proper name, so I am not only mystified as to why they opened mail that wasn't addressed to them, but I presume we can still contact any "Whiny Section 8 Nigger" we happen to encounter – as long as they don't seem to be involved in this case.

That is all for now.

Bill White, Commander
American National Socialist Workers Party


**c) Yahoo! Groups Posting, February 22, 2008, at 3:35 p.m.**[32]

---

[32]http://groups.yahoo.com/group/nsmamerica/messages/7241?threaded=1&m=e&var=1&tidx=1 (accessed on March 7, 2008). That posting was identical in all respects to the Vanguard posting, with the exception of the primary title, "Legal Help: Do Not Contact Whiny Section 8 Niggers."

It appears that at approximately the same time, White published the identical message on a Yahoo! Groups website.

**d) Vanguard News Network Forum, February 22, 2008, at 3:58 p.m.**

Approximately 23 minutes later, one of White's followers, identified by the name, "John Creagh," posted the following response to White's Vanguard posting: "Just to be clear, this is the lawyer you are not supposed to contact:" followed by what appears to be a copy of the information listed at Mottley's Troutman Sanders web site.   There was no personal identifying information provided in that response.

**2. Email and Related Posting, February 28, 2008, at 6:55 p.m.**

After the hearing on February 28, 2008, White sent an email to his counsel and to Mottley entitled "Norfolk Case Update," which included the text of a letter "[s]ent to our general membership, in case there was any doubt as to my intentions or my instructions regarding Mr. Mottley and company."   Included among the nearly four-page letter, White stated:

Comrades:

I just returned from Norfolk, Virginia, where a hearing was held today on some of the subpoenas that have been issued against us and our records.   The hearing was essentially two hours of delusional, ranting, paranoid people shouting at us, and if we hadn't wiped the floor with them, it would have been very irritating.  Some new things have developed, though, and before I get into a detailed discussion, I want to make something clear:

The American National Socialist Workers Party, LLC's Articles of Organization prohibit any member from engaging in criminal activity, which includes interfering

23

with any party to any lawsuit in which we are engaged. Further, they prohibit individuals with a number of personal defects associated with criminal behavior from joining, for the purpose of making sure our members are not individuals inclined to cross over some lines. These rules have always been strictly enforced, and we not only reject about a third of the membership applications we receive for this reason, but have suspended members and leaders in the past when they have not appropriately handled legal problems they have encountered. No member of the American National Socialist Workers Party, LLC, has ever committed a crime in furtherance of our political goals and it is my sincere hope no member ever will.

Because all of you know this, I can generally remind you of it with humor; however, since my humor falls dead on the enemies of humanity that have gathered against us, I thought I would restate the position of the ANSWP in the clearest words possible.

. . .

For instance, I mentioned our "mailing list" of the tenants. Well, we sent thirty pieces of mail, so of course we had a list. The other attorneys were ranting about "how did he get such a list?" and "James Henry must have given it to him", when, of course, we all know that I just went to the Virginia Beach GIS, looked up the apartments, then ran them through WhitePages.com. Knowing there were five buildings and thirty units, or six buildings and five units, or whatever there was, it was easy to figure out they were address #1, apt #1, 2, 3, 4 and 5, or whatever.

I don't think that's a terrible mystery, but paranoia, fear and lunacy prevailed and all sorts of conspiracy theories that would be denounced as "right wing paranoia" if they weren't focused on a racial activist were permitted to be argued before the court.

Similarly, there was all this ranting about "how did he discover the address and phone number of Mr [sic] Mottley, and the name of his spouse?" and asserted that the mere fact I knew where they lived was evidence I had spent all this time following them, et cetera [sic]. Of course, Mr [sic] Mottley is listed in the phone book, and it took all of ten seconds to confirm the information

24

about him that had already started to hit the Anonymous
messageboards [sic], but this big professional fancy law
firm somehow overlooked all of this as well.

They went into a lot of ranting about how I had
previously told no one to mess with them during the
trial, but said afterwards they were "fair game". Well,
of course, all I meant by that is that, once they are out
of my hair, I don't care what happens to them one way or
the other. That doesn't mean I want anything particular
to happen to them; in fact, I actively hope that this
concludes with them being sued into oblivion, paying me
a large judgment, and never having anything happen to
them upon which they hang any legitimate complaint.   It
does mean that I only care about them as long as they
have some implication on me and only want to be done with
them without any third (really, I guess, fourth) parties
getting any bright ideas and trying to "help".

. . .

Particularly, I could see agitated ANSWP fans who are not
members and not under my control in any way deciding to
"help", as they have when they have mailed nooses to
black leaders or kidnapped members of Jewish groups,
going after this attorney with some Anonymous tactics
that would do nothing but hurt our position.

In response to that possibility, I posed my somewhat
humorous and mostly serious admonition not to harass him.
I think anyone familiar with my writings could understand
what I meant when I made that post.   I cannot imagine
anyone interpreted it as a command to "kill him after the
trial," kill him after a specific hearing, or commit any
specific crime against him.

But, based upon apparent other false information he and
his law firm has [sic] received from these communist
criminals, he has decided that I was imminently planning
to assault him this afternoon, and made that case to the
court - thus the "urgent" call for my "immediate arrest".
He and the other attorneys also stated that they are so
terrified that they are considering withdrawing from the
case and leaving their clients hanging.   They weren't
joking either.   Many of them physically trembled in
court.   It was just sad and sickening.

. . .

25

So, we have [sic] hearing scheduled [sic] March 3 and March 6.  I've been asked to clarify our position, and our position remains as it was written in the ANSWP Articles or Organization two years ago - all members are prohibited from committing any crime against any person at any time, and will be expelled from the Party if they do so.

Bill White, Commander
American National Socialist Workers Party

Significantly, there was no personal identifying information published in that posting.

### a) Email to Mottley, February 28, 2008, at 8:35 p.m.

Late that evening, White also sent an email to his counsel and to Mottley stating that, "[t]he objectionable thread on Vanguard News Network was removed today."  This occurred as a result of the hearing on that date in which White indicated that while he did not control the Vanguard News Network forum, he was acquainted with the operator of that site and might be able to arrange for its removal. The Court further notes that while White was apparently able to remove the posting from the Vanguard site, the posting remained on the Yahoo! Groups site, though apparently unbeknownst to counsel.

### 3. Postings on Overthrow.com, April 3-17, 2008

Following the April 2, 2008 hearing, White posted various commentaries regarding the events of the hearing, and more expansively, his views on the entire "subpoena litigation," on his own web blog, Overthrow.com.  In the majority of those postings, White mentioned Mottley and the law firm of Troutman Sanders by name, including his criticisms and commentary on the merits of the

26

subpoena litigation, but he did not provide any personal information of counsel.

### 4. Overthrow.com Posting, April 3, 2008, at 9:54 a.m.[33]

The day after the April 2, 2008 hearing, White made another posting entitled, "Troutman Sanders Attorney Kevin Mottley," and subtitled, "For Those Who Want to Talk To Him - Nicely," in which he stated, "I have been thinking about this Troutman Sanders case, and I am tired of pretending that there is something wrong with telling people to contact and speak to someone about public statements they have made." In so doing, White not only posted the personal information of Mottley, including his home address and home telephone number (though he did not publish the name of Mottley's spouse), but he also posted the personal information of lead counsel for Plaintiff, attorney Lori K. Wagner. That posting contained the following instructions and admonitions:

> Write to them.  Call them. Tell them what you think.  Do not threaten them.  Do not harass them.  Do not commit crimes against them, at this point in time or any other point in time.  But, legally, contact them and share with them your point of view.

> You have a right to contact people who are involved in activities that draw public attention.  They do not have a right to conduct their activities in secret or to hide from you.  And if they do something irrational, like hire police bodyguards to protect them from "threats" that exist wholly in their imagination, we are in now [sic] way responsible for that.

> I am under no order from the court in Virginia Beach or

---

[33]http://12.107.40.66/lsn/news.asp?articleID=10655.

> any other court not to publish their address or phone
> number. The court has repeatedly had the opportunity to
> issue such an order and has declined to do so. They
> declined to do so at the first hearing, and they declined
> to do so at the hearing yesterday. I am no longer going
> to pretend that there is some jeopardy against me for
> doing activities that are completely legal.

That posting led to the Court's emergency telephone conference of April 4, 2008, <u>supra</u>.

### 5. Overthrow.com Posting, April 9, 2008, at 8:26 a.m.[34]

On April 9, 2008, White published a corrected posting in which he purported to provide an updated home address for attorney Wagner after being informed that his previous posting contained an incorrect address.

### D. The Motion for Sanctions

In the instant Motion for Sanctions, Intervening Plaintiffs argue that White should be sanctioned or similarly punished for the various postings discussed <u>infra</u>, under various theories. Intervening Plaintiffs first seek attorney's fees and costs as sanctions for White's conduct, which necessitated the filing and prosecution of the instant motion, citing the Court's "inherent authority" to punish conduct that "abuses the judicial process" under <u>Chambers v. NASCO</u>, 501 U.S. 32, 43 (1991). As discussed <u>infra</u>, the Court finds that, if actually warranted, the exercise of its inherent authority under <u>Chambers</u> to impose attorney's fees would provide the only practicable remedy in this matter.

---

[34]<u>http://12.107.40.66/lsn/news.asp?articleID=10669</u>.

Additionally, or in the alternative, Intervening Plaintiffs seek the imposition of civil and criminal sanctions against White, under <u>International Union v. Bagwell</u>, 512 U.S. 821, 826-34 (1994). In so doing, Intervening Plaintiffs concede the contempt powers of a magistrate judge, as set forth in 28 U.S.C. § 636(e), do not extend to White's conduct, thus Intervening Plaintiffs requested the issuance of a show cause order to a United States District Judge certifying the matter for civil and/or criminal contempt. The Court declines to do so, finding that its inherent authority would provide ample support for any decision to sanction White, if the Court decided it was appropriate.[35]

---

[35]The contempt powers of a United States magistrate judge are set forth in 28 U.S.C. § 636(e), as amended by the Federal Courts Improvement Act of 2000, and include summary criminal contempt authority in any case before the magistrate judge, as well as criminal and civil contempt authority in certain civil consent and misdemeanor cases.   Specifically, a magistrate judge's criminal contempt authority includes "the power to punish summarily by fine or imprisonment, or both, such contempt of the authority of such magistrate judge constituting misbehavior of any person <u>in the magistrate judge's presence</u> so as to <u>obstruct the administration of justice</u>."  28 U.S.C. § 636(e)(2) (emphasis added).  The Court notes that the contempt power of a magistrate judge, presiding over any case by consent of the parties, pursuant to 28 U.S.C. § 636(c), or presiding in any misdemeanor case, pursuant to 18 U.S.C. § 3401, also includes the "power to punish, by fine or imprisonment, or both, criminal contempt constituting disobedience or resistance to the magistrate judge's lawful writ, process, order, rule, decree, or command," after a proceeding "conducted upon notice and hearing under the Federal Rules of Criminal Procedure."   28 U.S.C. § 636(e)(3) (emphasis added).  That authority also includes the power to "exercise the civil contempt authority of the district court" in any case over which he presides with consent of the parties, pursuant to 28 U.S.C. § 636(c), or in any misdemeanor case, pursuant to 18 U.S.C. § 3401.  28 U.S.C. § 636(e)(4).  Insofar as none of the prerequisites for the exercise of such authority are

29

Finally, Intervening Plaintiffs do not oppose the arguments of Plaintiff[36] seeking the imposition of injunctive relief against White via the Court's broad authority under the All Writs Act, 28 U.S.C. § 1651(a) (authorizing federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law"), to control future conduct as necessary to ensure "the proper administration of justice"; however, Intervening Plaintiffs assert that any such relief standing alone would be insufficient to punish White for his conduct. The Court recognizes the broad powers afforded it under the All Writs Act, the exercise of which can include the imposition of duties on non-parties.[37]  Those powers are similar in their breadth to those articulated under Chambers, supra, but which generally involve injunctive relief that must be narrowly tailored

---

present here, the Court declines to provide any relief along these lines.

[36]The Court notes that Plaintiff United States did not file a motion for sanctions nor did it formally join the instant Motion for Sanctions filed by Intervening Plaintiffs.  Nevertheless, Plaintiff did actively participate in the briefing and argument of the motion, and the Court considered Plaintiff's position in formulating the instant report.

[37]See United States v. New York Telephone Company, 434 U.S. 159, 172-74 (1977) ("power conferred by the Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, . . . , and encompasses even those who have not taken any affirmative action to hinder justice.") (citations omitted).

and would necessarily be prospective only under these circumstances.[38] The use of the All Writs Act, however, is a "drastic remedy [that] must be used sparingly, . . ., consistent with constitutional guarantees of due process of law and access to the courts." Cromer v. Kraft Foods North America, Inc., 390 F.3d 812, 817 (4th Cir. 2004). Generally, attorney's fees are not available under the All Writs Act absent a showing "that, without the [grant of an] extraordinary writ, the court will be prevented or frustrated from exercising its . . . jurisdiction . . . ." Wick v. Brown, 40 F.3d 367, 373 (Fed. Cir. 1994). On the instant facts, and given the availability of sanctions under Chambers, the Court declines to provide any relief under the All Writs Act.

### E. The Evidentiary Hearing

On April 2, 2008, the Court conducted an evidentiary hearing on the Motion for Sanctions. Intervening Plaintiffs introduced a total of 27 documentary exhibits, which primarily consisted of various internet postings and emails by White, as well as the May

---

[38]See Tripati v. Beaman, 878 F.2d 351, 352 (1989) (use of All Writs Act to enjoin vexatious litigants "as long as [conditions imposed] are designed to assist the district court in curbing the particular abusive behavior involved."); United Computer Systems, Inc. v. AT&T Corp., 107 Fed. Appx. 818, 820-21, 2004 WL 1987350 (9th Cir. 2004) (authorizing use of All Writs Act for "narrowly tailored" injunctive relief, in combination with sanctions including attorney's fees under Chambers); Wrenn v. Vanderbilt University Hospital, 1995 WL 111480, *3 (6th Cir. 1995) (recognizing "court has the authority to enjoin harassing litigation under its inherent authority[, pronounced in Chambers,] and the All Writs Act.") (citing 28 U.S.C. § 1651(a), Chambers, 501 U.S. at 43-46, and Tripati, 878 F.2d at 352-53).

2007 letter and related documents. Plaintiff introduced four additional exhibits, which included a document recovered from White's computer that contained a list of attorneys involved in the underlying litigation, including their addresses and telephone numbers. White appeared and testified as to the various exhibits. Mottley, who as counsel for Intervening Plaintiffs had been the subject of the various internet postings by White, also testified, along with the court-appointed computer forensics expert, Dr. Dardick.[39]

The parties essentially stipulated to the authenticity of the various documents, that is, White did not contest that he authored the various writings, and he did not object to the content of the writings. White's primary objection to the documents was that of relevance: He contended that many of them were not presented in proper context. The Court notes that White did have the opportunity, through the cross-examination of witnesses and argument to the Court, to put the various postings in any pertinent context. The Court finds that those writings, which the Court has considered herein, speak for themselves and, consequently, the Court OVERRULES White's relevance objection.

In the presentation of evidence, Intervening Plaintiffs provided exhibits regarding other examples of White's allegedly violent behavior and/or his tendency to incite or instigate

---

[39]See supra note 21.

violence through his various writings in which he openly espouses his anti-African American and anti-Jewish ideologies and forcefully advocates white supremacy, segregation, and the "elimination" of those whom White opposes.   These exhibits included White's own account of his criminal prosecution in a Roanoke court, in which he was acquitted of an assault charge stemming from a physical altercation with an African American "crack dealer." This account included his self-serving description of the "euphoria" he felt as he choked the man during the altercation and his "recommend[ation] to all reading this that they consider taking a wicked man – a crack dealer, a pimp, an NAACP official defending black crime, or, perhaps a newspaper writer supporting them – and killing them with your bare hands as a test of what I have to say." Another exhibit was an editorial from White's May 2007 edition of the Nationalist Socialist magazine, lambasting the editor of the Roanoke Times, Chris Trejbal, who White claims "posted the personal information of 135,000 Virginia concealed [weapon] carry [sic] permit holders, pairing it with a column comparing them to sex offenders," and in which White boasted that, in response, "we mass mailed his neighbors to let them know of the peculiar feelings this 37-year old unmarried man has for homosexuals, . . . . We posted his home address and phone number online.  Bomb threats followed, and his

house had to be evacuated."[40]  Further examples of White's controversial postings included an article on his web blog, Overthrow.com, in which he openly advocated the execution of "Richard Warman, the sometimes Jewish, sometimes not, attorney behind the abuses of Canada's Human Rights Tribunal . . ., whom White claims "should be drug out into the street and shot, after appropriate trial by a revolutionary tribunal of Canada's white activists."  White further stated, "[i]t won't be hard to do, he can be found, easily, at his home, at [ ]."[41]

Among the arguments suggested by and incorporated into White's testimony were that the postings were not intended to be threatening to Mottley; the postings were intended to be humorous, even satirical; and the postings were never intended to be received or read by Mottley.  Indeed, the Court recognizes, but specifically rejects, White's argument that the postings were made in an effort to protect Mottley by advising White's followers not to engage in any acts of harassment or violence, at least not until the subpoena litigation ended.  The Court credits White with the concessions

---

[40]The Court notes that on cross-examination, White testified that his was only one of a number of sources that posted the personal information of Mr. Trejbal, thus White conceded that he could not take credit for the alleged "bomb threats" following his own posting of that information.

[41]Warman's Canadian address has been redacted here.  The Court notes that on cross-examination, White testified that this, and related postings, were taken out of context because they pertain to an over two-year long feud between White and Warman in which each has apparently published increasingly outrageous postings.

that he authored the various postings, and the Court further indulges White's beliefs and his constitutionally-protected rights to protect those beliefs; but overall, the Court finds White's testimony was entirely self-serving and disingenuous.

Mottley testified that he and his family suffered feelings of fear and intimidation as a result of the postings by White. Mottley stated that he first learned of the objectionable February 22, 2008, posting when he received an anonymous tip from a woman who identified herself as associated with a group called "Citizens Against Hate," which professes to be a watchdog against hate crimes. Upon learning of that posting, Mottley and his law firm took a number of steps designed to ensure his safety, including notifying local law enforcement, which resulted in increased safety patrols in his neighborhood, and hiring private security guards to surveil his home. Mottley also immediately filed the instant Motion for Sanctions, calling for the Court's intervention to sanction and/or enjoin White, which resulted in a steady flow of pleadings as well as hearings on those pleadings. Mottley stated that the postings caused him to question his decision to continue in his representation of the Intervening Plaintiffs in the underlying litigation, but there was no evidence presented that the postings or the resulting skirmishes over the instant Motion for Sanctions disrupted the conduct of the litigation. Mottley testified that he received two late-night calls made to his home

35

telephone number – during both of which the caller did not identify himself but asked to speak with Mottley's wife, identifying her by a name that Mottley stated would not likely have been used by anyone familiar with the Mottleys – though there was no evidence linking either of those calls to the postings by White or to White himself.    Mottley further testified that he received two emails from White, discussed supra, though both emails were also copied to White's counsel and were sent in conjunction with White's attempts to communicate with counsel as to actions taken as a result of the February 28, 2008, hearing.  There was no evidence presented of any direct threats to Mottley made by White, or anyone associated with or otherwise reading the postings made by White.

## II. LEGAL PRECEDENTS

### A. Available Sanctions and Other Remedies

As discussed infra, the Court finds that the only remedies practically available in this matter would be an award of attorney's fees under the Court's inherent authority to issue sanctions under Chambers, supra.  The Court further finds that the imposition of any such sanctions is entirely discretionary in nature and necessarily turns on whether White's conduct constituted a "true threat" against counsel under the prevailing definition of this term in the Court of Appeals for the Fourth Circuit.  On that basis, the Court chooses not to exercise such authority on the instant facts.

## 1. The Court has Discretion to Exercise Its Inherent Authority

Under <u>Chambers</u>, the Court has "inherent authority" to punish as contempt conduct before the Court and beyond its confines. 501 U.S. at 43-46. "It has long been understood that . . . 'Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates.'" <u>Id.</u> at 43 (citing <u>Anderson v. Dunn</u>, 6 Wheat. 204, 227 (1821)). "These powers are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" <u>Id.</u> (citing <u>Link v. Wabash R. Co.</u>, 370 U.S. 626, 630-31 (1962)). By virtue of such powers, the Court has wide discretion to fashion an appropriate sanction for conduct that "abuses the judicial process," including in the extreme case the outright dismissal of an action. <u>Id.</u> at 45 (citing <u>Link</u>, 370 U.S. at 630-31 (upholding federal court's <u>sua sponte</u> dismissal of an action for failure to prosecute)). As the Supreme Court has noted, however, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." <u>Id.</u> at 44 (citing <u>Roadway Express, Inc. v. Piper</u>, 447 U.S. 752, 764 (1980)).

In <u>Chambers</u>, the Supreme Court held that a federal court's inherent power to sanction is still applicable even if a statute or rule also allows for sanctions for the same egregious conduct. <u>Id.</u>

at 49-50. This is particularly true in the instance where the court finds bad-faith conduct in the course of litigation, in which case "if in the informed discretion of the court, neither the [sanctioning] statute nor the Rules are up to the task [of imposing sanctions], the court may safely rely on its inherent power." Id. at 50. Under Chambers, the range of sanctions can be monetary and/or non-monetary, and can readily include the award of attorney's fees. Id. at 45 (holding "the 'less severe' sanction of an assessment of attorney's fees is undoubtedly within a court's inherent power as well.") Those sanctions can be assessed against parties and non-parties alike. See, e.g., Roadway Express, 447 U.S. at 764 (a court may assess attorney's fees against counsel who willfully abuses judicial processes). See also Rainbow Magazine, Inc. v. Unified Capital Corp., 77 F.3d 278, 282 (9th Cir. 1996) (allowing sanctions to be imposed against a non-party and non-attorney under the court's inherent power) (citing Corder v. Howard Johnson & Co., 53 F.3d 225, 232 (9th Cir. 1995) (holding that courts may impose sanctions against a non-party "to curb abusive litigation practices")). Indeed, in Chambers, the Supreme Court noted with apparent approval that the lower court had levied non-monetary sanctions against several non-parties, including the reprimand of a trustee, the disbarment of an attorney, and the suspension of two other attorneys. Chambers, 501 U.S. at 41. However, those non-parties were found to have actively participated

38

in the misconduct that affected the underlying litigation. <u>Id.</u> at 35-41.

The application of the aforementioned principles to allegedly bad-faith conduct involving a non-party generally arises when the actions or omissions of a non-party cause the parties to the underlying litigation to incur substantial additional expenses or other extreme prejudice. <u>See, e.g.</u>, <u>Moten v. Bricklayers, Masons and Plasterers</u>, 543 F.3d 224 (D.C. Cir. 1976) (court imposed attorney's fees against non-party whose unsuccessful attempt to intervene in underlying litigation significantly increased costs of parties). Those cases often arise in the context of discovery disputes involving the violation of a court order or other process of the court - neither of which is present here - but are not limited to that setting. <u>See, e.g.,</u>   <u>Corder v. Howard Johnson</u>, 53 F.3d 225, 232 (9th Cir. 1994) (a court may impose attorney's fees to sanction a non-party whose actions or omissions cause the parties to incur additional expenses, based on a finding of a willful abuse of the judicial process or that the non-party acted unreasonably in causing such expenses) (citing <u>Roadway Express</u>, 447 U.S. at 764); <u>In re: Holloway</u>, 884 F.2d 476, 477-78 (9th Cir. 1989) (imposing monetary sanctions and injunctive relief against court reporter whose repeated dilatory filings resulted in severe prejudice to the parties and to the court). Generally, a finding of bad faith by the non-party is required. <u>Corder</u>, 53 F.3d at 232.

## 2. Application of <u>Chambers</u> in the Instant Case

The application of <u>Chambers</u> in the instant case involves allegedly threatening, intimidating and harassing behavior by a non-party, White, against one or more attorneys involved in conducting the underlying litigation. There is little question, on these facts, that White, a non-party to this litigation, engaged in bad-faith conduct insofar as his internet postings were meddlesome in nature, wholly unwarranted and uninvited, and designed to interfere with counsel's representation of the Intervening Plaintiffs. On this point the Court is unequivocal in its condemnation of White for the methods he used to voice his objections. It is also true, on the other hand, that the Court has great difficulty quantifying the ultimate impact of White's conduct on the underlying litigation, notwithstanding the subjective impact on counsel to whom these postings were directed. This raises the vexing question of defining the scope of protections afforded to a citizen to express his viewpoint under the First Amendment considering the limited impact of the expression of those viewpoints on the counsel representing litigants in a case before the court. <u>See</u> <u>United States v. Carmichael</u>, 326 F. Supp. 2d 1267, 1270 (M.D. Ala. 2004). Though Intervening Plaintiffs have characterized White's conduct as offensive to the Court, as having "defiled the temple of justice," and having "violated the rule of law," there are no credible allegations of any conduct directed to

40

the Court, i.e., there have been no violations of any court order, no disrespectful conduct or comments directed to the Court.[42] Despite the reprehensible nature of the information posted by White, his conduct before this Court and in the instant proceedings has been beyond reproach.[43]  As such, the Court can only in these circumstances exercise its inherent authority if the non-party's actions directed to counsel in the underlying litigation amounted to a "true threat" as that term has been defined under precedents established by the Supreme Court and as interpreted and applied by the Fourth Circuit.  Id. at 1279.  In other words, the non-party's

---

[42]The Court states without hesitation that significantly inappropriate actions directed to the Court, or in contravention of any Court proceeding or process of the Court, would result in swift and commensurate sanctions against White.  The significance of this point should not be lost on White or on any other similarly-situated person as a result of the Court's ultimate finding in the instant matter.  See,e.g., In re Prewitt, 280 F. Supp. 2d 548, 563-64 (N.D. Miss. 2003) (attorney sanctioned by court for repeated vexatious conduct resulting in ban from third floor of local federal courthouse); Nabkey v. Hoffius, 827 F. Supp. 450, 456 (W.D. Mi. 1993) (sanctions against plaintiff's "disdain for judicial authority" leading to "unreasonable and vexatious multiplication of proceedings"); Bethel v. Town of Oxley, 2006 WL 3449140, *1 (S.D. Ala. 2006) (sanctions against plaintiff for court filings used "as a platform to direct venomous rhetoric at the undersigned, as well as other federal judges sitting in this District").

[43]The Court notes that, "[e]ven when the contempt is not a direct insult to the court or the judge, it frequently represents a rejection of judicial authority, or an interference with the judicial process or with the duties of officers of the court." Codispoti v. Pennsylvania, 418 U.S. 506, 516 (1974) (quoting Bloom v. Illinois, 391 U.S. 194, 201-02 (1968)).  While the Court recognizes counsel's laudable efforts to extend representation to the Intervening Plaintiffs on a pro bono basis, there is simply no credible evidence before the Court that White's conduct significantly impacted the underlying litigation.

41

actions, taken as a whole and considering the context, must rise to the level of a "true threat" because such speech can never be protected under the First Amendment.   See Virginia v. Black, 538 U.S. 343, 359 (2003); Watts v. United States, 394 U.S. 705, 705-08 (1969); United States v. Bly, 510 F.3d 453, 458 (4th Cir. 2007).[44]

The current scope of this Court's inquiry is relatively narrow and includes only those postings on the internet by White, identified supra and discussed infra, in response to the issuance of the subpoenas in the underlying litigation and the related litigation involving the instant Motion for Sanctions, in which White published the personal information of counsel.   Thus, the content of the May 2007 letter to the individual Intervening Plaintiffs, see supra note 4, is not at issue here, though the Court may consider the content and circumstances surrounding the mailing of that letter as part of its contextual analysis of the instant postings.   See United States v. Darby, 37 F.3d 1059, 1063-64 (4th Cir. 1994) (applying objective standard in determining whether a communication constituted a "true threat," including consideration of reaction of an ordinary, reasonable recipient familiar with the context of the communication).   The Court also

---

[44]The Court recognizes, however, that some speech that does not rise to the level of a "true threat" may still be proscribed in certain limited circumstances.   See, e.g., Carmichael, 326 F. Supp. 2d at 1290-91 (discussing imposition of "gag order" to prevent posting certain information by defendant or his lawyer during a criminal proceeding even when the speech is otherwise presumptively protected by the First Amendment).

notes that the only subpoena at issue here is the Yahoo! subpoena, which was issued here in the Eastern District; the remaining subpoenas to White were issued out of the Western District of Virginia and have been addressed by that Court.  See supra note 6.

The Court first observes there are limited precedents upon which to rely in addressing the unique circumstances presented here.  The majority of cases familiar to the Court regarding the interpretation and application of "true threats" relate to the criminal prosecution of an accused under a variety of federal statutes proscribing threats of harm communicated either directly or indirectly by the speaker or communicated by mail, telephone or other electronic communication such as by email or via the internet.  These include 18 U.S.C. § 875, criminalizing the interstate communication of threats by telephone, mail, email or by the internet;[45] 18 U.S.C. § 876, criminalizing threats delivered by

---

[45]See, e.g., United States v. Darby, 37 F.3d 1059, 1061-66 (4th Cir. 1994) (criminal prosecution under 18 U.S.C. § 875 for interstate communication of threats by telephone to IRS facility); United States v. Sutcliffe, 505 F.3d 944, 950-961 (9th Cir. 2007) (criminal prosecution under 18 U.S.C. § 875 for interstate communication of threats to former employer via the internet); United States v. Morales, 272 F.3d 284, 285-88 (5th Cir. 2001) (criminal prosecution under 18 U.S.C. § 875 for interstate communication of threats to kill fellow students via an internet chat room); United States v. Kammersell, 7 F. Supp. 2d 1196, 1198-1202 (D. Utah 1998) (criminal prosecution under 18 U.S.C. § 875 for interstate communication of emails including bomb threats via the internet).

mail expressing the intent to kidnap or injure;[46] 18 U.S.C. § 871, criminalizing threats to kill the President of the United States;[47] 18 U.S.C. § 115, criminalizing threats to law enforcement personnel or federal judges;[48] and 18 U.S.C. § 1514, criminalizing threats or intimidation of witnesses in a federal criminal case.[49]   The Court also recognizes the case of <u>United States v. Gilbert</u>, 884 F.2d 454 (9th Cir. 1989), cited by Plaintiff, involving a criminal

---

[46]<u>See, e.g.</u>, <u>United States v. Bly</u>, 510 F.3d 453, 456-59 (4th Cir. 2007) (criminal prosecution under 18 U.S.C. § 876 for mailing threatening letters to state university officials); <u>United States v. Maxton</u>, 940 F.3d 103, 104-06 (4th Cir. 1991) (criminal prosecution under 18 U.S.C. § 876 for mailing threatening letters to federal magistrate judge).

[47]<u>See, e.g.</u>, <u>Watts v. United States</u>, 394 U.S. 705, 706-08 (1969) (criminal prosecution under 18 U.S.C. § 871 for making public statements threatening the life of the President of the United States); <u>United States v. Lockhart</u>, 382 F.3d 447, 450-52 (4th Cir. 2004) (criminal prosecution under 18 U.S.C. § 871 for making statements threatening the life of the President of the United States in a letter given to manager at a grocery store)

[48]<u>See, e.g.</u>, <u>United States v. Spring</u>, 305 F.3d 276, 279-81 (4th Cir. 2002) (criminal prosecution under 18 U.S.C. § 115 for attempting to mail letters to probation officer that contained death threats to probation officer, and his family, and death threats to others).   <u>See also</u> <u>Sheehan v. Gregoire</u>, 272 F. Supp. 2d 1135, 1139-43 (W.D. Wash. 2003) (considering constitutionality of state statute criminalizing publication of personal identifying information of court-related employees).

[49]<u>See, e.g.</u>, <u>United States v. Carmichael</u>, 326 F. Supp. 2d 1267, 1270-1301 (M.D. Ala. 2004) (motion for protective order under 18 U.S.C. §§ 1514 and 1512 for operation of website that published photographs and personal identifying information of government informants and agents participating as witnesses in criminal prosecution); <u>United States v. Carmichael</u>, 326 F. Supp. 2d 1303, 1303-05 (M.D. Ala. 2004) (consideration of similar protective order for publication of same information in newspaper).

prosecution under 42 U.S.C. § 3631 a statute that criminalizes
interference with housing rights through force or threats of force,
as well as the line of cases from the Ninth Circuit, applying
Gilbert and its progeny, involving application of the Freedom of
Access to Clinics Entrances Act (FACE), 18 U.S.C. § 248, which
provides an aggrieved person with a civil right of action against
whomever by "threat of force" intentionally intimidates any person
involved in providing reproductive health services, including
abortions, see, e.g., Planned Parenthood of the
Columbia/Willamette, Inc. v. American Coalition of Life Activists,
290 F.3d 1058 (9th Cir. 2002).[50]

---

[50]The Court also acknowledges the case of Richardson v.
Cabarrus, 151 F.3d 1030, 1998 WL 371999 (4th Cir. 1998), cited by
Intervening Plaintiffs, and In re Stabile, 436 F. Supp. 2d 406
(E.D.N.Y. 2006), cited by Plaintiff, though neither is applicable
here.    In Richardson, the court exercised its inherent power to
dismiss an action after the plaintiff sent three increasingly-
threatening letters to a key defense witness.    1998 WL 371999 at
*1-3 (citing United States v. Shaffer Equipment Co., 11 F.3d 450,
462 (4th Cir. 1993) (employing six-factor test for use of inherent
power to dismiss an action where "no judicial response [to the
threatening letters] short of dismissal would be adequate to
protect the integrity of the court or 'the public interest.'"))
The court found the letters issued in an attempt to intimidate
the witness, "based on the 'threatening' tone of the letters and
the implicit threats therein."    Id. at *4 ("IMMEDIATE RESULTS IN
THIS CASE MUST BE GIVE [sic] IT'S [sic] FULLEST ATTENTION OR AGAIN,
BYE, BYE, QUEER QUEEN BEE JESSIE ELIZABETH. . . . IT'S UP TO YOU OR
ELSE. . . .") (emphasis in original). Significantly, the court did
not employ the "true threat" standard, supra, in reaching its
conclusion that the letters were threatening.    Nevertheless,
Richardson is distinguishable insofar as the threats were made
directly to the witness in private letters that, at least
implicitly, suggested physical harm, the threats were made with the
clear intent to affect the witnesses' testimony, and the threats
were made by a party to the litigation.    In Stabile, the court used

45

The Court does not suggest here that its review of the case law is exhaustive by any means, but there is certainly one overriding observation to be drawn: the vast majority of cases involved a threatening communication, whether made in public, in writing, by telephone, by email or on the internet, that included a direct threat of harm or statements that could be interpreted as a direct threat of harm – whether or not the threat was communicated to or received by the intended victim, and whether or not the speaker had the ability to carry out the threat or was even inclined to do so if given the opportunity.  See, e.g., United States v. Maxton, 940 F.3d 103, 106 (5th Cir. 1991) ("As in the present case, most of the time the intent [to threaten the recipient at the time of the mailing] can be determined from the very nature of the words used in the communication; extrinsic evidence to prove an intent to threaten should only be necessary when the threatening nature of the communication is ambiguous.") (citations omitted).  As such, the majority of these cases are not directly on point here, because any arguably threatening language

_____

its power under the All Writs Act to enjoin a jockey's agent, and his attorney, who approached a court-appointed monitor with threats of physical violence and litigation if the monitor did not provide favorable support in efforts reinstate the agent's license.  436 F. Supp. 2d 409-412.  Again, the court did not employ the traditional "true threat" analysis, ostensibly because the threats of physical violence were so blatant and self-proving.  Id. 409 ("Stabile then threatened to cause serious physical injury to one of the [court-appointed] investigators.")  That case is distinguishable from the instant case.

used by White was indirect, at best.

Nevertheless, each of these cases stem from the Supreme Court's seminal case, <u>Watts</u>, <u>supra</u>, involving a criminal prosecution under 18 U.S.C. § 871(a), in which the Court held that an accused's public statements regarding killing the President of the United States was constitutionally-protected speech that did not constitute a true threat. 394 U.S. at 707-08 (distinguishing between speech that constituted a "true threat" and "political hyperbole" that is protected under the First Amendment). Since <u>Watts</u>, the case law in this area has evolved over time, primarily within the framework of the aforementioned federal statutes, though the definition of a "true threat" is not limited to a federal criminal prosecution. <u>See, e.g.</u>, <u>Virginia v. Black</u>, 538 U.S. 343, 359 (2003) (consideration of the constitutionality of Virginia's cross-burning statute, defining "true threat" as "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.") (citing <u>Watts</u>, 394 U.S. at 708; <u>R.A.V. v. City of St. Paul</u>, 505 U.S. 377, 388 (1992)).

The various courts of appeal have developed two differing objective theories for establishing whether a communication rises to the level of a "true threat" or is speech protected under the First Amendment. <u>See</u> <u>Planned Parenthood</u>, <u>supra</u>, 290 F.3d at 1074 n.7 (recognizing that all circuits apply an objective standard for

47

determining what is a "true threat" based either on the perspective of a "reasonable listener" or a "reasonable speaker.") The majority of the circuits, including the Fourth Circuit, have adopted a "reasonable listener" test, in which a communication is considered a true threat if a reasonable person, familiar with the context of the communication, would consider it as a threat.[51] Id.; see also, e.g., Bly, supra, 510 F.3d at 459 (applying "reasonable listener" standard for determining whether a communication constitutes a "true threat' in context of criminal prosecution under 18 U.S.C. § 876 for mailing written communication containing a threat to injure certain individuals). The remaining circuits, including the Ninth Circuit, adopt a "reasonable speaker" test, in which a communication is considered a true threat if a reasonable person, familiar with the context of the communication, would foresee that it would be interpreted as an expression of an intent to harm.[52] "The difference [between the two theories] does not

---

[51]See, e.g., United States v. Sovie, 122 F.3d 122, 125 (2d Cir. 1997); United States v. Darby, 37 F.3d 1059, 1066 (4th Cir. 1994); United States v. Morales, 272 F.3d 284, 287 (5th Cir. 2001); United States v. Landham, 251 F.3d 1072, 1080 (6th Cir. 2001); United States v. Hart, 212 F.3d 1067, 1072 (8th Cir. 2000); United States v. Callahan, 702 F.2d 964, 965-66 (11th Cir. 1983); and Metz v. Dep't of Treasury, 780 F.2d 1001, 1002 (Fed. Cir. 1986).

[52]See, e.g., United States v. Whiffen, 121 F.3d 18, 20-21 (1st Cir. 1997); United States v. Kosma, 951 F.3d 549, 556-57 (3d. Cir. 1991); United States v. Hartbarger, 148 F.3d 777, 782-83 (7th Cir. 1998); Planned Parenthood of the Columbia/Willamette, Inc. v. American Coalition of Life Activists, 290 F.3d 1058, 1074 n.7 (9th Cir. 2002); and United States v. Magelby, 241 F.3d 1306, 1311-13 (10th Cir. 2001).

appear to matter much because all [circuits] consider context, including the effect of an allegedly threatening statement on the listener." Id. The Supreme Court appears to recognize both theories, without expressing a preference:

> The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.' . . . Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or a group of persons with the intent of placing the victim in fear of bodily harm or death. Respondents do not contest that some cross burnings fit within this meaning of intimidating speech, and rightly so. . . . [T]he history of cross burning in this country shows that cross burning is often intimidating, intended to create a pervasive fear in victims that they are a target of violence.

Black, 538 U.S. at 359-60.

In the context of a criminal prosecution under the aforementioned statues, using either theory, the courts also consider the issue of whether the government bears the burden to establish the accused's subjective intent (i.e., that he intended the communication itself to be interpreted as a threat by the recipient and that it was a true threat) or whether proof of the accused's general intent suffices (i.e., that he merely intended to transmit the communication and that it contained a true threat). Again, these lines of cases primarily involve the application of various federal statutes criminalizing the communication of threatening or intimidating messages either directly or through

various forms of electronic communication. The Court notes that the Court of Appeals for the Fourth Circuit not only applies the "reasonable listener" test, infra, but has further adopted the "general intent" test, that is, the government does not have to establish that the accused intended the recipient to interpret the communication as a threat. See Darby, supra, 37 F.3d at 1066 (holding that 18 U.S.C. § 875 is a general intent statute). This is in accord with the Supreme Court's teaching in Black, supra, that "[t]he speaker need not actually intend to carry out the threat." 538 U.S. at 359-60. Thus, under such precedents, the mere communication of a true threat, with the intent to transmit the communication, is sufficient to establish the accused's guilt under the various federal statutes. Also, it is not always necessary that the intended victim actually be intimidated or threatened by the communication, or that the threatening communication actually be communicated to the intended victim. See United States v. Spring, 305 F.3d 276, 280-81 (4th Cir. 2002) (holding statements in a letter threatening to murder federal law enforcement officer and federal judge could be considered true threats under 18 U.S.C. § 115 even though accused did not communicate the threats to the intended victims since letters were never mailed); United States v. Morales, 272 F.3d 284, 285-88 (5th Cir. 2001) (criminal prosecution under 18 U.S.C. § 875 for interstate communication of messages in an internet chat room

allegedly threatening to inflict harm at a high school when the messages were received by a third party with no connection to the high school).

In the instant case, by comparison, this is not a criminal prosecution and there apparently is no directly applicable federal statute proscribing White's conduct.[53]   In addition, as discussed supra, in virtually all of the aforementioned cases, the language at issue specifically articulated the threats of harm to the victims, whether or not those threats were, or were intended to be, communicated to or received by the victims themselves.   And, in virtually all of those cases, the threats involved death or some sort of physical violence to be perpetrated against the victim.

---

[53]The Court recognizes there are at least two statutes cited by Intervening Plaintiffs and by Plaintiff, see supra notes 26 & 27, that attempt to address the issue presented by White's conduct here.   The Court is also aware of at least one other statute, the Driver's Privacy Protection Act of 1994, codified at 18 U.S.C. §§ 2721-2725, as amended in 2000, which prohibits the disclosure of "(1) personal information, . . .; or (2) highly restricted personal information, . . ., about any individual obtained by [a State] department [of motor vehicles] in connection with a motor vehicle record, without the express consent of [that] person . . . ." 18 U.S.C. § 2721 (a).   The protected "personal information" is defined to include "information that identified an individual, including an individual's photograph, social security number, driver identification number, name, [and] address (but not the 5-digit zip code), telephone number  . . . ." 18 U.S.C. § 2725(3).   These statutes signify Congress' intent to restrict the publication of the personal identifying information of certain classes of people, which appears particularly appropriate in the internet-age, where identity theft has become so prevalent.   Nevertheless, none of the aforementioned statutes appear sufficient to hold White criminally liable for his invasive and ill-mannered conduct toward Mottley and Wagner.

See Black, 538 U.S. at 360 (constitutionally-proscribable true threat occurs "where a speaker directs a threat to a person or a group of persons with the intent of placing the victim in fear of bodily harm or death.")  White's postings here did not involve any direct threats of harm or death to counsel, and the Court is hard-pressed to find any such indirect threats as well.[54]  Thus, none of the foregoing precedents are directly applicable here. Nevertheless, the Court looks to the analysis of those courts in establishing whether certain speech constitutes a true threat in order to determine if White's conduct here is proscribable.

### 2. The Fourth Circuit's Reasonable Listener Test

This Court finds the Fourth Circuit's interpretation and application of the "reasonable listener" test instructive to the

---

[54]The Court recognizes that in the February 22, 2008 posting, the vast majority of the acts White suggested his readers should not do to Mottley, and his wife, e.g., mailing of nooses, opening credit cards in their names, emptying their bank accounts, hacking their email accounts, misusing their social security numbers, see supra, are not physical threats, whether direct or indirect, and have no connotations of bodily harm.  That is not to suggest that such threats of "economic" harm should be encouraged; the opposite is true, since many of these are illegal in and of themselves. However, even assuming that White's postings did encourage or incite such behavior, there simply is no case law of which the Court is aware to characterize White's behavior as being a "true threat" as that term has been defined by the Supreme Court in Watts and its progeny.

The Court further notes that White also suggested in the February 22, 2008 posting that his readers should not visit or call the Mottleys at their home - either of which would almost certainly be unwanted, thus, if committed, would arguably be illegal. Certainly both suggestions are not economic in nature, but neither rises to the level of a proscribable threat of some physical harm.

instant analysis: whether an ordinary, reasonable person hearing or receiving the communication at issue would view it as a true threat of injury, considering the context of the communication. Spring, 305 F.3d at 280-81. Said another way, whether a communication contains a "true threat" turns on the reaction of a reasonable recipient familiar with the context of the communication. Id. That test has been explained and applied recently by the Fourth Circuit in Bly, 510 F.3d at 458-59 (citing Watts, 394 U.S. at 705-08 and Lockhart, 382 F.3d at 450-52). In Bly, the court considered the various contextual factors used by the Supreme Court in Watts, 394 U.S. at 705-08 (holding that an accused's public statements regarding killing the President of the United States did not constitute a true threat but were constitutionally-protected political hyperbole), which were then compared and contrasted with those presented in Lockhart, 383 F.3d at 450-52 (upholding criminal conviction under 18 U.S.C. § 871 for making written statements that were deemed to be true threats to kill the President), as a "further illustration of how allegedly threatening statements should be assessed." Bly, 510 F.3d at 459. This Court finds that analysis instructive in performing the instant true threat analysis.

In Watts, the accused, an anti-Vietnam war protester, stated at a public gathering in Washington, D.C., that "[i]f they ever make me carry a rifle the first man I want to get in my sights is

L.B.J. [President Lyndon Baines Johnson]," Watts, 394 U.S. at 706,
which resulted in his criminal prosecution under 18 U.S.C. § 871
(criminalizing threats of harm against the President of the United
States). The bedrock principle from Watts is that while the First
Amendment can never protect the communication of a "true threat,"
the court must consider the context of the communication in
assessing whether it constitutes such a threat or is merely
constitutionally-protected "political hyperbole." Id. at 706-07.
In so doing, the Supreme Court considered several contextual
factors in its analysis of the offensive remarks, which the Court
described as "a kind of very crude offensive method of stating a
political opposition to the President." Id. at. 708. First, the
Court noted that the communication was a conditional statement,
made "expressly conditional on a trigger event – being drafted into
the military – that removed the imminence of the threat." Id. at
707. Second, the statements were made at a public gathering on a
topic of great national interest and debate. Id. Third, the
communication was not delivered to the putative victim (the
President of the United States),[55] but instead to the crowd that
gathered at the rally, and the Court noted that the audience's
reaction (as well as the speaker's reaction) was laughter, not

---

[55]The Court notes that this is not to suggest a requirement
that the threat actually be communicated to the President, or any
other putative victim, for criminal prosecution under the various
federal statutes. See supra.

fear.  Id.  Based on these contextual factors, the Court held that
the accused's public statements regarding killing the President of
the United States did not constitute a true threat but were
constitutionally-protected political hyperbole.  Id.

In Lockhart, the Fourth Circuit also considered a criminal
prosecution under 18 U.S.C. § 871 for making threats against the
President.  382 F.3d 447.  In Lockhart, a job applicant gave a
threatening letter to a manager at a Food Lion grocery store that
stated, "if George Bush refuses to see the truth and uphold the
Constitution, I will personally put a bullet in his head."
Lockhart, 382 F.3d at 450.  The Fourth Circuit held that the
accused's conduct, considering the entire context, was
distinguishable from that in Watts, and thus the communication
constituted a true threat, sufficient to sustain the conviction
under the statute.  Id. at 452.  First, the court found that the
communication was grammatically, but not expressly conditional,
thus the recipient would have been unsure what would have made
President Bush "see the truth" so as to preclude the accused from
carrying out the threat.  Id.  Second, there was no indication that
the statements were a joke or that any laughter resulted.  Id.
Third, the statements were delivered in private (by hand-delivery
of the letter to the manager) rather than made in a public
gathering at an anti-war rally as in Watts.  Id. Finally, the
accused demonstrated no intent to engage in political discourse

with Food Lion management, which was very much unlike the comments delivered by the accused in <u>Watts</u>. <u>Id.</u>

In <u>Bly</u>, the Fourth Circuit considered the definition of a "true threat," as opposed to language comprising constitutionally-protected political hyperbole, in a criminal prosecution under 18 U.S.C. § 876 for sending threatening communications by mail and email to various officials at the University of Virginia, by the accused, who claimed that his work had been plagiarized and that he had been treated unfairly. 510 F.3d at 455-56. Among the statements made by the accused indicating his intent to "seek redress outside legal channels," were that "bullets are far cheaper and much more decisive." <u>Id.</u> at 456. The court's opinion reviewed the contextual factors from <u>Watts</u>, 394 U.S. at 707-08, compared and contrasted with those presented in <u>Lockhart</u>, 382 F.3d at 450-52, and ultimately held that the conduct of the accused was not protected by the First Amendment as political hyperbole. <u>Bly</u>, 510 F.3d at 459. Considering the context of the situation, the court first found that the threatening letters were delivered privately to the specific individuals, as in <u>Lockhart</u>, as opposed to being communicated in public to a wide audience, as in <u>Watts</u>. <u>Id.</u> Second, the threats were only grammatically conditional, and contained both implicit and explicit promises of violent retribution if the speaker did not obtain the desired result. <u>Id.</u> Thus, while the reader could have reasonably believed that the

accused would carry out the threats, that same reader would be unsure what measure of justice would appease the accused to prevent him from carrying out the threats. <u>Id.</u> This led the Court to conclude that the letters "contained true threats and the statements contained therein are not protected by the First Amendment."[56] <u>Id.</u>

### III. **ANALYSIS**

Guided by the foregoing principles, and considering the entire context of the various postings by White, the Court finds that the subject communications by White do not rise to the level of a true threat as contemplated by current Supreme Court and Fourth Circuit precedents.[57] The Court recognizes the unfortunate reality that the receipt of threats or suggestions of retaliation are not completely avoidable in the conduct of litigation in our courts. <u>See Sheehan v. Gregoire</u>, 272 F. Supp. 2d 1135, 1150 (W.D. Wash. 2003) ("This

---

[56]The Court notes that while the court in <u>Bly</u> did not specifically mention the reaction of the recipients of the threatening letters, the third contextual element from <u>Watts</u>, 394 U.S. at 707 ("both petitioner and the crowd laughed after the [threatening] statement was made"), there is little question from the Court's discussion of the facts that the reaction of those letters was <u>not</u> laughter. <u>See, e.g.</u>, <u>Bly</u>, 510 F.3d at 456 ("With the Letter, Bly enclosed copies of firearms practice targets with bullet holes near their centers to 'give [ ] evidence of a talent I possess for gun control—hitting the target.'")

[57]Again, the Court notes that its findings here are limited to those internet postings outlined <u>supra</u>, and the Court expresses no opinion on the legality or efficacy of the comments expressed by White in the May 2007 letter or any other communication by White not before the Court.

Court does not intend to minimize the real fear of harm and intimidation that law enforcement-related, corrections officer-related, and court-related employees, and their families, may experience. As the . . . statute recognizes, judges and court employees are common targets of threats and harassment."); United States v. Carmichael, 326 F. Supp. 2d 1267, 1301 (M.D. Ala. 2004) ("The court . . . concludes that, while the website certainly imposes discomfort on some individuals, it is not a threat sufficient to warrant a [gag order] on Carmichael's speech or an imposition on his constitutional right to investigate his case. This court appreciates the discomfort that attends involvement in matters of public controversy, but it is bound to weigh the interests of all parties."). Granted, this is more commonplace in the realm of criminal prosecutions, especially involving individuals accused of committing serious crimes for which a conviction would mean significant loss of liberty and even, in some cases, loss of life. See, e.g., United States v. Maxton, 940 F.2d 103, 104-05 (4th Cir. 1991) ("career criminal with a very unsavory past," who received prison sentence above suggested guideline range because of his "extreme recidivism" and his "egregious serious criminal record," wrote numerous threatening letters to federal magistrate judge, resulting in multiple criminal convictions under 18 U.S.C. § 876). It can also occur in other contexts, however, especially in cases such as the underlying litigation that can

implicate highly controversial social issues and arouse passions that lead to violent conduct.  See, e.g., Gilbert and Planned Parenthood, supra.

The Court finds the rationale expressed in two of the aforementioned cases, Sheehan and Carmichael, particularly compelling in the instant analysis.  In Sheehan, the court considered a state statute that outlawed the publication of "personal identifying information."  The statute was aimed at the operator of a website devoted to the issue of "police accountability," in which the author published the residential addresses, residential telephone numbers, birth dates and social security numbers of various persons involved in law enforcement, corrections and the court system.  272 F. Supp. 2d at 1139.  After the passage of the state statute aimed at proscribing the publication of such information, the website operator removed the information from the website and then filed suit challenging the constitutionality of the statute.  Id.  The court found the statute, which was based solely on the speaker's subjective intent to harm or intimidate, unconstitutional because "true threats do not hinge on the speakers' subjective intent."  Id. at 1142-43. Based on the nature of the information posted on the website, and considering its intent, the court noted in passing that the accused's "speech [directed to the issue of police accountability] is political and pertains to a subject of legitimate public

interest."   Id. n.2.   Though the issue in Sheehan was the constitutionality of the state statute, not an actual prosecution under the statute, the Court's observations on the challenges facing court-related personnel in the conduct of litigation are pertinent here:

> This Court does not intend to minimize the real fear of harm and intimidation that law enforcement-related, corrections officer-related, and court-related employees, and their families, may experience. As the State Court of Appeals noted, and the statute recognizes, judges and court employees are common targets of threats and harassment. However, we live in a democratic society founded on fundamental constitutional principles. In this society, we do not quash fear by increasing government power, proscribing those constitutional principles, and silencing those speakers of whom the majority disapproves. Rather, as Justice Harlan eloquently explained, the First Amendment demands that we confront those speakers with superior ideas:

> The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours. It is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests. To many, the immediate consequence of this freedom may often appear to be only verbal tumult, discord, and even offensive utterance. These are, however, within established limits, in truth necessary side effects of the broader enduring values which the process of open debate permits us to achieve. That the air may at times seem filled with verbal cacophony is, in this sense not a sign of weakness but of strength. We cannot lose sight of the fact that, in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated.

<u>Id.</u> at 1150 (citing <u>Cohen v. California</u>, 403 U.S. 15, 24-25 (1971)).

Similarly, in <u>Carmichael</u>, which is particularly analogous to the instant case, the court considered its power to order the removal of an internet website that the government alleged was threatening and harassing to its witnesses and agents involved in the criminal prosecution of a criminal defendant during the proceedings. 326 F. Supp. 2d at 1271-72. The website, which was posted by or on behalf of the criminal defendant, was presented in different versions, but it generally consisted of a "Wanted" style poster that contained the photographs, names and addresses of various government informants and agents who were allegedly involved in or connected to the underlying criminal prosecution. <u>Id.</u> at 1272. The ostensible purpose of the website was to collect information about the various informants and agents to aid the defense against the criminal prosecution, leading the government to seek a protective order barring him from posting the photographs or addresses of the witnesses or agents. <u>Id.</u> at 1272-73. The court first determined that "by virtue of federal statute and its inherent power," the court "ha[d] the authority, under appropriate circumstances, to issue a protective order that would direct a defendant to remove a website from the internet so as to protect the government's witnesses and agents from threats or

61

intimidation."[58]  Id. at 1270, 1277.  The court further noted that

such authority was discretionary, however, and ultimately turned on

the issue whether the website was "a constitutionally unprotected

'true threat' and not protected speech [under the First

Amendment]."  Id. at 1279 (citing Watts, 394 U.S. at 707 ("What is

a [true] threat must be distinguished from what is

constitutionally-protected speech."))   The court ultimately

concluded that Carmichael's website did contain speech protected by

the First Amendment, though that protection was deemed "not

particularly strong," because the publication of certain components

on the site, including the names and photographs of the witnesses

and government agents, was "further from the core of the First

Amendment."  Id. at 1290.  Also, the government had not carried its

burden to establish that the website constituted a true threat.

Id.   In reaching its conclusion, the court recognized the

uncomfortable dichotomy between the potential for harm to the

government's witnesses and agents, if the website was allowed to

remain, and the violation of the defendant's rights to free speech

and to prepare his defense, if the website were ordered removed:

> This case presents a conflict between, on the one hand,
> the government's interests in protecting the safety of
> its witnesses and agents and in enforcing the law, and,

---

[58]The court relied on 18 U.S.C. §§ 1512 and 1514, which
criminalize the harassment or intimidation of a victim, witness or
other person in a federal criminal case, and its inherent authority
under United States v. Noriega, 917 F.2d 1543, 1548 (11th Cir.
1990).  See Carmichael, 326 F. Supp. 2d at 1277.

on the other hand, Carmichael's less tangible constitutional interests in free speech and preparing his defense. Put another way, the government has argued that if Carmichael's site stays up, physical harm could come to witnesses and agents and the government could be inhibited from enforcing the law in the future, while Carmichael has argued that, if the site is taken down, his rights will be violated. The court has thus been asked not only to weigh very dissimilar interests but to predict the likelihood that future events will implicate those interests.

As professors Rotunda and Nowak have observed in writing about the constitutionality of prior restraints on speech, this posture creates an incentive for the court to over-predict the danger posed by Carmichael's website.[] If the court permits the site to remain up and a witness or agent is harmed, the court will be blamed for predicting incorrectly. However, if the court restricts or prohibits Carmichael's site, few will even to able to judge whether the court predicted accurately because the site will no longer be available in the same form, if at all. Thus, the safest course for the court is to over-predict the danger posed by Carmichael's site. Indeed, when confronted with a conflict between the public safety and an individual's rights, it is almost always going to be most comfortable to err on the side of public safety.

The antidote to this incentive is to examine rigorously the government's claim that Carmichael's website poses a threat. The court has done this and concludes that, while the website certainly imposes discomfort on some individuals, it is not a serious threat sufficient to warrant a prior restraint on Carmichael's speech or an imposition on his constitutional right to investigate his case. This court appreciates the discomfort that attends involvement in matters of public controversy, but it is bound to weigh the interests of all parties.

The court emphasizes, though, that a few differences in Carmichael's site could have changed the court's calculus.

Id. at 1301 (internal citations omitted).

With these principles in mind, the Court recognizes and

appreciates the uncomfortable position into which counsel was placed by White's postings. Certainly, the potential for an unpleasant outcome was present, and the Court stresses that even minute or subtle changes in White's conduct and his subsequent postings could readily have led the Court to reach a different conclusion. See Carmichael, 326 F. Supp. 2d at 1301 ("The court emphasizes, though, that a few differences in Carmichael's site could have changed the court's calculus. Nonetheless, for the reasons discussed above, the government has not made its case that the protective order it seeks is warranted.") The Court commends counsel for Intervening Plaintiffs, and counsel for the United States, for successfully representing their clients' interests and for proceeding courageously in the face of adversity. Here, however, counsel apparently were able to resolve the underlying litigation and reach an amicable settlement of that dispute, which is a testament to counsels' ability to prevent the unnecessary distractions caused by White's intrusion into this litigation from disrupting or preventing the settlement. Counsel are further commended for refusing to allow White's intrusion into the case from interfering with their obligations to their clients.

In the instant case, however, the Court declines to exercise its discretion to sanction White for his postings under the Court's inherent authority. In so doing, the Court considers three components: 1) the contextual analysis under the Fourth Circuit's

reasonable listener test, <u>see supra</u>; 2) the progression of White's postings and his conduct with respect to the instant motion; and 3) the ultimate impact of White's postings on the underlying litigation.

### 1. Context

The Court begins its contextual analysis with the recognition that there is no evidence before the Court that White communicated any threats directly to Mottley. This is significant because in virtually all cases of which the Court is aware on this topic, the accused's statements were directly or indirectly tied to a threat of harm to one or more victims. <u>See supra</u>. Nevertheless, the Court is guided here by the principles used by courts in assessing whether such statements communicated either to the intended victim or to others constitute threats.

First, nowhere in any of the postings by White did he issue any direct, or even indirect, threat of violence or suggestion of physical harm against Mottley.[59]

> Like Evers[, in <u>Claiborne</u>,] Carmichael has used language
> with threatening connotation, and, as with Evers, there
> is no evidence that he has "authorized, ratified, or

---

[59]The Court notes its concern over the repugnant nature of White's commentary and the possibility that he, or others with similar views, might be emboldened by the instant decision to make future harassing postings that violate the privacy of litigants. Again, the Court's position is clear:   even minute or subtle changes to the postings by White and/or the reaction of the readers of such postings could very well have led the Court to conclude that White's conduct was sanctionable. <u>Carmichael</u>, 326 F. Supp. 2d at 1301.

> directly threatened acts of violence." If Evers' literal
> threat – "If we catch any of you going in any of them
> racist stores, we're going to break your damn necks," .
> . ., – was not outside the First Amendment's protection,
> it is hard to see how Carmichael's use of language with
> at most non-specific threatening connotations could be
> unprotected.

Carmichael, 326 F. Supp. 2d at 1288 (quoting NAACP v. Claiborne

Hardware, 458 U.S. 886, 898-906 (1982)). Instead, White's postings

suggested a number of actions that his readers might take against

Mottley, e.g., mailing nooses, opening lines of credit, emptying

bank accounts, see supra, many of which would be inconvenient and

unfortunate, and even illegal in their own right, but which do not

amount to a threat of violence perpetrated against Mottley.

Carmichael, 326 F. Supp. 2d at 1296 ("there is insufficient

evidence to conclude that the website poses a serious and imminent

risk to the safety of government agents or to their future work as

undercover officers.")   Second, though White has directed the

subject postings to vent his discontent with the subpoenas issued

by Mottley, White has not merely singled out Mottley in the type of

postings at issue.   Instead, White appears to use the various

internet websites and blogs to attack any group or individual who

opposes White's cause or who support causes that conflict with

White's viewpoint.   Even a cursory review of the various postings

and internet websites by White reveals that he frequently launches

similar attacks on others situated similarly to Mottley.   Thus,

White's method of communication is not uncommon behavior for him.

While there has been some evidence proffered to the Court regarding the impact of White's attacks on others, e.g., claims of bomb threats received by an editor at the Roanoke Times, supra, there is nothing concrete by which the Court could conclude that White's postings have led to any acts of violence or harm to others. Id. at 1285 ("the evidence of an atmosphere of general intimidation is not enough to find that the website is a 'true threat.'") Fourth, as the Court discussed supra, the tenor and threatening nature of White's postings have diminished over the past several months since his initial posting on February 22, 2008. Indeed, after the first posting, White explicitly disclaimed any intent to threaten or harass Mottley, and he issued instructions to his readers not to violate the law. Id. at 1286 ("Carmichael's site explicitly explains its legitimate purpose and disclaims any intent to threaten or harass.") Fifth, there is little evidence before the Court as to the identity and number of persons actually reading these postings. The Court noted supra that after the initial objectionable posting on February 22, 2008, there appears to have been one posting in response that published information ostensibly from the internet website maintained by Mottley's law firm; otherwise, the Court is aware of no other responses to White's postings. Also, as the Court noted supra, there is no way to relate the two late-night telephone calls received by Mottley after White's postings to White himself or any reader of White's

postings.   <u>Carmichael</u>, 326 F. Supp. at 1288 n.44 ("The only evidence regarding an actual act of retaliation against any witness or agent in this case came from [informant] Denton, who testified that his house was broken into shortly after he agreed to be a witness in this case.  Denton interpreted the break-in as a threat. The circumstances of the break-in may be suspicious, but there is no evidence that Carmichael had anything to do with it.")

An additional element of the contextual analysis relevant to determining whether White's postings constitute true threats is the fact that these postings have been published on the internet. <u>Carmichael</u>, 326 F. Supp. 2d at 1288-89.  The Court recognizes that the internet presents the problem of virtually unlimited and rapid proliferation of information in a fashion unlike any other media presented in the other cases on this topic.  <u>Id.</u> at 1288 (citations omitted).   Nevertheless, the fact that White's postings are published on the internet is not enough to transform them into a true threat.  <u>Id.</u>  First, the Supreme Court has held that speech on the internet is not entitled to greater or lesser constitutional protection than speech in more traditional media.   <u>Id.</u> at 1289 (citing <u>Reno v. American Civil Liberties Union</u>, 521 U.S. 844, 870 (1997)).  Second, though counterintuitive, it is generally accepted that speech published to a wider audience is, in fact, less likely to be considered a "true threat" than if it were delivered directly to the target.  <u>Id.</u> (citing <u>United States v. Bellrichard</u>, 994 F.2d

68

1318, 1321 (8th Cir. 1993) ("correspondence delivered at home or at work is somewhat more likely to be taken by the recipient as a threat than is an oral statement made at a public gathering"); and Planned Parenthood, 290 F.3d at 1099 ("[S]tatements communicated directly to the target are much more likely to be true threats than those . . . communicated as part of a public protest.")) Thus, to the extent that White's postings are available for viewing on a variety of publicly-accessible websites, and thus by potentially an endless number of people, that fact makes it less likely that the information posted on the internet rises to the level of a true threat. Id.

Finally, the Court considers the possibility that while the postings at issue were not direct threats that White himself would inflict harm on Mottley or Mottley's family, the true intent of the postings was to incite others to inflict harm on them. Indeed, this appears to be the essence of counsels' argument since there has been no credible threat that White himself would be the one to inflict any such harm. Again, the analysis in Carmichael is instructive:

> The problem with this argument is that [it] implicates the Supreme Court's stringent 'incitement' doctrine. . . . Brandenburg stands for the proposition that, as a general rule, 'the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation. . . . To fall outside the First Amendment's protection, advocacy of violence must be 'directed to inciting or producing imminent lawless action and [be] likely to incite or produce such action.'

Carmichael, 326 F. Supp. 2d at 1287 (citing Brandenburg v. Ohio, 395 U.S. 444, 447 (1969) (advocacy of violence protected by First Amendment unless "directed to inciting or producing imminent lawless action and [be] likely to incite or produce such action"); and Claiborne, 458 U.S. at 927 ("mere advocacy of the use of force or violence does not remove speech from the protection of the First Amendment.")) There simply is insufficient evidence that White's postings "meet the imminency requirement of Brandenburg." Carmichael, 326 F. Supp. 2d at 1287.

### 2. Application of the Reasonable Listener Test

Applying the factors used by the Fourth Circuit, supra, the Court first notes that the postings by White were not merely grammatically conditional, like those in Bly, 510 F.3d at 459, and in Lockhart, 382 F.2d at 452. In the initial posting, White expressly stated that, "No one associated with the ANSWP is to contact anyone involved in the subpoena litigation against us while we are involved in defending these subpoenas," thus the instruction to his readers was that nothing was to occur until after the subpoena litigation had concluded. This is not unlike the speech made in Watts, which was expressly conditional on a specific event – the speaker's being drafted into the military, which the Supreme Court and the Fourth Circuit noted made the speech less of a threat. Watts, 394 U.S. at 707; Bly, 510 F.3d at 459. Second, while the Court squarely rejects White's contention that his

70

postings were intended to be humorous or satirical (there certainly was no laughter by Mottley or anyone at his law firm), the Court does concede that they were injected with White's own brand of levity – no matter how inappropriate or misguided – ostensibly to achieve the desired effect of entertaining his readers.[60]  Watts, 394 U.S. at 707; Bly, 510 F.3d at 459.  Third, while the Court rejects White's contention that his postings could not have been threatening because they were not intended to be read by Mottley, Spring, 305 F.3d at 280-81, it is clear that the postings were made publicly available, as in Watts, and at no time were they delivered or targeted individually to Mottley.  Watts, 394 U.S. at 708; Bly, 510 F.3d at 459.  The delivery of these messages using the internet makes them less threatening by their very nature.  Carmichael, 326 F. Supp. 2d at 1288-89.  Finally, though the Court utterly rejects the method by which White has chosen to communicate his views, there is no question that he has expressly intended to engaged in political discourse by his various postings.  Watts, 394 U.S. at 708; Bly, 510 F.3d at 459.  The Court does recognize, however, that the mere publication of the personal information of Mottley and

---

[60]Related to this point, the Court notes that the record does not fully establish what, if any, reaction resulted from the readers of the allegedly threatening postings.  The blog entries provided to the Court show that a small number of readers of those blogs appeared to have responded to White's postings, but there certainly has been no indication that any readers were incited or otherwise inflamed to commit any acts of violence towards Mottley.

71

Wagner, as in <u>Carmichael</u>, is, in and of itself, not political advocacy, thus White's First Amendment interest in such conduct "is not particularly strong." <u>Carmichael</u>, 326 F. Supp. 2d at 1290.

### 3. The Progression of White's Conduct

The Court finds that over time White's postings – and the sentiments he intended to communicate by those postings – have become increasingly less menacing and more of an expression of White's discontent with the ongoing litigation regarding the subpoenas. Specifically, since the original posting on February 22, 2008, in which White singled out Mottley (and his spouse) for having issued the subpoenas in the first instance, and in which he suggested a number of actions that the readers of such postings should not do (one plausible implication of such postings being that those were the very actions that White wanted his readers to undertake), the tone and tenor of those postings have become less belligerent. After the initial hearing on February 28, 2008, White authored additional postings in which he stated explicitly that he did not intend to threaten Mottley, and he specifically instructed his readers not to engage in any acts of harassment or violence, other than to contact Mottley and express their displeasure with the ongoing subpoena-related litigation.[61]   Indeed, in the most

---

[61]As the Court noted, <u>see supra</u>, there is little evidence that any readers of these postings actually acted on White's requests. There was evidence of two late-night telephone calls to Mottley's residence, but there is nothing to establish that such calls were related to or stemmed from any of White's postings.

recent postings, White appears content to publish the personal information of Mottley and Wagner for the simple reason to demonstrate that he can publish such information. As distasteful as White's actions are, and have been, the Court finds no violation of any federal statute or other precedent of which the Court is aware by White having posted information that is otherwise publicly available and obtained by legal means. See Sheehan, 272 F. Supp. 2d at 1142 ("Defendants cite no authority for the proposition that truthful, lawfully-obtained, publicly-available personal identifying information constitutes a mode of proscribable speech. Rather, disclosing and publishing information obtained elsewhere is precisely the kind of speech that the First Amendment protects.") (citing Bartnicki Vopper, 532 U.S. 514, 527 (2001) ("As a general matter, 'state action to punish the publication of truthful information seldom can satisfy constitutional standards.'") (citations omitted)). There have been no allegations that White obtained such information other than through publicly-available sources; the Court is unaware of any circumstances to the contrary.

With respect to the subpoenas at issue and the instant litigation of the Motion for Sanctions, White has participated fully and he does not appear to have interfered with the lawful processes of the Court. After lawfully objecting to the issued subpoenas and participating in a hearing on his motion to quash, the parties were able to negotiate a mutually-agreeable protective

order and White ultimately submitted to a discovery deposition.
There have been no allegations that White has failed to comply with
or disobeyed any order of the Court. The Court is mindful that the
only subpoena at issue before this Court is the Yahoo! subpoena,
the scope of which was substantially narrowed by counsel for
Intervening Plaintiffs at the February 28, 2008, hearing, which in
turn led counsel for White to lift his objection to the subpoena.
Significantly, it appears that the Yahoo! subpoena was never
responded to by Yahoo!, and no efforts have been made by counsel
for Intervening Plaintiffs to compel any response to that
subpoena.[62]

### 4. The Ultimate Impact on the Underlying Litigation

The Court finds that despite White's actions, there was
ultimately no measurable impact on the underlying litigation.
There were multiple hearings and related pleadings filed by all the
affected parties and the non-party. However, disputes over
subpoenas and other discovery-related matters are commonplace in
federal court litigation. The Court recognizes the arguments of

---

[62]The Court notes that White has maintained throughout this
proceeding that he has no involvement with Defendant Henry, and
there has been no evidence proffered to the Court that establishes
any link between Henry and White. The Court further notes,
however, that the computer forensics expert, Dr. Darden, continues
to examine various computers surrendered by White in response to
subpoenas issued out of the Western District of Virginia. The
Court expresses no opinion on the results of Dr. Darden's forensics
analysis. Based on the record before the Court, however, it does
not appear that any of the subject discovery that may be ongoing in
the Western District of Virginia would change the instant finding.

Intervening Plaintiffs and Plaintiff that the ongoing dispute with White over the various postings has been an unwanted and unnecessary distraction that very well could have disrupted the underlying litigation.   However, the facts do not support those arguments.  Despite the concerns expressed by counsel that Mottley may have chosen to withdraw from his representation of Intervening Plaintiffs because of his fear of harm to him or his family that may result from the posting of his personal information and/or that the postings might impact the prosecution of the underlying ligation, none of that occurred.  To the contrary, Mottley was able to successfully negotiate a settlement on his clients' behalf, the trial date remained in place during the entire process,[63] and the Court can discern no apparent impact on the litigation.

### IV. ORDER

For the foregoing reasons, the Court having considered the record in its entirety including the context of the postings at issue, FINDS that the subject postings do not constitute a true threat of harm, and accordingly, DENIES Intervening Plaintiffs'

---

[63]The Court does note that the parties mutually agreed on several occasions to revise the discovery deadlines, the first of which resulted in a revised trial date.   The Court understands those revisions were sought to allow the parties to continue their efforts to settle the underlying litigation, while preserving their rights to complete the litigation through trial if those efforts were unsuccessful.   Nevertheless, as a result of those revisions and ongoing negotiations, counsel for Intervening Plaintiffs and for Plaintiff sacrificed their right to conduct discovery depositions of Henry, which may well have provided information relevant to any connection between White and Henry.

Motion for Sanctions.

The Clerk shall mail a copy of this Opinion and Order to counsel of record for Intervening Plaintiffs and Plaintiff and to counsel of record for White.

F. Bradford Stillman
~~United States Magistrate Judge~~
United States Magistrate Judge

Norfolk, Virginia

July 25, 2008