# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
## Norfolk Division

Case No. 2:07-cv-00342-RBS-FBS

UNITED STATES OF AMERICA

Plaintiff

and

ANNETTE REDDICK, et al.,

Intervening Plaintiffs

v.

JOHN CROCKETT HENRY, et al.,

and

IN RE WILLIAM A. WHITE,

Defendants.

## BRIEF OF INTERVENING PLAINTIFFS IN SUPPORT OF
## OBJECTIONS TO REPORT OF MAGISTRATE

Anthony F. Troy (VSB No. 05985)
  tony.troy@troutmansanders.com
William H. Hurd (VSB No. 16769)
  william.hurd@troutmansanders.com
Stephen C. Piepgrass (VSB No. 71361)
  stephen.piepgrass@troutmansanders.com
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, VA 23219
Telephone: (804) 697-1200
Facsimile: (804) 698-5162

## BRIEF OF INTERVENING PLAINTIFFS IN SUPPORT OF OBJECTIONS TO REPORT OF MAGISTRATE

### INTRODUCTION

On August 25, 2008, Intervening Plaintiffs filed Objections to the Magistrate Judge's Opinion and Order that were set forth in the July 25, 2008, Opinion and Order ("Opinion"). *See* Intervening Plaintiff's Objections to Magistrate Judge's Opinion and Order, ("Objections").[1] Those Objections are now before the Court for a *de novo* review, in accord with the Mandate of the United States Court of Appeals for the Fourth Circuit.[2]

This brief is filed in support of the Objections and on behalf of a group of tenants ("the Tenants"),[3] who seek to vindicate their right to pursue – through their attorney – fair housing claims in federal court, free from interference by William A. White ("White"), a self-proclaimed neo-Nazi commander who threatened their counsel, Kevin W. Mottley ("Mottley"), and his family. The Tenants object to the decision of the Magistrate Judge refusing to hold White in contempt and refusing to impose sanctions upon him.

---

[1]    Dkt. No. 98, Magistrate's Opinion; Dkt. No. 102, Objections.

[2]    *See* Dkt. No. 131, Mandate of February 8, 2012, making effective the Fourth Circuit's Judgment and Opinion entered on December 1, 2011. On March 5, 2012, the Tenants filed a motion seeking a 15-page extension of the 30 page limit otherwise applicable to briefs in opposition provided in the Local Rules. Dkt. No. 141. Although that motion remains pending, it has not been opposed by any party to this case. In keeping with the motion and in anticipation of the Court's ruling, the instant brief is 45 pages in length.

[3]    The Tenants include: Annette Reddick; Tasha Reddick; Tiese Mitchell; J.M., an infant, by his next friend, Tiese Mitchell; J.M., an infant, by her next friend, Tiese Mitchell; Crystal Lewis; J.J., an infant, by his next friend, Crystal Lewis; Arlene Carter; R.C., an infant, by her next friend, Arlene Carter; and Z.C., an infant, by her next friend, Arlene Carter. (Tasha Reddick has infant children but due to direct threats mailed to her children, by name, she has not allowed their participation in this matter). *See* Appx. 357 (White's mailing to Ms. Reddick's two children). For ease of reference, "Appx." cites are to the Appendix that was filed as a part of the appeal to the Fourth Circuit. The Appendix is being filed with this Court as part of the papers accompanying this Memorandum.

Subsequent to the Magistrate Judge's Opinion, White was indicted in the U.S. District Court for the Western District of Virginia for acts of intimidation, including threats to the Tenants[4] and in December 2009 was found guilty by a jury on four of seven counts and subsequently received a 30-month sentence. These convictions were all related to White's various threats and acts of intimidation leveled against numerous different individuals, including a conviction for "intimidation with the intent to influence, delay and prevent the testimony in the official proceeding of" the Tenants.[5] The Tenants also successfully pursued civil claims against White for threats and intimidation in violation of the Fair Housing Act together with various Virginia statutes, resulting in a jury verdict of $265,000 and an award of attorney's fees and costs in the amount of $595,532.[6]

---

[4]    The threats to Mottley, the Tenants' counsel, were not part of the criminal charges.

[5]    *See* Jury Verdict in *United States v. White*, No. 7:08-cr-54 (Dkt. No. 137) (W.D. Va. Dec. 18, 2009) (available at https://ecf.vawd.uscourts.gov/doc1/ 19111299525). White appealed that verdict to the U.S. Court of Appeals for the Fourth Circuit. *United States v. White*, Nos. 10-4241, 10-4452, 10-4597, which on March 1, 2012, affirmed his conviction and remanded the matter for resentencing, since the Court had applied an incorrect standard regarding an enhancement for a victim's vulnerability – White having mailed threatening letters to the two minor children of Tasha Reddick, who were both under the age of nine. (*See United States v. White,* Nos. 10-4241, 10-4452, 10-4597, 2012 U.S. App. LEXIS 4198, at *45-46 (4th Cir. March 1, 2012). White immediately posted his intent to seek an *en banc* hearing, prognosticating a reversal since it was the "white judge" who said his conviction should be reversed and the "Jew" and "Negro" who condemned him. *See* March 2, 2012, internet post titled "Bill White Responds to WSLS article: 'There will be no change in sentence'" attached hereto as **Exhibit A**. White failed to file an *en banc* petition and on April 2, 2012, the Fourth Circuit denied a request of White to recall the mandate. *See United States v. White*, No. 10-4241, (Dkt. No. 81) (4th Cir. Apr 2, 2012).

[6]    *See* Final Judgment Order in *Unnamed Citizen A et al v. White*, No. 7:09-cv-54 (Dkt. No. 138) (W.D. Va. Nov. 8, 2010) (available at https://ecf.vawd.uscourts.gov/doc1/19111489374). White appealed that judgment to the Fourth Circuit, as well as the award of attorney fees. *Unnamed Citizen A et al. v. White*, No. 10-2288. On February 29, 2012, the Fourth Circuit, in a *per curiam* opinion, affirmed both the judgment and the award of attorney's fees. *See Unnamed Citizen A et al. v. White*, No. 10-2288 (Dkt. No. 48) (4th Cir. Feb. 29, 2012) (available at (Footnote continues.)

2

Postings (for which White ultimately was convicted) resulted in his initial arrest on or about September 11, 2008. These postings to Tenants were the subject of Mottley's investigation through the processes of this Court, including its rules of discovery and its powers of subpoena. White's arrest was only a month and half after the Magistrate Judge issued his July 25, 2008, opinion in the case at bar. In that opinion, the Magistrate Judge held that White's threat to Mottley (an officer of the court) – involving the posting by White on his internet site of (a) personal information about Mottley and his wife and (b) the statement that the Mottleys were "open game" for White's followers – did not constitute a "true threat" and was constitutionally protected.

## PRIOR PROCEEDINGS

The Magistrate Judge had jurisdiction under 28 U.S.C. § 636. Final judgment was entered by this Court on October 14, 2008. The Tenants noted an appeal on November 11, 2008, to the Fourth Circuit and, on February 8, 2012, the Fourth Circuit issued its mandate remanding the matter.

## ISSUES RAISED BY THE OBJECTIONS

1.     Did the Magistrate Judge err in refusing to impose sanctions on White for his internet postings against the Tenants' counsel and his family?

2.     Did White's internet postings constitute "true threats" against the Tenants' counsel and his family, so as to lack protection under the First Amendment?

---

https://ecf.vawd.uscourts.gov/doc1/19111799223; Dkt. No. 197). White's *en banc* petition regarding these rulings was also summarily denied on April 3. *See Unnamed Citizen A et al. v. White,* No. 10-2288 (Dkt. No. 52) (4th Cir. Apr 3, 2012) (available at https://ecf.vawd.uscourts.gov/doc1/19111823548; Dkt. No. 201).

2134537v4

3.      Assuming *arguendo* that White's internet postings were not "true threats,"
did the Magistrate Judge apply an incorrect legal standard when it determined that
the First Amendment protected White against sanctions?

## STATEMENT OF THE CASE

This matter arises out of a case brought by the United States of America against John

Crockett Henry ("Henry") and his company, Henry LLC of Virginia Beach ("Henry LLC"), for

violations of the federal Fair Housing Act, 42 U.S.C. §§ 3601-3631.  In its Complaint, the United

States, which was joined by Tenants as Intervening Plaintiffs, alleged that Henry engaged in

race-based discrimination against various African American residents of an apartment complex

owned by Henry LLC, located in Virginia Beach, Virginia.  The Tenants were at all times

represented in the federal District Court – on a *pro bono* basis – by the law firm of Troutman

Sanders LLP and by then-partner, Mottley.

During the course of the federal housing litigation, William A. "Bill" White, a nonparty

and self-styled Commander of the American National Socialist Workers Party ("ANSWP" or

"American Nazi Party"), caused virulent hate mail to be sent from his then-headquarters in

Roanoke, Virginia, to the Tenants.  In a letter dated May 23, 2007, White warned the Tenants

and other residents of Henry's apartment complex about the consequences that awaited them and

other African Americans who asserted their rights.[7]  The letter, which was written on ANSWP

letterhead with a Nazi swastika, stated:

> Whiny Section 8 Nigger
> 15 ½ St Apartments
> Virginia Beach, VA
>
>         Re:     Your complaint against Henry LLC

---

[7]      The letter was directed to all 30 tenants in the housing complex addressed to "tenants"
and by name to the five Tenants who had intervened, except that, as to Tasha Reddick, the letter
was addressed to her two minor children.

Dear Nigger Tenant:

I read today of your complaint against James Crockett Henry and Henry LLC. I do not know Mr. [sic] Henry, but I do know your type of slum nigger, and I wanted you to know that your actions have not been missed by the white community.

For too long, niggers like you have been allowed to get one over on the white man. You won't work. You won't produce. You breed and eat and turn the world around you into a filthy hole, but you won't do anything to earn or deserve the life you live. Niggers like you are nothing new. All of Africa behaves like you do – with the difference that, there, there is no white man to exploit, only brutal niggers [sic] dictators to give the lot of you the kind of government you deserve.

You may get one over on your landlord this time, and you may not. But know that the white community has noticed you, and we know that you are and will never be anything other than a dirty parasite – and that our patience with you and the government that coddles you runs thin.

Sincerely,

/s/

Bill White, Commander
American National Socialist Workers' Party
PO Box 8601
Roanoke, VA 24014

Appx. 346.

Accompanying the letter was the May 2007 issue of the National Socialist, a periodical published by White and his organization, the American National Socialist Workers Party. Entitled "The Negro Beast," the cover features an African American boy aggressively wielding what appears to be an assault rifle and is filled with virulent racist and anti-Semitic articles. Appx. 506-21.

The Tenants, through their counsel, Mottley, sought to determine whether, in sending the hate mail, White acted independently of Henry or whether there was a relevant nexus between

White and Henry. Thus, Mottley, acting as an attorney and officer of the court, served White with subpoenas compelling him to appear for a deposition and to produce documents and other materials. Appx. 420-26. The subpoenas also included document subpoenas to various entities controlled by White (the "Nazi Entities"). Appx. 427-48. Because the subpoenas were directed to White and the Nazi Entities located in or near Roanoke, Virginia, they were issued out of the U. S. Magistrate Judge for the Western District of Virginia.[8]

On February 11, 2008, White, represented by counsel, filed two motions to quash the subpoenas and, on February 19, 2008, Mottley filed a brief in opposition to White's motions to quash.[9] A motion to compel was also filed against White.[10]

By hiring counsel and filing proper motions, White was proceeding in accord with the manner in which the judicial system resolves controversies. However, rather than follow the rule of law and allow the court to resolve this discovery issue, White (in addition to self-help in destroying evidence to thwart discovery) a few days later continued his contumacious behavior by not only intimidating, harassing, and threatening Tenants, but also Tenants' counsel and his

---

[8]      Additionally, one subpoena was issued out of the U.S. Magistrate Judge for the Eastern District of Virginia because White's internet service provider is located in that jurisdiction.

[9]      White subsequently filed an amended motion to quash and for a protective order on February 27, 2008. Appx. 61a-q.

[10]      White eventually was recommended for sanctions by the U.S. Magistrate Judge for the Western District of Virginia for destroying 53,199 potentially relevant computer files three weeks after receiving the subpoenas and eight days before the motions to quash and motion to compel were scheduled to be heard. *United States v. Henry*, No. 7:08MC003, 2008 U.S. Dist. LEXIS 50892 (W.D. Va. July 1, 2008)) (ordering White to appear to show cause as to why he should not be held in contempt for destroying documents and sending profanity laced emails to the court).

wife.[11]   On Friday, February 22, 2008, White posted a message on the Vanguard News Network Forum ("Vanguard"), an internet site used frequently by those who share White's extreme, racist beliefs.   Appx. 333-37.   Directed to members of his so-called "American National Socialist Workers Party" ("ANSWP"), the message included the name and office address of Mottley, the name of Mottley's wife, their home address and phone number, as well as less than thinly-veiled threats against Mottley and his family.   *See* Appx. 333.   On February 27, 2008, the Tenants responded by filing a motion for sanctions.   *See* Appx. 55-61 (Motion for Sanctions and for Issuance of a Rule to Show Cause to William "Bill" A. White; collectively, "Motion for Sanctions").

This Court referred the matter to the U.S. Magistrate Judge,[12] who heard argument on February 28, 2008, and conducted a hearing on April 2, 2008.   On July 25, 2008, the Magistrate Judge issued an Opinion and Order denying the motion for sanctions, based on his view that White's internet postings did not constitute a "true threat" of harm under applicable case law and were, thus, constitutionally immune from sanctions.   Appx. 524-99. The Tenants then filed their objections to the Magistrate Judge's Opinion and Order.

---

[11]     White's disrespect for the rule of law, the judicial system, and the courts is further evidenced by his statement in one of his latest filings with the Fourth Circuit, in which White stated that "the Court and the law it represents has no more legitimacy than the force the Court can wield to enforce its orders – and, where the Court lacks the ability to order the effective use of violence the Court's proceedings and its law are just a farce."   Pet. for Rehearing En Banc, Dkt. No. 50, Appeal No. 10-2288 (March 14, 2012).

[12]     On March 4, 2008, the motion for sanctions was referred to Magistrate Judge Stillman, who was to issue a "Report and Recommendation."   *See* March 4, 2008, docket entry referring motion; March 6, 2008 Minute Entry ("This matter is to be held before Judge Stillman on the motion for sanctions (#44) and he will issue an r&r.").

2134537v4

## STATEMENT OF FACTS

### The February 22 Internet Posting

At the heart of this case are February 22, 2008, postings and a February 28, 2008, posting by White on the Vanguard website about Kevin Mottley and directed to Kevin Mottley. The February 22 message[13] was as follows:

**Legal Help: Do Not Contact Whiny Section 8 Niggers**

Comrades:

In case anyone needed to be told, and I realize all of you do not. No one associated with the ANSWP is to contact anyone involved in the subpoena litigation against us while we are involved in defending these subpoenas. **After we are done with our legal dispute, they are open game**, but while we are involved in this legal dispute, there is to be nothing done that would cause someone to have valid reason to further investigate our records.

No one is to contact this attorney, Kevin W Mottley, partner at Troutman Sander, or his wife, Patricia P. Mottley. You are not to go by their home at [street address], or call them at [home telephone number]. Do not send them "hate fliers" or nooses. Do not call and record them and place those phone calls on YouTube. Do not open credit cards in their name, empty their bank accounts by internet, hack their emails, or otherwise invade their privacy or misuse their social security numbers. I would tell you which social security numbers not to misuse, but I cannot publish such information in this forum, but don't misuse them anyway. None of that. I know they are wasting thousands of dollars of our money, but we can be patient and deal with them legally.

Further, do not contact any of the Negroes involved in this case. Because I do not know what Negroes are involved in this case and they are not willing to provide

---

[13]    This message was the second message sent that day by White to his followers. The first message that day was a "Subpoena Lawsuit Update" stating that, "this idiot Motley [sic] has barked up the wrong tree" and that "he's hit the tar baby and is going to [be] brought to that <u>nasty</u> awakening real son [sic]." Appx. 452-53.  Mottley, in the February 19, 2008, Motion to Compel papers had attached some of White's internet writings. Thus, White not only knew that Mottley was reading the postings, but also made clear to his followers the manner in which he was going to react to a judicial proceeding (the contempt motion). Those postings as well as the postings of February 28 were on the Vanguard News Network, a Neo Nazi web site. *See* Intervening Plaintiffs' Motion to Compel, Dkt. No. 38, Exhibit F; Appx. 341-44; Appx. 364-67. Mottley was unaware that White was also using other web sites, including Yahoo!.

us with a list of them so we can determine whether or not we have any
information relevant to them, I cannot tell you what Negroes not to contact.
However, I would assume anyone that seemed involved in the case should be left
alone. I have a mailing list that reads "Whiny Section 8 Nigger" for several
addresses, but I am told that is not their proper name, so I am not only mystified
as to why they opened mail that wasn't addressed to them, but I presume we can
still contact any "Whiny Section 8 Nigger" we happen to encounter -- as long as
they don't seem to be involved in this case.

That is all for now.

Bill White, Commander
American National Socialist Workers Party[14]

Appx. 333-37 (Intervening Plaintiffs' Exhibit ("Ex.") 1) (emphasis added).[15]

Significant in this posting is its declaration that Mottley and his family would soon be

"open game" – a hunting term implying that the Mottleys would be fit objects for violence.

This declaration was less than cleverly coupled with a list of actions that readers were "not" to

do – at least, not yet.[16]  However, the Magistrate Judge was not fooled:

Indeed, the Court recognizes, but specifically rejects White's argument that the
postings were made in an effort to protect Mottley by advising White's
followers not to engage in any acts of harassment or violence, at least not until
the subpoena litigation ended.[17]

Appx. 557 (Mag. Op.).  As the Magistrate Judge also concluded, quite properly:

---

[14]   On the same day, the same message was posted by White on a "Yahoo! Groups" website.
Appx. 338-40.  While Mottley learned of the Vanguard message on the same day it was posted,
he did not learn of the parallel Yahoo posting until days later.

[15]   Unless otherwise noted, all references to an "Exhibit" or "Ex." herein are to Exhibits
introduced into evidence by Intervening Plaintiffs at the April 2, 2008, hearing.

[16]   A common tactic among white supremacist groups is to issue directives to members
phrased in the negative, so that the issuer can purportedly maintain deniability.  *See* discussion n.
35 *infra*.

[17]   Such "subpoena litigation" was scheduled to be resolved on February 28, less than a
week from White's posting.

9

2134537v4

White, a non-party to this litigation, engaged in bad-faith conduct insofar as his internet postings were meddlesome in nature, wholly unwarranted and uninvited, *and designed to interfere with counsel's representation of the Intervening Plaintiffs.* (Emphasis added)

Appx. 563 (Mag. Op.).

### The Effects of White's Misconduct

When Mottley received news of White's Vanguard posting on February 22, he was in the midst of working on the underlying case. He immediately stopped his work and telephoned his wife, whose immediate reaction was fear for her safety and that of their children. Mottley then notified law enforcement of the posting. He notified his firm and left work early to notify his neighbors of the incident and to be with his wife. In the days following White's posting, Mottley did little to no work on the underlying case or on any other matter he was handling for other clients. Communicating with law enforcement, making sure his home was secure and researching what the federal courts could do to address the situation consumed his time. *See* Appx. 251-69 (Transcript ("Tr.") Apr. 2, 2008 (testimony of Mottley)).

The management of Mottley's law firm, Troutman Sanders LLP, also considered White's posting a clear risk to Mottley's safety. They contacted the local police, who stated that they too were aware of and concerned about White. Appx. 259 (Tr., Apr. 2, 2008). The firm, at the suggestion of an officer of the Henrico County SWAT team, hired off-duty officers of the Henrico County Police Department to guard Mottley's home and the Henrico County Police Department stepped up its patrols of Mottley's neighborhood. At his own expense, Mottley had a security system installed in his home within one week of White's posting. Appx. 251-69.

As Mottley testified, White's posting had a significant, lasting effect on him, his work, his wife and family. They felt threatened by the posting. Indeed, White's posting encouraged his fellow neo-Nazis to "go by" the Mottleys' personal residence. It also referred to sending

2134537v4

"nooses" to Mottley and his wife, a clear reference to physical harm which the Mottleys might suffer as a result of the subpoenas.

The Mottleys' reaction to the internet posting was entirely reasonable – a fact later conceded by White's own counsel, who stated that, "you could tell they were threatened by this . . . I think [Mottley is] a reasonable person. So we'll concede that his response was one that was a reaction that you'd have to say he did feel threatened." Appx. 329 (Tr., Apr. 2, 2008).

### The Motion for Sanctions

On February 27, 2008, the Tenants filed a motion for sanctions against White, together with a supporting brief. Appx. 55-61. They also noticed the motion to be heard by the Magistrate Judge the following day, February 28, the date of the previously-scheduled hearing on the discovery issues. The motion asked the court to sanction White for bad faith under *Chambers v. NASCO*, 501 U.S. 32 (1991), and it sought to invoke the court's contempt powers – both civil and criminal.

At the hearing, which White attended, the Magistrate Judge expressed keen concern about the posting and strongly suggested that the posting be removed by White from the Vanguard website that day. The Magistrate Judge also made clear that the Court was ". . . gravely concerned, seriously and gravely concerned that anyone would attempt to influence a . . . lawyer in a case properly before this court. . . . Our cases are brought on and prosecuted in this court under the rule of law. We cannot and will not allow anyone to affect the ordinary processes of this court. . . ."[18] Appx. 104 (Tr., Feb. 28, 2008). White apparently removed *that* posting. But, unbeknownst to everyone in the courtroom except for White, he had not just posted the

---

[18]    As discussed *infra,* this concern falls precisely within the Court's inherent powers to sanction, as articulated by *Chambers.*

message on the Vanguard location.  He also had posted the threat on another internet location –
his "Yahoo! Groups" web page.  White removed the Vanguard posting, but, consistent with his
disrespect for court processes,[19] not the Yahoo posting.  *See* Appx. 338-40.  That posting was
contemptuously left online until April 1, 2008, the day before White knew he had to appear back
in court. (Tr., 82, Apr. 2, 2008).

### The February 28 Internet Posting

At the February 28 hearing, the Court, noting its profound concern for the safety of Mr.
Mottley and his family, commanded White, as indicated, to remove the posting.  Appx. 127-31.
On that very evening, – and at the same time he was removing his first Vanguard posting (but
not his Yahoo! posting) against Mottley – White escalated his threats with a new posting, this
time sent directly to Mottley.  Rather than allowing any respite ". . . from a fear of violence and
from the disruption that fear engenders" (the very reason why threats are not protected), *United
States v. White*, No. 10-4241, 2012 U.S. App. LEXIS 4198, at *19 (4th Cir. Mar. 1, 2012),  that
posting described an organization called "Anonymous" as well as their tactics in targeting
perceived enemies.  Appx. 341-44.  In this context, White compared Mottley with Joan Lefkow,
a U.S District Court Judge in the Northern District of Illinois, whose husband and mother were
brutally slain by unknown killers in 2005 and whose murders White ascribes to the same
"Anonymous" whose wrath Mottley is now deemed to have provoked:

> As Mottley has gotten nastier and nastier, and sunk deeper into this delusionary
> [sic] alternate reality he's created around this case, I've seen his efforts could
> quickly balloon into the kind of nastiness that draws an Anonymous response.  As
> we all know, . . . someone becomes '*open game*'[20] the moment they stick their

---

[19]    *See, e.g., supra* n. 12 and accompanying discussion.

[20] Respectfully, it would be sheer naivety to think White's use of the term "open game" was
coincidental.  He knew the term was a communication and message among the Anonymous
(Footnote continues.)

head up; a lot of people don't even stick their head up, but become targets
. . . I remember what happened to [United States District Court Judge] Joan
Lefkow, for instance, and know what the segment of Anonymous which thinks it
is capable of 'helping' is capable of doing.

*See* Appx. 343 (Feb. 28, 2008, email from William A. White to Kevin Mottley) (emphasis

added). Mottley received this communication on his Blackberry while at a dinner with his wife

to celebrate a birthday. He well understood the reference to Judge Lefkow,[21] and it obviously

disrupted any celebration. Thus, at the same time White was advising the Court that he would

take down the Vanguard posting, he was scheming (consistent with his first posting a few days

earlier) to make Mottley a target of Anonymous.

### The Late Night Phone Calls

Within the same time frame of White's February 28 posting, in the "early hours," at

approximately 1:00 a.m. on March 1, Mottley and his wife received two phone calls at their

residence that were a few minutes apart. Mottley answered the phone both times. In each call, a

male voice asked to speak to Mottley's wife first by the name "Patricia" and then in the second

---

group, and he knew the group well. On March 1, 2005, shortly after Judge Lefkow's family was
murdered, White wrote on his "Overthrow.com" blog that when he heard the story he laughed
and thought "Good for them [Anonymous]!" White then stated that he was looking forward "to
seeing who else this new white nationalist group of assassins kills next," and then went even
further, suggesting and identifying five (5) people who "may" (read "should") "be next on [the]
hit list" – three federal prosecutors, a federal agent, and an official of the Anti-Defamation
League. *See United States v. White*, No. 1:08-cr-00851-1, Amended Indictment of Feb. 10,
2009, at *9 (available at https://ecf.ilnd.uscourts.gov/doc1/06706068587). White considered the
Anonymous group to be assassins. *Id.* Thus, rather than complying with any judicial command
to remove postings, White was attempting to put Mottley on a "hit list" and he was directly
communicating that fact to Mottley.

[21]     As the Fourth Circuit just explained in *United States v. White*, No. 10-4241, 2012 U.S.
App. LEXIS 4198, at *35, discussing White's threats against Jennifer Petsche, a Citibank
employee who received threatening emails from White, comparing her (as he did Mottley) to
Judge Lefkow: "Any reasonable recipient of this email would have taken it as a threat of
violence. . . . [T]he anonymous mailing of a newspaper about Judge Lefkow to judicial officers
with words 'be aware be fair' constituted a true threat." (Citation omitted.)

call by the name "Pat." Mottley hung up the phone each time after advising the caller that no one by that name lived in the residence. Although Patricia is her legal name and "Pat" is a common nickname, Mottley's wife does not go by *either* of these names among her friends, family and acquaintances. Appx. 267-68 (Tr., Apr. 2, 2008).

The names used by the caller were significant, however, in that "Patricia" was the name used by White to refer to Mottley's wife in his posting one week earlier, while "Pat" is a common short form of "Patricia." The unknown caller's use of these particular names was no coincidence given White's directive and the proximity in time to the hearing on the motion (one day earlier) when Mottley's family was scheduled to become "open game." Mottley checked the caller identification feature on his home telephone; the caller had blocked his number, and the "*69" call-back feature could not be activated. *Id.* These precautions, taken by the anonymous late night caller in order to remain anonymous, heightened the anxiety the calls instilled, along with White's threats and call for "open game." [22]

### The Reasonableness of Mottley's Reaction

The reasonableness of Mottley's reaction is further established by other instances in which White posted personal information of others on the internet. In an internet posting to the same Vanguard audience on March 26, 2008, White openly advocated the murder of another

---

[22]    As explained in the separate response to White's recently filed Motion for Contempt, these calls corroborate the reasonableness of Mottley's understanding that White's communications were threats. They are not, however, as White asserts, the "core issue" (See White's Motion for Contempt and to Dismiss at 1) in this case.    The core issue is the communications that Mottley and any reasonable listener would perceive as threats.    The identity of the person who made those calls and the reason why the calls were made is irrelevant. What matters is White's communications themselves, which, as will be explained, constituted true threats. The calls, and Mottley's perception of them, do corroborate the reasonableness of Mottley's reactions that he and his family were being threatened. It is the perception of Mottley as opposed to who may have actually made the calls that is the pertinent point.

2134537v4

attorney. In a posting entitled, "Kill Richard Warman," White said Warman "should be drug out into the street and shot, after appropriate trial by a revolutionary tribunal of Canada's white activists. It won't be hard to do, he can be found, easily, at his home, at [address redacted]." Appx. 409-11.[23]

Similarly, a representative of the Southern Poverty Law Center contacted White in an attempt to interview him. Simply because he was asked for an interview, White posted the man's name, home address, telephone number and birth date on the same web page in an effort to intimidate him. *See* Appx. 456-66 (Posting of William A. White to Vanguard News Network Forum, http://www.vnnforum.com/showthread.php?t=61519 (Nov. 20, 2007)). White also posted the name, address and phone number of one of the man's relatives on the webpage. *Id.* at 457. White then insinuated a threat of violence against the man and his relative, writing, "I'll have some people drop by." *Id.*

Another individual participating on the web page questioned White's tactic of posting "innocent" family members on the web page. That voice of relative moderation was met with rebuke from White, who said:

My view:

Total war.

Kill them, kill their families, kill everyone they know.
Bind - Torture – Kill

---

[23]     White was eventually acquitted of federal charges of threatening Mr. Warman. While a jury convicted White of the threats, the District Court later determined that those threats were part of a larger political complaint advocating the overthrow of the Canadian government, and thus not criminally sanctionable. *See United States v. White*, No. 7:08-cr-54 (Dkt. No. 155) (available at https://ecf.vawd.uscourts.gov/doc1/19111327092).
    There was no larger political context in Mottley's case. Instead, Mottley's reactions, as a reasonable listener, were based on White's calls to "kill" him and his family, and postings by White of the Mottleys' personal contact information.

> If you can't tell, I've been in a bad mood lately. Some assholes owe me $90,000
> and are dragging their feet paying. I may be getting ready to do some serious
> killing -- the only question is what direction I go.
> - I need a smiley with a machine gun right about here-

Appx. 462.

Additionally, during the April 2, 2008, hearing, White confirmed statements he made regarding the choking of another man indicating that "[t]he feeling of killing [the man] was the greatest feeling I have ever experienced." Mottley's concerns included his knowledge of this type of posting by White.

In addition to the internet postings, the reaction of Mottley's law firm, the local police and the Henrico County SWAT team speak to the nature of White's postings. All of those entities interpreted White's communications as serious threats, thus providing corroborating evidence that White's communications would be taken as true threats by a reasonable person.[24] *See White,* 2012 U.S. App. LEXIS 4198, at *25 (discussing threats against Petsche and reaction of Citibank employees, Bank security officers and law enforcement officers as corroboration of Petsche's reasonable reaction).

### The Magistrate Judge's Opinions

The Magistrate Judge's opinion found that White engaged in "bad-faith conduct . . . designed to interfere with counsel's representation of Intervening Plaintiff. . . ." Appx. 563 (Mag. Op.). Indeed, the Magistrate Judge had "little question" as to the correctness of the bad faith factual determination (Appx. 563 (Mag. Op.)), and it found that White's testimony to the

---

[24]     Of course, White already conceded that Mottley is a reasonable person, by stipulation of his counsel. *See* Appx. 329 (Tr., Apr. 2, 2008).

contrary "was entirely self-serving and disingenuous." Appx. 558 (Mag. Op.).[25] Nevertheless,

the Magistrate Judge concluded that it could not sanction White for engaging in this misconduct

because it did not view White's internet posting as a "true threat" and, on this basis, and without

any further analysis or balancing of interests, concluded that the posting was protected by the

First Amendment.

## SUMMARY OF ARGUMENT

Most importantly, based on the recognition that White's actions were taken in bad faith

and with the purpose of disrupting a judicial proceeding, the Magistrate Judge should have

recognized that, under *Chambers*, the Court had inherent authority to impose sanctions and

should have recommended that the Court do so – including attorney's fees, costs of security by

Mottley, his firm and the local county, as well as a monetary sanction – to vindicate the judicial

process, even without a formal finding of contempt.  The Magistrate Judge erred in failing to

recognize and recommend the exercise of such authority.

The Magistrate Judge also erred in concluding that the First Amendment protected

White's internet postings and prevented the entry of any judicial sanction against him.  The error

was two-fold:

First, contrary to the Magistrate Judge's assessment, White's internet postings constituted

a "true threat."  Thus, they lacked constitutional protection.

Second, even if the internet postings were not a "true threat," the Magistrate Judge erred

by ending its analysis there.  Speech that does not constitute a true threat still may be proscribed

where the regulation at issue satisfies strict scrutiny.  Regulation of speech is constitutionally

---

[25]     These findings were not objected to by White and thus not subject to further review.  Fed.
R. Civ. P. 72(b)(4).

2134537v4

permissible if it is narrowly tailored to serve a compelling governmental interest. Yet the Magistrate Judge wholly ignored this well-established constitutional standard and treated the First Amendment as if its protections were absolute.

When the applicable constitutional standard is applied, it is clear that the sanctions sought against White by the Tenants are permissible under the First Amendment. Those sanctions would serve the compelling government interests of ensuring that civil rights litigants have access to the courts and preserving the integrity of judicial proceedings.[26]  Moreover, because White would be sanctioned only because his internet postings violated those compelling interests – and were intended to do so – the requested sanctions would satisfy the narrow tailoring requirement.

The Court should vacate and reverse the decision of the Magistrate Judge and enter sanctions against White.

## ARGUMENT

**STANDARD OF REVIEW**

Fed. R. Civ. P. 72(b)(3) provides for a *de novo* review by a district court of a Magistrate Judge's report and recommendation on a dispositive matter:

> The district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify that recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

The district court conducts a *de novo* review of those portions of a Magistrate Judge's report and recommendation to which specific objections were made. Fed. R. Civ. P. 72(b)(3); *Lucas v. Astrue*, No. 6:10-CV-00049, 2012 U.S. Dist. LEXIS 2701, at *4 (E.D. Va. March 1, 2012). The

---

[26]     When issuing such subpoenas, Mottley was acting as an "officer of a court." Fed. R. Civ. P. 45(a)(3).

phrase "*de novo* determination," as used in Rule 72, means that a District Court Judge must give "fresh consideration" to portions of the Magistrate Judge's report and recommendation. In other words, the court should make an independent determination of the issues. *United States v. Raddatz*, 447 U.S. 667, 675 (1980); *Baker v. Patterson Med. Supply, Inc.,* No. 4:11cv37, 2012 U.S. Dist. LEXIS 14733, at *3-4 (E.D. Va. Feb. 3, 2012). In exercising *de novo* review, the Court analyzes the issue using the same standard as that used by the Magistrate Judge. *Combs v. Astrue*, No. 4:11CV43, 2012 U.S. Dist. LEXIS 6916, at *3 (E.D. Va. Jan. 19, 2012).

I. **PURSUANT TO *CHAMBERS* THE MAGISTRATE JUDGE SHOULD HAVE SANCTIONED WHITE.**

Separate and apart from the "true threat" and strict scrutiny analysis, the Magistrate Judge should have recommended sanctioning White pursuant to the Court's inherent power to prevent a litigant from "defiling the temple of justice" by acting in bad faith during the course of litigation in a manner intended to disrupt judicial proceedings. No First Amendment analysis need be applied to sanction conduct aimed at disrupting a judicial proceeding.

A. **The Magistrate Judge should have recommended the exercise of this Court's inherent power to sanction White for "defiling the temple of justice," when he acted in bad faith to interfere with litigation.**

In *Chambers*, 501 U.S. at 43, the Supreme Court described the "inherent power" of courts to impose "respect . . . and submission to their lawful mandates." The Court held that "[t]hese powers are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* (Internal quotation marks and citations omitted). The Supreme Court further explained that this power exists to "fill in the interstices" between statutes and rules that provide for sanctions because, "[t]hese other mechanisms, taken alone or together, are not substitutes for the inherent power, for that power is both broader and narrower than other means of imposing sanctions." *Id.*

at 47. "[W]hereas each of the other mechanisms [for imposing sanctions] reaches only certain individuals or conduct, the inherent power extends to a full range of litigation abuses." *Id.* That inherent power extends not only to parties, but to non-parties as well. *See* n. 27, *infra.*

*Chambers* addressed whether the power to assess attorneys' fees was included in a court's inherent power. The Supreme Court answered that question in the affirmative, reasoning that more "severe" sanctions (for example, "outright dismissal of a lawsuit") had previously been recognized as being part of a court's inherent power. *Id.* (citing *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764 (1980)). "Consequently, the less severe sanction of an assessment of attorney's fees is undoubtedly within a court's inherent power as well." *Chambers* 501 U.S. at 45 (citations and quotations omitted). The Court also found support for its holding in a commonly-recognized exception to the so-called "American Rule," which prohibits fee shifting in most cases. This exception provides that "a court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 45-46 (citing numerous cases).[27]

> In this regard, if a court finds that fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorneys' fees against the responsible party, as it may *when a party shows bad faith by delaying or disrupting the litigation* or by hampering enforcement of a court order. The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy.

---

[27]   The inherent power to sanction applies to non-parties to the litigation as well as to parties. *See, e.g., Rainbow Magazine, Inc. v. Unified Capital Corp.,* 77 F.3d 278 (9th Cir. 1996) (holding that a non-party could be sanctioned under a court's inherent power to sanction recognized in *Chambers*).

2134537v4

*Id.* at 46 (emphasis added).[28]

> **B.      The inherent power to assess attorneys' fees is separate and apart from the inherent contempt power and does not involve the same statutory and rule-based procedural considerations as contempt proceedings.**

As made plain by the foregoing passage from *Chambers*, the inherent power to assess attorneys' fees is distinct from "the more drastic sanctions available for contempt of court…" *Id.* at 46. To assess attorneys' fees and make a party whole under *Chambers*, a court need only find that a person has acted in bad faith, vexatiously, wantonly or for oppressive reasons or in such a manner that he has "defiled the temple of justice." *Id.* "[A] court must, of course, exercise caution in invoking its inherent power, and it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees." *Id.* at 50. But, nothing more is required.

In a contempt proceeding, by contrast, a court is faced with numerous considerations bearing upon the court's power, the required procedure and the permitted remedies. These considerations include whether the conduct occurred in the court's presence (*i.e.*, whether the contempt is "direct" or "indirect"), whether the court can punish the conduct summarily or only through a plenary hearing, whether the contempt is criminal, civil or both, whether the court must refer the matter to a United States attorney for prosecution, and whether the defendant is entitled to trial by jury. *See International Union v. Bagwell*, 512 U.S. 821, 826-34 (1994).

Such considerations are largely inapplicable when assessing attorneys' fees pursuant to a court's inherent power. Indeed, the misconduct in *Chambers* violated no court order, occurred

---

[28]      Obviously the discussion about fees was necessary in view of the traditional adherence to the "American Rule" and the fee shifting exceptions to that Rule. Logically the more traditional powers of the Court would also exist to include in any sanction reparation for the damages caused. This would include, for example, the costs associated with the Mottleys having to obtain security as well as compensation for the other disruptions caused by White. Such reparations are necessary to "mak[e] the . . . party whole for expenses caused." *Chambers*, 501 U.S. at 46.

largely outside the Court's presence, was prosecuted and ruled upon by the District Judge, and did not require a jury. Nevertheless, the Court acted within its "discretion" when it assessed $1 million in attorneys' fees based on a finding of "bad faith" – the very finding made in the instant case by the Magistrate Judge, but not implemented due to the mistaken belief that a First Amendment analysis was required.

### C. A court may permissibly assess attorneys' fees using its inherent power even when other statutory or rule-based mechanisms exist to address the misconduct.

Even when statutes or rules address misconduct, a court may still use its inherent power. *Chambers*, 501 U.S. at 50.

> [W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. *But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power.*

*Id.* (emphasis added). *Chambers* illustrates this principle. The Court could have assessed sanctions under Rule 11 to address the filing of false and frivolous pleadings. *Id.* at 51. Other Rules might have provided partial relief. *Id.* "Much of the bad-faith conduct by Chambers, however, was beyond the reach of the Rules" and "only the inherent power could address" the conduct. To hold otherwise would "serve only to foster extensive and needless satellite litigation, which is contrary to the aim of the Rules themselves." *Id.* Accordingly, even though other remedies existed, the Court permissibly invoked its inherent power.[29]

---

[29]     Even Justices Scalia and Kennedy in dissent recognize the applicability of the exercise of inherent power in situations such as the one at bar — situations where counsel for White asserts that there is no rule or statute applicable to deal with White's conduct other than a warning in the form of an injunction. Justice Scalia believes that statutory provisions must be relied upon before shifting attorney fees; Justice Kennedy believes that statutory provisions or applicable Rules of court must first be relied upon before the exercise of inherent power; and both Justices believe that no exercise can be asserted for prelitigation conduct (in *Chambers* a bad faith breach (Footnote continues.)

In this case, the Magistrate Judge found bad faith conduct by White. As the Magistrate Judge stated, White's actions were "in bad faith, . . . were meddlesome in nature, wholly unwarranted and uninvited and designed to interfere with counsel's representation of the intervening [Tenant] Plaintiffs." Appx. 563 (Mag. Op.). Nonetheless, the Magistrate Judge failed to recommend sanctions against him pursuant to *Chambers*. The Court failed to issue sanctions not out of any exercise of discretion, but because of its erroneous and incomplete "true threat" analysis.

**D.      The Magistrate Judge should have used the inherent power to sanction White because his conduct "defiled the temple of justice" and was in bad faith.**

Without question, White's conduct in seeking to harass and intimidate not only the Tenants but also the Tenants' counsel and his spouse qualifies as bad faith. In addition, White's conduct sought to, and did, defile the temple of justice and affected the judicial authority of this Court. In issuing the subpoenas to White, counsel was acting as an officer of this Court carrying out the duties of that position. As an officer of the Court, an attorney is not unlike other officers of the Court — judges, clerks[30] and marshals — each of whom are duty-bound to carry out their court-related functions. Like other court officers, counsel should be entitled to assume that his safety (and the safety of his spouse) will not be threatened in the process.

---

of contract that occurred three weeks prior to litigation's being brought). However, both Justices recognize the need to deal with bad faith conduct during litigation. *Chambers*, 501 U.S. at 59 (Scalia, J.) (writing that the "American Rule" does not in principle bar fee shifting as a sanction for procedural abuse and such fee shifting as a sanction can be imposed for litigation conduct characterized by bad faith) and at 64 (Kennedy, J.) (writing that the inherent power exists to sanction bad faith litigation practices when necessary to preserve the authority of the court).

[30]      Of course the clerks of court are still in the business of issuing subpoenas to third-party witnesses such as White – the same conduct that resulted in counsel and counsel's spouse being harassed here. Fed. R. Civ. Pro. 45(a)(3).

2134537v4

One of the factual findings in *Chambers* was that Chambers devised a plan "of obstruction, delay, harassment, and expense sufficient to reduce NASCO to a condition of exhausted compliance." 501 U.S. at 40. Similarly, other cases following *Chambers* illustrate that efforts to intimidate, threaten or harass provide a sufficient foundation for sanctions. In *Richardson v. Cabarrus Cnty Bd. of Educ.*, No. 97-2313, 1998 U.S. App. LEXIS 12106 (4th Cir. June 9, 1998), the Court's exercise of inherent power was affirmed in the sanction of a litigant who sent several intimidating letters to a witness.[31] In *Thomas v. Baca*, No. CV 06-06981, 2007 U.S. Dist. LEXIS 20518, at *22 (C.D. Cal. Feb. 28, 2007), sanctions were assessed against a lawyer who engaged in conduct toward opposing counsel that "appears to be part of a strategy to intimidate counsel and to gain an advantage in the discovery dispute. . . ."[32]

White's conduct was similar to the conduct at issue in the foregoing cases, but far worse in degree. The purpose of White's conduct was (1) to create "haints" in the minds of the Tenants, *White,* 2012 U.S. App. LEXIS 4198, at *10, thereby intimidating them to prevent their testimony (the very crime for which White was convicted, *Id.* at *28), and (2) to increase the risks of litigation for counsel to such a degree that fear for counsel's family would override

---

[31]    While this is an unpublished opinion of the Fourth Circuit, the case is precedent dealing with conduct that is analogous to White's conduct in the context of a *Chambers* sanctions motion. For that reason, it "has precedential value in relation to a material issue" in this case and is properly cited under the Fourth Circuit's Local Rule 32.1.

[32]    Similarly, in upholding the jury's finding of guilt against White for his actions taken against the Tenants themselves, the District Could discussed *United States v. Varani*, 435 F.2d 758, 762 (1970) (relied upon just recently in *White* at 29) for the proposition that when "the intimidation is the vehicle for the commission of a different crime" (or in this case interference with the Court) the words do not need to rise to the level of a true threat. *See United States v. White*, No. 7:08-cr-54 (Dkt. No. 155) at *6 (available at https://ecf.vawd.uscourts.gov/doc1/19111327092).

2134537v4

counsel's professional responsibility as a zealous advocate, so that ultimately it would no longer be "worth it" for counsel to continue his pursuit of discovery against White.

In the present case, White threatened, intimidated and harassed an officer of the court who, by issuing lawful subpoenas, was engaged in carrying out his lawful duties to his clients. By engaging in such conduct, White caused damage to Tenants and their counsel, not to mention counsel's spouse. This is the very sort of "bad faith [conduct] . . . displayed toward both . . . adversary and the court" that demands the exercise of a court's inherent powers to preserve respect for itself and its officers. *Chambers,* 501 U.S. at 43-44 ("Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates."). *Id.* at 44. The trial court therefore had inherent authority to punish White's actions, regardless whether they did or did not constitute a "true threat."

Under these circumstances, a remedy was required. Even if the Magistrate Judge declined to hold White in contempt, it should have suggested imposition of sanctions pursuant to inherent authority.[33] Its failure to do so is an abuse of discretion, prompted by its mistaken view about the need for a "true threat" analysis, and it constitutes error.

**E.    The Magistrate Judge erred in deciding that the Court could not use its inherent power to sanction White because his conduct was directed toward counsel, rather than the Court.**

It is clear that the decision of the Magistrate Judge should be reversed if it believed it had no authority to sanction White, when it actually did have such authority. *Randall v. Prince*

---

[33]    Indeed, if Congress can criminalize the use of intimidation with the intent to influence or delay judicial proceedings – 18 U.S.C. §1512(b), which is the very statute White was found guilty of violating with regard to his actions against the Tenants – a Court exercising its inherent authority under *Chambers* can certainly sanction similar disruptive conduct, regardless of any true threat analysis.

*George's County*, 302 F.3d 188, 211 (4th Cir. 2002) (a court abuses its discretion if it makes a mistake of law). In a salient passage, the Magistrate Judge demonstrated a misunderstanding of the inherent power of courts, which led to the Magistrate Judge deciding that the Court's hands were tied by constitutional limitations:

> There have been no violations of any court order, no disrespectful conduct or comments directed to the Court. . . . [T]he Court *can only in these circumstances* exercise its inherent authority if the non-party's actions directed to counsel . . . amounted to a "true threat" . . . . In other words, the non-party's actions, taken as a whole, *must* rise to the level of a "true threat" because such speech can never be protected under the First Amendment.

Appx. 564-65.

These words clearly convey the Magistrate Judge's view that, where the misconduct is directed to *counsel* rather than to the *court*, it has no authority to impose sanctions unless the misconduct constitutes a true threat against counsel. This is simply not the law. Chambers makes clear that the inherent power of the Court reaches not only to conduct displayed to the court, but also toward adversaries, 501 U.S. at 54, and to non-parties to litigation, *Rainbow Magazine, Inc., v. Unified Capital Corp.*, 77 F.3d 278 (9th Cir. 1996).

## II. THE MAGISTRATE JUDGE ERRED IN CONCLUDING THAT WHITE'S INTERNET POSTINGS WERE NOT A "TRUE THREAT."

As the Supreme Court has explained, true threats are not constitutionally protected. *Virginia v. Black*, 538 U.S. 343, 351 (2003) (citing *Watts v. United States*, 394 U.S. 705, 708 (1969) (*per curiam*)). The Magistrate Judge acknowledged this principle, but failed to apply it correctly, erroneously ruling that White's internet postings were not a true threat.

### A. The Magistrate Judge Recognized the "Reasonable Listener" Test, But Failed to Apply It Correctly.

The Magistrate Judge accurately observed that, for words to constitute a true threat, it is unnecessary that the words have the intended effect, and it is not even necessary that the words

be received by the target. *See United States v. Spring*, 305 F.3d 276, 280-81 (4th Cir. 2002); *see also United States v. Armel*, 585 F.3d 182, 184-85 (4th Cir. 2009) (reaffirming the "reasonable listener" test and stating that "defendants inability [or failure] to carry out specific threats does not render them harmless"). As the Magistrate Judge correctly noted, the main consideration is whether the words would be considered a true threat by a "reasonable listener." Appx. 571-73 (Mag. Op.). As recently stated by the Fourth Circuit in *United States v. White,* 2012 U.S. App. LEXIS 4198, at *20, "whether the statement amounts to a true threat is determined by the understanding of a *reasonable recipient familiar with the context* that the statement is a 'serious expression of an intent to do harm' to the recipient. This is and has been the law of this circuit" (citation omitted) (emphasis in original)). In its analysis of the true threat question, however, the Magistrate Judge forgot these principles.

The Magistrate Judge viewed White's postings from White's perspective and found that they "were injected with White's own brand of levity – no matter how inappropriate or misguided – ostensibly to achieve the desired effect of entertaining his readers." Appx. 594 (Mag. Op.). Additionally, in discussing the "reasonable listener" test, the Magistrate Judge suggested that the postings were not a "true threat" since they were made publicly and at no time were delivered or targeted individually toward Mottley (this was a factual error, in view of the February 28 posting, which was sent directly to Mottley) and were expressly intended to be "political discourse." Appx. 595 (Mag. Op.).

This reasoning, which focused on what White supposedly intended, has nothing to do with the "reasonable listener" test. Under the reasonable listener test, it is not the intent of the speaker but the impression made on the listener that matters – and White's own counsel conceded that Mottley was reasonable in believing that White's postings were a threat. Appx.

27

329 (Tr., Apr. 2, 2008 ("[Y]ou could tell they were threatened by this . . . I think [Mottley is] a reasonable person. So we'll concede that his response was one that was a reaction that you'd have to say he did feel threatened.")); *see also* discussion *supra* at 12.

It was illogical, clearly erroneous, and contrary to the evidence and the law to find that declaring Mottley and his wife "open game," providing their home location and phone number (plus their social security numbers, if one called White), suggesting harassing calls, nooses, uninvited visits, identity theft, and disruption of their economic life, and *directly* telling Mottley that he was now on the Anonymous hit list and would end up dead, like the relatives of Joan Lefkow, somehow constituted "political discourse" or were meant to do anything but incite fear in Mottley and his family and the disruption that such fear engenders. White's posting plainly constituted a "true threat" under the reasonable listener test.

**B.    White's Internet Postings Constituted a True Threat of Bodily Harm.**

In ruling there was no "true threat," the Magistrate Judge relied heavily on its view that White's internet postings contained no threat of physical harm against Mottley. *See* Appx. 575, 588 (Mag. Op.). How White's inflammatory language, especially when directed to a group of individuals known for using violence to achieve their ends, could be construed as being anything other than a threat of bodily harm is difficult to understand.

A noose is a clear reference to a lynching, historically used by the Ku Klux Klan to kill blacks. "Open game" is a clear reference to hunting season and was a message to the Anonymous group, known for violence. And the reference to the killings of Judge Lefkow's family, as the Fourth Circuit has found, would be taken as a threat of violence by any reasonable recipient of the communication. *White,* 2012 U.S. App. LEXIS 4198, at *25. And if members of the neo-Nazi movement – a movement notorious for using violence to promote its repugnant

views – were to "go by" the Mottleys' house, one can be sure it would not be to sell Girl Scout cookies.   Any listener presented with these words would reasonably understand them to be threats of bodily harm.   Remarkably, the Magistrate Judge said this language had *"no connotations* of bodily harm" and did not constitute a "direct, *or even indirect*, threat of violence or suggestion of physical harm against Mottley [and his wife]."  *See* Appx. 575, 588 (Mag. Op.). (Emphasis added).[34]  This finding and misanalysis of the facts is clearly erroneous and amounts to an abuse of discretion.

The Magistrate Judge also appears to have relied, at least in part, on the fact that White told his comrades "not" to perform the bad acts.  *See* Dkt. No. 98 (Mag. Op.) at 52, 67, 70, and 72.  To the extent the Magistrate Judge relied on White's use of the word "not," such reliance was naïve and misplaced.

First, even if one accepts White's use of the word "not" at face value, his instructions came with an important limitation.  Specifically, the word "not" applied only to the time period when the subpoena litigation was pending.  In White's own words, Mottley and his wife would become "open game" "after" the "subpoena litigation," and the "subpoena litigation" was supposed to end at the hearing on February 28, 2008, just six days after White's posting.

Second, any reasonable listener would see through White's transparent attempt to avoid legal trouble by couching his instructions in the negative.  If White truly intended to discourage violent action against Mottley, rather than threaten it, there would have been no need to recite

---

[34]     The Magistrate Judge gave these statements an unwarranted dilution, paraphrasing them as White having "invited his followers and the readers of his postings to contact counsel and express their displeasure over the subpoenas." Appx. 530 (Mag. Op.).  Yet again any analysis of what White intended is at odds with the "reasonable listener" test.

Mottley's address and phone number or the name of his wife.  Indeed, White's own counsel

agreed with this interpretation of the posting when, during the February 28 hearing, he stated:

> My client's position – and he's – you perhaps seen us here at the table, was very
> upset with me, wants to make it clear. . . . he says he has some crazy followers.
> He has a point of view I disagree with, and I have stated that, but he has some
> crazy followers for his point of view, and his effort was to try not – to encourage
> them not to do things that are crazy.  *I think that does logically beg the question*
> *why even do it, why give the detail* [as to counsel's name, wife's name, home
> address, etc.]," in the first place.   ·

Appx. 125-26 (Tr., Feb. 28, 2008) (emphasis added).  Given White's own counsel's

concession, it is surprising the Magistrate Judge gave any weight whatsoever to White's

use of the word "not," especially after finding White's testimony "entirely self-serving

and disingenuous." Appx. 558 (Mag. Op.).

Lastly such conclusions are inexplicably at odds with the Magistrate Judge's own

conclusions that it: ". . . recognizes but specifically rejects White's argument that the postings

were made in an effort to protect Mottley by advising White's followers not to engage in any

acts of harassment or violence. . . ." Appx. 557 (Mag. Op.)

In short, to the extent the Magistrate Judge allowed White to cleverly avoid sanctions by

using the word "not," the Magistrate Judge's opinion conflicted with the factual findings and

constituted an abuse of discretion.[35]

---

[35]    The Magistrate Judge's ruling also failed to take into account that couching instructions
in the negative is a common tactic employed by white supremacists; a tactic that was brought to
the Court's attention.  As noted by Chief Administrative Law Judge Heifetz in *HUD v. Wilson*,
HUDALJ 03-98-0692-8 (2000); Appx. 654, words are key in the white supremacist world,
especially, when one understands the concept of "leaderless resistance" which is an integral
feature of their activity.  As articulated by ALJ Heifetz, "leaderless resistance" is:

> a philosophy of armed struggle that is utilized and advocated in the white
> supremacist world.  Essentially it says that rather than taking action as a group . . .
> such as the Ku Klux Klan, individuals, *without having direction from a leader,*
> *should take hostile or harassing action against victims or potential victims in*

(Footnote continues.)

**C.    True Threats Are Not Limited to Threats of Physical Violence.**

Assuming *arguendo* that the Magistrate Judge was correct that White somehow did not threaten physical violence, the Magistrate Judge still erred. Contrary to the Magistrate Judge's assumption, true threats are not limited to threats of physical violence. This is shown both by case law and by common sense.

In *Virginia v. Black*, the Supreme Court upheld a statutory prohibition on cross-burning with intent to intimidate. In explaining its rationale, the Court said: "Intimidation in the constitutionally proscribable sense of the word is *a type* of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of *bodily harm or death*." 538 U.S. at 360 (emphasis added). In other words, placing a victim in fear of bodily harm or death is *a type* of true threat, thus implicitly acknowledging that there are also *other types* of true threats. One other type of true threat is a statement that places the victim in fear that his *property* will be destroyed or damaged. Thus, in *United States v. Viefhaus*, 168 F.3d 392, 394 (10th Cir. 1999), the court defined a "true threat" to include "a declaration of intention . . . to injure another *or his property* by the commission of some unlawful act" (emphasis added). Other courts have agreed. *E.g., Porter v. Ascension Parish Sch. Bd.*, No. 02-274-B-M2, 2004 U.S. Dist. LEXIS 1175, at *31 (M.D. La. Jan. 28, 2004) ("the Court concludes that Adam's drawing was a true threat of an intent to harm or cause injury to others *or school property* and is not entitled to First Amendment protection") (emphasis added); *United States v. Anderson*, No. 00-CR-15 (NAM), 2000 U.S. Dist. LEXIS 4445, 11-12 (N.D.N.Y Mar. 30, 2000) (describing a threat to burn a person's car and concluding, "[t]his is a true threat"); *see also Ward v. Utah*, 398

---

*order to give deniability to the organization*, but also at the behest of the greater white revolution.

F.3d 1239, 1249 (10th Cir. 2005) ("an act which causes the person to fear for his physical safety *or damages the property of that person*, is an archetypal example of a true threat") (emphasis added, quotation omitted); *United States v. Cassel*, 408 F.3d 622, 636 (9th Cir. 2005) (finding statutorily prohibited intimidation includes threats to both person and property).

Moreover, to say that a true threat must include a threat of bodily harm would lead to absurd results. If an angry litigant convincingly vows that he will come one night and burn down the house of a witness, or a juror, or a lawyer, he has truly threatened them. His words are no less a threat if he then cleverly adds that he will come at a time when everyone is out of the house and on vacation so that only property damage will occur. Like a threat of bodily harm, such a "property only" threat is intended to instill fear and disruption of life and in this case was intended to interfere with the judicial processes by inducing fear and influencing conduct. The First Amendment does not protect such words as these. *See Black*, 538 U.S. at 360 ("a prohibition on true threats protects individuals from the *fear* of violence and from the *disruption* that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur") (emphasis added, internal quotation marks and citation omitted). *See also White*, 2012 U.S. App. LEXIS 4198, at *22 (while cross burning [discussing *Black*] would need an element of intimidation to be considered a true threat, a true threat to injure a person can be criminalized without more).

In sum, even setting aside the physical threat imparted through references to "open game" and nooses, harassing phone calls and references to Judge Lefkow, White's internet postings were still intended to instill fear in the Mottleys that their property – including their private home and financial accounts – would be subjected to harm. This threat to property, standing alone,

32

constituted a true threat and, as such, it enjoys no constitutional protection. This concept has been validated in a case involving White himself.[36]

### D.   White Is Not Protected by His Pattern of Threatening Language.

The Magistrate Judge also took into account – and actually counted in White's favor – his pattern of misconduct on the internet, stating:

> Though White has directed the subject postings to vent his discontent with the subpoenas issued by Mottley, White has not merely singled out Mottley in the type of postings at issue. Instead, White appears to use the various internet websites and blogs to attack any group or individual who opposes White's cause or who support causes that conflict with White's viewpoint . . . he frequently launches similar attacks on others situated similarly to Mottley. Thus, White's method of communication is not uncommon behavior for him.

Appx. 589 (Mag. Op.). In other words, in the view of the Magistrate Judge (which again ignores the views of reasonable listeners), the more people White threatens, the more constitutional protection his threats receive. The law cannot be so perverse. And, indeed, it is not. The proper procedure is the one employed in *White*, where each of the respective recipient's cases were individually analyzed, resulting in a finding, for example, that White's threatening communications to both Petsche and the Tenants constituted communications that a reasonable listener would find to be true threats. The fact that White has threatened many does not diminish the true threat contained in his postings directed at Mottley.

---

[36]   In his Memorandum Opinion and Order of February 4, 2010, in *United States. v. White*, Judge Turk interpreted the Court's decision in *United States v. Gartmad*, 53 F.3d 329 (4th Cir. 1995) to mean that acts of intimidation and harassment do not require fear of physical harm, holding that, in the context of 18 U.S.C. §1512(b), an act of "intimidation [or harassment] does not require a threat made with the intent to place the victim in fear of physical harm or death." *United States v. White*, No. 7:08-CR-00054, 2010 U.S. Dist. LEXIS 9603, at *16 (W.D. Va. Feb. 4, 2010).

### E.   White Is Not Protected by the Fact that No Violence Occurred.

The Magistrate Judge also credited White with the fact that "there is nothing concrete by which the Court could conclude that White's postings have led to any acts of violence or harm to others." Appx 590 (Mag. Op.). This conclusion by the Magistrate Judge was also erroneous.

First, this conclusion ignores the harm to the judicial process which even the Magistrate Judge found to have taken place as a result of White's actions. It is undisputed that White's postings did disrupt and interfere with the representation provided by Tenant's counsel by forcing him, among other things, to spend considerable time making sure his family was protected.

Second, actual violence or other harm is not necessary in order for there to be a true threat. Indeed, it is not necessary that the person making the threat have any intention or ability to carry it out. *See Black*, 538 U.S. at 359-60 ("The speaker need not actually intend to carry out the threat."). Even under the *Brandenburg*[37] test, the only requirement is that the speaker use specific words advocating unlawful conduct. There is no requirement that the speaker have the specific intent to incite unlawful conduct. *See White*, 2012 U.S. App. LEXIS 4198, at *24. Similarly, "a true threat ... can be criminalized without more. *Id.*

### F.   White Is Not Protected by His Later, More Muted Postings.

The Magistrate Judge was also somehow impressed by the fact that "the tenor and threatening nature of White's Postings have diminished over the past several months since his initial posting on February 22, 2008." Appx. 529 (Mag. Op.); *see also* Appx. 595-96 (Mag. Op.). Perhaps they did diminish, although the February 28, 2008, posting directly to Mottley

---

[37]   *Bradenburg v. Ohio*, 344 U.S. 944 (1969).

showed no such signs. After all, the initial postings already achieved much of their desired effect by letting Mottley know that he had become a marked man among white supremacists and by terrifying Mottley and his family.[38]  Besides, once White was hauled into court on a motion for sanctions, it naturally became part of White's defense to improve – or make others perceive that his conduct had improved – at least for the time being.  But none of this *subsequent* conduct has any bearing whether the postings in question constituted true threats *at the time they were made*. Put another way, taking into account White's later postings is problematic and inconsistent with any analysis of a "true threat" because it makes the evidence under consideration a moving target. Such an approach is contrary to and unsupported by any case law.

Nonetheless, if White is allowed the benefit of his later, more muted postings, he also must be required to bear the burden of incendiary messages sent after the Magistrate Judge issued his opinion.  For example, on August 16, 2008, White posted yet another missive regarding Mottley and his wife. This time, White suggested that "Civil Rights Attorney Kevin Mottley and his wife would star perfectly in the role of the 'family'" in *Funny Games*, a movie about two psychotic young men who take a family hostage in their vacation home and subject them to horrible torture.  White then goes on to ask his followers: "Anyone think I'm off base on that?"  *See* Appx. 642, 644-47 (August 16, 2008 posting regarding Mottley and his wife and description of *Funny Games*).

This additional posting was called to the attention of this Court when Tenants objected to the decision of the Magistrate Judge, but it was not addressed when the Magistrate Judge's decision was affirmed.  Appx. 621.

---

[38]     Including the concern of his neighbors, his firm, and Henrico police.

### G. White Is Not Protected by the Fact that Internet Readers Are Anonymous and Their Numbers Unknown.

The Magistrate Judge also thought it was helpful to White's case that "there is little evidence before the Court as to the identity and actual number of persons actually reading these postings." Appx. 590 (Mag. Op.). This finding of course ignores the fact that we know one person who read the postings: Kevin Mottley, to whom the February 28 posting was directed. And it is Mottley's understanding of the postings that matters under the "reasonable listener" test. It also ignores the fact that White's two tirades on February 22 came only after White, based on the Motion for Contempt that Mottley filed on February 19, realized that Mottley was monitoring White's postings. Directly addressing the Magistrate Judge's finding, not knowing everyone who reads postings is almost always the case when something is posted on the internet. The potential audience of an internet posting is virtually the entire world, but the actual audience is almost impossible to determine. Unless the internet is to be turned into a free-fire zone for threats, the supposed lack of evidence as to "the identity and actual number of persons actually reading these postings" is entirely irrelevant.

Some facts are known about the audience, however, and these facts, though important, were ignored by the Magistrate Judge. This is not a case where the postings in question appeared on a website generally devoted to innocuous topics. These postings were placed on Vanguard, a website carrying extreme, often violent, white supremacist rhetoric. This was a website where postings were likely to be read by the subset of internet users most likely to be motivated to seek out messages of this sort and to take action against Mottley.[39] Moreover, White admitted that he

---

[39] This is true even accepting White's recent assertion in his Motion to Dismiss and for Contempt that one of his followers read his postings and was motivated, either by the FBI (according to White) or by the posting, to harass Mottley and his wife by late night phone calls.

had members and supporters of the ANSWP in Richmond and the surrounding areas. Appx. 184 (Tr. Apr. 2, 2008). These persons would have been, and were, part of the intended audience of White's postings to the Vanguard website.

By posting his messages on the Vanguard website, a website frequented by white supremacists – including some whom White knew were located near Mottley's home – White made his message *more* menacing, not less so, especially when applying the reasonable listener standard. The Magistrate Judge's suggestion to the contrary is flawed and without merit. *See* Appx. 594 (Mag. Op.).

### H.   The Magistrate Judge Misapplied the *Brandenburg* Test.

The Magistrate Judge next excused White on the theory that sanctioning him would run afoul of *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). The Magistrate Judge read *Brandenburg* for the proposition that "advocacy of violence [is] protected by [the] First Amendment unless directed to inciting or producing imminent lawless action and [must be] likely to incite or produce such action." Appx. 593 (Mag. Op. (citing 395 U.S. at 447)). But the speech at issue in *Brandenburg* advocated the overthrow of the government, not harm against a specific individual.

In *Brandenburg*, the issue involved calls by the Ku Klux Klan, at a rally that vilified blacks and Jews in general, for members of these ethnic groups to be returned to Africa and Israel respectively. The Court, reaffirming its holding in *Noto v. United States*, 367 U.S. 290 (1961), held that "the mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action." 395 U.S. at 448. Advocacy of violent means for political or economic change is protected, except where such advocacy is "directed to inciting or producing

imminent lawless action and is likely to incite or produce such action." *Id.* But this does not mean that advocating violence against specifically-named individuals is protected. Nor can any concept of "political speech" begin to be applied when the threat is sent directly to the named individual as it was in Mottley's instance.

Under the Magistrate Judge's misplaced analysis, it would be perfectly lawful to encourage others to kill a specific lawyer – or, perhaps, even a specific legislator, executive or judge – so long as the encouragement is qualified by some phrase that would make the proposed murder appear less than "imminent." While *Brandenburg* may protect much incendiary political rhetoric, it does not figure into the analysis whether comments about a specific individual constitute a true threat and it certainly does not figure into any analysis of threats directly communicated to an individual.[40]

## I.     The Magistrate Judge Relied on a False Analogy with *Watts.*

The Magistrate Judge also noted that White gave "instruction to his readers that nothing was to occur [to Mottley] until after the subpoena litigation had concluded." Appx. 593 (Mag. Op.).[41] According to the Magistrate Judge, "[t]his is not unlike the speech made in *Watts*, which was expressly conditional on a specific event – the speaker's being drafted into the military. . . ."

---

[40]     Even if *Brandenburg* applied to White's statements, the *Brandenburg* standard is satisfied. Although the Magistrate Judge found that there was no evidence of any connection between the internet postings and the late-night phone calls at the Mottleys' house, this finding ignored the strong circumstantial evidence that the calls took place within hours after the subpoena litigation was to have been resolved, and the fact that the callers referred to Mottley's wife as "Pat" and "Patricia" (when everyone who knows her knows that she goes by another name). To ignore the link between the postings and the calls requires willful blindness by the Court.

[41]     Again the Magistrate Judge's conclusions are inexplicable when remembering that he effectively rejected any reliance on White's use of the "do not" phrase. Appx. 557.

*Id.* If the speech in *Watts* was not a true threat, the Magistrate Judge reasoned, then neither was the speech at issue here.

There is, of course, a big difference between potentially being drafted into the military and the subpoena litigation's ending. The former may *never* occur; the latter was certain to occur – and quite soon, within the week. Accepting the words "do not" at face value (though, as previously explained, this is an inappropriate assumption), by telling his readers that the end of the subpoena litigation would make Mottley and his family "open game," White was signaling to his followers precisely when he wanted the harm of Mottley to begin. Given the scheduled February 28 hearing date, it was to be less than a week from his posting. This is a true threat, not a speculative rhetorical statement.

## J. The Effect on the Underlying Litigation Is Irrelevant to Determining Whether White's Internet Posting Is a True Threat.

Finally, the Magistrate Judge takes comfort in the fact that "despite White's actions, there was ultimately no measurable impact on the underlying litigation." Appx. 597-98 (Mag. Op.). The degree of harm caused by White – both to the underlying litigation and to Mottley's family – may very well affect the measure of sanctions imposed on White: the greater the harm experienced, the greater the sanctions should be. But the degree of subsequent harm cannot possibly affect whether the posting was a true threat. For example, a true threat made against the President does not somehow acquire constitutional protection if he never hears of it and it never disrupts his schedule. Even if the underlying litigation turned out just as it would, had there been no internet posting, that result was obtained only after substantial disruption of counsel's schedule, only after substantial diversion from Tenants' case and only after substantial measures were taken to protect counsel and his family. Such disruptions of the judicial process should not have been ignored.

2134537v4

In short, the Magistrate Judge's analysis of the true threat issue was absolutely flawed. White's internet posting constituted a true threat and, as such, merited no constitutional protection whatsoever.

### III.   THE MAGISTRATE JUDGE ERRED BY RULING THAT BAD FAITH INTERFERENCE WITH COUNSEL CANNOT BE SANCTIONED UNLESS IT IS A "TRUE THREAT."

The Magistrate Judge had no trouble recognizing that White's internet campaign against Motley constituted "bad-faith conduct . . . designed to interfere with counsel's representation of [Tenants]" in their Fair Housing Act case.  Appx. 563 (Mag. Op.).  Even so, the Magistrate Judge failed to sanction White based on a mistaken belief that the Court lacked authority to do so.  Because White's conduct was aimed only at one of the lawyers – and did not involve "violations of any court order" or "disrespectful conduct or comments directed to the Court" – the Magistrate Judge felt that there was nothing it could do unless the conduct at issue constituted a "true threat."  As the Magistrate Judge explained its logic:

> The Court can only in these circumstances exercise its inherent authority if the non-party's actions directed to counsel in the underlying litigation amounted to a "true threat" as that term has been defined under precedents established by the Supreme Court and as interpreted and applied by the Fourth Circuit.

Appx. 564 (Mag. Op.).

The Magistrate Judge was mistaken.  Counsel of record is an officer of the court.  And, when an individual deliberately interferes with the judicial process by harassing and abusing counsel of record – or any other court personnel – the court has inherent authority to sanction the offender regardless of whether his actions constitute a "true threat."[42]  By reducing the issue of sanctions to whether a true threat occurred, the Magistrate Judge again erred.

---

[42]    This issue is also discussed *supra* at 26.

As the Supreme Court has explained, there are some categories of speech that are, with rare exception, wholly outside the protections of the First Amendment. True threats are one such category.[43] But to say that speech lies *within* the protections of the First Amendment is not to say that those protections are absolute. In order for government to regulate speech based on its content, the regulation must survive *strict scrutiny*. Though this is a very demanding test, it is by no means impossible to satisfy. The regulation at issue – here, a court-imposed sanction – must serve a compelling government interest and be narrowly tailored to promote that interest. *See Seattle Times v. Rhinehart*, 467 U.S. 20, 32 (1984) (speech may be regulated if the "practice in question furthers an important or substantial governmental interest unrelated to the suppression of expression and [if] the limitation of First Amendment freedoms is no greater than is necessary or essential to the protection of the particular governmental interest involved").[44]

The Magistrate Judge erred because he never even employed strict scrutiny and, thus, ended his constitutional analysis prematurely. Having not conducted a proper analysis under strict scrutiny, the Magistrate Judge mistakenly felt that his hands were tied and that no sanction could be imposed. This is reversible error, in and of itself. Moreover, when an appropriate

---

[43]     Among other examples are obscenity and fighting words. *See generally R.A.V. v. St. Paul*, 505 U.S. 377 (1992).

[44]     This is black letter law. "[A] content-based speech restriction . . . can stand only if it satisfies strict scrutiny. If a statute regulates speech based on its content, it must be narrowly tailored to promote a compelling Government interest." *United States v. Playboy Entm't Group*, 529 U.S. 803, 813 (2000) (citing *Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). *Accord Fed. Election Com. v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 265 (1986) ("Where at all possible, government must curtail speech only to the degree necessary to meet the particular problem at hand, and must avoid infringing on speech that does not pose the danger that has prompted regulation."); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) ("For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.").

41

analysis is conducted, it is clear that the sanctions sought by Tenants easily satisfy strict scrutiny because they serve a compelling government interest and are narrowly tailored.

At least two compelling government interests are at stake here.   First, there is a compelling government interest in ensuring that civil rights litigants, their attorneys, and others who assist them, are able to access the courts and pursue their claims without being subjected to bad-faith conduct designed to interfere with the lawful pursuit of civil rights.   Congress recognized this interest in the Fair Housing Act itself, which makes it "unlawful to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted by [the Fair Housing Act]." 42 U.S.C. § 3617.[45]

Second, there is a compelling government interest in preserving the integrity of judicial proceedings, including "the orderly and expeditious disposition of cases." *Chambers*, 501 U.S. at 44.  This naturally includes a federal court's interest in having officers of the court – including counsel of record – shielded from bad faith efforts to intimidate them and also allows clients the full ambit of their attorney's obligation of zealous advocacy.  The court's interest is especially acute when, as here, counsel is attacked for having issued subpoenas, a vital role traditionally exercised by the court's clerical personnel. *See* Fed. R. Civ. P. 45(a)(3) ("An attorney also may

---

[45]     *See also* 47 U.S.C. § 223 (prohibiting, *inter alia*, the use of a computer for purposes of harassment), and 18 U.S.C. § 119 (prohibiting, *inter alia*, the disclosure of personal information regarding an officer of the court with the intent to threaten, intimidate or incite violence against that officer).  White violated both of these statutes with his postings on the Vanguard website, as well as 42 U.S.C. § 3617, the very statute that a jury found was violated as to the Tenants' exercise of their rights. *See* n. 5, *supra*.

issue and sign a subpoena *as an officer of . . . a court* in which the attorney is authorized to practice") (emphasis added).

The narrow tailoring prong of strict scrutiny also is satisfied. This is so because the sanctions sought by Tenants would be imposed on White based on an individualized determination that, as recognized by the Magistrate Judge, he had engaged in bad faith acts designed to interfere with the two compelling interests at stake here: *i.e.,* access to courts for civil rights litigation and integrity of judicial proceedings. The Magistrate Judge has, of course, already made the determination of White's bad faith. Appx. 562 (Mag. Op.). He simply failed to recognize that such an individualized determination – coupled with the compelling nature of the interests at stake – allowed the imposition of sanctions even if White's internet campaign against Mottley did not rise to the level of a true threat.

In refusing to sanction White, the Magistrate Judge apparently believed he was following *United States v. Carmichael*, 326 F. Supp. 2d 1267 (M.D. Ala. 2004), a case he described as "particularly compelling in the instant analysis." Appx. 580-588 (Mag. Op.). The Magistrate Judge, however, misread *Carmichael*. It is true that, in *Carmichael*, no sanctions were imposed; however, unlike the Magistrate Judge here, the *Carmichael* court did not stop with its conclusion that the speech at issue was not a true threat. Instead, the *Carmichael* court sought to "strike a balance." *Carmichael*, 326 F. Supp. 2d at 1292. "The fact that Carmichael's website is protected speech does not end the Court's First Amendment inquiry. Under some circumstances, First Amendment rights must give way during a criminal proceeding in order to preserve a fair trial." *Id.* at 1290.

While the case at bar is not criminal in nature, it nevertheless involves very important legal issues: the right to live in housing free from racial discrimination. Moreover, unlike the

case in *Carmichael*, the internet postings at issue here were not related to any attempt to gather evidence in order to prepare a defense against legal proceedings. Thus, White's undefined constitutional interests – whatever they may be – do not weigh heavily in the balance as did the interests of the defendant in *Carmichael*.

By injecting himself into the underlying litigation with his hate mail – and by being subjected to subpoenas – White was not just a member of the public at large. Albeit not a party, he was a participant in the litigation and, as such, his speech was, at a minimum, subject to the balancing test used in *Carmichael*. Under strict scrutiny analysis, White's right to make internet postings is outweighed by the right of the Tenants to pursue their civil rights claims without disruption and by need for courts to conduct their business without disruption. In fact, the very idea that White could divert so drastically – with bad faith and intent to disrupt – the judicial process, and do so with impunity because of a finding that he did not engage in "true threats," demonstrates the need for the Court to carry out a full analysis whether punishment of White for these postings can pass strict scrutiny under the First Amendment. By his failure to conduct any such analysis, the Magistrate Judge plainly erred.

## CONCLUSION

The Magistrate Judge began his analysis with the comment that "the receipt of threats or suggestions of retaliation" is, these days, just an "unfortunate reality" of litigation. Appx. 580 (Mag. Op.). With all due respect to the Magistrate Judge, it may be commonplace in some third-world countries for attorneys, court officers and judges to receive threats and to fear retaliation against themselves and their families, but it ought not to be commonplace in this Commonwealth, in this District, in this Circuit or in the United States of America. Respectfully, this Court has a duty to protect its judges, officers and the attorneys whose everyday work is a

necessary component of upholding the "rule of law." White employed extrajudicial methods –

acting outside the rule of law – in an attempt to disrupt the judicial process. He, under any

reasonable analysis, leveled "true threats" about and directly against the Tenant's counsel, Kevin

Mottley. This is the sort of "defil[ing]" of the "temple of justice" against which the Court's

authority is meant to be exercised. *Chambers*, 501 U.S. at 46. The Magistrate Judge should

have exercised this authority. His failure to do so was erroneous and should be reversed.

Respectfully submitted,


By: ____/s/ Stephen C. Piepgrass____


Anthony F. Troy (VSB No. 05985)
  tony.troy@troutmansanders.com
William H. Hurd (VSB No. 16769)
  william.hurd@troutmansanders.com
Stephen C. Piepgrass (VSB No. 71361)
  stephen.piepgrass@troutmansanders.com
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, VA 23219
Telephone: (804) 697-1200
Facsimile: (804) 698-5162

2134537v4

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of April 2012, I will electronically file the

foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification

of electronic filing (NEF) to the following users:

### Counsel for the United States
Lori K. Wagner (VSB No. 39446)
Trial Attorney
Attorney for the United States of America
United States Department of Justice
Civil Rights Division
Housing & Civil Enforcement Section – NWB
950 Pennsylvania Ave, NW
Washington, D.C. 20530
E-mail: lori.wagner@usdoj.gov

Susan L. Watt (VSB No. 17733)
Supervisory Ass't, United States Attorney
Attorney for the United States of America
United States Attorney's Office
8000 World Trade Center
101 West Main Street
Norfolk, Virginia 23510
susan.watt@usdoj.gov

### Counsel for Defendant
Barry Randolph Koch
Inman & Strickler PLC
575 Lynnhaven Pkwy, Suite 200
Virginia Beach, VA 23452
(757) 486-7055
bkoch@inmanstrickler.com

And I will send the foregoing by U.S. Mail to:

### William A. White
P. O. Box 8631
Roanoke, VA 24014

2134537v4

_____/s/ Stephen C. Piepgrass_____
Stephen C. Piepgrass (VSB No. 71361)
Counsel for Intervening Plaintiffs
TROUTMAN SANDERS LLP
P.O. Box 1122
Richmond, Virginia 23218-1122
Telephone:  804-697-1320
Fax:  804-698-5147
stephen.piepgrass@troutmansanders.com

2134537v4

2134537v4