# EXHIBIT A

In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 11-2150 & 11-2209

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*
*Cross-Appellee,*

*v.*

WILLIAM WHITE,

*Defendant-Appellee,*
*Cross-Appellant.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:08-cr-00851-1—**Lynn Adelman**, *Judge.*

ARGUED JUNE 8, 2012—DECIDED OCTOBER 26, 2012

Before POSNER, FLAUM, and WILLIAMS, *Circuit Judges.*

PER CURIAM. William White was charged with soliciting the commission of a violent federal crime against a juror in violation of 18 U.S.C. § 373. The alleged solicitations at issue were messages that White posted to a website that he created to advance white supremacy, which included White's 2005 statement that "[e]veryone associated with the Matt Hale trial has deserved assas-

sination for a long time," and his 2008 publication of information related to the foreperson, "Juror A," of the jury that convicted Hale. The 2008 post disclosed Juror A's home address and mobile, home, and work phone numbers, though it did not contain an explicit request for Juror A to be harmed.

White was tried and convicted by a jury. White then filed a Rule 29 motion for entry of a judgment of acquittal, arguing that the evidence was insufficient to convict him of solicitation. The district court granted the motion, finding that the government failed to present sufficient evidence for a reasonable juror to conclude that White was guilty of criminal solicitation, and that White's speech was protected by the First Amendment. The government appeals that ruling, and White has filed a cross-appeal urging a new trial if we reverse the judgment of acquittal. After reviewing the trial record, we conclude that a rational jury could have found beyond a reasonable doubt that, based on the contents of the website, its readership, and other contextual factors, White intentionally solicited a violent crime against Juror A by posting Juror A's personal information on his website. Criminal solicitation is not protected by the First Amendment, and so we reverse White's acquittal and reinstate his conviction. Also, because White is not entitled to a new trial, we remand for sentencing.

## I. BACKGROUND

To best understand the facts of this case it is helpful to have some basic familiarity with another case involving Matthew Hale, a white supremacist convicted

of solicitation under 18 U.S.C. § 373. *See United States v. Hale*, 448 F.3d 971 (7th Cir. 2006) (per curiam).

The defendant in that case led a white supremacist organization known as the World Church of the Creator ("World Church"). A religious organization operating under the name "Church of the Creator" sued World Church for trademark infringement in federal court. Both parties moved for summary judgment and Judge Joan Lefkow granted the motion of Hale's organization, World Church. But we reversed and remanded for judgment to be entered in favor of Church of the Creator. After Judge Lefkow abided by our instructions, Hale informed his followers that they were "in a state of war with this federal judge." *Id.* at 978. He then sent an email to Tony Evola, a cooperating witness who had infiltrated World Church, requesting the home address of Judge Lefkow. One day later, Evola and Hale met. Evola asked Hale if they were "gonna exterminate the rat." Hale answered, "I'm gonna fight within the law" but "that information's been . . . provided" so "[i]f you wish" to "do anything yourself, you can, you know?" Evola responded, "Consider it done," to which Hale replied, "Good." *Id.* at 979. A jury convicted Hale for, among other things, criminally soliciting harm to Judge Lefkow, and he received a sentence of 40 years in prison. *Id.* at 982. The foreperson of that jury was "Juror A," the target of the alleged solicitation in this case.

William White is an avid supporter of Matthew Hale. An active white supremacist, White created and served as editor of a website, Overthrow.com, which sought to advance that cause. On February 28, 2005, only hours

after Judge Lefkow's husband and mother were tragically murdered,[1] White applauded the crimes on his website. He wrote, "Everyone associated with the Matt Hale trial has deserved assassination for a long time . . . . In my view, it was clearly just, and I look forward to seeing who else this new white nationalist group of assassins kills next." Not long afterward, in March 2005, White described an email, circulating on the internet, that contained the personal identification information of the FBI agents and prosecutors ("scumbags") who investigated and prosecuted Hale. White noted that they might be the "next targets of the unknown nationalist assassin who killed the family of Chicago Judge Joan Lefkow." He explained on his website that he would not disclose the agents' and prosecutors' personal information, however, because there was "so great a potential for action linked to such posting."

On February 13, 2007, White published on his website the address of Elie Wiesel, an internationally known Holocaust survivor, "In Case Anyone Was Looking For Him." White praised Eric Hunt, "a fan of [the] website," as a "loyal soldier" for attacking Wiesel a few days earlier, on February 1. White presented similar information about six black teenagers in Jena, Louisiana in September 2007, suggesting that they be "lynch[ed]" for their involvement in a schoolyard fight that garnered national attention due to its racial overtones. He continued this trend in 2008 by posting the personal information of individ-

---

[1] Neither Hale nor White (nor anyone connected to either of them) was responsible for the murders.

uals whom he labeled "anti-racist" or "enemies" of white supremacy. One such post, "Kill Richard Warman," advocated the murder of a noted Canadian civil rights lawyer. That particular message could be accessed from any page on the website because it could be retrieved using a hyperlink located in a static column of the site, called "Top Articles." Another post—"Kill This Nigger?"—contained images of and articles about then-presidential candidate Barack Obama. One article displayed a photograph of the presidential candidate with swastika-shaped crosshairs superimposed over his face,[2] and stated that "White people must deny [Barack Obama] the presidency . . . by any means necessary."

Those postings, however, were mere prelude to the conduct that got White indicted for criminal solicitation. On September 11, 2008, White authored a post titled, "The Juror Who Convicted Matt Hale." In it, he disclosed personal, identifying information about Juror A. The post read:

> Gay anti-racist [Juror A] was a juror who played a key role in convicting Matt Hale. Born [date], [he/she] lives at [address] with [his/her] gay black lover and [his/her] cat [name]. [His/Her]

---

[2] White moved in limine to prevent these posts from reaching the jury, but the district court denied his request because the posts evidenced White's intent, or were direct evidence of the "strongly corroborative circumstances" required under § 373, or both.

phone number is [phone number], cell phone [phone number], and [his/her] office is [phone number].

The post further stated that the "gay Jewish [Juror A], who has a gay black lover and ties to professional anti-racist groups, and who also personally knew [an individual] killed by Ben Smith, a follower of Hale, was allowed to sit on his jury without challenge and played a leading role in inciting both the conviction and harsh sentence that followed." The entry featured a color photograph of Juror A.

One day later, White uploaded an identical message to a different portion of the website. The post carried the title: "[Juror A] Updated-Since They Blocked the first photo." Apparently, Juror A's employer had blocked public access to the page on its website that contained information about Juror A and the color photograph of the juror that appeared in White's first post. White's second post stated, "Note that [Employer] blocked much of [Juror A's] information after we linked to [his/her] photograph." The photograph of Juror A that appeared was embedded in the Overthrow server so that only White could remove it.

On October 22, 2008, a grand jury indicted White for soliciting the commission of a violent federal offense against Juror A in violation of 18 U.S.C. § 373. The indictment charged that White had "solicited and otherwise endeavored to persuade another person to injure Juror A on account of a verdict assented to by Juror A, in violation of Title 18, United States Code 1503." *See also*

18 U.S.C. § 1503 (outlawing injuring or threatening to injure a federal juror). A grand jury returned a superseding indictment against White on February 10, 2009. White moved to dismiss the indictment, and the district court granted his motion after finding that White's internet postings were protected speech and that the indictment failed to sufficiently allege "corroborating circumstances" of White's criminal intent.

The government appealed. We reversed because the indictment was facially valid and White's First Amendment rights were protected by the government's burden to prove beyond a reasonable doubt that White had the requisite intent for criminal solicitation. *United States v. White*, 610 F.3d 956, 961 (7th Cir. 2010) (per curiam). As we explained:

> The government informed us at oral argument that it has further evidence of the website's readership, audience, and the relationship between White and his followers which will show the posting was a specific request to White's followers, who understood that request and were capable and willing to act on it. This evidence is not laid out in the indictment and does not need to be. The existence of strongly corroborating circumstances evincing White's intent is a jury question. . . . The government has the burden to prove, beyond a reasonable doubt, that White intended, through his posting of Juror A's personal information, to request someone else to harm Juror A. After the prosecution presents its

case, the court may decide that a reasonable juror could not conclude that White's intent was for harm to befall Juror A, and not merely electronic or verbal harassment.

*Id.* at 962 (internal citations omitted).

On remand, White was tried before an anonymous jury. The government offered as evidence the postings made by White that we described above. The government also called several witnesses. FBI Special Agent Paul Messing testified that he installed highly sophisticated computer software on the computer and server that agents seized from White. The software allowed the FBI to search for specific articles and words that White personally posted on the Overthrow website. Officer John Dziedzic explained that an internet user who visited the Overthrow website before the site had been disabled could have seen all of White's postings.

The government also presented the testimony of Juror A. That testimony established that at approximately 9:30 a.m. on September 11, 2008, Juror A received a phone call from a telephone registered to White's wife. The male caller asked Juror A to confirm Juror A's name, date of birth, address, and service on the jury that convicted Hale. The caller did not, however, threaten Juror A. Less than thirty minutes after the call was disconnected, White posted Juror A's personal information on Overthrow. Juror A almost immediately began receiving harassing text messages. The messages conveyed things like "sodomize Obama," "Bomb China," "kill McCain," and "cremate[] Jews." Juror A testified that these mes-

Nos. 11-2150 & 11-2209                              9

sages were "all . . . really upsetting." Juror A reported receiving text messages of the same nature for the next few days. Juror A was not personally threatened, stalked, or physically harmed after White's initial post.

FBI Special Agent Maureen Mazzola also testified at trial. She described what an internet user who viewed the Overthrow website on September 11, 2008 would have seen. According to her, on that day the site's visitors would have immediately been directed to the post about Juror A. They would not have been able to see White's other posts unless they accessed them via hyperlink or viewed other portions of the website. According to Agent Mazzola, a user would have "to be either looking for it or reading every single article on the website" to access White's other posts.

The last two witnesses the government called to testify were Phil Anderson and Michael Burks. Both were former members of the American National Socialist Workers Party ("ANSWP"), a white supremacist organization that White organized and directed. After his home was searched and his computer seized, White asked Anderson to reach out to other white supremacists to find out if they were aware of any plans to harm Juror A. White expressed concern that "someone may be trying to do something" to Juror A. Anderson reported back that his associates had not seen the Juror A post and were not aware of any plans to harm Juror A.

On October 29, 2008, White was arrested. After his arrest, he sent letters to both Anderson and Burks. White requested that Anderson testify regarding "the fact that

you have never done anything criminal, and do not interpret articles on Overthrow.com as criminal instructions." And White asked Burks to testify about ANSWP's "rejection of criminal activity and violent crime," and thanked him for his support. At trial, both Anderson and Burks maintained that White never instructed them to commit criminal acts and they never interpreted anything he posted on Overthrow as instructions to harm Juror A in particular.

Burks, however, acknowledged that some violent white supremacists—of whom White had knowledge and approved—might have looked to Overthrow for criminal instructions. He cited the Richard Warman post as an example. According to Burks, in addition to authoring that post, White disclosed Warman's information during a radio show and stated at that time that "this bastard has lived way too long. If somebody wants to kill him, here's his address." Burks testified that White repeated this sentiment "two or three times," and White "really didn't care if something did happen." Burks interpreted the Warman, Wiesel, and Jena Six posts as requests that people go out and do violent things. But he expressly denied ever seeing anything on Overthrow or hearing anything from White that he understood as a call to harm Juror A.

At the close of the evidence, the district court instructed the jury that the government must prove the following elements beyond a reasonable doubt:

> First, that the defendant solicited, commanded, induced, or otherwise endeavored to persuade another person to carry out a violent federal crime.

Nos. 11-2150 & 11-2209                                    11

> Second, with strongly corroborative circum-
> stances, that the defendant intended for another
> person to commit a violent federal crime.

The court also crafted a First Amendment instruction,
which combined two of White's six proposed First Amend-
ment instructions. The court explained:

> The First Amendment protects vehement,
> scathing, and offensive criticism of others; how-
> ever, a solicitation, command, inducement, or
> endeavor to persuade another to engage in con-
> duct constituting a violent felony as defined in
> these instructions is not protected by the First
> Amendment.

> If the purpose of the speaker or the tendency of his
> words are directed to ideas or consequences re-
> mote from the commission of the criminal act,
> then the speech is protected by the First Amend-
> ment.

> Speech is protected unless both the intent of the
> speaker . . . and the tendency of his words was
> to produce or incite an imminent lawless act.

> An imminent lawless act is one that is likely to
> occur.

> A statement which is mere political hyperbole
> or an expression of opinion does not constitute
> a solicitation.

> If you find that the defendant's statements were
> no more than an indignant or extreme method of

> stating political opposition to the juror in
> the Matthew Hale case, then you are justified in
> finding that no solicitation was, in fact, made
> and you may find the defendant not guilty.

The jury convicted White of soliciting a violent federal
crime against Juror A. White filed a post-trial motion
for judgment of acquittal, requesting in the alternative
a new trial. The district court ruled that the government
failed to present sufficient evidence to sustain White's
conviction. The court found that White's posts were
not objective solicitations and nothing on the website
"transformed" them into solicitous instructions. Addi-
tionally, the court found that the government failed to
present adequate evidence of section 373's "strongly
corroborative" circumstances, which is necessary under
the statute to prove intent. Finally, the court held that
because the government did not prove White's criminal
intent beyond a reasonable doubt, White's posts were
protected speech under the First Amendment. The
district court granted White's Rule 29 motion and condi-
tionally denied his request for a new trial. Both the gov-
ernment and White appeal.

## II. ANALYSIS

Subsection (a) of 18 U.S.C. § 373 states, in relevant part,
that:

> Whoever, with intent that another person engage
> in conduct constituting a felony that has as an
> element the use, attempted use, or threatened use
> of physical force against property or against the

> person of another in violation of the laws of the
> United States, and under circumstances strongly
> corroborative of that intent, solicits, commands,
> induces, or otherwise endeavors to persuade
> such other person to engage in such conduct,
> shall be imprisoned . . . .

The underlying felony White allegedly solicited was
harm to Juror A, which is prohibited by 18 U.S.C. § 1503
("Whoever . . . by threats or force . . . endeavors to influ-
ence, intimidate, or impede any grand or petit juror . . . or
injures any such grand or petit juror . . . on account of any
verdict or indictment assented to by him, or on account
of his being or having been such juror . . . shall be
punished . . . ."). So to convict White of solicitation, the
government had to prove beyond a reasonable doubt:
(1) with "strongly corroborative" circumstances that
White intended for another person to harm Juror A; and
(2) that White solicited, commanded, induced, or other-
wise tried to persuade the other person to carry out that
crime. 18 U.S.C. § 373(a); *see also Hale*, 448 F.3d at 982
("[T]he government had to establish (1) with 'strongly
corroborative circumstances' that Hale intended for
Tony Evola to arrange the murder of Judge Lefkow; and
(2) that Hale solicited, commanded, induced, or otherwise
tried to persuade Evola to carry out the crime.").

## A. The District Court's Judgment of Acquittal Must Be Reversed Because a Reasonable Jury Could Have Convicted White of Criminal Solicitation

A judgment of acquittal must be granted when "the
evidence is insufficient to sustain a conviction." Fed. R.

Crim. P. 29(a). Our review is *de novo*. *United States v. Presbitero*, 569 F.3d 691, 704 (7th Cir. 2009). Our job, however, is not to "reweigh the evidence nor second-guess the jury's credibility determinations." *United States v. Tavarez*, 626 F.3d 902, 906 (7th Cir. 2010). Rather, we view the evidence in the light most favorable to the government and ask whether *any* rational jury could have found the essential elements of the charged crime beyond a reasonable doubt. *Presbitero*, 569 F.3d at 704. "We will set aside a jury's guilty verdict only if 'the record contains no evidence, regardless of how it is weighed,' from which a jury could have returned a conviction." *Id.* (quoting *United States v. Moses,* 513 F.3d 727, 733 (7th Cir. 2008)). But the defendant "bears a heavy burden on appeal, as he must demonstrate that no rational trier of fact could decide beyond a reasonable doubt" that he committed the offense charged. *See United States v. Cervante,* 958 F.2d 175, 178 (7th Cir. 1992).

We begin our analysis with our instructions to the district court on remand: "After the prosecution presents its case, the court may decide that a reasonable juror could not conclude that White's intent was for harm to befall Juror A, and not merely electronic or verbal harassment." *White,* 610 F.3d at 962. The government bore not only the burden of proving White's intentional solicitation, but it also had to prove beyond a reasonable doubt the objective of that solicitation: harm or the threat of harm to Juror A, not mere electronic or verbal harassment. *Id.*; *cf. United States v. Rahman*, 34 F.3d 1331, 1337 (7th Cir. 1994) (requiring the government to show with "strongly corroborative" circumstances that the defendant "intended for [the solicitee] to *extort*

*and rob* [the victim] of $60,000," and that the defendant "solicited, commanded, induced, or otherwise tried to persuade [the solicitee] to carry out the *extortion and robbery*." (emphasis added)).

A reasonable jury could have found that the government met this burden. Whether White's post was a criminal solicitation depended on context, and the government provided ample evidence of such context from which a rational jury could have concluded that the post was an invitation for others to harm Juror A, though fortunately no one accepted the invitation. The post attributed to Juror A characteristics intended to make the target loathed by readers of White's neo-Nazi website: a Jew, a homosexual with a black lover, and above all the foreman of the jury that had convicted Overthrow.com's hero, Matthew Hale—an anti-Semitic white supremacist—of soliciting the murder of a federal judge. And whereas White previously refrained from "republish[ing] the personal information" of others involved in the Hale trial because, as White acknowledged, "there [was] so great a potential for action linked to such posting," White expressly published Juror A's personal information, including Juror A's photograph, home address, and telephone numbers.

The post has a context created by previous posts on the website that had solicited the murder of Barack Obama, Richard Warman (a Canadian civil rights lawyer and the bane of hate groups), Elie Wiesel, and six black teenagers known as the "Jena 6." Other posts had congratulated murderers or urged the murder of enemies

defined in terms that would embrace Juror A. All that was missing was an explicit solicitation to murder Juror A. But the description summarized above would have made Juror A seem to loyal readers of Overthrow.com as being at least as worthy of assassination as Richard Warman, who had been described in a post, published only a few months before the Juror A post, as "Richard, the sometimes Jewish, sometimes not, attorney behind the abuses of Canada's Human Rights Tribunal," who "should be drug out into the street and shot, after appropriate trial by a revolutionary tribunal of Canada's white activists. It won't be hard to do, he can be found, easily, at his home, at [address]." And Juror A could be found at home just as easily because White posted Juror A's personal contact information along with the denunciation.

The "abuses" of the Canadian Human Rights Tribunal had been left unspecified in the denunciation of Warman, whereas Juror A was identified as instrumental in the conviction of the hero Hale: If "all [Juror A] was . . . was another anonymous voice in a dirty Jewish mob, screaming for blood and for the further impoverishment of the white worker . . . [he/she] would hardly be of note. But [Juror A] is something more. [He/She] was not only a juror at the nationally publicized trial of Matt Hale, but the jury foreman, and the architect of both Hale's conviction and his extreme and lengthy 40-year sentence." If Warman should be killed, then *a fortiori* Juror A should be killed, or at least injured. White didn't have to *say* harm Juror A. All he had to do and did do to invite violence was to sketch the characteristics

Nos. 11-2150 & 11-2209                                        17

that made Juror A a mortal enemy of White's neo-Nazi movement and to publish Juror A's personal contact information.

The fact that White made an effort to discourage assassination attempts against Juror A when law enforcement moved against his website shows at a minimum that he knew he was playing with fire. But a reasonable jury could have also interpreted such evidence as intent to solicit violence against Juror A followed by a change of mind when he realized that if someone harmed Juror A he could get in trouble. There was enough evidence of White's intent to solicit the murder of, or other physical violence against, Juror A, to justify a reasonable jury in convicting him.

It's true that the posts that establish the context that makes the solicitation to violence unmistakable were not links to the posts on Overthrow.com about Juror A. That is, they were not words or phrases in blue in the posts that if clicked on by the reader would appear on the reader's computer screen. Some of the explicit solicitations to murder had been published on Overthrow.com months, even years, earlier, though others were recent. The Juror A posts had appeared between September 11 and October 3, 2008, the postings regarding Wiesel and the Jena 6 between February 3 and September 20, 2007. But the Warman and Obama death threats were recent—March 26, 2008 and September 9, 2008 respectively—the latter threat having been posted two days before the first threat against Juror A.

Regardless of when these other still-accessible posts were technically created, a reasonable jury cannot be

expected to ignore the audience, who may not have been as concerned about such chronological specifics. Readers of Overthrow.com were not casual Web browsers, but extremists molded into a community by the internet—loyal and avid readers who, whether or not they remember every specific solicitation to assassination, knew that Overthrow.com identified hateful enemies who should be assassinated. A reasonable jury could infer that members of the Party were regular readers of the Overthrow website, which prominently displayed links to the Party's own website, to its streaming radio, and to its hotline. One witness testified that he learned of the Party through Overthrow.com. White identified one reader in a post on the website as a "loyal soldier" and "fan of this website," and there is similar language in other posts. Two members of the party who testified made clear their familiarity with the contents of the website over a period of years. Though these members specifically denied interpreting White's post as an invitation to harm Juror A, a reasonable jury could have thought, based on White's reaching out to them for support following the search of White's home, that they were biased in White's favor and therefore skewed their testimony in order to protect a fellow supremacist.

The government also established "strongly corroborative circumstances" of White's intent to urge the killing of, or harm to, Juror A. Typically, the government will satisfy its burden of strongly corroborating the defendant's intent by introducing evidence showing that the defendant: (1) offered or promised payment or some other benefit to the person solicited; (2) threatened to

Nos. 11-2150 & 11-2209                                    19

punish or harm the solicitee for failing to commit the offense; (3) repeatedly solicited the commission of the offense or expressly stated his seriousness; (4) knew or believed that the person solicited had previously committed a similar offense; or (5) acquired weapons, tools or information, or made other preparations, suited for use by the solicitee. *United States v. Gabriel*, 810 F.2d 627, 635 (7th Cir. 1987) (citing S. Rep. No. 307, 97th Cong., 1st Sess. 183 (1982)). These factors are not exclusive or conclusive indicators of intent, *id.*, but they are representative examples of the types of circumstantial evidence that a rational jury could rely on to corroborate the defendant's intent. *See Hale*, 448 F.3d at 983 ("The existence of strongly corroborating circumstances is a question of fact for the jury." (citation omitted)).

Such circumstantial evidence, much of which is already recounted above, exists here. In posts on his website directed at his neo-Nazi readers, White wrote that "everyone associated with the Matt Hale trial has deserved assassination for a long time;" he expressly solicited violence against Obama, Warman, Wiesel, and the Jena 6; he praised Wiesel's assailant and appreciated that White's expressed views "may have played a role in motivating" the assailant; he went to the trouble of obtaining and publishing Juror A's contact information after expressly recognizing the "great [] potential for action" linked to the posting of personal contact information of other "scumbags" involved in the Hale trial; and after learning of the FBI's investigation he demonstrated awareness that his posts might induce readers to commit a violent act against Juror A.

Though the government did not present a specific "solicitee," it was unnecessary to do so given the very nature of the solicitation—an electronic broadcast which, a reasonable jury could conclude, was specifically designed to reach as many white supremacist readers as possible so that *someone* could kill or harm Juror A. 18 U.S.C. § 373 requires proof of intent "that another *person*" commit the felony, and White's desire for *any* reader to respond to his call satisfies this requirement. *See White*, 610 F.3d at 960 ("a specific person-to-person request is not required" (citing *United States v. Rahman*, 189 F.3d 88, 117-18 (2d Cir. 1999)).

White rightfully emphasizes that the First Amendment protects even speech that is loathsome. But criminal solicitations are simply not protected by the First Amendment. *See id.*; *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) ("[T]hose [words] which by their very utterance inflict injury or tend to incite an immediate breach of the peace" are not protected by the First Amendment); *see also United States v. Williams*, 553 U.S. 285, 297 (2008) ("Offers to engage in illegal transactions are categorically excluded from First Amendment protection." (citations omitted)). A reasonable jury could have found that White's posts constituted "a proposal to engage in illegal activity" and not merely "the abstract advocacy of illegality." *See id.* at 298-99. Accordingly, the First Amendment provides no shelter for White's criminal behavior.

For the above reasons, White's acquittal must be reversed.

## B.  White Is Not Entitled to a New Trial

"If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed." Fed. R. Crim. P. 29(d)(1). Upon acquitting White, the district court, pursuant to this rule, conditionally denied White's motion for a new trial, which White now challenges as an abuse of discretion. *See United States v. Wilson*, 237 F.3d 827, 831-32 (7th Cir. 2001). None of White's arguments have merit.

### 1.  Anonymous Jury

White first argues that the district court erred in empanelling an anonymous jury. "A court weighing the need for an anonymous jury must . . . balance the defendant's interest in preserving the presumption of innocence and in conducting a useful voir dire against the jurors' interest in their own security and the public's interest in having a jury assess the defendant's guilt or innocence impartially." *United States v. Mansoori*, 304 F.3d 635, 650 (7th Cir. 2002) (citations omitted).

> Factors bearing on the propriety of an anonymous jury include the defendant's involvement in organized crime; his participation in a group with the capacity to harm jurors; whether he previously has attempted to interfere with the judicial process; the severity of the punishment that the defendant would face if convicted; and

whether publicity regarding the case presents
the prospect that the jurors' names could be-
come public and expose them to intimidation
or harassment.

*Id.* at 650-51. "We review the decision to use an anony-
mous jury only for an abuse of discretion, remaining
particularly deferential to the district court's substantial
discretion in this area." *United States v. Morales*, 655 F.3d
608, 621 (7th Cir. 2011) (citations omitted). Even if the
district court errs in empanelling an anonymous jury,
a new trial is unwarranted where such error was
harmless, such as when voir dire is "extremely thorough,"
*Mansoori*, 304 F.3d at 652, or when the jurors are told
that their names are withheld "to prevent out-of-
court contact, not out of concern for juror safety,"
*Morales*, 655 F.3d at 623, in combination with other
factors mitigating prejudice.

White almost exclusively emphasizes the alleged
lack of "some evidence indicating that intimidation is
likely." *Mansoori*, 304 F.3d at 651. But such evidence
could not be clearer here. It was certainly clear by the
time the district court granted the government's motion
to empanel an anonymous jury that White had posted
the personal contact information—*of a juror*—also in a
case involving a white supremacist, which resulted
in harassment and intimidation. White also does not
challenge the district court's finding that his target audi-
ence had previously committed acts of violence against
their perceived enemies, particularly those involved in
the justice system, or the fact that there had been some

publicity of the case, exacerbating the risk that the jurors' identities would become public. The district court's consideration of these factors in deciding to empanel an anonymous jury was therefore not an abuse of discretion.

Though unnecessary to address, we also note the absence of harm. White argues that the jury's anonymity predisposed it to believe that White was dangerous and therefore a criminal, and emphasizes Juror 8's expression of concern about putting his name on the juror sign-in sheet. But the district court assured Juror 8 that the sign-in sheet was not public and that it could be sealed, and it confirmed that Juror 8 did not discuss his concern with any other juror. Most importantly, the court asked him whether he could still render a fair verdict, and he responded "Yes." We agree with the district court that "some concerns on the part of jurors were likely unavoidable" given the context, but the district court properly ensured that Juror 8's specific concerns would not give rise to improper bias against White by confirming that he could be impartial. The district court also told the jurors that they were kept anonymous in order to ensure a fair and impartial trial and to prevent contact with the parties and lawyers; it did not mention security as a reason. And White does not challenge the rigor of the district court's voir dire, or any other measure taken by the court to ensure him a fair trial. Accordingly, even if the district court erred in empanelling an anonymous jury, such error was harmless.

### 2. Admission of Rule 404(b) Evidence

Next, White challenges the district court's Rule 404(b) admission of his posts concerning people other than Juror A. Rule 404(b) prohibits the admission of evidence of "prior bad acts to show that the defendant's character is consistent with a propensity to commit the charged crime; however, it allows the court to admit evidence of a defendant's prior [acts] for other permissible, non-propensity purposes," such as intent. *United States v. Perkins*, 548 F.3d 510, 513-14 (7th Cir. 2008). In order to be admissible, such evidence must:

> (1) be directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) show that the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) be sufficient to support a jury finding that the defendant committed the similar act; and (4) have probative value that is not substantially outweighed by the danger of unfair prejudice.

*Id*. This court reviews a district court's Rule 404(b) admission for abuse of discretion. *Id*. at 513.

Taking the last prong first, we note that the probative value of these posts was particularly strong, in that they helped the government to satisfy its burden of producing evidence of circumstances "strongly corroborative" of White's intent (and for that reason, the first prong is also satisfied). Though there was an undeniable danger that the jury would be inflamed against him when exposed to his "noxious views," *Hale*, 448 F.3d at 986,

the jury had already been exposed to White's white supremacist views from other evidence that was unquestionably admissible, and White never sought a specific limiting instruction. The district court's conclusion that such danger did not "substantially outweigh" the strong probative value of these posts was therefore not an abuse of discretion. While the admission of prior posts might be improper in another electronic criminal solicitation case, we simply cannot say that the district court, in its consideration of the unique facts and evidentiary context, erred in this one. *See id.* at 985 ("We give special deference to the district court's assessment of the balance between probative value and prejudice because that court is in the best position to make such assessments.").

As for the remaining factors, though several of these posts were created a year or more before the Juror A post, they were nonetheless "close enough in time to be relevant" in that they were contemporaneously available at the time of the post about Juror A. And there is no dispute that these posts were made by White. Accordingly, the district court's Rule 404(b) admission of White's posts concerning people other than Juror A was not an abuse of discretion.

### 3. White's Proposed Jury Instructions Concerning the First Amendment

White finally argues that a new trial is warranted because the district court failed to include four of his proposed jury instructions concerning the First Amendment.

Briefly summarized, these include: an instruction that speech is protected when it incites imminent lawless action, an instruction that speech may not be banned simply because it is unpopular, an instruction that speech scrutinizing people involved in the prosecution of crimes (e.g., jurors) is protected, and an instruction that speech approving of past violence by others is protected.

Plain error review applies when counsel fails to "object, on the record, to the judge's refusal to tender the defendant's instructions [and] clearly state the reasons for his or her objections." *United States v. Douglas*, 818 F.2d 1317, 1320 (7th Cir. 1987); *see* Fed. R. Crim. P. 30(d). The government points out that after the court expressly made its instructions ruling and asked White's counsel, "Do you have any objections, by the way, . . . or are you otherwise satisfied with the instructions?", counsel responded, "Judge, I'm pretty sure—I haven't looked at the other ones, but I'm satisfied with the elements instruction that I think is the main one." The government therefore argues that no objection was made. White counters that his proposed First Amendment instructions were vigorously debated, albeit before the district court ruled on the instructions.

We have said that, so long as defense counsel "alert[s] the court and the opposing party to the specific grounds for the objection in a timely fashion," then "[t]here is no utility in requiring defense counsel to object again after the court has made its final ruling." *United States v. James*, 464 F.3d 699, 707 n.1 (7th Cir. 2006). But in the case of

the court's refusal to give a proposed instruction, some of our cases have suggested that objections must be made *after* a ruling is made, or at least after the district court indicates how it intends to rule.[3] *See United States v. Irorere*, 228 F.3d 816, 825 (7th Cir. 2000) (objection not preserved where defendant "did not object on the record at the time the district court refused to give the defendant's proposed instruction"); *United States v. Green*, 779 F.2d 1313, 1320 n.6 (7th Cir. 1985) (objection not preserved where "the defendant originally argued on behalf of his proposed instruction, but offered no further comment, much less an objection" after court adopted other instructions). And counsel can simply object by stating that he or she objects and incorporates arguments previously made. *See United States v. Hollinger*, 553 F.2d 535, 543 (7th Cir. 1977) ("While the process of stating for the record that such pre-charge objections are incorporated by reference is a somewhat pro forma exercise, we are nevertheless of the opinion that the better practice would be for counsel to see that the record affirmatively shows that counsel has renewed his specific objections by the incorporation method."); *see also United States v. Requarth*, 847 F.2d 1249, 1254 (7th Cir. 1988) ("Specific objections to instructions that are distinctly made at an instructions conference may be incorporated by reference."). It would have been wise for White's counsel to have at least

---

[3] *See* Fed. R. Crim. P. 30(b) ("The court must inform the parties before closing arguments how it intends to rule on the requested instructions.").

objected and incorporated his previous arguments by reference when the district court gave him an express opportunity to do so after it had made its ruling on the instructions. *See generally Hollinger*, 553 F.2d at 543 (district court has discretion to determine when the "distinct statement of the matter to which counsel objects and the grounds of the objections are stated" pursuant to Rule 30(d)).

In any event, we need not decide whether plain error review applies, because we find that the district court did not improperly exclude his proposed instructions even on *de novo* review. *See James*, 464 F.3d at 707 (review of district court's refusal to give proposed jury instructions is *de novo*). "To be entitled to a particular theory of defense instruction, the defendant must show the following: (1) the instruction is a correct statement of the law, (2) the evidence in the case supports the theory of defense, (3) that theory is not already part of the charge, and (4) a failure to provide the instruction would deny a fair trial." *Id.*

Excluding White's proposed jury instructions was not improper. The district court essentially incorporated White's proposed instruction about speech being protected unless it incites imminent lawless action, and adopting any additional emphasis on that point as White proposed could have been misleading because it would have suggested that the solicitation of a non-immediate crime was protected, when it is not. *See White*, 610 F.3d at 960 ("solicitations[] remain categorically outside [the First Amendment's] protection"). And the

Nos. 11-2150 & 11-2209                                    29

district court essentially incorporated White's proposed
instruction about unpopular speech when it told the
jury that the "First Amendment protects . . . offensive
criticism of others," and that speech that is nothing
more than an "indignant or extreme method of stating
political opposition to the juror in the Matthew Hale
case" was not criminal. This latter instruction also
captured White's proposed instruction about the First
Amendment protecting speech that scrutinizes people
involved in the prosecution of crimes, such as jurors.
And White was not clearly denied a fair trial by the ex-
clusion of his proposed instruction concerning speech
approving of past violence by others. No reasonable
juror would interpret the district court's instruction
about what solicitation means—"an endeavor to
persuade another to engage in conduct constituting a
violent felony"—to mean that mere approval of past
violence automatically translates into solicitation of
future criminal conduct.

   The district court's jury instructions concisely described
the protections of the First Amendment and correctly
informed the jury that criminal solicitations fall outside
its protection. *See Trident Inv. Mgmt., Inc. v. Amoco Oil
Co.*, 194 F.3d 772, 780 (7th Cir. 1999) ("[w]e will not find
reversible error in jury instructions if, taken as a
whole, they fairly and accurately inform the jury about
the law"). The inclusion of White's proposed instruc-
tions would have been unduly cumulative and poten-
tially confusing, and White points to no indication that
the jury failed to appreciate the protections of the First
Amendment, to the extent they were relevant in this

criminal solicitation case. *See DePaepe v. Gen. Motors Corp.*, 33 F.3d 737, 743 (7th Cir. 1994) ("'Inadequate jury instructions are cause for reversal only if it appears that the jury's comprehension of the issues was so misguided that one of the parties was prejudiced.'" (citation omitted)).

Therefore, the district court's exclusion of White's proposed jury instructions was not erroneous. White's argument that the cumulative impact of all the above alleged errors warrants a new trial is also without merit.

### III. CONCLUSION

For the reasons stated above, the judgment of acquittal entered by the district court is REVERSED, the conviction is REINSTATED, and the case is REMANDED for sentencing. White's cross-appeal is DISMISSED.