UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division



*In re:*

William A. White,

   Movant/Respondent.[1]

───────────────────────────────

UNITED STATES OF AMERICA

   Plaintiff,

and

ANNETTE REDDICK, *et al.*

   Intervening   Civil No. 2:07cv342
   Plaintiffs,

v.

JOHN CROCKETT HENRY, *et al.*

   Defendants.

## OPINION AND ORDER

 This matter is before the Court on remand from the United States Court of Appeals for the Fourth Circuit for a <u>de novo</u> review of Magistrate Judge Stillman's Order Denying Intervening Plaintiffs' "Motion for Sanctions and for Issuance of a Rule to Show Cause to William 'Bill' A. White" ("Magistrate Judge Order") and Intervening Plaintiffs' objections thereto. ECF Nos. 98, 128. On July 17, 2013, the Court held a hearing in

---

[1] Due to the current posture of this matter, the Court **DIRECTS** the clerk to amend the style of this action, as reflected in this Opinion and Order.

this matter. The Court has carefully considered the arguments made at the hearing, as well as the extensive record, which includes the thorough Magistrate Judge Order, Intervening Plaintiffs' objections thereto, the numerous briefings concerning those objections, and the orders and opinions of the original District Judge and the Fourth Circuit. For the reasons discussed below, the Court, having conducted a de novo review of the Magistrate Judge Order and objections thereto, hereby **ADOPTS AND APPROVES** the findings and recommendations set forth in the Magistrate Judge Order, as supplemented by this Order. Accordingly, the Court **DENIES** Intervening Plaintiffs' motion for sanctions.

## I. BACKGROUND

Intervening Plaintiffs' Motion for Sanctions presents this Court with a significant, yet vexing, question about the proper balance of constitutional powers and protections. Intervening Plaintiffs seek an award of sanctions against nonparty Respondent, William A. White ("White"), under the inherent powers that this Court derives from Article III of the United States Constitution. Their request for relief is based on the content of several Internet blog postings that White authored during the course of the underlying dispute. These postings paired White's criticisms of the Court, its processes, and the litigants appearing before it, with expressions of his anti-

Semitic and white supremacist views and, at times, with the personal, identifying contact information of the attorneys involved. The Court's resolution of this matter, therefore, requires it to consider not only the scope of its inherent powers, particularly in light of White's status as a nonparty to the litigation, but also the status of White's numerous Internet postings under the First Amendment. Upon its resolution of these significant threshold questions, the Court must determine the proper balance between its own exercise of constitutional authority and any First Amendment interest White may have had in his online speech. Before considering these substantial questions, the Court reviews the extensive factual and procedural history of this case.

## II. FACTUAL AND PROCEDURAL HISTORY

This matter has a long and detailed history, one that has, at various points, been interrupted by unrelated (although factually similar) proceedings involving White. The Court reviews such history—which dates back to 2006—in its entirety, to give a comprehensive account of the questions presently before the Court and the manner in which those questions developed in this and other proceedings.

### A. Underlying Litigation

The underlying litigation involved claims brought by the United States ("United States" or "Plaintiff") against a

3

Virginia Beach apartment complex owner, John Crockett Henry ("Henry"), for alleged violations of the Fair Housing Act, 42 U.S.C. § 3601 et seq., (the "Act").  Henry operated his apartment complex under the federally subsidized Section 8 Housing Choice Voucher Program, also known as the Section 8 Moderate Rehabilitation Program.  As a participant, Henry rented units to applicants who qualified through the City of Virginia Beach's Department of Housing and Neighborhood Preservation, which administered the Section 8 housing subsidy program under a contract with the Department of Housing and Urban Development ("HUD").

The underlying dispute arose when five (5) residents of Henry's complex and their minor children filed complaints with HUD, between August 2006 and February 2007, alleging that Henry and his company, Henry LLC of Virginia Beach ("Henry LLC"), (collectively "Defendants"), had instigated and engaged in discriminatory and harassing treatment based on the complainants' race and family status.[2]  As required by the Act,

---

[2] These complaints included allegations that Henry: imposed "quiet time" on black residents, but not white residents; threatened to have black residents and visitors arrested as trespassers, but allowed white residents to have visitors without similar threats; turned off the electricity of at least one black resident; made racially discriminatory remarks to black residents; referred to children of black residents as "monkeys" and "niggers"; told the resident-complainants that they could only have children of a certain sex living with them; and entered the apartments of black residents when they were not at home and without justification or the residents' consent.  Intervenor Compl. ¶ 15, ECF No. 25.

the Secretary of HUD conducted an investigation and, on April 26, 2007, issued a Determination of Reasonable Cause and a Charge of Discrimination charging Defendants with engaging in discriminatory practices in violation of the Act.  Compl. ¶ 13, ECF No. 1.

On or about May 18, 2007, the HUD complainants elected to have the Charge of Discrimination claims resolved in a federal civil action, pursuant to 42 U.S.C. § 3612(a).  The Secretary of HUD authorized the Attorney General to commence this action and, on July 25, 2007, the United States filed the underlying complaint.  Compl. ¶ 15, ECF No. 1.  On August 23, 2007, the HUD complainants—Annette Reddick, Tasha Reddick, Tiese Mitchell, Crystal Lewis, Arlene Carter, and their minor children, R.C., Z.C., J.J., J.M., and J.M ("Intervening Plaintiffs")—moved for leave to intervene in the litigation, which motion the Court granted by Memorandum Order entered on October 1, 2007.[3]  ECF Nos. 9, 13, 23.  That same day, Intervening Plaintiffs filed their Intervenor Complaint alleging that Defendants' discriminatory housing practices violated the Act and other state and federal statutes.  Intervenor Compl. ¶¶ 18-21, ECF No. 25.

---

[3] Intervening Plaintiffs filed a second motion to intervene on August 29, 2007, which modified the first motion to redact the names of the minor claimants.  ECF No. 13.

### B.    White's Involvement in Underlying Litigation

William White is the "Commander" of the American National Socialist Workers' Party (the "ANSWP"), which he formed in 2006. White was not a party to the underlying litigation.   Rather, he inserted himself in the dispute between Intervening Plaintiffs and Defendants prior to the commencement of the action when he sent packages to several tenants of Henry's complex, including Intervening Plaintiffs.[4]   Each package included a letter and a copy of the May 2007 issue of the National Socialist, White's neo-Nazi magazine.   The letter, dated May 23, 2007, was printed on ANSWP letterhead (which featured a shield bearing a Nazi swastika) and contained numerous racial epithets and threatening language.[5]   The magazine cover displayed a large swastika and the

---

[4] Although the record before this Court does not explain how White obtained the tenants' information, the Court of Appeals for the Fourth Circuit, when reviewing White's separate conviction for transmitting threats to injure or intimidate Intervening Plaintiffs to prevent their testimony, explained that the HUD complaints giving rise to the underlying action "had been reported in the media, and the formal complaint, which included the names of the [Intervening Plaintiffs], was available on HUD's website." United States v. White, 670 F.3d 498, 503 (4th Cir. 2012).

[5] The Court repeats White's offensive letter only to establish the proper context of the events that followed:

May 23, 2007
Whiny Section 8 Nigger
15 ½ St Apartments
Virginia Beach, VA

Re:  Your complaint against Henry LLC

Dear Nigger Tenant:

words, "The Negro Beast" sprawled across the image of an African American child holding what appears to be a large rifle.  Like the cover, the editorials and articles in the magazine included blatantly anti-Jewish and anti-African American commentary.

Although White stated in the May 23, 2007 letter that he did not know Defendants, his statements concerning his awareness of and discontent with the tenants' complaints prompted counsel

---

I read today of your complaint against James Crockett Henry and Henry LLC.  I do not know Mr [sic] Henry, but I do know your type of slum nigger, and I wanted you to know that your actions have not been missed by the white community.

For too long, niggers like you have been allowed to get one over on the white man.  You won't work.  You won't produce.  You breed and eat and turn the world around you into a filthy hole, but you won't do anything to earn or deserve the life you live. Niggers like you are nothing new.  All of Africa behaves as you do – with the difference that, there, there is no white man to exploit, only brutal nigger dictators to give the lot of you the kind of government you deserve.

You may get one over on your landlord this time, and you may not.  But know that the white community has noticed you, and we know that you are and will never be anything other than a dirty parasite – and that our patience with you and the government that coddles you runs thin.

Sincerely,

/s/

Bill White, Commander
American National Socialist Workers' Party
PO Box 8601
Roanoke, VA 24014

As described below, White was convicted of intimidation to influence, delay, and prevent the tenants' testimony against Defendants, in violation of 18 U.S.C. § 1512(b)(1), in connection with this May 23, 2007 letter to Henry's tenants.  See White, 670 F.3d at 501, 503-04.

for Intervening Plaintiffs, including Kevin W. Mottley of Troutman Sanders LLP ("Mottley"), to issue several subpoenas directed to the discovery of any relationship between White and Henry. In January 2008, counsel issued five (5) subpoenas to White and his various business interests[6] and one (1) subpoena to YAHOO! INC. (the "Yahoo! subpoena"), White's email server.[7] Because White and his entities were located in Roanoke, the subpoenas directed to them were issued out of the Western District of Virginia. Only the Yahoo! Subpoena was issued out of this Court, as Yahoo! is a resident of Northern Virginia, within this Court's jurisdiction.

On February 11, 2008, White, through counsel, timely moved this Court to quash the subpoenas and for a protective order. ECF No. 36. That same day, White amended his motion, correcting an attached exhibit. ECF No. 37. Both the original and amended motions addressed all of the subpoenas, including those issued

---

[6] On January 30, 2008, subpoenas were issued to the following persons and entities: William "Bill" A. White (also requiring White to appear for a deposition on March 3, 2008); White Politics, LLC c/o William "Bill" A. White; American Nationalist Socialist Works' Party, LLC, c/o William "Bill" A. White; National Socialist Movement of Roanoke, LLC, c/o William "Bill" A. White; and White Homes and Land, LLC, c/o William "Bill" A. White.

[7] The Court notes that, at the time these subpoenas were issued, Henry's deposition had not been scheduled. Accordingly, counsel had not attempted to question Henry regarding any connection with White. Additionally, as the Magistrate Judge noted, the Court has never been given an explanation for the nearly eight-month delay between White's mailing of the offensive packages in May 2007 and the issuance of the subpoenas in January 2008. Mag. Judge Order 10 n.12, ECF No. 98.

out of the Western District of Virginia.  On February 18, 2008, Intervening Plaintiffs moved to compel White to produce documents and to appear at a deposition on March 3, 2008.[8]  ECF No. 38.  White again amended his motion to quash, on February 27, 2008, this time restricting its scope to the Yahoo! subpoena issued out of this Court.  Because the parties were unable to agree on the scope of the subpoenas, the Court set a hearing for February 28, 2008.  On February 22, 2008, the day that the February 28th hearing was noticed, White posted on various internet websites and blogs the message that initially gave rise to the instant motion for sanctions.[9]

### C. Procedural History of Intervening Plaintiffs' Motion for Sanctions

On February 27, 2008, Intervening Plaintiffs filed a motion for sanctions and for issuance of a rule to show cause to White ("Motion for Sanctions"), alleging that White had attempted to threaten and intimidate Mottley, an officer of the Court, and his wife.  Mot. for Sanctions, ECF No. 44.  The Motion for

---

[8] As noted in the Magistrate Judge Order, White's March 3, 2008 deposition did not occur.  Mag. Judge Order 11 n.15, ECF No. 98. "Apparently, counsel for the parties were present and prepared to conduct the deposition, but the parties were unable to resolve their dispute over the scope of the subpoenas and the related discovery deposition. . . ." Id.

[9] The February 28, 2008 hearing was set at 8:47 a.m. on February 22, 2008.  White made the posting that initially formed the basis of Intervening Plaintiffs' underlying motion at approximately 3:55 p.m. that same day.

Sanctions was based on an internet posting White made at approximately 3:55 p.m. on February 22, 2008 to the Vanguard News Network, an internet forum in which members express anti-Semitic and white supremacist views.[10] The posting revealed Mottley's personal information—including his name, home address, telephone number, and the name of his spouse—and directed readers not to take a series of specific actions against Mottley until after the dispute over the subpoenas had been resolved, although the posting was arguably designed to invite White's readers to take precisely those actions described. Counsel for Intervening Plaintiffs first learned of the posting on February 23, 2008, when they were contacted by an unnamed person associated with "Citizens Against Hate," a watchdog organization that apparently monitors hate crimes and speech. In response to the posting, counsel filed the Motion for Sanctions and noticed a hearing for the same date as the February 28, 2008 subpoena hearing. The Motion for Sanctions was referred to the Magistrate Judge pursuant to 28 U.S.C § 636(b)(1)(A), Federal Rule of Civil Procedure 72(a), and Local Rule 72, which collectively provide for the automatic referral to magistrate judges of all non-dispositive pretrial matters.

---

[10] White's posting also appeared on the ANSWP Yahoo! Groups page, although this fact was apparently unknown at the time the Motion for Sanctions was filed.

The Magistrate Judge conducted the February 28, 2008 hearing on White's second amended motion to quash.[11]  The Court heard limited argument at the hearing regarding the basis for Intervening Plaintiffs' Motion for Sanctions—including an overview of the allegedly threatening posting, the actions Mottley and his firm took in response to such posting, and the legal grounds asserted for relief—but the matter was not formally heard because White had not been given sufficient time to reply to the motion.  Out of concern for Mottley's safety, and the safety of his family, the Court asked White whether he would agree to remove the objectionable posting, pending the Court's disposition of the Motion for Sanctions.  Through counsel, White indicated that he did not personally control Vanguard News Network, but that he would be willing to ask its

---

[11] The scope of the hearing was limited to the Yahoo! subpoena. At the hearing, counsel for Intervening Plaintiffs substantially narrowed the scope of such subpoena, based on a federal statute restricting the production of electronic communications by an internet service provider.  In response, counsel for White essentially withdrew his objection to the Yahoo! subpoena.  The Magistrate Judge denied both the second amended motion to quash and Intervening Plaintiffs' motion to compel as moot.  Although the subpoena (as limited) remained, Yahoo! was apparently never compelled to respond.

White maintained that Intervening Plaintiffs violated the law by issuing the Yahoo! subpoena in the first instance.  His various internet postings have expressed his intention to file suit against counsel for Intervening Plaintiffs and the law firm of Troutman Sanders for issuing the subpoena.  White also posted that counsel tried to "settle" the subpoena dispute by offering White a "release" that White insists he refused to accept.  Mag. Judge Order 13 n.18, ECF No. 98.  As the Magistrate Judge observed, White's position concerning the issuance of the Yahoo! subpoena has no bearing on the questions now before the Court.  Id.  Accordingly, the Court expresses no opinion regarding such contentions.

operator to remove the objectionable posting.   White personally affirmed his attorney's representations to the Court.   Based on White's representations and on the fact that he had not been afforded an opportunity to respond to the Motion for Sanctions, the Magistrate Judge did not specifically order White to remove the objectionable posting.   However, the Magistrate Judge repeatedly emphasized to White that his conduct going forward would be of significant interest and concern to the Court.   At the end of the hearing, the Court established a briefing schedule and set the matter for a telephonic status conference on March 6, 2008.[12]   At the status conference, the Magistrate Judge provided for additional briefing and set an evidentiary hearing on the Motion for Sanctions.

The evidentiary hearing was held on April 2, 2008. Intervening Plaintiffs offered twenty-seven (27) exhibits and the United States offered an additional four (4) exhibits. White appeared and testified at the hearing and was questioned about the various exhibits.   Mottley also testified, as did a court-appointed computer forensics expert, Dr. Dardick.[13]   Dr.

---

[12] Following the February 28, 2008 hearing, White sent two emails to his attorney and to Mottley.   The first, entitled "Norfolk Case Update," was apparently a copy of an email sent to ANSWP's general membership concerning the hearing.   The second was a brief email confirming that the Vanguard News Network posting had been removed. These emails are discussed in greater detail below.   See infra II.F.2.

[13] Dr. Dardick was appointed by a United States Magistrate Judge in the Western District of Virginia, Roanoke Division, to serve in

Dardick testified regarding his examination of certain computer equipment surrendered by White in compliance with the subpoenas issued out of the Western District of Virginia. At the end of the hearing, the Court took the matter under advisement. The following day, April 3, 2008, the Magistrate Judge conducted a telephonic status conference at which all parties were directed to order and share the expenses of a transcript from the April 2, 2008 evidentiary hearing.

On April 4, 2008, the Magistrate Judge held an emergency telephonic status conference with the parties, after Plaintiff and Intervening Plaintiffs notified the Court of another posting, made on April 3, 2008 at 9:54 a.m., in which White again published Mottley's personal information, as well as information relating to Lori K. Wagner ("Wagner"), lead counsel for the United States.[14] At the April 4, 2008 telephonic status conference, the Magistrate Judge ordered expedited briefing regarding the significance of White's latest posting to the Court's consideration of Intervening Plaintiffs' Motion for Sanctions. The Court set another telephonic status conference for April 11, 2008. At this final status conference, the

connection with that Court's consideration of the discovery disputes concerning the subpoenas issued out of that District.

[14] Wagner notified the Court that White's April 3, 2008 posting did not include her correct contact information. On April 9, 2008, White reposted his April 3, 2008 posting, updating Wagner's home address. These posts are discussed in greater detail below. See infra II.F.3.

Magistrate Judge heard argument from the parties regarding the additional postings.

Before the April 11, 2008 status conference, the Court was advised that the underlying litigation between Intervening Plaintiffs and Defendants had settled by agreement. The Court confirmed this settlement at the status conference. On April 14, 2008, the Court was further advised that Plaintiff and Defendants had also settled, pursuant to a consent decree. However, this latter settlement was subject to approval by the Department of Justice ("DOJ"). On April 29, 2008, the District Court entered a consent order dismissing the Intervenor Complaint with prejudice, based on the compromise settlement agreement executed between Intervening Plaintiffs and Defendants on April 2, 2008, the same day as the evidentiary hearing before the Magistrate Judge on the Motion for Sanctions. Consent Order, ECF No. 90. On May 13, 2008, the District Court entered the consent decree filed by Plaintiff. Consent Decree, ECF No. 95. That same day, based on the entry of both the Consent Order and Consent Decree, the District Court entered an agreed order dismissing the case with prejudice and retaining jurisdiction to enforce the settlement agreements. Order, ECF No. 96. Although the underlying litigation had ended, the Motion for Sanctions remained pending before the Magistrate Judge in accordance with the United States Supreme Court's decision in <u>Cooter & Gell v.</u>

Hartmarx Corp., 496 U.S. 384 (1990), which held that a federal court may consider collateral issues, including a sanctions motion, after the underlying action has settled. Id. at 396. The Magistrate Judge issued his Opinion and Order denying Intervening Plaintiffs' Motion for Sanctions on July 25, 2008. Mag. Judge Order, ECF No. 98.

Following an extension of time for filing, Intervening Plaintiffs filed their objections to the Magistrate Judge Order on August 25, 2008. ECF Nos. 102 & 103. Intervening Plaintiffs included as an attachment to their objections an additional posting that White had made on August 16, 2008.[15] Intervening Pls.' Br. in Supp. of Objections to Mag. Judge Order, ECF No. 103, Ex. 1. White did not file objections to the Magistrate Judge Order nor a response to Intervening Plaintiffs' objections. However, his attorney, Henry Brown ("Brown") notified the Court by letter dated August 28, 2008 that he needed to withdraw from the case for medical reasons. ECF No. 107. Brown filed a motion to withdraw as counsel on September 11, 2008, which motion the Court granted on October 3, 2008. ECF Nos. 108 & 110. White did not retain new counsel.

---

[15] In this post, White suggested that Mottley and his wife "would star perfectly in the role of 'the family'" from the movie "Funny Games," which depicts a family being subjected to physical and mental torture, violence, and, ultimately, death at the hands of two serial killers. ECF No. 103, Ex. 1 & 2. This posting is discussed further below. See infra II.F.4.

On October 14, 2008, the District Court entered a final order adopting and approving the findings and recommendations set forth in the Magistrate Judge Order, following a review of the same for "clear error." Final Order, ECF No. 111. Intervening Plaintiffs appealed. The matter remained pending on appeal for approximately three years, apparently due to White's involvement in two separate criminal prosecutions, as discussed below. Ultimately, the United States Court of Appeals for the Fourth Circuit vacated the District Court's order and remanded the case for a "de novo" review of the Magistrate Judge Order. See Reddick v. White, 456 F. App'x 191, 191 (4th Cir. 2011) (per curiam). Following remand, the original District Judge entered a recusal order and the matter was transferred to the undersigned. Mem. Order 9, ECF No. 158.

### D.   Procedural History Following Remand

Before the case was reassigned, White filed several pro se motions. Although these motions were related to Intervening Plaintiffs' Motion for Sanctions, they alleged facts not previously considered by the Court. ECF Nos. 135-37. Based on White's pro se motions and on Intervening Plaintiffs' request for oral argument concerning their objections to the Magistrate Judge Order, this Court decided to set a hearing. ECF No. 169. Because White was in federal custody on a separate matter, the Court had to determine how White wished to participate in the

16

hearing.   Accordingly,  on  August  7,  2012,  the  Court  ordered
White  to  advise  whether  he  would  appear  through  retained
counsel,  appointed  counsel,  or  personally.   Id.   In its  Order,
the  Court  emphasized  that  White  did  not  have  a  guaranteed  right
to  counsel  and  that  any  appointment  of  counsel  would  be  made  in
the  Court's  discretion.   Id.  (citing  28  U.S.C.  §  1915(a)).
Additionally,  if  White  wished  to  continue  pro  se,  the  Court
ordered  that  he  show  cause  why  he  should  not  be  required  to
incur  the  cost  of  his  transportation  to  the  hearing.   Id.

Pursuant  to  the  Court's  August  7,  2012  Order,  White  filed  a
motion  for  appointment  of  counsel  on  August  23,  2012,  which
motion  the  Court  granted  on  October  23,  2012,  after  locating  an
attorney  who  was  able  and  willing  to  represent  White  on  a  pro
bono  basis.  ECF  No.  175.   Following  the  appointment  of  counsel,
the  Court  set  a  briefing  schedule  on  White's  pending  pro  se
motions  and  on  Intervening  Plaintiffs'  objections  to  the
Magistrate  Judge  Order.   ECF  No.  181.   Shortly  before  his
response  deadline,  White  filed  an  unopposed  motion  for  leave  to
file  a  supplemental  brief  and  to  extend  the  briefing  schedule,
which  motion  the  Court  later  granted.   In  accordance  with  this
modified  schedule,  briefing  on  all  pending  matters  concluded  on
March  7,  2013.   White  then  withdrew  his  pro  se  motions,  leaving
only  the  de  novo  review  of  the  Magistrate  Judge  Order  pending
before  the  Court.

On June 21, 2013, the Court conducted a telephonic status conference in this matter at which it excused the United States, who had not originally joined in Intervening Plaintiffs' objections to the Magistrate Judge Order, from further participation in the instant request for sanctions. The Court also set oral argument on Intervening Plaintiffs' objections. The Court held a hearing on July 17, 2013, at which Intervening Plaintiffs and White, through counsel, argued extensively regarding the Court's authority to sanction White for his online postings and the potential First Amendment implications of doing so. At the end of the hearing, the Court took the matter under advisement.

### E.   White's Criminal Prosecutions

In addition to the protracted procedural history of this matter, reviewed above, White's involvement in two separate criminal proceedings, and his conduct in relation to those proceedings, has greatly impeded this Court's ability to resolve Intervening Plaintiffs' objections to the Magistrate Judge Order. First on October 22, 2008, eight days after the original District Judge issued the Final Order in this matter, White was indicted in the Northern District of Illinois for soliciting the commission of a violent federal offense in violation of Title 18, United States Code, Section 373. United States v. White, 698 F.3d 1005, 1010 (7th Cir. 2012) (per curiam). Less than two

months later, on December 11, 2008, White was named in a seven-count indictment in the Western District of Virginia, which charged him with threatening and intimidating various individuals, including Intervening Plaintiffs.[16]  <u>United States v. White</u>, 670 F.3d 498, 501 (4th Cir. 2012).  The Court briefly reviews the overlapping factual and procedural histories of these prosecutions below.

### 1. Conduct Charged in the Northern District of Illinois

White's indictment in the Northern District of Illinois stemmed from an Internet post he authored following the trial and conviction of Matthew Hale, another white supremacist, for criminally soliciting harm to Northern District of Illinois Judge Joan Lefkow, who had ruled against Hale in a trademark infringement matter.[17]  <u>White</u>, 698 F.3d at 1008-09.  White's post,[18] titled, "The Juror Who Convicted Matt Hale," criticized

---

[16] Count Three of the Western District of Virginia indictment charged White with intimidating Intervening Plaintiffs, by sending the May 23, 2007 packages, for the purpose of influencing, delaying or preventing their testimony against Defendants, in violation of 18 U.S.C. § 1512(b)(1).  <u>White</u>, 670 F.3d at 501, 503-04.

[17] Hale received a sentence of forty (40) years imprisonment as the result of his convictions.  <u>White</u>, 698 F.3d at 1009 (citing <u>United States v. Hale</u>, 448 F.3d 971, 982 (7th Cir. 2006) (per curiam)).

[18] White's post appeared on Overthrow.com, a website he had created and edited that sought to advance the cause of white supremacy.  <u>White</u>, 689 F.3d at 1009.

the verdict and disclosed the Hale jury foreperson's ("Juror A") personal, identifying information.[19]   The post read:

> Gay anti-racist [Juror A] was a juror who played a key role in convicting Matt Hale.   Born [date], [he/she] lives at [address] with [his/her] gay black lover and [his/her] cat [name].   [His/Her] phone number is [phone number], cell phone [phone number], and [his/her] office is [phone number].

Id. at 1009-10.   The post further stated that:

> [G]ay Jewish [Juror A] who has a gay black lover and ties to professional anti-racist groups, and who also personally knew [an individual] killed by Ben Smith, a follower of Hale, was allowed to sit on this jury without challenge and played a leading role in inciting both the conviction and the harsh sentence that followed."

Id. at 1010.   The entry featured a color photograph of Juror A.

Id.   White uploaded an identical message to Overthrow.com the next day, after Juror A's employer blocked public access to the page that contained Juror A's information and photograph.   Id.

---

[19]   White's Juror A post was not his first criticism of the Hale case.   He had previously applauded the tragic murder of Judge Lefkow's husband and mother, writing on February 28, 2005, "Everyone associated with the Matt Hale trial has deserved assassination for a long time. . . In my view, it was clearly just, and I look forward to seeing who else this new white nationalist group of assassins kills next." White, 698 F.3d at 1009.   As the Seventh Circuit noted, neither Hale nor White (or anyone connected with either of them) was responsible for the murders.   Id. at 1009 n.1.   A short time later White circulated an email that contained personal, identifying information of the FBI agents and prosecutors who investigated and prosecuted Hale, noting that they might be the "next targets of the unknown nationalist assassin who killed the family of Chicago Judge Joan Lefkow." Id. at 1009.   However, White stated that he would not post the information circulated to his website because there was "so great a potential for action linked to such posting." Id.

In this second post, White embedded Juror A's photo in the Overthrow.com server so that only he could remove it. Id.

The grand jury indicted White for soliciting the commission of a violent federal offense against Juror A, in violation of Title 18, United States Code, Section 373. The indictment charged that White had "solicited and otherwise endeavored to persuade another person to injure Juror A on account of a verdict assented to by Juror A, in violation of Title 18, United States Code[, Section] 1503." Id. at 1010. White was taken into custody in Roanoke, Virginia on October 22, 2008 and remained in custody pending trial. Minute Entry, White, No. 1:08cr851-1 (N.D. Ill. Oct. 22, 2008), ECF No. 8 (noting White's arrest); see also Minute Entry, White, No. 1:08cr851-1 (N.D. Ill. Dec. 5, 2008), ECF No. 22 (detaining White pending trial); Mandate of USCA, White, No. 1:08cr851-1 (N.D. Ill. Dec. 18, 2008), ECF No. 37 (affirming the district court's detention order). On February 10, 2009, the Grand Jury returned a superseding indictment against White. White, 698 F.3d at 1010. White moved to dismiss the indictment and, on July 24, 2009, the district court granted his motion, finding that "White's internet postings were protected speech and that the [superseding] indictment failed to sufficiently allege 'corroborating circumstances' of White's criminal intent." Id. After dismissing the superseding indictment, the district court

ordered White's release.   Minute Entry, <u>White</u>, No. 1:08cr851-1 (N.D. Ill. July 24, 2009), ECF No. 108.   The Government appealed.

## 2.   Convictions in the Western District of Virginia

The order releasing White from custody in the Northern District of Illinois activated the warrant issued out of the Western District of Virginia in connection with the indictment returned against White there.  <u>Id.</u>  White was transferred to the Western District of Virginia where he was again detained pending trial.[20]  As noted above, White had been indicted in the Western District of Virginia on December 11, 2008 for criminally threatening and intimidating various individuals.   Following a jury trial, White was convicted of Counts One, Three, Five, and Six of the indictment.  <u>White</u>, 670 F.3d at 501.

Count One charged White with transmitting via interstate commerce threats to injure or intimidate Citibank employee Jennifer Petsche ("Petsche").  <u>Id.</u>  White had been engaged in a dispute with Citibank regarding a debt he owed them and their reporting of his past due amounts to credit agencies.   Following the resolution of that dispute, White became angered when adverse commentary on his credit report was not immediately

---

[20] Both the Magistrate and District Judges in the Western District of Virginia ordered White released subject to certain conditions, however the Fourth Circuit reversed and ordered White detained. Judgment of USCA, White, No. 7:08cr54-JCT (W.D. Va. Oct. 21, 2009), ECF No. 59.

removed.  Id. at 502.   White called Citibank approximately 50 times over the course of 24 hours, eventually leaving a voicemail for Petsche, a litigation specialist.  Id.   White apparently wanted a copy of the letter that Citibank had sent to the credit reporting agencies.  Id.   Petsche's supervisor advised her not to respond.  Id.   The next day, White left Petsche a message on her home answering machine indicating that he had sent her an email.  Id.   Petsche reported the call to Citibank.  Id.

The email, which White had sent to several versions of Petsche's email address, included Petsche's full name, age, birth date, current home address, three of her previous home addresses, her current phone number, and her husband's full name.  The email then stated:

> I understand you think you're very tough and you think that by dragging this process out you have created me a lot of misery; that is an incorrect assessment but I must admit I have run out of patience with you and your smug attitude.   I hope the fact that I've obviously paid someone to find you conveys the seriousness with which I take your current attitude.

> If you resolve this issue quickly and efficiently I can guarantee you will not hear from me again; if you don't, well, you will be well known to the Citibank customers you are currently in litigation with in [a] very short amount of time.

> Again, make my life easy, fax over the letter, and you will not be hearing from me again.

> PS: I took the liberty of buying the [Citicard] corporate phone directory and locating information on your outstanding disputed credit accounts from an

internet dealer today, and can probably make you better known to your customers than the security measures you enact at your company indicate you would like. Consider this, as I'm sure, being in the collections business and having the attitude about it that you do, that you often make people upset. Lord knows that drawing too much publicity and making people upset is what Joan Lefkow did.

Id. The email included a hyperlink to a Google search on Joan Lefkow, through which Petsche learned that Joan Lefkow was a judge whose husband and mother had been murdered.

In addition to his conduct related to Petsche, White was also tried and convicted of Count Three, which charged him with intimidating Intervening Plaintiffs in an effort to "influence, delay, or prevent the[ir] testimony." Id. at 501 (citing 18 U.S.C. § 1512(b)(1)). Count Three was based entirely on the packages that White sent to Defendants' tenants on May 23, 2007. See supra note 4.

White was also convicted of Count Five, which charged him with transmitting threats to injure or intimidate via interstate commerce to Kathleen Kerr, the Director of Residential Life at the University of Delaware ("Kerr"). White, 670 F.3d at 501 & 504. Kerr had helped to develop a "diversity training program" at the University of Delaware that attracted national media attention. Id. at 504. After learning of the program, White called Kerr at her office and spoke with her assistant, Carol Bedgar ("Bedgar"), to whom he identified himself as "Commander

Bill White of the American White Workers' Party." Id. After White asked to speak with Kerr and was informed that she was not in the office, he "said that he knew that she was there because he had just spoken to her husband[,] Chris." Id. White then recited Kerr's home telephone number and a residential address that Bedgar recognized as Kerr's father's address. Id. Bedgar asked White if she could take a message and he replied, "Yes. Just tell her that people that think the way she thinks, we hunt down and shoot." Id. Phone records produced at trial revealed that the call to Kerr's office had been placed from White's home. Id.

In addition to the phone call, White posted an entry to Overthrow.com entitled, "University of Delaware's Marxist Thought Reform," which included Kerr's full name, email address, date of birth, spouse's name, spouse's date of birth, home address, vacation home address, and telephone numbers. Id. The post instructed readers to "go to their homes," and further stated, "We shot Marxists sixty years ago, we can shoot them again." Id. A second post, titled "Smash the University of Delaware," included personal information for both Kerr and the University President with the instruction, "You know what to do. Get to work!" Id.

Like Counts One and Five, Count Six also charged White with transmitting via interstate commerce threats to injure or

intimidate, in violation of Title 18, United States Code, Section 875(c). White, 670 F.3d at 501. This Count addressed White's online postings about Richard Warman ("Warman"), a Canadian civil rights lawyer who "actively fights 'hate speech' in Canada and specifically targets white supremacist movements."[21] Id. at 505.

White first contacted Warman via personal email in July 2006. White's email "lament[ed] the fact that the website of Alex Linder, a well-known white supremacist had been shut down by the Canadian government and stat[ed] that Linder was 'correct when he says the assassination of Canadian Jews and the officials who bow to them would be an act of patriotism.'" Id. According to Warman, the email "marked the beginning of a 'campaign of terror' that lasted for two years, during which White repeatedly referred to Warman as a 'Jew' and advocated violence towards him, even championing his murder." Id. Although the Government introduced evidence of several communications from 2006 and 2007,[22] only two communications from 2008 formed the basis of Count Six.

---

[21] Warman "often brings cases against neo-Nazi groups and their websites before the Canada Human Rights Tribunal, which awards a 'bounty' to individuals who successfully bring such suits even if they were not the victims of the hate speech." White, 670 F.3d at 505.

[22] The following communications were introduced at White's trial for context:
   In October 2006, White contacted Warman directly, mailing a package to Warman's home containing one of White's magazines, which

First, in February 2008, White posted to the Vanguard News Network a link to an article that described a neo-Nazi group's firebombing of a Canadian civil rights activist's home. *Id.* Underneath the link, White wrote, "Good. Now someone do it to Warman." *Id.* Second, in March 2008, White posted an entry to his own website entitled, "Kill Richard Warman, man behind human rights tribunal's abuses should be executed." *Id.* The post began:

> Richard Warman, the sometimes Jewish, sometimes not, attorney behind the abuses of Canada's Human Rights Tribunal should be drug [sic] out into the street and shot, after appropriate trial by a revolutionary tribunal of Canada's white activists. It won't be hard to do, he can be found easily at his home, at [Warman's home address].

*White*, 670 F.3d at 506. The posting went on to describe Warman's use of Canadian hate speech laws against white supremacists and compared White's calls for Warman's execution

---

had a picture of Warman on the back cover under the caption, "Yeah, We Beat This Prick." *White*, 670 F.3d at 505. Beneath the caption were Warman's home address and the words, "Tired of the Jews taking away your rights?" *Id.*

In February 2007, White published a "work of fiction" on his website entitled "The Death of Robert Waxman in the Not Too Distant Future." *Id.* The original title of this post was "The Death of Robert Warman. . . ." *Id.* (emphasis and omission in original). The post included a disclaimer that "since it is illegal to publish material like this in Canada, we are publishing it here as a favor to our Canadian allies. May we all pray that this work becomes something more [than] mere fiction." *Id.* (alteration in original). The story itself detailed real cases in which Warman had been involved and featured a protagonist smiling as he placed a shotgun in "Waxman's" mouth and pulled the trigger. *Id.*

In addition to White's direct contact with Warman and the Waxman story, White posted comments about Warman throughout 2007, "repeatedly calling for his assassination and posting his home address." *Id.*

27

to the advocacy of United States citizens for the death of Osama Bin Laden. White concluded with an "irreconcilable fact: Richard Warman is an enemy, not just of the white race, but of all humanity, and he must be killed. Find him at home and let him know you agree: [Warman's home address]."[23]  Id.

Following his trial and conviction of Counts One, Three, Five, and Six, White moved for a judgment of acquittal. Regarding Counts One, Five, and Six, he argued that his posts were "political hyperbole" protected by the First Amendment and not "true threats" punishable under § 875(c).  White, 670 F.3d at 506.  Regarding Count Three, he argued that, to violate 18 U.S.C. § 1512(b)(1), intimidation must rise to the level of a "true threat," which he claimed his May 23, 2007 packages to Intervening Plaintiffs did not.  Id. at 514.  The district court denied White's motion as to Counts One, Three, and Five, finding more than enough evidence to support the jury's verdicts, but granted his motion as to Count Six.  Id.  Both White and the Government appealed.  Id.

Based on its post-trial rulings, the district court proceeded to sentencing on Counts One, Three, and Five.  On

_____

[23] White reiterated his call in May 2008, in a posting entitled "Kill Richard Warman," that said, "I do everything I can to make sure everyone knows where to find this scum, particularly because it makes him so mad: Kill Richard Warman! [Warman's home address]."  White, 670 F.3d at 506.  This post was not charged in Count Six, but was instead offered at trial only for context.

April 14, 2010, White was sentenced to thirty (30) months of imprisonment and thirty (30) months of supervised release on each count, all to be served concurrently.  Judgment, <u>White</u>, No. 7:08cr54-JCT (W.D. Va. Apr. 19, 2010), ECF No. 190.  In determining the sentence, the district court declined to apply to Count Three a vulnerable victim enhancement available under the United States Sentencing Guidelines.  The Government appealed.[24]

### 3.  Remand and Conviction in the Northern District of Illinois

During White's prosecution in the Western District of Virginia, the Government's appeal from the Northern District of Illinois's order dismissing the superseding indictment against White remained pending before the Seventh Circuit.  On August 16, 2010, just three months after White was sentenced in the Western District of Virginia, the Seventh Circuit reversed the district court and remanded the case for further proceedings, holding that "the indictment was facially valid" and that "White's First Amendment rights were protected by the government's burden to prove beyond a reasonable doubt that [he] had the requisite intent for criminal solicitation." <u>White</u>, 698 F.3d at 1010 (citing <u>United States v. White</u>, 610 F.3d 956, 961 (7th Cir. 2010) (per curiam)).

---

[24] The Fourth Circuit consolidated all of the pending appeals. Order of USCA, <u>White</u>, No. 7:08cr54-JCT (W.D. Va. Apr. 26, 2010), ECF No. 200.

Following remand, White was tried by an anonymous jury and, on January 5, 2011, the jury returned a guilty verdict against White on the sole count of the superseding indictment. Minute Entry, White, No. 1:08cr851-1 (N.D. Ill. Jan. 5, 2011), ECF No. 148). White moved for entry of a judgment of acquittal, arguing that the evidence presented at trial was insufficient to convict him of soliciting harm to Juror A. White, 698 F.3d at 1008. White alternatively moved for a new trial. The district court granted White's motion for judgment of acquittal, concluding that the evidence had, indeed, been insufficient to support a conviction of criminal solicitation and, accordingly, that White's speech was protected by the Frist Amendment. Id. The district court conditionally denied White's motion for a new trial and ordered White released. Id.; accord Minute Entry, White, No. 1:08cr851-1 (N.D. Ill. Apr. 19, 2011), ECF No. 172 (ordering White's release). The Government appealed the judgment of acquittal and White appealed the conditional denial of his motion for a new trial. White, 698 F.3d at 1008. Because White had served the sentence imposed by the district court in the Western District of Virginia, he was released from custody in April 2011, at which time he began serving his three-year term of supervised release. See Order on Petition for Issuance of Warrant, White, No. 7:08cr54-JCT (W.D. Va. May 11, 2012), ECF No. 271. Eight months after White's release, the

Fourth Circuit issued its order remanding this matter for a _de novo_ review of the Magistrate Judge Order and Intervening Plaintiffs' objections thereto. See _Reddick_, 456 F. App'x at 191.

### 4.   Remand, Supervised Release Violation, and Resentencing in the Western District of Virginia

Shortly after the Fourth Circuit remanded the instant action, it issued a separate opinion affirming the Western District of Virginia's rulings on White's motion for acquittal and affirming White's convictions on Counts One (Petsche), Three (Intervening Plaintiffs), and Five (Kerr).[25] Finding that the district court erred in declining to apply the vulnerable victim enhancement under § 3A1.1(b)(1) of the United States Sentencing

---

[25] The Fourth Circuit affirmed the district court's judgment of acquittal as to Count Six (Warman), holding that White's two 2008 posts about Warman did not rise to the level of "true threats." _White_, 670 F.3d at 513. In so holding, the Fourth Circuit noted that the communications at issue were "not directed to Warman but to the public generally and did not communicate an intent to take any action whatsoever." _Id._ Although the _White_ court observed that "neither direct communication nor personal or group involvement in the threat is an essential component to finding a true threat," it held that "the lack of both, along with the fact that White's language was clearly directed to others in the form of advocacy makes it impossible for us to conclude that a reasonable recipient would understand White's communications to be serious expressions of intent to commit harm." _Id._ at 513-14 (emphasis in original). Ultimately, "[t]he principal message expressed in White's communications was that someone else should kill Warman." _Id._ at 514 (emphasis in original). Despite the fact that the communications and the context surrounding them "may have undoubtedly frightened Warman, those communications at most conveyed a serious desire that Warman be harmed by others but did not convey a serious expression of intent to do harm from the perspective of a reasonable recipient." _Id._ (emphasis in original)

31

Guidelines, the Fourth Circuit vacated White's sentence and remanded the matter for resentencing.[26]   Id. at 516.   The district court set White's case for resentencing on May 14, 2012.   Notice of Hearing, White, No. 7:08cr54-JCT (W.D. Va. Apr. 12, 2012), ECF No. 266.   White continued on supervised release pending resentencing.   Three days before White was to be resentenced, the probation officer petitioned the district court for revocation of White's supervised release, after a home visit to White's residence revealed that all of his personal items were missing and that he had left a note for his landlord advising that he had moved and had no intention of returning. Order on Petition, White, No. 7:08cr54-JCT (W.D. Va. May 11, 2012), ECF No. 271.   The district court issued an order on the petition and a warrant for White's arrest and cancelled the resentencing hearing.[27]   Notice of Cancellation, White, No. 7:08cr54-JCT (W.D. Va. May 11, 2012), ECF No. 270; Order on Petition, White, No. 7:08cr54-JCT (W.D. Va. May 11, 2012), ECF

---

[26] The enhancement was sought because, when sending the May 23, 2007 packages to Intervening Plaintiffs, White had addressed a package to one tenant's two minor children.   The Fourth Circuit concluded that the Government had presented evidence that White knew or should have known of the victims' vulnerability because he "had read the tenants' HUD complaint, which described how Reddick's children were called 'nigger children' by the landlord and three times referenced the fact that Reddick's children 'were playing outside,' indicating their youth."   White, 670 F.3d at 516.

[27] White absconded from supervision three weeks after the instant matter was transferred to the undersigned.

No. 271; Arrest Warrant Issued, White, No. 7:08cr54-JCT (W.D. Va. May 30, 2012), ECF No. 274.

White was arrested in Playa Del Carmen, Mexico on June 8, 2012. See Sentencing Mem. 2, No. 7:08cr54-JCT (W.D. Va. Sept. 6, 2012), ECF No. 303. He remained in custody pending a revocation hearing, which was held on September 14, 2012. See Minute Entry, White, No. 7:08cr54-JCT (W.D. Va. Aug. 7, 2012), ECF No. 286 (reflecting White's initial appearance and remand to custody); Judgment, White, No. 7:08cr54-JCT (W.D. Va. Sept. 14, 2012), ECF No. 310. Based on White's admission of the violations charged, the district court revoked his supervised release and sentenced him to ten (10) months of imprisonment on each of Counts One, Three, and Five, all to be served concurrently. Judgment, White, No. 7:08cr54-JCT (W.D. Va. Sept. 14, 2012), ECF No. 310.

Shortly after revoking his supervised release, the district court resentenced White, applying § 3A1.1(b)(1)'s vulnerable victim enhancement as directed, to a term of thirty-three (33) months imprisonment and thirty-six (36) months of supervised release on each of Counts One, Three, and Five, all to be served concurrently. Amended Judgment, White, No. 7:08cr54-JCT (W.D. Va. Oct. 25, 2012), ECF No. 316. White was resentenced on the same day that this Court appointed counsel to represent him in the instant action. See Order, ECF No. 176.

33

5.    **Remand and Sentencing in the Northern District of Illinois**

On October 26, 2012, three days after White was resentenced in the Western District of Virginia, the Seventh Circuit reversed the district court's judgment of acquittal as to his conviction in the Northern District of Illinois, holding that a reasonable jury could have convicted him of criminally soliciting harm to Juror A, in violation of 18 U.S.C. § 373. White, 698 F.3d at 1008.  Because criminal solicitation is not protected by the First Amendment, the Seventh Circuit reinstated his conviction.  Id.  Holding that White was not entitled to a new trial, the Court remanded the case for sentencing.  Id.  The Seventh Circuit's opinion was docketed in White's Northern District of Illinois case on December 12, 2012, the day after this Court established its briefing schedule.  Opinion, White, No. 1:08cr851-1 (N.D. Ill. Dec. 12, 2012), ECF No. 202; see also Order, ECF No. 181.  White was sentenced on Count One of the superseding indictment on February 20, 2013.  Judgment, White, No. 1:08cr851-1 (N.D. Ill. Feb. 20, 2013), ECF No. 210.  He received a sentence of forty-two (42) months of imprisonment and three (3) years of supervised release.  Id.  White remains incarcerated at this time.

F.    **Postings at Issue**

As the above review of White's extensive legal troubles reveals, he frequently employs Internet postings as a means for

34

expressing his dissatisfaction with the actions, beliefs, or status of others.  In such postings, White regularly discloses the personal, identifying information of his targets, pairing that information with disparaging and, in some cases, criminally threatening or intimidating language.  At issue here are a number of communications authored by White and published or otherwise distributed on the Internet.  Of the approximately eleven individual communications at issue, four are particularly troubling because they include the personal, identifying information of counsel.[28]

White does not dispute that he authored the various postings and, as the Magistrate Judge Order notes, there is also little question that White had some degree of control over and/or access to the websites on which the posts appeared.  Mag. Judge Order 19-20, ECF No. 98.  Rather, White has argued only that the <u>content</u> of the postings is not sanctionable.  The relevant postings are reviewed below.

### 1.   The February 22, 2008 Postings

a.   **ANSWP Yahoo! Groups Posting, February 22, 2008, 12:44 a.m.**

The first posting of which the Court is aware, entitled "Subpoena Lawsuit Update," appeared on the ANSWP Yahoo! Groups page on February 22, 2008 at 12:44 a.m.  Intervening Pls.' Reply

---

[28] Excerpts of the relevant postings, in redacted form, are provided below.

Br. to White's Br. in Opp'n to Mot. for Sanctions ("Pre-Hr'g Reply Br.") Ex. B, ECF No. 67-3.[29]   The post reads:

Comrades:

An update on this subpoena lawsuit.

First, we are certainly going to win.  That is good news.  This idiot Motley [sic] has barked up the wrong tree and didn't even take the time to do some basic research into who I was and what my companies are and who owns them besides me, etc [sic], when he filed [the subpoenas], and so he's hit the tar baby and is going to be brought to that nasty awakening real son [sic].

Second, the bad news:  Its [sic] probably going to cost at least $5000-$6000 [sic] to win this.  This is bad because its [sic] another pain [in] the rear I don't need and more money I have to advance the party. Any help with this is appreciated.

Third, the good news:  This guy has screwed up so bad that, if I have anything to say about it, we're going to sue him and his law firm under a precedent he established for filing subpoenas without cause and recoup all of this money in the end.  Further, if we can, we're going to drag SPLC into this for having collaborated with him, as it is becoming more and more clear to me that the motivation here is not to actually discover anything about what happened with Norfolk, but to harass me because this guy doesn't like me calling a nigger a nigger.

This is not the first time that some half wit [sic] attorney with a big name and a shiny law firm has been publicly embarrassed coming after me, and it won't be the last.  However, we will need everyone's support to fight this and win.

---

[29]   This posting was made available at http://groups.yahoo.com/group/nsmamerica/message/7237, however, the Yahoo! group page has since been made private, preventing access without pre-approval from the group administrator.  The post was apparently last accessed on February 22, 2008.  Mag. Judge Order 20 n.30.

        Bill White, Commander
        American National Socialist Workers Party

Id.  Although this posting preceded the posting that initially

gave rise to Intervening Plaintiffs' Motion for Sanctions, the

record suggests that counsel may not have been aware of White's

postings on the ANSWP Yahoo! Groups page until sometime well

after White's posting to the Vanguard News Network approximately

fourteen hours later.

   b.   **Vanguard News Network Forum Posting, February 22, 2008**

     White's posting to the Vanguard News Network[30] on February

22, 2008[31] gave rise to the underlying Motion for Sanctions.  Am.

Non-Party White's Br. in Opp'n to Intervening Pls.' Mot. for

Sanctions ("Pre-Hr'g Br. in Opp'n") Ex. A, ECF No. 59-2.  In

that posting, White, writing as ANSWP "Commander," stated:

     Legal Help: Do Not Contact Whiny Section 8 Niggers

     Comrades:

     In case anyone needed to be told, and I realize all of
     you do not.

     No one associated with the ANSWP is to contact anyone
     involved in the subpoena litigation against us while
     we are involved in defending these subpoenas.  After
     we are done with our legal dispute, they are open

---

     [30] As noted above, the Vanguard News Network is an internet forum
in which members express anti-Semitic and white supremacist views.

     [31] As the Magistrate Judge Order notes, the Vanguard News Network
posting does not include a specific time stamp.  Mag. Judge Order 21,
ECF No. 98.  However, it is likely that this posting was made close in
time to the identical posting that appeared on ANSWP's Yahoo! Groups
page, which was time stamped at 3:35 p.m. on February 22, 2008.

game, but while we are involved in this legal dispute, there is to be nothing done that would cause someone to have valid reason to further investigate our records.

No one is to contact this attorney, Kevin W [sic] Mottley, partner at Troutman Sander [sic], or his wife, Patricia P [sic] Mottley. You are not to go by their home at [Mottley's home address], or call them at [Mottley's phone number]. Do not open credit cards in their name, empty their bank accounts by Internet, hack their emails, or otherwise invade their privacy or misuse their social security numbers. I would tell you which social security numbers not to misuse, but I cannot publish such information in this forum, but don't misuse them anyway. None of that.

I know they are wasting thousands of dollars of our money, but we can be patient and deal with them legally.

Further, do not contact any of the Negroes involved in this case. Because I do not know what Negroes are involved in this case and they are not willing to provide us with a list of them so we can determine whether or not we have any information relevant to them, I cannot tell you what Negroes not to contact. However, I would assume anyone that seemed involved in the case should be left alone. I have a mailing list that reads "Whiny Section 8 Nigger" for several addresses, but I am told that is not their proper name, so I am only mystified as to why they opened mail that wasn't addressed to them, but I presume we can still contact any "Whiny Section 8 Nigger" we happen to encounter -- as long as they don't seem to be involved in this case.

That is all for now.

Bill White, Commander
American National Socialist Workers Party

<u>Id.</u>

c.    **ANSWP Yahoo! Groups Posting, February 22, 2008, 3:35 p.m.**

At approximately the same time that White posted the above message to the Vanguard News Network, he published an substantively identical posting to the ANSWP Yahoo! Groups page, under the heading, "In Case Anyone Needed to Be Told: Do Not contact Virginia Beach Niggers ...[.]"  Pre-Hr'g Reply Br. Ex. E, ECF No. 67-6.  This posting was time stamped at 3:35 p.m. Id.

d.    **Vanguard News Network Posting, February 22, 2008, 3:58 p.m.**

Less than one hour after White posted Mottley's personal, identifying information to the Vanguard News Network, one of his followers, identifying himself as "John Creagh," posted the following response: "Just to be clear, this is the lawyer you are not supposed to contact," followed by information about Mottley apparently obtained from Troutman Sanders' firm website, including Mottley's professional contact information, his representative experience, distinctions, education, admissions, and memberships.  Pre-Hr'g Br. in Opp'n Ex. A, ECF No. 59-2. The response post did not include any personal, identifying information but it did refer to the underlying litigation, including what appears to be Troutman Sanders' diversity policy under the statement, "He's probably taking this case to show he's on board with the firm's diversity policy."  Id.  It does

39

not appear that White was involved in authoring this posting, nor that he responded to it in any way.

### 2. The February 28, 2008 Emails

a. ANSWP General Membership Email, Copied to Counsel, February 28, 2008, 6:55 p.m.

As discussed above, the Magistrate Judge conducted a hearing on February 28, 2008 regarding the subpoena dispute between White and Intervening Plaintiffs. At that hearing, the Court received limited argument on Intervening Plaintiffs' Motion for Sanctions, which was initially based only on White's February 22, 2008 posting to the Vanguard News Network. Hr'g Tr. 4-22, 45-75, Feb. 28, 2008, ECF No. 60. During argument, counsel for Intervening Plaintiffs suggested that, "[White] can post something indicating he now understands the rule of law and that he denounces and rejects the suggestions that people are open game once litigation ceases," reiterating, "He can do that. Why doesn't he? What's going on?" Hr'g Tr. 65-66, Feb. 28, 2008. After the February 28, 2008 hearing, White sent an email to his counsel and to Mottley entitled, "Norfolk Case Update," which included the text of an email "[s]ent today to our general membership, in case there was any doubt as to my intentions or my instructions regarding Mr. Mottley and company." Intervening Pls.' Supplemental Br. in Supp. of Mot. for Sanctions ("Pre-Hr'g

Supplemental Br.") Ex. A, ECF No. 55-2.   The email was approximately four pages long and stated:

Comrades:

I just returned from Norfolk, Virginia, where a hearing was held today on some of the subpoenas that have been issued against us and our records.   The hearing was essentially two hours of delusional ranting, paranoid people shooting at us, and if we hadn't wiped the floor with them, it would have been very irritating.   Some new things have developed, though, and before I get into a detailed discussion, I want to make something clear:

The American National Socialist Workers Party, LLC's Article of Organization prohibit any member from engaging in criminal activity, which includes interfering with any party to any lawsuit in which we are engaged.   Further, they prohibit individuals with a number of personal defects associated with criminal behavior from joining, for the purpose of making sure our members are not individuals inclined to cross over some lines.   These rules have always been strictly enforced, and we not only reject about a third of the membership applications we receive for this reason, but have suspended members and leaders in the past when they have not appropriately handled legal problems they have encountered.   No member of the American National Socialist Workers Party, LLC, has ever committed a crime in furtherance of our political goals and it is my sincere hope no member ever will.

Because all of you know this, I can generally remind you of it with humor; however, since my humor falls dead on the enemies of humanity that have gathered against us, I thought I would restate the position of the ANSWP in the clearest words possible.

That said, back to my report on today's events:

Today's morning in court was more like a stay in a mental institution than a proper court hearing.   I've never sat in a hearing in which there was more rhetoric and speech making and less evidence presented, and I hope to never sit through such a thing again.   Apparently, a member of the well known

41

[sic] criminal organization Citizens Against Hate sent a packet of "information" to Troutman Sanders just before we entered the hearing, and, as a result of these clearly bogus lies from people Troutman Sanders should know are convicted felons, this bogus Motion for Criminal Sanctions was entered, leading to attorneys jumping up and down and pounding the pulpit to demand my immediate arrest.  As I am sitting here writing this, it is safe for you to assume this demand was not granted.

. . .

I don't pretend to know all the details; I came into the hearing almost an hour late after getting caught in traffic in Richmond and trying to find parking in Norfolk.  I estimated the drive at four and a half hours but it turned into five and a half.  As I walked in, some old woman from the Department of Justice was shouting about how "Mr [sic] White's failure to appear for this hearing today is just further evidence of his intent to commit imminent criminal acts against Mr [sic] Mottley" or something to that effect.  As best I can gather, Citizens Against Hate told Troutman Sanders that I was planning to assassinate the Mottley family after the hearing today, and, as a result, the FBI and the police had provided Mottley and the attorneys with round the clock bodyguards.  Given that this is not the first time that Citizens Against Hate has knowingly made a false report of a crime in order to play a prank on a white activist, you would think the DOJ would take some action against them; however, as we all know, claiming to be an anti-racist is a good way to get immunity from prosecution.

. . .

With that summary, I describe today's hearing as ranting because this was not the kind of rational discussion of the law that usually occurs in a courtroom, but a lot of irrational accusations coming from people who were clearly both terrified and completely ignorant of what they were talking about. The six or seven attorneys on the other side first ranted about how I was involved in a conspiracy with this James Henry, and then said that the fact I started my letters with "I do not know James Henry" was "proof" that I did know James Henry, because,

obviously, why would I say that unless I was deliberately trying to mislead a future court investigation into me?

Yeah, that was the kind of logic we faced all day. I don't know if the judge was buying it or not, but he was excessively indulgent. It just gave me a headache.

For instance, I mentioned our "mailing list" of the tenants. Well, we sent thirty pieces of mail, so of course we had a list. The other attorneys were ranting about "how did he get such a list?" and "James Henry must have given it to him", [sic] when, of course, we all know that I just went to the Virginia Beach GIS, looked up the apartments, then ran them through WhitePages.com. Knowing there were five buildings and thirty units, or six buildings and five units, or whatever there was, it was easy to figure out they were address #1, apt #1, 2, 3, 4, and 5, or whatever. I don't think that's a terrible mystery, but paranoia, fear and lunacy prevailed and all sorts of conspiracy theories that would be denounced as "right wing paranoia" if they weren't focused on a racial activist were permitted to be argued before the Court.

Similarly, there was all this ranting about "how did he discover the address and phone number of Mr [sic] Mottley, and the name of his spouse?" and asserted that the mere fact I knew where they lived was evidence I had spent all this time following them, et cetera. Of course, Mr [sic] Mottley is listed in the phone book, and it took all of ten seconds to confirm the information about him that had already started to hit the Anonymous messageboards [sic], but this big professional fancy law firm somehow overlooked all of this as well.

They then went into a lot of ranting about how I had previously told no one to mess with them during the trial, but said afterwards they were "fair game". [sic] Well, of course, all I meant by that is that once they are out of my hair, I don't care what happens to them one way or the other. That doesn't mean I want anything particular to happen to them; in fact, I actively hope that this concludes with them being sued into oblivion, paying me a large judgment,

and never having anything happen to them upon which they hang any legitimate complaint.  It does mean that I only care about them as long as they have some implication on me and only want to be done with them without any third (really, I guess, fourth) parties getting any bright ideas and trying to "help". [sic]

As most of you know, there is a large presence on the internet known as Anonymous.  My strong suspicion is that Troutman Sanders has never read http://nya.7chan.org/b/, but gathered around websites such as nimbusters.org, 7chan.org, 4chan.org, 420chan.org and so on, Anonymous freely breaks the laws of the United States, trading all sorts of illegal pornography, photos and videos of crimes, and deliberately targeting people with abuse ranging from mean pranks to serious crimes.  Since discovering this, I have opposed it, filed injunctions against it, and seen the federal courts not only powerless to stop it, but actively protect it, when it has been involved in harassing white activists.  I have also seen this federal court protection of Anonymous criminality lead many activists, both racial and anti-racist, to adopt the Anonymous tactic in targeting perceived enemies.

As Mottley has gotten nastier and nastier, and sunk deeper into this delusionary alternate reality he's created around this case, I've seen his efforts could quickly balloon into the kind of nastiness that draws an Anonymous response.  As we all know, from the Anonymous perspective, someone becomes "open game" the moment they stick their head up; a lot of people don't even stick their head up, but become targets just at random as people browse the web.  I remember what happened to Joan Lefkow, for instance, and know what the segment of Anonymous which thinks its capable of "helping" is capable of doing.

Particularly, I could see agitated ANSWP fans who are not members and not under my control in any way deciding to "help", [sic] as they have when they have mailed nooses to black leaders or kidnapped members of Jewish groups, going after this attorney with some Anonymous tactics that would do nothing but hurt our position.  In response to that possibility, I posted my somewhat humorous and mostly serious admonition not to harass him.  I think anyone familiar with my writings could understand what I meant when I made

that post.   I cannot imagine anyone interpreted it as a command to "kill him after the trial," kill him after a specific hearing, or commit any specific crime against him.   But, based upon apparent other false information he and his law firm has [sic] received from these communist criminals, he has decided that I was imminently planning to assault him this afternoon, and made that case to the court -- thus the "urgent" call for my "immediate arrest". [sic]   He and the other attorneys also stated that they are so terrified that they are considering withdrawing from the case and leaving their clients hanging.   They weren't joking either.   Many of them physically trembled in court.   It was just sad and sickening.

So I don't know what to do with these fools.  I've now got another week of BS hearings and will probably eventually have to fight off a Show Cause order on contempt because of these loonie's [sic] angry ranting.   There was a lot of talk in the court today about the benefits of "democracy", [sic] but it strikes me that any system that allows irrational people to come forward with no evidence and harass someone because of right and moral political views that they hold is a system that we would be better off without.   There was a time when the United States objected to Nuremburg-style show trials; what I suffered through today looked a lot like one.   I guess the one advantage of our system is that generally judges don't buy these kinds of lies, however, judges who understand the politically motivated verdict are increasingly common, and who knows how things will go.

So, we have hearing[s] scheduled March 3 and March 6. I've been asked to clarify our position, and our position remains as it was written in the ANSWP Articles of Organization two years ago -- all members are prohibited from committing any crime against any person at any time, and will be expelled from the Party if they do so.

Bill White, Commander
American National Socialist Workers Party

Id.   The lengthy email did not contain personal, identifying information for Mottley or anyone else associated with the underlying litigation.

b.   **Email to Counsel and Mottley, February 28, 2008, 8:35 p.m.**

After forwarding the above email to his own counsel and to Mottley, White authored a second email to them, entitled, "Thread Removed From Vanguard News Network," and stating that, "[t]he objectionable thread on Vanguard News Network was removed today."   Intervening Pls.' Br. in Supp. of Objections to Mag. Judge Order ("Post-Remand Br. in Supp. of Obj.") J.A. at 345, ECF No. 152-5.   At the hearing that morning, the Court had inquired whether the posting could be removed pending the resolution of Intervening Plaintiffs' Motion for Sanctions. Hr'g Tr. 69, Feb. 28, 2008.   White had indicated through counsel that, although he did not exercise direct control over the Vanguard News Network, he was acquainted with the site's operator and could potentially arrange for the removal of his previous posting. Id. at 70-71.   White's second direct email to his attorney and to Mottley on February 28, 2008 apparently confirmed that he had succeeded in having the Vanguard News Network posting removed.   The email did not disclose, as the Magistrate Judge Order notes, that the posting remained available on ANSWP's Yahoo! Groups page, a fact apparently unknown to counsel and the Court.

### 3.   The April 2008 Postings to Overthrow.com

After the parties had fully briefed Intervening Plaintiffs' Motion for Sanctions, the Magistrate Judge held an evidentiary hearing on the motion at 10:00 a.m. on April 2, 2008. Following the hearing, White authored postings to his own Internet blog, Overthrow.com, in which he expressed his views on the hearing and, more expansively, on the entire "subpoena litigation." In the majority of these postings, White mentioned Mottley and the law firm of Troutman Sanders by name, but he did not provide any personal, identifying information. However, White did again publish such information in at least two postings of which the Court is aware, one made the day after the hearing and another made on April 9, 2008, while expedited briefing concerning the impact of the April 3, 2008 post was ongoing.

### a.   Overthrow.com Posting, April 3, 2008, 9:54 a.m.

The day after the April 2, 2008 hearing, White authored a posting entitled, "Troutman Sanders Attorney Kevin Mottley," and subtitled, "For Those Who Want To Talk To Him -- Nicely."[32] The post was styled as a "Commentary" and began: "I have been thinking about this Troutman Sanders case, and I am tired of

---

[32] The posting was originally available at http://12.107.40.66/lsn/news.asp?articleID=10655. Mag. Judge Order 27 n.33. The Court, however, was unable to access a copy of the posting at this location. A copy of the posting was attached to Intervening Plaintiffs' supplemental brief in support of their Motion for Sanctions. Ex. A, ECF No. 76-2.

pretending that there is something wrong with telling people to contact and speak to someone about public statements they have made."  Intervening Pls.' Supplemental Br. in Supp. of Mot. for Sanctions ("Post-Hr'g Supplemental Br. in Supp.") Ex. A, ECF No. 76-2.  The post went on to describe Mottley as "the ridiculous, cowardly, shaking-trembly [sic] attorney who basically cried on the stand yesterday when describing how terrified and fearful he was that I suggested people not talk to him about this case." Id.  Apparently referring to Mottley's testimony at the April 2, 2008 hearing, White wrote: "He asked me to reverse this statement, which I will do now."  Id.  The post continued, referring to Mottley and Wagner and including what White believed to be accurate contact information for both:[33]

> Kevin Mottley, the attorney representing the niggers in Virginia Beach lives at [Mottley's home address] in Richmond, Virginia [zip code] and his home phone number is [Mottley's home phone number].  Lori Wagner, the lead attorney for the Department of Justice, lives at [physical address] Richmond, Virginia [zip code].

> Write to them.  Call them.  Tell them what you think. Do not threaten them.  Do not harass them.  Do not commit crimes against them, at this point in time or any other point in time.  But, legally, contact them and share with them your point of view.

> You have a right to contact people who are in activities that draw public attention.  They do not have a right to conduct their activities in secret or to hide from you.  And if they do something irrational, like hire police bodyguards to protect

---

[33] As described below, the contact information provided in the April 3, 2008 posting for Wagner was incorrect.

> them from "threats" that exist wholly in their imagination, we are in now [sic] way responsible for that.
>
> I am under no order from the court in Virginia Beach or any other Court not to publish their address or phone number. The court has repeatedly had the opportunity to issue such an order and has declined to do so. They declined to do so at the first hearing, and they declined to do so at the hearing yesterday. I am no longer going to pretend that there is some jeopardy against me for doing activities that are completely legal.
>
> The court in Virginia Beach has the authority, under the All Writs Act, to order me not to publish information that is disrupting the course of a trial or prejudicing one party or another. It does not have the authority to punish me ex post facto for material that is not criminal and which is not aimed at disrupting the flow of justice. It has declined, so far, to prevent me from publishing this information, and, until it changes its mind, I am going to obey the law and let all of our readers know exactly who these people are.

Id.  The posting then provided a link to a news article describing the April 2, 2008 hearing, under the phrase "[y]ou can read about the case here." Id.

     **b.  Overthrow.com Posting, April 9, 2008, 8:26 a.m.**

As discussed above, the Court conducted an emergency telephonic status conference on April 4, 2008 in response to White's April 3, 2008 posting to Overthrow.com. Following the status conference, the Magistrate Judge established an expedited briefing schedule concerning the impact of White's subsequent posting on the pending Motion for Sanctions. Order 2, ECF No. 74. Per the Court's Order, briefing was to conclude on April

49

10, 2008 and a second telephonic status conference was to take place on April 11, 2008.  Id.

As ordered, the United States filed a supplemental brief on April 8, 2008.  Supplemental Submission in Supp. of Mot. for Sanctions, ECF No. 75.  In that brief, the United States stated that "Mr. White ha[d] incorrectly listed the residential address for counsel of the United States."  Id. at 2 n.1.  The next day, before White's counsel filed his response brief,[34] White published a corrected version of the April 3, 2008 posting, in which he provided an updated home address for Wagner.[35]  This posting was apparently otherwise identical to the April 3, 2008 post.

### 4. Overthrow.com Posting, August 16, 2008, 9:20 a.m.

In addition to the postings reviewed above, which were the only communications considered by the Magistrate Judge, White authored a final post less than one month after the Magistrate

---

[34] White's counsel filed his supplemental response brief pursuant to the Court's Order at 5:18 p.m. on April 9, 2008, after the corrected posting was published.  Supplemental Resp. in Opp'n to Mot. for Sanctions, ECF No. 77.

[35] According to the Magistrate Judge Order, White's corrected posting was made at 8:26 a.m. on April 9, 2008 and originally appeared at http://12.107.40.66/lsn/news.asp?arcticleID=10669.  Mag. Judge Order 28 & n.34, ECF No. 98.  The posting no longer appears at this address and a copy of it was not included in the record.  However, the record does reveal that White made a second posting that was apparently substantively identical to his April 3, 2008 posting, except for the corrected address provided for Wagner.  Mag. Judge Order 28, ECF No. 98.