Judge issued his Opinion and Order denying Intervening Plaintiffs' Motion for Sanctions.[36]  In this final post, which was made to Overthrow.com on the morning of August 16, 2008, White stated:

> I saw the movie "Funny Games" the other night, and it occurred to me:
>
> Civil Rights Attorney Kevin Mottley of Troutman Sanders and his wife would star perfectly in the role of "the family". [sic]
>
> Anyone think I'm off base on that?

Intervening Pls.' Corrected Br. in Supp. of Objections to Mag. Judge Order ("Br. in Supp. of Obj.") Ex. A, ECF No. 104-2.  The post included the following "tags": "contempt," "funny games," and "movie review."  Id.  According to the plot summary attached to Intervening Plaintiffs' objections to the Magistrate Judge Order, "Funny Games" tells the story of "a middle-class family [who] submits both physically and mentally to the torture, violence, and death foisted upon them by two young, unexpected white-gloved visitors at their vacation retreat near the lake."  Id. Ex. B, ECF No. 104-3.  Significantly, this posting did not include any personal, identifying contact information for Mottley or his wife.

_____

[36] The review of the Magistrate Judge Order remained pending before the District Court when White authored the August 16, 2008 post. Intervening Plaintiffs' included a copy of the post and argued its relevance in their written objections to the Magistrate Judge Order. See Intervening Pls.' Corrected Br. in Supp. of Objections to Mag. Judge Order, ECF No. 104.

### G.   Evidence Presented at April 2, 2008 Hearing

In addition to the postings at issue, the Court has before it the evidence presented to the Magistrate Judge at the evidentiary hearing held on April 2, 2008.  At the hearing, Intervening Plaintiffs introduced twenty-seven documentary exhibits, including White's May 23, 2007 letter, related documents, and various Internet postings and emails authored by White.  The United States introduced four additional exhibits, including Dr. Dardick's reports and a document recovered from White's computer that listed the names, addresses, and phone numbers of the attorneys involved in the underlying litigation.  As noted above, White, Dr. Dardick, and Mottley testified at the hearing.  The Court reviews the relevant exhibits and testimony below.

### 1.   Summary of Exhibits Offered

Intervening Plaintiffs offered the majority of the exhibits entered at the April 2, 2008 hearing.  Many of these were copies of White's other writings, which Intervening Plaintiffs alleged show his tendency toward violent behavior and his practice of endeavoring to incite or instigate violence through written communications that 1) openly espouse his anti-African American and anti-Jewish ideologies, and 2) forcefully advocate in favor of white supremacy, segregation, and the "elimination" of those

whom White opposes.[37]   Some exhibits addressed White's May 23, 2007 packages to Intervening Plaintiffs, as well as the resulting media coverage. Post-Remand Br. in Supp. of Obj. J.A. 358-67, 371-77, ECF No. 152-6.   These posts, which were authored in the week immediately following White's mailing of the packages, included several derogatory descriptions of Intervening Plaintiffs and emphasized White's view that his conduct toward them had been "perfectly legal."[38]   Id.

In addition to the commentary regarding the underlying litigation, Intervening Plaintiffs offered other examples of White's allegedly inciting writings, including comments endorsing the murder of "white people opposed to racism," postings hypothesizing about the effect on the 2008 presidential election were then-candidate Barack Obama to be assassinated, id. at 400, summaries of ANSWP's white supremacist purpose and goals, id. at 406-07, and the 2008 postings calling for Richard

---

[37] White objected to the relevance of various writings that he had authored, which were presented at the evidentiary hearing, on the basis that they were taken out of context. The Magistrate Judge noted that White had the opportunity, through cross-examination of witnesses and argument to the Court, to provide any pertinent context. Id. Concluding that the writings spoke for themselves, the Magistrate Judge overruled White's objection. Id. White has not objected to this ruling and the Court finds no clear error in the same.

[38] These postings, which appeared on Overthrow.com and Overthrow.blog, referred to Intervening Plaintiffs as "niggers," "disgusting nigger parasites," and "half-people . . . and their bastard half-animal race." Post-Remand Br. in Supp. of Obj. J.A. 358-67, ECF No. 152-6.

Warman's murder that formed the basis and context for White's prosecution in the Western District of Virginia, id. at 409-17.

One particularly deplorable posting detailed White's exhibitionistic and self-serving view of his physical altercation with an African American "crack dealer." Id. at 384-90. White authored the post on February 20, 2008, after he was acquitted of the resulting assault charge. Id. at 384. In it, White lamented the state of his community and what he viewed as a failure to act on the part of law enforcement. Justifying his actions, White stated, "I have additionally become convinced that the murder of wicked men, when conducted in a selfless manner, is a path to transcendence and to God." Id. at 386. White went on to express the "euphoria" he felt as he choked the other man, which he described as "a peace greater than any sensation I have ever felt." Id. at 387. He continued: "It was as if I was bathed in light. I felt closer to God as I killed this wicked man, and it is a sensation I hope to be able to feel again." Id. White "recommend[ed] to all reading this that they consider taking a wicked man -- a crack dealer, a pimp, an NAACP official defending black crime, or perhaps a newspaper writer supporting them -- and killing them with your bare hands as a test of what I have to say." Id. at 388. He emphasized his belief that:

54

> [T]he murder of the wicked, including all of those in positions of power who support the commission of wickedness and support the modern world that creates such conditions of wickedness, is a positive duty of every National Socialist, just as the protection and the defense of the lives of the good, the innocent, and the defenseless among them is a burden we are compelled to bear.

Id.  White then declared: "God can be found through the murder of wicked men, and being killed while murdering wicked men is a path to heaven." Id. at 388.

In another posting, dated November 20, 2007, White reproduced, under the words "Fuck off," a copy of an interview request that he had received from Brentin Mock of the Southern Poverty Law Center ("Mock"). Post-Remand Br. in Supp. of Obj. J.A. 456, ECF No. 152-7. In a comment to this post, White disclosed Mock's personal, identifying information, including his name, age, date of birth, home address, and phone number, with a notation that Mock's home phone was "connected." Id. at 457. Immediately preceding Mock's information was the statement, "I'll have some people drop by." Id. The comment continued, "And you have a relative down here in Roanoke," followed by the name, address, and phone number of a woman whose last name was also "Mock." Id. Concerning Mock's apparent relation, White stated, "Interesting. Are you going to be obnoxious enough I need to look deeper?" Id. When one of White's followers, writing under the name "Frank Blanc,"

55

questioned White's inclusion of the information concerning Mock's relative, he responded:

> My view:  Total war.  Kill them, kill their families, kill everyone they know.
>
> Bind - Torture - Kill.
>
> If you can't tell, I've been in a bad mood lately. Some assholes owe me $90,000 and are dragging their feet paying.  I may be getting ready to do some serious killing -- the only question is what direction I go.
>
> -I need a smiley with a machine gun right about here.

Id. at 462.  After Mock apparently reiterated his request for an interview, White again commented:  "Nigger doesn't understand what 'fuck off' means."  Id. At 463.  After reprinting Mock's response, White continued, "Someone should have told him -- the only way to really piss me off is to be a pissant [sic] nobody and to talk to me like your life has value.  Just doing that makes me want to hunt his black ass down."  Id. at 463.

Another exhibit, the May 2007 edition of the National Socialist magazine that White had included in the packages he sent to Intervening Plaintiffs, featured an editorial lambasting the editor of the Roanoke Times, Chris Trejbal, who White claimed had "posted the personal information of 135,000 Virginia concealed carry [sic] permit holders, pairing it with a column comparing them to sex offenders."  J.A. 348.  In the editorial, White boasted that, in response:

> [W]e mass mailed his neighbors to let them know of the peculiar feelings this 37-year old unmarried man has for homosexuals, along with our February issue on Gay Jews.  Both were featured on the evening news.  We also posted his home address and phone number online. Bomb threats followed, and his house had to be evacuated.[39]

Id.  The editorial continues, summarizing a press statement that ANSWP had apparently released and bragging, "As of the day we went to press, that statement was the number one Google result for anyone checking on Trejbal's name."  Id.

## 2.   Summary of Testimony

As noted above, White, Dr. Dardick, and Mottley testified at the April 2, 2008 hearing.  White testified regarding the exhibits and his intentions in making the relevant postings. Dr. Dardick then testified as to his review of White's computers.   Finally, Mottley testified regarding the objectionable postings and his reaction to those postings.

During his testimony, White admitted to authoring and posting various exhibits, as the parties had stipulated at the outset of the hearing.  Regarding the postings at issue in this matter, White testified that they were not intended to be threatening to Mottley and that they were never intended to be read or received by Mottley.  White claimed that the postings

---

[39] At the hearing, White testified that he was only one of a number of sources that posted Mr. Trejbal's personal information. Hr'g Tr. 30-31, Apr. 2, 2008.  Thus, White conceded that he could not take credit for the alleged "bomb threats" following his own posting of that information.  Id.

were meant to be humorous and satirical, as he maintained was true of all of his writings. He also suggested that the postings were designed to protect Mottley, in that they advised White's followers, who White characterized as difficult to control, not to engage in any acts of harassment or violence, at least not until the litigation had ended. Regarding the emails he sent directly to counsel on February 28, 2008, White testified that he sent the first in response to what he perceived as a request from Intervening Plaintiffs' counsel that he contact his supporters and clarify his position, and that he sent the second in response to the Court and counsels' concerns regarding the continued availability of the February 22, 2008 Vanguard News Network posting during the Court's consideration of Intervening Plaintiffs' Motion for Sanctions.

White's explanations, of both the instant writings and his style of communication generally, were overwhelmingly self-serving and, at times, seemed to mock the very serious concerns raised by the underlying Motion for Sanctions. For example, in addressing the potential that his writings could be misinterpreted if read out of context, White testified, "I think a person familiar with the poison of modernity might misinterpret what I had to say. I don't know that they would necessarily need my [other] writings. But if they were familiar with my writings, they would see things my way." Hr'g Tr. 70,

58

Apr. 2, 2008. When asked by Intervening Plaintiffs' counsel about his failure to remove the February 22, 2008 Yahoo! Group's posting after the Court expressed concerns at the February 28, 2008 hearing about the identical posting to the Vanguard News Network, White testified that he did not remove the Yahoo! Groups posting "[b]ecause it was [a] pointless endeavor to begin with, and it was just done because you were just looking at that Web site, and it was just done to make you feel happier than you felt before. The actual substance of the act was pointless." Id. at 83.

Dr. Dardick testified as an expert in the field of forensic analysis of computer information. Id. at 91-92. His testimony focused on his recovery and examination of three computers pursuant to the subpoenas issued to White and his various entities out of the Western District of Virginia. Dr. Dardick explained the process of forensic imaging that he conducted on White's computers and his search of the resulting images for relevant keywords, including the names of the attorneys involved in the underlying litigation. Id. at 94-96. Dr. Dardick testified that when he searched for Mottley, "the term Kevin Mottley - not Mottley by itself but Kevin Mottley combined appeared 82 times."[40] Id. at 100. When he searched "Mottley,"

---

[40] The name "Patricia Mottley," appeared at least one time. Id. at 101.

alone, that number increased to "454."[41]   Id.   On cross-examination, Dr. Dardick noted that the results have been inflated to some degree by redundancy or repetitious documents. Id. at 113.   Dr. Dardick testified that he was able to locate at least one document containing all of the relevant attorney names, entitled "attorneys-vabeach.txt."   Hr'g Tr. 105, Apr. 2, 2008.   Based on the computer's time stamp, Dr. Dardick determined that this document was created at 3:29 p.m. on February 29, 2008, the day after the first hearing before the Magistrate Judge in this matter.[42]

---

[41] The names of the other attorneys involved appeared with much less frequency.   However, Dr. Dardick testified that he did not include any middle initials in his search and, therefore, may not have identified every instance in which a specific attorney's name appeared.

[42] The Magistrate Judge noted that, at the time of the evidentiary hearing, Dr. Dardick's examination of White's computer equipment was ongoing.   Mag. Judge Order 14 n.21.   At this Court's July 17, 2013 hearing, Intervening Plaintiffs proffered that Dr. Dardick's review of White's computers revealed that approximately 53,000 documents had been deleted on or about February 20, 2008, while White's motion to quash (as originally styled to include all of the subpoenas issued) remained pending before the Magistrate Judge in this Court.   It appears that the alleged deletion was previously raised before the Magistrate Judge in the Western District of Virginia, who issued an order requiring White to appear before the district court to show cause why he should not be held in criminal contempt for his conduct. Order, United States et al. v. Henry et al., No. 7:08mc003 (W.D. Va. July 1, 2008), ECF No. 34.   White's hearing before the district court was continued indefinitely by sealed order entered on July 7, 2008. See Order, Henry, No. 7:08mc003 (W.D. Va. July 29, 2008), ECF No. 43 (denying White's motion to continue the show cause hearing based on the district court's prior order).   It appears no further action was taken against White for the alleged deletion of documents under subpoena.   However, as this Court noted at the July 17, 2013 hearing, White's conduct in the Western District of Virginia is not directly relevant to the resolution of the instant matter.

Following a brief recess, Mottley testified regarding his decision to issue subpoenas to White and his various organizations, based on White's May 23, 2007 packages to Intervening Plaintiffs. When White moved to quash the subpoenas, Mottley stated that he responded, on February 19, 2008, three days before White's initial posting, by advising the Court not only of White's offensive and intimidating packages, but also of the "boasting and bragging" that White had engaged in on the Internet, specifically in his postings to Overthrow.com. Id. at 122-23. Mottley apparently attached some of these postings to his brief.[43]

Mottley testified that he first learned of the objectionable February 22, 2008 posting to the Vanguard News Network when he received an email from a woman identifying herself as a member of "Citizens Against Hate," a self-proclaimed watchdog organization that monitors and opposes hate crimes. Mottley further testified that, upon learning of the posting, he and his law firm took a number of steps designed to

---

[43] Counsel for Intervening Plaintiffs has repeatedly argued that Mottley's filing put White on notice that Mottley was reading his Internet writings, such that White could have reasonably foreseen that Mottley would read any future postings concerning him and his representation of Intervening Plaintiffs. However, the postings giving rise to the Motion for Sanctions were made to the Vanguard News Network and to ANSWP's Yahoo! Groups page, not to Overthrow.com. Although Intervening Plaintiffs' brief may have put White on notice that counsel was monitoring his website, it does not necessarily follow that White knew or should have know that counsel was monitoring other websites, which, indeed, they were not, as the record reveals.

ensure his safety, including notifying local law enforcement
(which resulted in increased safety patrols in his neighborhood)
and hiring private security guards to surveil his home. Mottley
also immediately filed the instant Motion for Sanctions.

Mottley explained that he "perceived th[e] posting . . . to
be a threat to [his] safety, not only [his] physical
safety . . . but also the security of [his] financial accounts,
[his] home, and most importantly, of [his] wife," who was not
involved in the underlying case. Id. at 126-27. Mottley stated
that he and his family suffered feelings of fear and
intimidation as a result of White's postings[44] and that the
postings caused him to question his continued representation of
Intervening Plaintiffs in the underlying litigation. Mottley
further testified that he suspended his work on the case upon
learning of White's posting. Mottley estimated that he had
spent approximately 80-100 hours responding to the posting
(including his work on the Motion for Sanctions) between the
time he became aware of it and the April 2, 2008 hearing.[45]
Mottley stated that he would have spent approximately half of

---

[44] On cross-examination, Mottley clarified that he feared White,
but that "perhaps the even greater concern [was] those to whom he
publishes . . . information who act upon it themselves[,] who may be
associated with him." Hr'g Tr. 149-50, Apr. 2, 2008.

[45] Mottley stated that this estimate did not include the time he
spent talking with law enforcement or dealing with the issue at home.

this time on the underlying litigation, had he not been diverted by White's posting.

In addition to his knowledge of and reaction to the initial posting, Mottley testified that he had received two phone calls to his home telephone number in the early morning hours of March 1, 2008. Mottley stated that the male caller, who did not identify himself, asked to speak with Mottley's wife by the name included in White's posting, a name Mottley said would not likely have been used by anyone familiar with their family.[46] Mottley testified that his caller identification system had registered both calls as coming from "unknown name, unknown number." Hr'g Tr. 137, Apr. 2, 2008. Mottley stated that he had dialed the "*69" callback feature on his telephone to determine who had placed the calls and that this feature had also failed to reveal the caller's identifying information. Id. at 138. No other evidence concerning the caller's identity was presented at the hearing. Finally, Mottley testified about the two emails he had received directly from White on February 28, 2008, both of which had also been copied to White's counsel and had addressed issues raised at the hearing earlier that day.

---

[46] Mottley summarized the calls on cross examination as follows, beginning with the first call: "'May I speak with Pat? You've got the wrong number.' Hang up. Ten minutes later, 'Well, then can I speak to Patricia, then?' Answer: 'You've got the wrong number,' click. That's it." Hr'g Tr. 148, Apr. 2, 2008.

No evidence was presented at the lengthy April 2, 2008 hearing suggesting that White's conduct with respect to Mottley, or the resulting Motion for Sanctions, disrupted or otherwise delayed the underlying dispute, despite Mottley's testimony that he suspended his work on the matter immediately following the initial posting.[47]  Additionally, there was no evidence of any direct communication from White to Mottley beyond the two emails following the February 28, 2008 hearing, sent to both Mottley and White's counsel.

## H.  Question Presented

As the above review makes clear, prior to his involvement in the criminal proceedings before the Northern District of Illinois and the Western District of Virginia, White frequently commented on the underlying litigation, the subpoenas issued to him during the course of that action, and his views concerning counsel (in particular, Mottley) and the Court.  The question before the Court on this de novo review of the Magistrate Judge Order and Intervening Plaintiffs' objections thereto is whether White's Internet communications should subject him to sanctions under the Court's inherent powers.

---

[47] Counsel for the United States did suggest that the Motion for Sanctions and related proceedings required multiple extensions of the underlying discovery schedule and generally "interfered" with the resources available for the case.  Hr'g Tr. 184-85, Apr. 2, 2008. However, no testimony or evidence of such disruptions was presented to the Court.

### III. LEGAL STANDARD

The scope of a magistrate judge's authority is defined by statute, 28 U.S.C. § 636, and includes the ability to hear and determine two types of referrals from the district court. First, Section 636(b)(1)(A) provides that a district "judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court," except for eight enumerated dispositive motions, such as motions to dismiss and motions for summary judgment. 28 U.S.C. § 636(b)(1)(A). When a magistrate judge considers a pretrial matter pursuant to § 636(b)(1)(A), the district court reviews the magistrate judge's order only to determine if it "is clearly erroneous or contrary to law." Id. For those dispositive motions excepted from subsection (A), a district court may "designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit . . . proposed findings of fact and recommendations. . . ." 28 U.S.C. § 636(b)(1)(B). "[A]ny party may serve and file written objections to such proposed findings and recommendations" within fourteen days after service. Id. If objection is made, the district court is required to review de novo "those portions of the report or specified proposed findings or recommendations to which objection is made." Id. The Supreme Court has summarized the authority provided for in § 636(b)(1) as follows: "nondispositive" pretrial matters are governed by

65

§ 636(b)(1)(A), while "dispositive" matters are governed by § 636(b)(1)(B). See Reddick, 456 F. App'x at 193 (citing Gomez v. United States, 490 U.S. 858, 873-74 (1989)).

Federal Rule of Civil Procedure 72 implements the provisions of § 636 and, accordingly, provides for the referral of both "nondispositive" and "dispositive" matters to magistrate judges. Fed. R. Civ. P. 72. Concerning the former, Rule 72(a) permits the referral of "a pretrial matter not dispositive of a party's claim or defense . . . to a magistrate judge to hear and decide." Fed. R. Civ. P. 72(a). The magistrate judge "must promptly conduct the required proceedings and, when appropriate, issue a written order stating the decision." Id. Parties are permitted to object to the magistrate judge's decision within fourteen days and, where such objection is made, "[t]he district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or contrary to law." Id. Rule 72(b) provides for the referral of "dispositive motions." Concerning these matters, the magistrate judge is directed to "promptly conduct the required proceedings" and to make "[a] record . . . of all evidentiary proceedings." Fed. R. Civ. P. 72(b)(1). Instead of issuing an order stating his decision, "[t]he magistrate judge must enter a recommended disposition, including, if appropriate, proposed findings of fact." Id. If a party timely objects to any proposed finding

66

or recommendation, "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to."   Fed. R. Civ. P. 72(b)(3) (emphasis added).   "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note) (emphasis added).

The underlying Motion for Sanctions was originally referred to the Magistrate Judge as a nondispositive pretrial matter pursuant to § 636(b)(1)(A) and Federal Rule of Civil Procedure 72(a).   In accordance with these provisions, the Magistrate Judge issued an opinion and order denying the Motion for Sanctions and, based on Intervening Plaintiffs' objections, the original district court judge reviewed the opinion and order for clear error.   Finding none, the district court affirmed.   On appeal, the Fourth Circuit held that "[a] motion for sanctions under the district court's 'inherent' power is not a pretrial matter under § 636[(b)(1)(A)],"[48] because magistrate judges do

_____

[48] The Motions for Sanctions requested relief under, among other things, the Court's inherent powers, as described in Chambers v. NASCO, 501 U.S. 32, 43 (1991).   The Motions for Sanctions and the Magistrate Judge Order's conclusions regarding all of the relief sought therein are discussed below.

67

not have inherent Article III powers, but instead possess only those powers vested in them by Congress. Reddick, 456 F. App'x at 193. The Fourth Circuit continued: "Assuming a district court can delegate its inherent power under § 636(b)'s 'additional duties' clause, de novo review of the exercise of those powers is required." Id. (citing United States v. Osborne, 345 F.3d 281, 289-90 (4th Cir. 2003)). Because the Magistrate Judge Order was issued after the underlying litigation had concluded, the Fourth Circuit also held that it was "'dispositive of a claim,' that is, [the] claim against White." Id. For these reasons, the appellate court vacated the district court's final order and remanded the matter for a de novo review in accordance with the requirements set forth in § 636(b)(1)(B). It is to this review that the Court now turns.

## IV. DISCUSSION

### A. Intervening Plaintiffs' Motion for Sanctions and Other Relief

In the instant Motion for Sanctions, Intervening Plaintiffs argued that White should be sanctioned or similarly punished under a number of theories for his online conduct during the course of the underlying action. Mot. for Sanctions 3-4, ECF No. 44. First, pursuant to the Court's inherent powers, as described in Chambers v. NASCO, 501 U.S. 32 (1991), and its civil contempt powers, Intervening Plaintiffs prayed for an

68

order assessing sanctions, including attorneys' fees and costs, against White. Id. Under these same theories, Intervening Plaintiffs also requested an order enjoining White, ANSWP, and any of its members from publishing the personal information of Intervening Plaintiffs, their counsel, or their family members and from making any statement, or engaging in any conduct, for the purpose of intimidating or harassing the same. Id. at 4. Finally, Intervening Plaintiffs' asked the Court to issue an order to show cause, pursuant to the Court's inherent criminal contempt powers under International Union v. Bagwell, 512 U.S. 821, 826-34 (1994), and Federal Rule of Criminal Procedure 42, compelling White to explain why he should not be held in criminal contempt for his online conduct. Id.

During the February 28, 2008 subpoena hearing, at which the Magistrate Judge heard limited argument regarding the Motion for Sanctions, the United States suggested that the Court could also grant relief under the All Writs Act, 28 U.S.C. § 1651, which authorizes courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." Hr'g Tr. 60, Feb. 28, 2008 (quoting 28 U.S.C. § 1651(a)). The Magistrate Judge established a briefing schedule at the hearing and, in so doing, specifically requested that the parties address whether relief was available under the All Writs Act, as suggested. Id. at 73-

69

74.    Intervening Plaintiffs did not oppose the imposition of such injunctive relief, however, they argued that any such relief, standing alone, would be insufficient to punish White for his conduct.  Mag. Judge Order 30, ECF No. 98.

After briefing had concluded, Intervening Plaintiffs raised two additional sources of support for the relief requested against White.[49]  Mag. Judge Order 16-17, ECF No. 98.  First, they cited 47 U.S.C. § 223, which criminalizes the use of a telephone or other communications device to "annoy, abuse, threaten, or harass any person."  Id. at 16.  Intervening Plaintiffs argued that White's postings encouraged or induced others to use the telephone to harass counsel (Mottley and/or Wagner) in contravention of § 223.  Intervening Plaintiffs also cited 18 U.S.C. § 119, which concerns the protection of certain individuals from publication of "restricted personal information."  Id. at 17.  However, they apparently did not argue the application of § 119 to the facts before the Court. Id.

B.    **Sources of Court's Authority to Grant the Relief Sought**

The Magistrate Judge Order considered the various forms of relief sought and concluded that the only practicable remedy available to Intervening Plaintiffs was an award of attorneys'

---

[49] These arguments were raised at the April 11, 2008 status conference during argument regarding White's April 2008 postings. Mag. Judge Order 16-17, ECF No. 98.

fees pursuant to the Court's inherent powers, as provided for in Chambers.   Mag. Judge Order 28, ECF No. 98.   The Magistrate Judge Order declined to issue a show cause order or to certify the matter to the district court for civil and/or criminal contempt, as Intervening Plaintiffs had initially requested, finding that the Court's inherent authority provided "ample support for any decision to sanction White," should it determine that sanctions were appropriate.   Id. at 29.   The Magistrate Judge Order also declined to provide any relief under the All Writs Act, 28 U.S.C. § 1651(a), as proposed by the United States, concluding that the only relief available under the All Writs Act, based on the record before the Court, would be prospective injunctive relief and not attorneys' fees, as Intervening Plaintiffs had requested. Id. at 30-31.

Regarding the additional bases for action proposed at the April 11, 2008 status conference, the Magistrate Judge Order concluded that relief under 47 U.S.C. § 223 was not appropriate, despite Mottley's testimony regarding the phone calls he had received, because no evidence had been presented that connected those calls to any actions taken by White and nothing else before the Court implicated § 223's provisions.   Id. at 17. Concerning 18 U.S.C. § 119, the Magistrate Judge Order noted that the parties had failed entirely to argue the availability of relief under § 119 and, accordingly, concluded that the

71

statute, which was generally intended to protect court personnel involved in active court proceedings, was not applicable to the case. Id. at 18.

Intervening Plaintiffs have not objected to the Magistrate Judge Order's conclusion that "the only remedies practically available in this matter would be an award of attorneys' fees under the Court's inherent authority to issue sanctions under Chambers, supra." Id. at 36. Rather, Intervening Plaintiffs have continuously objected only to the Magistrate Judge Order's conclusions regarding the Court's ability to sanction White's conduct pursuant to Chambers and to the Magistrate Judge Order's corresponding discussion of the significant constitutional concerns implicated by such an award. The nature of Intervening Plaintiffs' ongoing objection has been repeatedly clarified in the extensive briefings before the Court and at the hearing held on July 17, 2013.[50]

---

[50] The Court does observe that in their initial Objections to the Magistrate Judge Order, Intervening Plaintiffs briefly referenced (in the prayer for relief) their prior request for civil and/or criminal contempt findings. See Intervening Pls.' Objections to Mag. Judge Order 3-4, ECF No. 102. Despite such reference, Intervening Plaintiffs failed to specifically object, in their initial objections and in all of the subsequent briefings, to the Magistrate Judge Order's refusal to certify the matter to the district court for civil and/or criminal contempt. See Mag. Judge Order 29, ECF No. 98. Instead, Intervening Plaintiffs have argued only that the Magistrate Judge erred in refusing to award sanctions under the Court's inherent powers. Indeed, in one of the briefs filed before this Court, Intervening Plaintiffs specifically distinguished the relief they continue to seek from a judgment against White pursuant to the Court's contempt powers. See Post-Remand Br. in Supp. of Obj. 21-22, ECF No.

Considering _all_ of Intervening Plaintiffs' arguments regarding the Magistrate Judge Order and their representations at the July 17, 2013 hearing, the Court finds that Intervening Plaintiffs have failed to "file specific written objections to the proposed findings and recommendations" concerning any proposed ground for relief except an exercise of the Court's inherent powers pursuant to Chambers. Fed. R. Civ. P. 72(b). Thus, the Court need only review such findings and recommendations for clear error. See Diamond, 416 F.3d at 315. Having reviewed the record and the Magistrate Judge's conclusions regarding each and every proposed ground for relief to which objection was _not_ made, the Court finds no such clear error and, accordingly, **ADOPTS** and **APPROVES** the same. In so doing, the Court notes that the Magistrate Judge did not find that the Court lacked the authority to sanction White pursuant to the alternatively proposed grounds for relief, but instead declined to exercise any such authority, in his discretion. The Court turns, then, to the _de novo_ review of its authority to grant the relief sought pursuant to its inherent powers, as set forth in Chambers and related cases.

---

152. Furthermore, Intervening Plaintiffs confirmed at the July 17, 2013 hearing that they continue to seek sanctions pursuant only to the Court's inherent powers.

73

C.    **Court's Inherent Authority to Sanction White under <u>Chambers</u>**

After determining that an award of attorneys' fees pursuant to the Court's inherent authority under <u>Chambers</u> would provide the only practicable remedy for White's conduct, the Magistrate Judge considered the possibility of imposing such sanctions, concluding, first, that such an award was "entirely discretionary in nature." Mag. Judge Order 36, ECF No. 98. The Magistrate Judge went on to consider whether, in light of the First Amendment concerns implicated by an award of sanctions against White for the content of his Internet postings, such an award was an appropriate exercise of the Court's discretion and its inherent power, concluding that it was not. The Magistrate Judge Order's First Amendment analysis is considered at length below. Here, the Court first addresses the nature of its inherent authority under <u>Chambers</u> and whether that authority would support an award of sanctions against White, were such an award deemed appropriate.

### 1.    Legal Standard

Article III, Section 1 of the United States Constitution vests "[t]he judicial Power of the United States . . . in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. Section 2 defines the scope of this power, providing that it shall extend to certain enumerated "Cases" and

74

"Controversies." U.S. Const. art. III, § 2. The first session of the first United States Congress, which convened two years after the Constitutional Convention, enacted the Judiciary Act of 1789 by which it exercised the authority provided in Article III to create a system of lower federal courts—including this Court—capable of exercising Article III's judicial power.[51] See The Judiciary Act of 1789, ch. 20, 1 Stat. 73, 92 (1789); see also John O. Peters, From Marshall to Moussauoi: Federal Justice in the Eastern District of Virginia 4-5 (2013); Charles Warren, New Light on the History of the Federal Judiciary Act of 1789, 37 Harv. L. Rev. 49, 57 (1923).

It has long been recognized that, inherent in the judicial power vested and defined by Article III, there exist "'[c]ertain implied powers [that] must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court because they are necessary to the exercise of all others.'" Chambers, 501 U.S. at 43 (quoting United States v. Hudson, 7 Cranch 32, 34 (1812))

---

[51] The lower courts' ability to exercise such power has always, of course, been limited by Congress's definition of their jurisdiction, which is traditionally narrower than the jurisdiction authorized by Article III. See, e.g., Merrell Dow Pharms. Inc. v. Thompson, 478 U.S. 804, 807 (1986) (noting that Congress's grant of "arising under" jurisdiction in the Judiciary Act of 1875 "conferr[ed] a more limited power" than the "constitutional meaning of 'arising under'" contained in Article III); Jones v. Brennan, 465 F.3d 304, 307 (7th Cir. 2006) (recognizing that the Judiciary Act of 1789 conferred narrower diversity jurisdiction to federal courts than the diversity jurisdiction defined in Article III).

(citing Roadway Express, Inc. v. Piper, 447 U.S. 752, 764 (1980)). "These powers are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" Id. (quoting Link v. Wabash R. Co., 370 U.S. 626, 630-31 (1962)). Such powers are generally "shielded from direct democratic controls."[52] Roadway Express, 447 U.S. at 764; accord Chambers, 501 U.S. at 44. Accordingly, and in light of their potency, "they must be exercised with restraint and discretion." Roadway Express, 447 U.S. at 764.

The federal courts' inherent power to sanction bad faith or contemptuous conduct is "the most prominent" of the inherent powers. Roadway Express, 447 U.S. at 764; accord Chambers, 501 U.S. at 44 (quoting Ex parte Robinson, 19 Wall. 505, 510

---

[52] "It is true that the exercise of the inherent power of lower federal courts can be limited by statute and rule, for '[t]hese courts were created by act of Congress.'" Chambers, 501 U.S. at 47 (quoting Ex parte Robinson, 19 Wall. 505, 511 (1874)). However, the Chambers court made clear that statutory and rule-based sanctioning schemes do not "displace[] the inherent power to impose sanctions for bad-faith conduct." Id. at 46; see also id. at 47 (quoting Weinberger v. Romero-Barcelo, 456 U.S. 305, 313 (1982)) ("'[W]e do not lightly assume that Congress has intended to depart from established principles' such as the scope of a court's inherent power."). The Court concluded that "nothing in the[se] other sanctioning mechanisms or prior cases interpreting them . . . warrants a conclusion that a federal court may not, as a matter of law, resort to its inherent power to impose attorney's fees as a sanction for bad-faith conduct." Id. at 50. However, a court "may not do that which the Rules plainly forbid[, as] Congress has the power to abrogate a lower court's inherent authority" and will be deemed to have done so when it "adequately express[es]" such intent. Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc., 2 F.3d 1397, 1407 (5th Cir. 1993) (citing Chambers, 501 U.S. at 47).

(1874)). Such broad power necessarily inheres to the court as a means of "protecting the due and orderly administration of justice and [of] maintaining the authority and dignity of the court. . . ." Roadway Express, 447 U.S. at 764 (quoting Cooke v. United States, 267 U.S. 517, 539 (1925)) (internal quotation marks omitted) (citing 4 W. Blackstone, Commentaries *282-*285); see also In re Howe, 800 F.2d 1251, 1252 (4th Cir. 1996); United States v. Schaffer Equip. Co., 11 F.3d 450, 462 (4th Cir. 1993). It "reaches both conduct before the court and that beyond the court's confines." Chambers, 501 U.S. at 44. When exercising this power, a court has wide discretion "to fashion an appropriate sanction for conduct [that] abuses the judicial process," including, in the extreme case, the outright dismissal of an action. Chambers, 501 U.S. at 44-45 (citing Roadway Express, 447 U.S. at 765).

Pursuant to Chambers, sanctions under a court's inherent power can readily include an award of attorneys' fees under the appropriate circumstances, which the Supreme Court described as exceptions to the general rule in federal courts that a litigant cannot recover his counsel fees. Chambers, 501 U.S. at 45 (summarizing the wide range of available sanctions and concluding that, "'the less severe sanction' of assessment of attorney's fees is undoubtedly within a court's inherent power as well" (quoting Roadway Express, 447 U.S. at 765)). Under one

such exception, a court may award attorneys' fees "when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" Id. (quoting Alyeska, 421 U.S. at 258-59). When, as here, an award is sought for bad faith conduct, a court may assess attorneys' fees against the responsible party if it finds "'that fraud has been practiced upon it, or that the very temple of justice has been defiled.'" Id. (quoting Universal Oil Prods. Co. v. Root Refining Co., 328 U.S. 575, 580 (1946)). Such an award may also be appropriate "when a party 'shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order.'"[53] Id. (quoting Hutto v. Finney, 437 U.S. 678, 689 n.14 (1978)). The imposition of sanctions under this bad-faith exception:

> [T]ranscends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of "vindicat[ing] judicial authority without resort to the more drastic sanctions available for contempt of court and mak[ing] the prevailing party whole for the expenses caused by his opponent's obstinacy."

Id. (quoting Hutto, 437 F.3d at 689 n.14)) (alterations in Chambers). However, a federal court must "exercise caution in invoking its inherent power, and it must comply with the

---

[53] In this instance, "the bad-faith exception resembles the third prong of Rule 11's certification requirement, which mandates that a signer of a paper filed with the court warrant the paper 'is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.'" Chambers, 501 U.S. at 46 n.10.

mandates of due process, both in determining that the requisite bad faith exists and in assessing fees." Id. at 50 (citing Roadway Express, 447 U.S. at 767). Indeed, in recognizing the court's authority to shift fees under this inherent power, the Fourth Circuit has emphasized that such authority is limited to "the extraordinary circumstances where bad faith or abuse can form a basis for doing so." Hensley v. Alcon Labs., Inc., 277 F.3d 535, 543 (4th Cir. 2002) (citing Chambers, 501 U.S. at 45-46).

A federal court's inherent power to sanction may be exercised even if a statute or rule also authorizes sanctions for the same egregious conduct. Chambers, 501 U.S. at 50 ("[N]either is a federal court forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules."). But the Chambers court expressed the preference that, "where there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power." Id. On the other hand, "if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent powers." Id.

Thus, "[i]t is well-settled that a federal court, acting under its inherent authority, may impose sanctions against

79

litigants or lawyers appearing before the court so long as the court makes a specific finding that they engaged in bad faith conduct." In re Yorkshire, LLC, 540 F.3d 328, 332 (5th Cir. 2008) (collecting cases); accord Stalley v. Methodist Healthcare, 517 F.3d 911, 920 (6th Cir. 2008) ("We have the inherent power to punish with sanctions those who litigate in bad faith."). The Court's ability to sanction such conduct is not, however, limited to parties and their counsel.[54] See, e.g., Manez v. Bridgestone Firestone N. Am. Tire, LLC, 533 F.3d 578, 585 (7th Cir. 2008) ("No matter who allegedly commits a fraud on the court—a party, an attorney, or a nonparty witness—the court has the inherent power to conduct proceedings to investigate that allegation and, if it is proven, to punish that conduct."); In re Rainbow Magazine, Inc., 77 F.3d 278, 278 (9th Cir. 1996) (upholding sanctions levied under the court's inherent powers against corporate debtor's principal who orchestrated the bad faith filing of the bankruptcy petition); Corder v. Howard Johnson & Co., 53 F.3d 225, 232 (9th Cir. 1994) (citing Roadway Express, 447 U.S. at 764) ("[E]ven in the absence of statutory authority, a court may impose attorney's fees against a non-

---

[54] The Chambers court noted with apparent approval that the lower court had levied substantial non-monetary sanctions against non-parties whose misconduct had impacted the underlying litigation. Chambers, 501 U.S. at 41 n.5 (noting that the lower court had sanctioned a trustee by reprimand, had disbarred one attorney, and had suspended two others).

party as an exercise of the court's inherent power to impose sanctions to curb abusive litigation practices"). But see In re VIII S. Mich. Assocs., 175 B.R. 976, 982-83 (Bankr. N.D. Ill. 1994) (concluding that Chambers should be limited to parties and their counsel and declining "to impose sanctions litigation conduct to a non-party expert who has not appeared before the court and has not violated a court order"). The court's inherent power to sanction a nonparty's bad faith conduct is not, however, without limit. See Helmac Prods. Corp. v. Roth (Plastics) Corp., 150 F.R.D. 563, 567 (E.D. Mich. 1993); accord Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc., 2 F.3d 1397, 1406-07 (5th Cir. 1993) (quoting NASCO, Inc. v. Calcasieu Television & Radio, Inc., 894 F.2d 696, 702 (5th Cir. 1990)) ("[I]nherent authority 'is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function.' . . . In short, the inherent power springs from the well of necessity, and sparingly so."); cf. Am. Civil Liberties Union v. Holder, 673 F.3d 245, 256 (4th Cir. 2011) (noting that the inherent powers of the lower federal courts are not "absolute"). Although the federal courts may certainly sanction disruptive or disobedient bad faith conduct, "the Court's power to sanction cannot possibly extend to everyone who interferes with litigation before the court. Otherwise the power to

sanction would be so wide that it would be unenforceable." Helmac Prods., 150 F.R.D. at 567 (emphasis added).

Several courts have considered the proper scope of the inherent authority to sanction nonparties, however, "no clear rule has emerged, especially with respect to non-parties who[, as here,] did not violate any specific court order." United States v. City of Detroit, Mich., No. 03-72258, 2010 WL 5326953, at *3 (E.D. Mich. Dec. 21, 2010) (citing In re So. Mich. Assocs., 175 B.R. 976, 981-87 (Bankr. N.D. Ill. 1994)).  In such cases, courts have generally agreed that, although the "inherent power to sanction includes sanctioning non-parties for bad faith conduct . . . additional safeguards may be warranted." Feldman v. Davidson, No. 05-61760-CIV, 2009 WL 995473, at *2 (S.D. Fla. Apr. 13, 2009); accord Anchondo v. Adnerson, Crenshaw & Assocs., LLC, No. CV 08-202 RB/WPL, 2011 WL 4549279, at *4 (D.N.M. Sept. 29, 2011) (citing Helmac Prods., 150 F.R.D. at 568); Pafumi v. Davidson, No. 05-61679-CIV, 2008 WL 4084418, at *3 (S.D. Fla. Sept. 3, 2008).

In determining the appropriate safeguards, some courts have focused on the degree of disruption resulting from the nonparty's bad faith conduct, awarding sanctions, for instance, when the nonparty's acts or omissions have caused the parties to incur additional expenses or have resulted in some other severe prejudice. See, e.g., SECO Nevada v. McMordie (In re Holloway),

82

884 F.2d 476, 477 & n.2 (9th Cir. 1989) (per curiam) (sanctioning a court reporter for "repeated and flagrant failures to meet court-imposed deadlines" that resulted in "severe prejudice to both the parties and the court"); Moten v. Bricklayers, Masons & Plasterers Int'l Union of Am., 543 F.2d 224, 239-40 (D.C. Cir. 1976) (per curiam) (awarding a portion of the fees and costs incurred by the fee petitioner against a non-party who unsuccessfully sought to intervene). Other courts have additionally considered the degree of the nonparty's interest and participation in the underlying litigation. See, e.g., Helmac Prods., 150 F.R.D. at 567; see also Anchondo, 2011 WL 4549279, at *4 (applying the Helmac test); Adell Broad. Corp. v. Ehrlich, Nos. 299061 & 299966, 2012 WL 468258, at *9 (Mich. App. Feb. 14, 2012) (same). In these latter cases, a two-part test has emerged to assist courts in determining whether to invoke their inherent power to sanction a nonparty. Specifically, for his disruptive conduct to be sanctionable, "a non-party not subject to court order must (1) have a substantial interest in the outcome of the litigation and (2) substantially participate in the proceedings in which he interfered." Helmac Prods., 150 F.R.D. at 568; cf. Books are Fun, Ltd. v. Rosebrough, 239 F.R.D. 532, 555 (S.D. Iowa 2007) (noting that the Helmac court "pioneered [this] two-part test to gauge the propriety of imposing sanctions upon [a] non-party" but

distinguishing the facts before the court from those in Helmac). This test is designed to "effectively limit the scope of the Court's inherent power to sanction to those individuals who were either (1) parties, (2) subject to a court order, or (3) real parties in interest." Helmac Prods., 150 F.R.D. at 568. It "excludes an individual who has only a minor degree of involvement with the litigation and who acts outside the presence of the court." Id. For, although "such a person may interfere with litigation, the Court's interest in safeguarding the integrity of its proceedings must give way to a limitation on the Court's authority commensurate with its traditional powers." Id. With these approaches in mind, the Court turns to its analysis of the instant Motion for Sanctions.

### 2.   Analysis

Intervening Plaintiffs have sought an award of sanctions against White on the ground that his numerous Internet postings—many of which disclosed counsel's personal, identifying information—constituted a bad faith attempt to "disrupt the proceedings of the Court." Intervening Pls.' Reply Br. in Supp. of Objections to Report & Recommendation of Mag. Judge ("Post-Remand Reply Br.") 2, ECF No. 189. Specifically, Intervening Plaintiffs have argued that, while subject to lawful subpoenas issued out of this District and the Western District of Virginia and during the pendency of his own Motion to Quash those

84

subpoenas, White "stepped outside" the rule of law and the Court's process by authoring the allegedly threatening posts, which were arguably designed to intimidate Intervening Plaintiffs and their counsel. Id. at 12.

Before this Court can sanction White for his online writings pursuant to its inherent power, it must determine whether he acted in bad faith when he authored and published the relevant postings, whether he was subject to the Court's inherent power to sanction at the time he did so, and whether any such bad faith conduct disrupted or interfered with the underlying litigation. See Chambers, 501 at 45-46 (authorizing an award of attorneys' fees pursuant to the court's inherent powers when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons," as shown "by [his] delaying or disrupting the litigation or by [his] hampering enforcement of a court order" (internal quotations and quotation marks omitted)); In re Holloway, 884 F.2d at 477 (concluding that sanctions under the Court's inherent power were appropriate when a court reporter's repeated failure to meet deadlines caused "severe prejudice to both the parties and the court"); Helmac Prods., 150 F.R.D. at 568 (requiring, in part, that a nonparty not subject to a court order "substantially participate in the proceedings in which he interfered" before he may be subject to sanctions under the court's inherent power (emphasis

85

added)).  As to the first inquiry, whether White acted in bad faith, the Magistrate Judge had "little question" that White had "engaged in bad-faith conduct insofar as his internet postings were meddlesome in nature, wholly unwarranted and uninvited, and designed to interfere with counsel's representation of Intervening Plaintiffs."  Mag. Judge Order 40, ECF No. 98.  "On this point[,] the Court [wa]s unequivocal in its condemnation of White for the methods he used to voice his objections."  Id. This Court agrees.

White authored numerous offensive postings concerning the underlying litigation, Intervening Plaintiffs, and their counsel, and made such postings publicly available on the Internet.  Several contained counsel's personal, identifying information and arguably encouraged their readers to contact or otherwise harass counsel (especially Mottley) based on their representation of Intervening Plaintiffs' interests in the underlying Fair Housing Act suit.  Many of White's postings appeared shortly after filings and docket entries were made in the case, either by the parties or the Court.  For example, the February 22, 2008 posting to the Vanguard News Network that initially gave rise to Intervening Plaintiffs' Motion for Sanctions was made within hours of the Court's setting of the February 28, 2008 subpoena hearing.  Compare Minute Entry, Feb. 22, 2008 (entered at 8:47 a.m. setting hearing) with Pre-Hr'g

Br. in Opp'n Ex. A., ECF No. 59-2 and Pre-Hr'g Reply Br. Ex. E, ECF No. 67-6 (reflecting postings to Vanguard News Network and Yahoo! Groups at 3:35 p.m. on February 22, 2008). White's April 9, 2008 posting to Overthrow.com—which included personal, identifying information for both Mottley and Wagner—was published while expedited briefing concerning his substantively identical April 3, 2008 posting to Overthrow.com was ongoing and was apparently corrected in response to information contained in counsel's filings with the Court. Specifically, the Government's attorney, Wagner, had filed a supplemental brief in support of Intervening Plaintiffs' Motion for Sanctions on April 8, 2008 at 4:50 p.m., in accordance with the Magistrate Judge's Order entered on the previous day. Supplemental Submission in Supp. of Mot. for Sanctions, ECF No. 75. In that brief, Wagner noted that White had incorrectly listed her residential address. Id. at 2 n.1. White published the corrected posting, which amended Wagner's home address, at 8:46 a.m. the next morning, before his counsel filed the ordered response brief at 5:18 p.m. See Mag. Judge Order 28 & n.34; see also Supplemental Resp. in Opp'n to Mot. for Sanctions, ECF No. 77. The timing of White's postings exemplifies, as Intervening Plaintiffs have argued, his repeated decision to step outside of this Court's process to express his dissatisfaction with that process generally and with counsel in particular.

Furthermore, the record shows that White continued authoring postings even after being strongly admonished by the Court regarding the dangers inherent in and the Court's deep concern with such activities. At the February 28, 2008 hearing on White's Motion to Quash and Intervening Plaintiffs' related motion, the Magistrate Judge expressed his "profound[] concern about the risk of harm to Mr. Mottley and his family on account" of White's "unfortunate submission to . . . the Vanguard site, because it contains personal information, including address and telephone number and even Mr. Mottley's wife." Hr'g Tr. 73, Feb. 28, 2008. Out of this concern, the Magistrate Judge suggested that White remove the posting, which he agreed to do. Id. at 69-71. The Magistrate Judge then established an abbreviated briefing schedule for the Motion for Sanctions "because of the urgency of the matter and the concerns the Court has about the personal safety of Mr. Mottley." Id. at 73. Indeed, the Magistrate Judge's final remarks at the hearing made clear the Court's view of White's activities.

> Now, finally, Mr. Brown, come up to the podium. Last comment. The last e-mail that Mr. White apparently submitted to this blog is dangerous and intimidating, potentially, and I admonish you to understand, on your own behalf and on behalf of your client, that the Court is very, very concerned about the possible effect on the personal safety of counsel for the intervening plaintiffs and will take such action as is necessary to protect the interest of those who come before the Court to exercise their rights. The Court

will take this action [for] Mr. White, who is in the same position. We clear on that?

Id. at 75-76.   White's counsel affirmed, "Certainly, Your Honor." Id. at 76.   The Magistrate Judge's admonishment could not have been more aptly put nor more clear.   And yet, White's conduct continued, in blatant disregard of both the Court's expressed concern and his own representations to the Court. Indeed, despite his agreement to remove the February 22, 2008 posting from the Vanguard News Network, White failed to disclose the existence of an identical posting to ANSWP's Yahoo! Groups page, leaving that posting publicly available for weeks following the February 28, 2008 hearing and removing it only on the eve of the April 2, 2008 evidentiary hearing in this matter.[55]   Hr'g Tr. 82, Apr. 2, 2008.   When asked why he failed to disclose or remove this second posting, White testified, "Because it was a pointless endeavor to begin with," stating that he removed only the posting of which counsel and the Court were aware "to make [them] feel happier than [they] felt before." Id. at 83.   Although Intervening Plaintiffs have not sought sanctions on the basis of White's deceptive conduct and dismissive attitude, as revealed at the April 2, 2008

---

[55] Additionally, on February 29, 2008, the day after the Magistrate Judge conducted the February 28, 2008 subpoena hearing, White apparently compiled the personal contact information of all counsel involved in the underlying litigation, as Dr. Dardick's testimony at the April 2, 2008 evidentiary hearing concerning his review of White's computers revealed. Hr'g Tr. 105-06, Apr. 2, 2008.

evidentiary hearing, such conduct, when viewed in the context of the Court's strongly worded admonishments, supports the conclusion that White acted in bad faith when he continued to author and maintain the relevant postings.

Having determined that the timing and context of White's Internet postings support a finding of bad faith, the Court turns to the question of whether White was subject to the Court's inherent authority when he authored and published those postings. As discussed above, White was not originally a party to the underlying action. Additionally, despite the Magistrate Judge's firm reproach, he never ordered White to remove the relevant postings or to refrain from authoring future postings. Accordingly, White's conduct "did not violate any specific court order." City of Detroit, 2010 WL 5326953, at *3 (citing In re So. Mich. Assocs., 175 B.R. at 981-87). However, although White was not a party to the underlying action, he was not entirely removed from the matter. White entered his own name on the Court's records and sought to invoke the power of this Court to his own benefit when he filed his Motion to Quash on February 11, 2008, nearly two weeks before the first relevant postings were published on February 22, 2008.[56] Indeed, the Magistrate

_____

[56] Although White was subject to several lawfully issued subpoenas out of the Western District of Virginia and his email server, YAHOO!, was subject to a subpoena issued out of this District prior to February 11, 2008, the Court need not determine whether the issuance of such subpoenas, alone, was sufficient to bring White within the

Judge recognized and affirmed White's status before the Court at the February 28, 2008 hearing, noting that White was "in the same position" as Intervening Plaintiffs, who had "come before the Court to exercise their rights." Hr'g Tr. 75-76, Feb. 28, 2008.   As another court so aptly stated, "This is not a situation in which the court is being asked to enter an award against a person wh[o] had in no way entered its name upon the court records." Moten, 543 F.2d at 239 (discussing an award of attorneys' fees and costs under Title VII against a nonparty association that had sought to object to a settlement agreement without formally intervening).

Even under the two-part Helmac test, White's Motion to Quash evidences a sufficient degree of interest and participation to support a finding that he was subject to this Court's inherent power when he authored the relevant postings, including its power to sanction bad faith litigation conduct. First, White had a substantial interest in the outcome of the litigation concerning his Motion to Quash, which initially addressed all of the subpoenas issued to himself and his various organizations. Helmac Prods., 150 F.R.D. at 568. Had the Court ordered White to comply with the subpoenas, he would have been required to turn over numerous documents and electronic devices,

reach of its inherent powers, because all of White's allegedly sanctionable conduct occurred after he, himself, appeared in this matter by filing the Motion to Quash.

as Intervening Plaintiffs' counsel represented at this Court's July 17, 2013 hearing.  The fact that he sought to avoid such compliance through hiring an attorney and moving to quash the subpoenas (albeit in the wrong district), shows that White considered his interest in the matter to be substantial. Indeed, this fact is confirmed by White's own description of the matter in the relevant postings.  See, e.g., Pre-Hr'g Reply Br. Ex. B, ECF No. 67-3 (characterizing the matter as a "subpoena lawsuit," estimating that the dispute concerning the subpoenas would cost ANSWP several thousand dollars, and declaring White's intent to file suit against Mottley for unlawfully issuing the subpoenas).

Second, by filing the Motion to Quash, White substantially participated in the dispute.  Helmac Prods., 150 F.R.D. at 568. He entered his own name on the Court's records and sought to invoke the Court's power to his own end.  It would be untenable for this Court to allow White to employ the Court's power to limit a lawfully issued subpoena and simultaneously evade that same power, as applied to his own bad faith conduct.  The Court does not read the relevant case law to compel such a result. Indeed, even courts that have declined to extend Chambers to nonparties have done so on the ground that those parties "ha[d] not appeared before the court" or "violated a court order." See, e.g., In re VIII S. Mich. Assocs., 175 B.R. at 982-83.

White appeared before this Court by seeking relief from a subpoena lawfully issued out of this District. He cannot now claim immunity from the Court's inherent powers simply because he was not named in the initial and intervening complaints. Although not a party-in-fact, White was most certainly a real party in interest, at least during the pendency of his Motion to Quash and the related Motion for Sanctions.[57] See Helmac Prods., 150 F.R.D. at 568. Indeed, although not dispositive, even White, in his own contemporaneous writings, recognized the Court's power over him. See, e.g., Post-Hr'g Supplemental Br. in Supp. Ex. A, ECF No. 76-2 (declaring that White was "under no order from the court in Virginia Beach or any other Court not to publish [counsel's] address or phone number" while recognizing that the Court "has the authority . . . to order [him] not to publish information that is disrupting the course of a trial or prejudicing one party or another").

For the above reasons, the Court concludes that, although White was not originally a party to the underlying litigation, he brought himself within the scope of the Court's inherent Article III powers when he filed his Motion to Quash on February

---

[57] Although the Magistrate Judge resolved the dispute concerning White's Motion to Quash at the February 28, 2008 hearing, White remained subject to the Court's inherent power pending its determination of Intervening Plaintiffs' allegation that he had acted in bad faith during the pendency of that motion. Accordingly, the Court finds that White's continued postings after February 28, 2008 occurred while he remained subject to the Court's inherent authority.

93

11, 2008. He remained subject to the Court's power during the pendency of that motion and the related Motion for Sanctions. Because White acted in bad faith when he authored the relevant postings and he did so while within reach of the Court's inherent authority to sanction such bad faith conduct, the only question remaining is whether White's bad faith conduct disrupted or interfered with the prosecution of this case, such that the Court should—in its discretion—exercise its inherent power to sanction White, as Intervening Plaintiffs request. Before considering the degree to which White's conduct interfered with the underlying dispute,[58] the Court reviews the nature of that conduct at issue—speech—and the significant constitutional concerns implicated by an award of sanctions based solely on such conduct. It is to these questions the Court now turns.

---

[58] Although some courts have focused on the degree of disruption resulting from the nonparty's bad faith conduct in determining whether that individual is subject to the Court's inherent authority, see, e.g., SECO Nevada, 884 F.2d at 477 & n.2, the Court finds White's own invocation of its authority, through the filing of his Motion to Quash, is alone sufficient to support such a finding. However, the Court does consider this factor when determining whether sanctioning White is an appropriate exercise of its discretion under Article III. Cf. Feldman, 2009 WL 995473, at *2 (noting that, although the "inherent power to sanction includes sanctioning non-parties for bad faith conduct . . . additional safeguards may be warranted" when the court is exercising such power).

**D.   Factors Informing the Court's Discretion to Exercise its Inherent Authority to Sanction White**

**1.   Nature of White's Sanctionable Conduct**

The first question the Court considers in determining whether to sanction White is the nature of his sanctionable conduct, that is, those actions that he took (as the Court has already found) in bad faith during the course and within the scope of the underlying litigation. Intervening Plaintiffs have proffered only White's Internet postings and emails in support of their Motion for Sanctions, or, put more simply, his speech. There are no allegations, before this Court at least, that White destroyed evidence, filed duplicitous or meritless pleadings, or took any other action designed to disrupt or delay the underlying litigation.[59] Intervening Plaintiffs have sought and continue to seek sanctions based only on the <u>content</u> of White's Internet postings and communications. Considering the propriety

---

[59] Intervening Plaintiffs did argue at the July 17, 2013 hearing that White had deleted several thousand documents from computers subject to subpoenas issued out of the Western District of Virginia and that a magistrate judge in that district recommended that a show cause order be issued requiring White to show cause why he should not be held in criminal contempt for the alleged deletion. Despite White's alleged misconduct before that court, there are no allegations that he has taken any such action here. Additionally, as noted above, the record reveals that whatever misconduct occurred in the Western District of Virginia was addressed and disposed of before that court. <u>See</u> Order to Show Cause, No. 7:08mc00003-JCT-mfu (W.D. Va. July 1, 2008), ECF No. 34; <u>see also</u> Order, No. 7:08mc00003-JCT-mfu (W.D. Va. July 29, 2008), ECF No. 43 (denying White's previously filed motion to continue the show cause hearing as moot). Accordingly, the Court does not consider such allegations as relevant, sanctionable conduct in this matter.

of such an award, the Magistrate Judge concluded that sanctions under Chambers were appropriate only if White's speech fell outside the purview of the First Amendment to the United States Constitution, that is, only if his postings amounted to a 'true threat' as that term has been defined under precedents established by the Supreme Court and . . . interpreted and applied by the Fourth Circuit." Mag. Judge Order 41, ECF No. 98. Intervening Plaintiffs object to the Magistrate Judge's consideration of this question, arguing that "[n]o First Amendment analysis need be applied to sanction conduct aimed at disrupting a judicial proceeding." Post-Remand Br. in Supp. of Obj. 17, ECF No. 152; accord Post-Remand Reply Br. 13, ECF No. 189. This Court disagrees, finding, for the reasons set forth below, that the status of White's speech under the First Amendment is an integral and indispensable question necessary to the Court's determination of the Intervening Plaintiffs' request for relief.

a.   Relevance of the First Amendment

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise therof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for redress of grievances." U.S. Const. amend. I. "The freedom of speech and of the press

96

secured by the First Amendment . . . . against abridgment by the United States is similarly secured to all persons by the Fourteenth [Amendment] against abridgment by the state." Scheider v. State, 308 U.S. 147, 160 (1939). Similarly, as the Supreme Court recently observed, "[c]ourts, too, are bound by the First Amendment." Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 326 (2010) ("Substantial questions [as to the courts' own lawful authority] would arise if courts were to begin saying what means of speech should be preferred or disfavored" in their review of allegedly unconstitutional acts of Congress); see also New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964) (holding that judgment in a civil law suit for defamation "must be measured by standards that satisfy the First Amendment").

It is well recognized that "[t]he First Amendment affords protection to symbolic or expressive conduct as well as to actual speech." Virginia v. Black, 538 U.S. 343, 358 (2003) (collecting cases). Indeed, a fundamental principle of First Amendment jurisprudence is that all such expression is presumptively protected against government interference and restraint. See Schad v. Borough of Mount Ephraim, 452 U.S. 61, 65-66 (1981); Roaden v. Kentucky, 413 U.S. 496, 504-05 (1973). Only in limited and defined circumstances, such as when the expression is judicially determined to be a "true threat" or an

97

incitement to imminent lawlessness, does the expression lose its protected status. *See, e.g.*, *Black*, 538 U.S. at 358-60 (noting that "[t]he First Amendment permits 'restrictions upon the content of speech in a few limited areas, which are 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality,'" including "true threats" (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382-83 (1992))); *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (per curiam) (recognizing that the Constitution "has immunized from government control" those categories of speech protected by the First and Fourteenth Amendments, but holding that "advocacy of the use of force or of law violation . . . directed to inciting or producing imminent lawless action and likely to incite or produce such action" is not so protected). Accordingly, when speech falls within the ambit of the First Amendment, the government—including this Court—lacks the power to regulate or prevent its dissemination based solely on the fact that "a vast majority of citizens believe [it] to be false and fraught with evil consequence." *Black*, 538 U.S. at 358 (quoting *Whitney v. California*, 274 U.S. 357, 374 (1927) (Brandeis, J., concurring)) (internal quotation marks omitted); *accord Texas v. Johnson*, 491 U.S. 397, 414 (1989); *cf. Citizens United*, 558 U.S. at 326 (observing that serious questions concerning the court's

authority "would arise if courts were to begin saying what means of speech would be preferred or disfavored"). Indeed, the First Amendment protects "vehement, caustic, and sometimes unpleasantly sharp attacks," as well as language that is "vituperative, abusive, and inexact." Watts v. United States, 394 U.S. 705, 708 (1969) (quoting Sullivan, 376 U.S. at 270) (internal quotation marks omitted). This insistent protection of disfavored or even repugnant speech reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open." Id.; accord Knox v. Serv. Emp. Int'l Union, Local 1000, 132 S. Ct. 2277, 2288 (2012) (collecting cases "not[ing] the close connection between our Nation's commitment to self-government and the rights protected by the First Amendment"). It "creates an 'open marketplace' in which differing ideas about political, economic, and social issues can compete freely for public acceptance without improper government interference." Knox, 132 U.S. at 2288 (citing New York State Bd. of Elections v. Lopez Torres, 552 U.S. 196, 208 (2008)).

Where government action, such as an award of sanctions, is directed toward presumptively protected expression, our system of justice places "the duty . . . on this Court to say where the individual's freedom ends and the State's power begins." Thomas v. Collins, 323 U.S. 516, 529-30 (1945). It is a delicate and,

99

at times, vexatious question, one that in this case requires the Court to balance its own interests and the interests of those appearing before it against "the indispensable democratic freedoms secured by the First Amendment." Id. at 530 (collecting cases); accord United States v. Carmichael, 326 F. Supp. 2d 1267, 1279 (M.D. Ala. 2004) ("The court's inherent authority or discretion to regulate the actions of trial participants is . . . limited by the constitutional rights of the parties."); Helmac, 150 F.R.D. at 568 ("[T]he Court's interest in safeguarding the integrity of its proceedings" is not without limit, it must, at some point, "give way to a limitation on the Court's authority commensurate with its traditional powers"). The preferred place of such freedoms in our constitutional scheme "gives these liberties a sanctity and a sanction not permitting dubious intrusions." Thomas, 323 U.S. at 530. Accordingly, where such liberties are implicated, the Court cannot properly consider the exercise of its own constitutional power without balancing such an exercise against the constitutional protection provided by the First Amendment. And, when weighing power against protection, "it is the character of the right assertedly threatened or violated[,] rather than [of] the power being exercised[,]" that determines the proper standard of review. Schad, 452 U.S. at 68 (citing Thomas, 323 U.S. at 529-30). Thus, the Court's consideration of

100