Intervening Plaintiffs' Motion for Sanctions cannot begin and end with its determination concerning the scope of its inherent authority under Article III. The Court must also discharge its duty to consider the status of White's bad faith conduct—that is, his speech—under the First Amendment.[60]

**b.   Status of White's Speech under the First Amendment**

As discussed above, speech, such as White's Internet postings and emails, is presumptively protected under the First Amendment unless it falls within "certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem." Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72 (1942) (collecting cases). These categorical exceptions from First Amendment protection include "the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." Id. at 572. They also include "true threats" and speech that incites imminent lawless action. See Watts, 394 U.S. at 708; see also Brandenburg, 395 U.S. at 448-49.

---

[60]   Even Chambers recognized the Court's duty to "comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees." 501 U.S. at 50 (citing Roadway Express, 447 U.S. at 767).

In determining not to recommend an award of sanctions against White for his various postings, the Magistrate Judge focused primarily on whether White's writings rose to the level of a "true threat," as that term had been defined by the Supreme Court in Watts v. United States, 394 U.S. 705, 705-08 (1969) and Virginia v. Black, 538 U.S. 343, 359 (2003), and interpreted in subsequent decisions across various Circuits and the Supreme Court. On this question, the Magistrate Judge reviewed a number of such cases, the majority of which "relate[d] to the criminal prosecution of an accused under a variety of federal statutes proscribing threats of harm communicated either directly or indirectly by the speaker or communicated by mail, telephone, or other electronic communication such as by email or via the [I]nternet." Mag. Judge Order 43, ECF No. 98. The Magistrate Judge observed that "the vast majority of cases involved a threatening communication . . . included a direct threat of harm or statements that could be interpreted as a direct threat of harm." Id. at 46. The Magistrate Judge concluded that the cases were, therefore, not "on point here, because any arguably threatening language used by White was indirect, at best." Id. at 46-47.

The Magistrate Judge then discussed, at length, the various tests that courts have used to determine whether speech constitutes a "true threat" and the burden of proof applicable

102

to such an inquiry. See Mag. Judge Order 47-50. Noting that the Fourth Circuit applies a "reasonable listener test" and a "general intent" standard of proof, the Magistrate Judge determined that, under these approaches, "the mere communication of a true threat, with the intent to transmit the communication is sufficient to establish the accused's guilt under the various federal statutes," id. at 50, and further observed that "it is not always necessary that the intended victim actually be intimidated or threatened by the communication, or that the threatening communication actually be communicated to the intended victim," id. (citing United States v. Spring, 305 F.3d 276, 280-81 (4th Cir. 2002) and United States v. Morales, 272 F.3d 284, 285-88 (5th Cir. 2001)). Although the Magistrate Judge found this case to be distinguishable from all of the precedents before the Court at that time, he nevertheless looked to the analyses described in those cases to determine whether White's speech was proscribable as a "true threat." See id. 51-52. Considering the Supreme Court's decision in Watts and various Fourth Circuit cases interpreting that decision, the Magistrate Judge concluded that, based on the entire context of the various postings, "the subject communications by White d[id] not rise to the level of a true threat as contemplated by current Supreme Court and Fourth Circuit precedents." Id. at 57.

Specifically, the Magistrate Judge found that there was "no evidence before the Court that White communicated any threats directly to Mottley," a fact that distinguished this case from "virtually all cases of which the Court [wa]s aware on this topic," in which "the accused's statements were directly or indirectly tied to a threat of harm to one or more victims." Id. at 65. Additionally, the Magistrate Judge found that "nowhere in the postings by White did he issue any direct, or even indirect, threat of violence or suggestion of physical harm against Mottley." Id. at 65-66 ("White's postings suggest a number of actions that his readers might take against Mottley . . . many of which would be inconvenient and unfortunate, and even illegal in their own right, but which do not amount to a threat of violence perpetrated against Mottley." (emphasis in original)). Furthermore, the context of White's postings established that he frequently "use[s] the various [I]nternet websites and blogs to attack any group or individual who opposes [his] cause or who support[s] causes that conflict with [his] viewpoints." Id. at 66. And, although there was some suggestion that White's prior, unrelated postings had inspired action by his followers, the Magistrate Judge observed that "there [wa]s nothing concrete by which the Court could conclude that [such] postings have led to any acts of violence or harm to others." Id. at 67.

104

The Magistrate Judge also considered the fact that there was no evidence concerning the audience for White's postings and nothing clearly relating those postings to any actions taken against counsel (including the two late-night phone calls to Mottley). Id. at 67-68. In the same vein, the Magistrate Judge found that the wide availability of White's writings on the Internet made them less likely to constitute a true threat than communication delivered directly to the target. Id. at 68-69. Finally, the Magistrate Judge noted that "the tone and tenor" of White's postings throughout the pendency of the Motion for Sanctions had become "less belligerent." Id. at 72-73. The Magistrate Judge found, for all of these reasons, that White's postings constituted protected speech under the First Amendment. Based on this finding and his further determination that the postings "ultimately [had] no measurable impact on the underlying litigation," the Magistrate Judge recommended denying Intervening Plaintiffs' Motion for Sanctions. Id. at 74, 75-76.

Although the Magistrate Judge focused almost entirely on whether White's various postings constituted "true threats," he also briefly considered whether the writings, if "not direct threats that White himself would inflict harm on Mottley or Mottley's family," were nevertheless intended "to incite others to inflict harm on them." Id. at 69. Citing the analogous district court decision in United States v. Carmichael, 326 F.

105

Supp. 2d 1267, 1287 (M.D. Ala. 2004), the Magistrate Judge noted that any suggestion of such intent necessarily "implicates the Supreme Court's stringent 'incitement' doctrine." Mag. Judge Order 69, ECF No. 98 (quoting Carmichael, 326 F. Supp. 2d at 1287). Describing this rigorous standard, the Magistrate Judge concluded that the evidence was "simply . . . insufficient" to show that any of White's postings met "the imminency requirement of Brandenburg." Id. at 70 (quoting Carmichael, 326 F. Supp. 2d at 1287).

Intervening Plaintiffs have strenuously objected to the Magistrate Judge's First Amendment analysis of White's postings. Specifically, Intervening Plaintiffs contend that the relevant postings did, in fact, constitute a "true threat," such that they fall outside the scope of constitutional protection. Post-Remand Br. in Supp. of Obj. 17, ECF No. 152. On this point, Intervening Plaintiffs' argument is two-fold. First, they contend, contrary to the Magistrate Judge's holding, that White's various postings included true threats of bodily harm, based on White's use of terms such as "noose" and "open game," his reference to Judge Lefkow, and his veiled suggestion that readers "go by" Mottley's residence. Id. at 28. Intervening Plaintiffs argue that, when communications including such references are sent to "members of the neo-Nazi movement—a movement notorious for using violence to promote its repugnant

106

views"—a reasonable listener would understand them to be threats of bodily harm. Id. at 29. Second, Intervening Plaintiffs contend that constitutionally proscribable "true threats" are not limited to threats of physical violence. Rather, threats intended to instill fear of harm to property, alone, are sufficient to show a "true threat." Id. at 33.

Intervening Plaintiffs also object to the Magistrate Judge's analysis of White's speech under Brandenburg, arguing that the fact that White's speech advocated harm to a specific individual (rather than overthrow of the government) distinguishes it from the exacting standard set forth in that case. Id. at 37. Accordingly, Intervening Plaintiffs contend that White's postings in this matter are excluded from First Amendment protection both as "true threats" and as incitements to imminent lawlessness.[61]

Finally, Intervening Plaintiffs argue that, to the extent that White's postings could be viewed as protected speech, the Magistrate Judge erred in failing to balance White's First Amendment interests against "the compelling government interests of ensuring that civil rights litigants have access to the

---

[61] The Court notes that, at the July 17, 2013 hearing, Intervening Plaintiffs suggested that the incitement exception may not apply in this case; however, because they did not specifically disclaim their prior objection and because incitement was discussed at length during the hearing, the Court does consider the status of White's speech under this exception further below.

courts and preserving the integrity of judicial proceedings." Id. at 17-18. Intervening Plaintiffs argue that a strict scrutiny analysis of the interests involved would have revealed that the award of sanctions sought is narrowly tailored to serve such compelling government interests. Id. at 18. They object to the Magistrate Judge's failure to conduct such an analysis.[62]

In response to Intervening Plaintiffs' numerous objections, White argues that his postings are protected speech under the First Amendment, such that they cannot provide a basis for sanctioning him under Chambers. Br. in Opp. to Intervening Pls.' Objections to Mag. Judge Order 4-13, ECF No. 185. Regarding the "true threat" analysis, White contends that his postings did not constitute a "true threat" because they "did not contain any direct or indirect expression of an intent to harm," they "w[ere] not directly communicated to Mottley," and they "did not threaten physical violence." Id. at 5. In support of this position, White relies primarily on the Fourth Circuit's analysis of his Warman postings in its decision to affirm the district court's judgment of acquittal on Count Six of the indictment in the Western District of Virginia. Id. at

---

[62] In addition to these primary objections, Intervening Plaintiffs raised several arguments concerning the Magistrate Judge's discussion of the relevant context of White's speech. See Post-Remand Br. in Supp. of Obj. 33-37, 39, ECF No. 152. Rather than summarizing each of these arguments here, the Court discusses its own, de novo, review of the relevant context below.

5-7 (citing White, 670 F.3d at 505-06, 513-14).  White next argues that his postings were not incitements to imminent lawlessness, as that exception was defined in Brandenburg, because they do not "incite" any action and, to the extent action is recommended or suggested, any such suggestion "lacks the imminence element required by Brandenburg." Id. at 8.

With all of the above arguments in mind, the Court turns to its own First Amendment analysis of the relevant postings.  The Court first considers whether White's writings amounted to a "true threat" before addressing whether the postings should otherwise be excluded from constitutional protection as incitements to imminent lawlessness.

### i.  True Threats

"True threats" are a category of speech that falls outside the scope of First Amendment protection.  See, e.g., Watts, 394 U.S. at 707 ("What is a threat must be distinguished from what is constitutionally protected speech.").  The United States Supreme Court has defined "true threats" as "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Black, 538 U.S. at 359 (citing Watts, 394 U.S. at 708 and R.A.V., 505 U.S. at 388).  A "speaker need not actually intend to carry out the threat" for his speech to be proscribable. Id. at 359-60.  Rather, such

speech falls outside of the First Amendment, irrespective of whether the speaker intends to fulfill the threat, because upon its utterance, "the government has the right, if not the duty, to 'protect[] individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur.'" United States v. Jeffries, 692 F.3d 473, 478 (6th Cir. 2012) (quoting R.A.V., 505 U.S. at 388) (citing Chaplinsky, 315 U.S. at 568 and White, 670 F.3d at 507); see also Black, 538 U.S. at 359 (quoting R.A.V., 505 U.S. at 388); United States v. Turner, 720 F.3d 411, 420 (2d Cir. 2013) (quoting Black, 538 U.S. at 360)).

### (a) Legal Standard

As the Magistrate Judge aptly observed, the relevant precedents regarding "true threats" are somewhat limited due to the unique circumstances presented in this case. Mag. Judge Order 43, ECF No. 98. Indeed, although several courts, including the Fourth Circuit Court of Appeals, have considered this exception to the First Amendment, the fact remains that "[t]he majority of cases . . . regarding the interpretation and application of 'true threats' relate to the criminal prosecution of an accused[, including White,] under a variety of federal statutes proscribing threats of harm communicated directly or indirectly" to recipients or through various channels of communication. Id. The Magistrate Judge thoroughly reviewed a

110

number of such representative cases, which included prosecutions under 18 U.S.C. § 875,[63] criminalizing the interstate communication of threats by telephone, mail, email, or the Internet; 18 U.S.C. § 876,[64] criminalizing threats delivered by mail expressing the intent to kidnap or injure; 18 U.S.C. § 871,[65] criminalizing threats to harm the President of the United States; and 18 U.S.C. § 115,[66] criminalizing threats to law enforcement personnel or federal judges.  In addition to the wide range of federal prosecutions reviewed by the Magistrate Judge, this Court observes that the law concerning "true threats" has also developed in prosecutions under various state laws.  See, e.g., Black, 538 U.S. at 348, 358-63 (discussing whether the act of cross burning with the intent to intimidate,

---

[63] Mag. Judge Order 43 n.45 (citing United States v. Sutcliffe, 505 F.3d 944, 950-61 (9th Cir. 2007); United States v. Morales, 272 F.3d 284, 285-88 (5th Cir. 2001); United States v. Darby, 37 F.3d 1059, 1061-66 (4th Cir. 1994); United States v. Kammersell, 7 F. Supp. 2d 1196, 1198-1202 (D. Utah 1998)); see also White, 670 F.3d at 506-14.

[64] Mag. Judge Order 44 n.46 (citing United States v. Bly, 510 F.3d 456-59 (4th Cir. 2007); United States v. Maxton, 940 F.3d 103, 104-06 (4th Cir. 1991)); see also United States v. Keyser, 704 F.3d 631, 638-39 (9th Cir. 2012).

[65] Mag. Judge Order 44 n. 47 (citing Watts v. United States, 394 U.S. 705, 706-08 (1969); United States v. Lockhart, 382 F.3d 447, 450-52 (4th Cir. 2004)); see also United States v. Christenson, 653 F.3d 697, 699 (8th Cir. 2011).

[66] Mag. Judge Order 44 n. 48 (citing United States v. Spring, 305 F.3d 276, 279-81 (4th Cir. 2002); Sheehan v. Gregoire, 272 F. Supp. 2d 1135, 1139-43 (W.D. Wash. 2003)); see also United States v. Turner, 720 F.3d 411, 418-25 (2d Cir. 2013).

as prohibited by Virginia Code § 18.2-423, constituted a proscribable "true threat"); United States v. Tan Duc Nguyen, 673 F.3d 1259, 1266 (9th Cir. 2012) (considering the contents and targeted mailing of a letter to foreign-born voters as evidence that it may have constituted a "true threat" subject to regulation under a California statute prohibiting intentional acts of voter intimidation); Yawili v. California, No. 2:10cv2867, 2012 WL 1552424, at *5 (E.D. Cal. Apr. 30, 2012) (holding that a petitioner for federal habeas relief failed to show that his conviction under § 422 of the California Penal Code violated the First Amendment, because the statute criminalized "true threats" to commit crimes that will result in death or great bodily injury).

Although the majority of cases defining and interpreting the "true threat" exception to the First Amendment arise in criminal prosecutions, others have analyzed the exception in the civil context, most often in suits involving student or prisoner speech. See, e.g., Doe v. Pulaski Cnty. Special Sch. Dist., 306 F.3d 616, 621-27 (8th Cir. 2002) (reversing a district court's decision to void a student's expulsion based on a finding that the student's communication to his classmate, which repeatedly used derogatory epithets to describe her and expressed his desire to sodomize, rape, and kill her, constituted a proscribable "true threat"); D.J.M. ex rel D.M. v. Hanniblal

Pub. Sch. Dist. No. 60, 647 F.3d 754, 760-65 (8th Cir. 2011) (affirming the district court's partial grant of summary judgment on a student's 42 U.S.C. § 1983 action because the student's statements on instant messaging about his desire to obtain a gun to shoot himself and others were "true threats" and, therefore, not protected speech under the First Amendment); Torres v. Clark, No. 12-3997, 2013 WL 1409327, at *1-2 (3d Cir. 2013) (unpublished table decision) (holding that a prisoner's intercepted letter, which included a statement that if a correctional officer "keeps acting like he is above policy/law somebody is going to break his jaw is what I assume?!" constituted a proscribable "true threat"); In re Parmelee, 63 P.3d 800, 807-08 (Wash. Ct. App. Feb. 3, 2003) (holding that a prisoner's grievance calling an officer a "prick" and a "shithead" and demanding he be fired "before his attitude gets him fucked up" constituted a proscribable "true threat").[67]

---

[67] Of course, the Court is mindful that any discussion in these cases must necessarily be read in light of the Supreme Court's repeated recognition of those "special characteristics" of schools and prisons that accord government actors a greater degree of flexibility to regulate speech. See, e.g., Morse v. Frederick, 551 U.S. 393, 403-06 (2007) (citing Hazelwood Sch. Dist. v. Kulmeier, 484 U.S. 260, 266 (1988) (reviewing prior student speech cases establishing that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings," including and in particular, their First Amendment rights (quoting Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 682 (1986)); Fraser, 478 U.S. at 678-89; Tinker v. Des Moines Indep. Ctmy. Sch. Dist., 393 U.S. 503, 504-14 (1969)); see also Turner v. Safley, 482 U.S. 78, 89 (1987) (holding that prison regulations of inmate speech are constitutional if they are "reasonably related to

Other cases have considered the exception's application in civil rights of action and to remedies created under federal law. See, e.g., Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition of Life Activists et al., 290 F.3d 1058, 1077 (9th Cir. 2002) (determining—in the context of a private right of action under the Freedom of Access to Clinics Entrances Act (FACE), 18 U.S.C. § 248—that the statutory term "threat of force" "means what our settled threats law says a true threat is" and, accordingly that threatening statements violating FACE are "unprotected under the First Amendment"); Carmichael, 326 F. Supp. 2d at 1279-1290 (declining to issue a temporary restraining order, as provided for by 18 U.S.C. §§ 1512 and 1514, because the respondent's operation of a website including the photographs and personal identifying information of government witnesses in a criminal prosecution was not a "true threat" and the respondent's First Amendment interest in the website outweighed the Government's proffered interests in preserving the jury pool and protecting witnesses).

Despite the numerous and extensive discussions of the "true threat" exception, no case, of which this Court is aware, has applied that exception to a request for sanctions such as that

---

legitimate penological interests," and further concluding that "subjecting the day-to-day judgments of prison officials to a strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration").

presented by the unique circumstances here. However, in conducting its review of the representative case law, this Court can identify several general principles instructive to the analysis at hand. Accordingly, as did the Magistrate Judge, this Court considers the guidance provided by the Fourth Circuit and other courts concerning "true threats," to determine the status of White's postings under that exception to the First Amendment. In so doing, the Court observes that, although "there is considerably less authority on the subject," it is reasonable to "assume that those speech acts which the government may criminally prosecute with little or no concern for the First Amendment, the government may likewise subject to civil penalty or make subject to private causes of action." Rice v. Paladin Enterps., Inc., 128 F.3d 233, 246-47 (4th Cir. 1997) (discussing the incitement exception, as defined in Brandenburg, in the context of a private right of action for aiding and abetting wrongful death against the publisher of a manual instructing readers on how to be a "hit man," albeit in light of several damaging stipulations concerning the publisher's intent in marketing the book); accord id. at 248 ("[T]he First Amendment might well (and presumably would) interpose the same or similar limitations upon the imposition of civil liability for abstract advocacy, without more, that it

115

interposes on the imposition of criminal punishment for such advocacy.").

The various circuit courts of appeal have developed two objective theories for determining whether a communication rises to the level of a proscribable "true threat." The majority, including the Fourth Circuit, have adopted a "reasonable recipient" or "reasonable listener" test, in which a court considers whether "a <u>reasonable recipient familiar with the context</u>" would understand the statement to be "a 'serious expression of an intent to do harm' to the recipient." <u>White</u>, 670 F.3d at 509 (emphasis in original) (quoting <u>Black</u>, 538 U.S. at 359); e.g., <u>Turner</u>, 730 F.3d at 420; <u>United States v. Williams</u>, 690 F.3d 1056, 1066 (8th Cir. 2012) (quoting <u>United States v. Mabie</u>, 663 F.3d 322, 332 (8th Cir. 2011)); <u>Jeffries</u>, 692 F.3d at 478, 480; <u>United States v. Nishnianidze</u>, 342 F.3d 6, 15 (1st Cir. 2003); <u>United States v. Morales</u>, 272 F.3d 284, 287 (5th Cir. 2001). Other circuits have adopted a "reasonable speaker" test, in which a communication is considered a "true threat" if a reasonable person, familiar with the context of the communication, would foresee that it would be interpreted as an expression of an intent to harm. E.g., <u>Planned Parenthood</u>, 290 F.3d at 1074 n.7; <u>United States v. Whiffen</u>, 121 F.3d 18, 20-21 (1st Cir. 1997); <u>United States v. Kosma</u>, 951 F.2d 549, 556-57 (3d Cir. 1991); <u>United States v. Khorrami</u>, 895 F.2d 1186, 1192-

116

93 (7th Cir. 1990) (citing United States v. Hoffman, 806 F.2d 703, 707 (7th Cir. 1986)).  The difference between these two approaches is not significant, "because all [circuits] consider context, including the effect of an allegedly threatening statement on the listener."  Planned Parenthood, 290 F.3d at 1074 n.7; accord United States v. Alaboud, 347 F.3d 1293, 1297 n.3 (11th Cir. 2003) (citing Jennifer Rothman, Freedom of Speech and True Threats, 25 Harv. J.L. & Pub. Pol'y 283, 303 (2001)) (noting that the Eleventh Circuit has not specified whether the "listener-based" or "speaker-based" approach should apply because "[b]oth tests are basically a 'listener-based' test" in that, even under the latter approach "the jury would have to decide how a reasonable listener would understand the communication in order to determine how a reasonable speaker would foresee the effect of his or her communication").

In its most recent discussion of "true threats," the Fourth Circuit affirmed the application of the "reasonable recipient" test in this Circuit.  Accordingly, when determining whether White's postings in this case are proscribable "true threats" subject to sanctions under the Court's inherent power, the Court considers, as the Fourth Circuit did in the cross-appeals from his separate convictions and post-judgment acquittal in the Western District of Virginia, whether "a reasonable recipient familiar with the context" would understand his writings to be

117

"a 'serious expression of an intent to do harm' to the recipient."[68]  White, 670 F.3d at 509; accord United States v. Armel, 585 F.3d 182, 185 (4th Cir. 2009) (quoting United States v. Roberts, 915 F.2d 889, 891 (4th Cir. 1990) (holding that statement is a "true threat" "if 'an ordinary reasonable recipient who is familiar with the context . . . would interpret [it] as a threat of injury'"). Under this objective inquiry, "[t]he speaker need not actually intend to carry out the threat," Black, 538 U.S. at 359-60, nor must he subjectively intend to threaten the recipient, see, e.g., White, 670 F.3d at 508-09 (interpreting the Supreme Court's definition of "true threats" in Black to require only that the speaker "intend to communicate a threat" and, accordingly, rejecting White's contention that Black requires the speaker to specifically intend to threaten); United States v. Nicklas, 713 F.3d 435, 439-40 (8th Cir. 2013) (same); Jeffries, 692 F.3d at 479-80 (same).[69]  Furthermore, "a statement may qualify as a [true]

---

[68] The Supreme Court has, of course, defined the subject "intent to do harm" as "an intent to commit an act of unlawful violence to a particular individual or group of individuals." Black, 538 U.S. at 359 (citing Watts, 394 U.S. at 708).

[69] As the Fourth Circuit explained, "in Black, [the court] was not focusing on § 875(c) but rather on a Virginia statute making it a crime to burn a cross with the intent of intimidating a person." White, 670 F.3d at 508 (citing Black, 538 U.S. at 359). That case, therefore, included a statutory intent requirement in addition to the general intent standard that the majority of circuits apply to the "true threats" analysis. See, e.g., id. at 509 (quoting United States v. White, No. 7:08cr54, 2010 WL 438088, at *8 (W.D. Va. Feb. 4, 2010),

threat even if it is never communicated to the victim." United States v. Spring, 305 F.3d 276, 280-81 (4th Cir. 2002) (citing United States v. Patillo, 431 F.2d 293, 295-96 (4th Cir. 1970)); cf. United States v. Lockhart, 382 F.3d 447, 451-52 (4th Cir. 2004) (concluding that a defendant's letter to a Food Lion manager was a true threat against the President of the United States, in violation of 18 U.S.C. § 871(a), without regard to the fact that the President never received the letter). Thus, "it is not always necessary that the intended victim actually be intimidated or threatened by the communication." Mag. Judge Order 50, ECF No. 98. As the Magistrate Judge aptly observed, under the relevant precedents, "the mere communication of a true threat, with the intent to transmit the communication, is sufficient to establish the accused's guilt under the various federal statutes." Mag. Judge Order 50; see also White, 670

---

aff'd in part & vacated in part, 670 F.3d 498 (4th Cir. 2012)). Indeed, "under well-accepted First Amendment doctrine, a speaker's motivation is entirely irrelevant to the question of constitutional protection." Id. at 511 (quoting FEC v. Wis. Right to Life, Inc., 551 U.S. 449, 468 (2007)). Only one circuit court—the Ninth Circuit—has interpreted Black to require such a subjective intent to threaten. Id. at 510 (citing United States v. Cassel, 408 F.3d 622, 643-44 (9th Cir. 2005)). However, as the Fourth Circuit observed, "even Cassel stands in doubt, as a later Ninth Circuit opinion applied the objective test." Id. (citing United States v. Romo, 413 F.3d 1044 (9th Cir. 2005)). Although, more recently, the Ninth Circuit seems to have "retreat[ed]" from Romo." Id. (citing United States v. Bagdasarian, 652 F.3d 1113, 1117 n.14 (9th Cir. 2011)). Whatever the state of the law in the Ninth Circuit, it is clear from the Fourth Circuit's holding in White that "true threats" in this Circuit require only a general intent to communicate and not a specific intent to threaten. Id. at 511.

F.3d at 509.   "[W]hether the statement amounts to a true threat is," of course, "determined by the understanding of a <u>reasonable recipient familiar with the context</u>."  <u>White</u>, 670 F.3d at 509.

Courts, in both criminal and civil cases, have looked to a variety of factors when determining "how a reasonable recipient would view [a] purported threat."  <u>Doe</u>, 306 F.3d at 624 (citing <u>United States v. Dinwiddie</u>, 76 F.3d 913, 925 (8th Cir. 1996)). These factors stem from the Supreme Court's decision in <u>Watts</u>. In that case, the accused, an anti-Vietnam war protester, stated at a public rally in Washington, D.C. that "[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J.," that is, then-President Lyndon Baines Johnson.  <u>Watts</u>, 394 U.S. at 706.  Based on this statement, Watts was prosecuted and convicted under 18 U.S.C. § 871, which criminalizes threats of harm against the President of the United States.  The Supreme Court reversed, holding that Watts' speech was not a threat. <u>Id.</u> at 708.  In so doing, the Court recognized the fundamental distinction between constitutionally protected speech and "true threats," observing that the context of the communication is essential to determine whether it is protected by the First Amendment.  <u>Id.</u> at 707-08.  From the enunciation and application of these bedrock principles, courts (including the Fourth Circuit) have identified certain contextual factors relevant to the analysis of allegedly threatening remarks.  <u>See</u> Mag. Judge

120

Order 54, ECF No. 98; see also United States v. Bly, 510 F.3d 453, 459 (4th Cir. 2007); Doe, 306 F.3d at 623; Carmichael, 326 F. Supp. 2d at 1281.

First and most critically, courts consider the language itself. See, e.g., Watts, 394 U.S. at 708 (discussing the conditional nature of Watts' purported threat); White, 670 F.3d at 512 (finding that White's email to Petsche constituted a "true threat" because it specifically threatened certain actions if Petsche did not respond to his demands and concluded by comparing Petsche to Judge Lefkow); Bly, 510 F.3d at 459 (finding a "true threat" where Bly's communications "implicitly and explicitly promised violent retribution if he did not receive the result he sought"); Carmichael, 326 F. Supp. 2d at 1281-82; cf. United States v. Maxton, 940 F.2d 103, 106 (4th Cir. 1991) (noting that the intent required to find a "true threat" "can often be gleaned from the very nature of the words used in the communication"). However, in considering the language used, a court is not bound by a literal or "close syntactical analysis" of the purported threat. Turner, 720 F.3d at 422. Indeed, at least one circuit has expressly counseled against a "rigid adherence to the literal meaning of a communication without regard to [the] reasonable connotations derived from its ambience." Id. (quoting United States v. Malik, 16 F.3d 45, 50 (2d Cir. 1994)) (internal quotation marks

121

omitted).  Thus, after reviewing the alleged threat, courts next consider the context in which it was made, including not only the forum in which the statement was communicated, but also the reaction of the audience upon its utterance.  See, e.g., Watts, 394 U.S. at 707-08 (noting that Watts' statements were made at a public gathering, on a topic of great national interest and debate, and that the audience reacted with laughter, not fear); White, 670 F.3d at 512-13 (considering the seriousness with which the recipient and law enforcement took White's statements concerning Petsche and Kerr and, with respect to Kerr, the fact that such statements occurred in the context of White's public opposition to the University of Delaware's diversity program); United States v. Lockhart, 382 F.3d 447, 451-52 (4th Cir. 2004) (reviewing the defendant's actions in delivering a purportedly threatening letter to the manager of a Food Lion and observing that she gave the letter "in a serious manner without suggesting it was meant in jest" and that nothing in her "actions suggest[s] she intended to engage in political discourse"); Doe, 306 F.3d at 623 (listing several contextual factors, including the reaction of those who heard the alleged threat, the speaker's history (if any) of threatening the recipient, and whether the recipient had reason to believe that the speaker was prone to violence).  Finally, in reviewing the full context, courts consider whether the purported threat was communicated

122

directly to the putative victim. See, e.g., White, 670 F.3d at 513 (observing that direct communication and personal or group involvement in the threat are not "an essential component[s] to finding a true threat, [but that] the lack of both," in context, prevented a finding that a reasonable recipient would understand White's Warman postings to be serious expressions of intent to commit harm); Doe, 306 F.3d at 623 (noting direct communication as one of the relevant factors to a "true threat" analysis).

### (b) Development of the "True Threat" Exception in the Fourth Circuit

The Fourth Circuit has considered the application of these contextual factors in a number of cases, the most recent of which involved those communications authored by White that formed the basis for his prosecution in the Western District of Virginia. See White, 670 F.3d at 502-06 (summarizing the subject writings). The Court reviews several of these decisions before proceeding to its analysis of the postings at issue.

First, in United States v. Cooper, 865 F.2d 83 (4th Cir. 1989), the Fourth Circuit reviewed a defendant's conviction under 18 U.S.C. § 878, which criminalizes threats against foreign officials. Id. at 84. The defendant in that case had made two statements to government agents concerning India's Prime Minister, Rajiv Gandhi. First, the defendant telephoned a Secret Service agent and made "some threatening statements about

123

Gandhi but said that he would attempt to kill Gandhi only if the C.I.A. provided him with funds and that, with C.I.A. funding, he would attempt an assassination outside of the United States." Id. at 84. This statement did not form the basis for his conviction, as the charge was dismissed because "it was clearly conditional[] and its premise [was] absurd." Id. at 85. The defendant was prosecuted and convicted based on a second statement to an official attached to the Office of the Joint Chiefs of Staff at the Pentagon. Id. at 84. The defendant telephoned this official and stated "that the Secret Service had given him $50,000 'to blow Gandhi's brains out' and that he had 'scoped out four areas in D.C. to blow [Gandhi's] brains out." Id. This official testified that he thought the defendant's "statements were made in a serious vein and not in jest," although he acknowledged that he did not believe that the Secret Service would assist in a potential assassination of the Prime Minister. Id. at 84-85. On appeal, the defendant argued that his speech was not a threat punishable under § 878. Id. at 85. After reviewing the Supreme Court's analysis in Watts, the Fourth Circuit held that the statement was a punishable threat because the defendant claimed that he had selected four potential assassination sites in the District of Columbia and because such claim was made in the context of his "freely

124

expressed" opposition to Gandhi and evidence that he had recently attended a gun show.[70]   Id.

After the Supreme Court's 2003 decision in Black, the Fourth Circuit revisited the "true threats" exception in a series of cases.   In Lockhart, a job applicant was prosecuted under 18 U.S.C. § 871 for making threats against then-President George W. Bush.   382 F.3d at 449.   After approaching a Food Lion manager about available positions, the applicant handed a letter to the manager as she was leaving that stated, "If George Bush refuses to see the truth and uphold the Constitution I will personally put a bullet in his head."   Id.   The Fourth Circuit held that the accused's conduct, when considered in the entire context, constituted a "true threat" distinguishable from the statements considered in Watts.   Id. at 452.   Using Watts and its prior decision in Cooper as benchmarks, the court considered several contextual factors in evaluating the status of the applicant's letter.   Reviewing the language itself, the court found "nothing in [the letter's] contents that signale[d] it [wa]s intended to be a joke."   Id.   The court also noted that

---

[70] The Court observes that the Fourth Circuit analyzed the defendant's statements under a willfulness standard that is no longer applicable to a "true threats" analysis.   Compare Cooper, 865 F.2d at 85 (citing Patillo, 431 F.2d at 297-98) (noting that, under Patillo, statements could not "be the subject of a criminal conviction unless made with a present intention to do the threatened harm") with Black, 538 U.S. at 359-60 (holding that "[t]he speaker need not actually intend to carry out the threat" for it to constitute a criminally punishable threat).

the applicant "gave the letter to the Food Lion manager, whom she did not know before entering the store, in a serious manner without suggesting it was meant as jest." Id. The court found that, "although the letter contain[ed] political statements," the manner in which it was delivered was factually distinguishable from Watts' public speech at a political rally. Id. Finally, the court observed that the applicant's "threat [wa]s not conditional in the same manner as the threat in Watts," which was expressly conditioned on the speaker's being drafted into the United States Armed Forces. Id. (citing Watts, 394 U.S. at 708). Rather, while her statements concerning President Bush were "grammatically conditional," the court found that nothing in her letter "indicate[d] what events or circumstances would prevent the threat from being carried out." Id. In light of the applicant's language and the context surrounding that language, the court concluded that her letter could not "be considered either legitimate political hyperbole or jest" and that it was, therefore, "a true threat not protected by the First Amendment." Id.

The Fourth Circuit revisited the "true threat" exception three years later in Bly, which involved a criminal prosecution under 18 U.S.C. § 876 for mailing threatening communications. 510 F.3d at 455-56. In that case, a former doctoral candidate at the University of Virginia ("UVA") sent several threatening

126

communications via mail and email to various UVA officials, claiming "that UVA personnel had plagiarized his work and treated him unfairly." Id. at 456. Included in these communications were statements regarding the candidate's intent to "seek redress outside legal channels," including the observations that "bullets are far cheaper and much more decisive" and that "[a] person with my meager means and abilities can stand at a distance of two football fields and end elements of long standing dispute with the twitch of my index finger." Id. In addition to such statements, the candidate sent "copies of firearms practice targets with bullet holes near their centers to 'give[] evidence of a talent I possess for gun control—hitting the target.'" Id. Following the district court's refusal to dismiss the portion of the indictment charging him with violating § 876, the candidate entered a conditional guilty plea. Id. at 455. On appeal, he claimed that his statements were "constitutionally protected 'political hyperbole,' and not an unprotected 'true threat' to injure." Id. at 457. The Fourth Circuit reviewed the contextual factors from Watts and then, using Watts and Lockhart as benchmarks, concluded that the candidate's speech was not protected by the First Amendment. Id. at 459. In so holding, the court found the candidate's statements to be "more akin to those made in Lockhart." Id. "Unlike in Watts, the [communication] was not

127

addressed to a public audience and, as in <u>Lockhart</u>, it was delivered privately to specific individuals." <u>Id.</u> Additionally, like the letter in <u>Lockhart</u>, the candidate's statements "were only grammatically conditional," in that they "both implicitly and explicitly promised violent retribution if [the candidate] did not receive the result he sought," but did not provide the reader any indication as to "what measure of justice would appease [him]." <u>Id.</u>

The Fourth Circuit most recently considered the "true threats" exception in <u>White</u>, which affirmed the district court's post-judgment rulings as to White's four counts of conviction in the Western District of Virginia. <u>White</u>, 670 F.3d at 501. This Court finds <u>White</u> to be particularly instructive to its analysis because, there, the Fourth Circuit was required to consider several examples of allegedly threatening Internet postings and emails, all of which were authored by the respondent here, White.[71] Having reviewed the factual background of White's convictions in detail above, the Court considers the Fourth Circuit's determinations as to whether the postings in that case

---

[71] Indeed, many of these communications have been offered as context for the relevant postings in this case. <u>See</u> Hr'g Ex. List Ex. 5-7, 17-18, Apr. 2, 2008 (summarizing exhibits offered at the evidentiary hearing, including the letter and magazine that White sent to Intervening Plaintiffs, which formed the basis of Count Three of his indictment in the Western District of Virginia, and copies of his Warman posts, which formed the basis and context of Count Six).

amounted to "true threats" excluded from First Amendment Protection.

In White, the court reviewed White's convictions and post-judgment acquittal under 18 U.S.C. § 875, which criminalizes the interstate transmission of communications threatening injury.[72] 670 F.3d at 507. Considering White's language and several contextual factors, the Fourth Circuit held that White's communications to Petsche and Kerr were "true threats" sufficient to support his convictions on Counts One and Five. Id. at 512-13. Regarding his interactions with Petsche, the court considered evidence "that White had paid money to locate a large amount of personal information about [her]" and that he had expressly advised her of that fact. Id. at 512. The court also noted that White's email to Petsche "specifically threatened" to "act if Petsche did not respond quickly, concluding . . . by comparing Petsche to Judge Lefkow, whose relatives had been murdered." Id. at 512. The court held that

---

[72] Before reviewing White's conduct with respect to Petsche (Count 1), Kerr (Count 5), and Warman (Count 6), the court generally observed that § 875 "criminalizes pure speech" and, accordingly, "must be interpreted 'with the commands of the First Amendment clearly in mind.'" Id. (quoting Watts, 394 U.S. at 707). The court recognized that such commands, however, exclude "true threats" to injure because of their "potential to cause . . . harm and imperil the security of individual citizens." Id.; see also id. ("'[P]rotecting individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur' are [the] fundamental concerns about the security and safety of individual citizens that place 'threats of violence . . . outside the First Amendment.'" (quoting R.A.V., 505 U.S. at 388)).

129

"[a]ny reasonable recipient of [such an] email would have taken it as a threat of violence." Id. (citing United States v. Floyd, 458 U.S. 844, 849-50 (8th Cir. 2006)). Finally, the court considered the reaction that White's email generated, observing that "Petsche, as well as other Citibank employees, security officers, and law enforcement officers took White's email as a serious threat," which "provid[ed] corroborating evidence of how the threat would be taken by a reasonable person." Id. (citing United States v. Roberts, 915 F.2d 889, 891 (4th Cir. 1990)).

Regarding White's communications with and concerning Kerr, the court considered the fact that White had "called [her] office and left a message that people who thought the way that [she] did were hunted down and shot." Id. at 513 (emphasis in original). Additionally, White's "delivery of the message carried a serious tone and was taken seriously." Id. "Kerr, her husband, the officials at Delaware University, and law enforcement agencies took the call, in the context of White's public opposition to Delaware's program, to be a serious expression of intent to harm Kerr." Id. Again, the court concluded that these reactions "provid[ed] corroborating evidence of how the threat would be taken by a reasonable recipient familiar with the context." Id.

130

After affirming White's convictions on Counts One and Five, the court considered his postings about Warman, concluding that the two communications that formed the basis of Count Six did not amount to proscribable "true threats." White, 670 F.3d at 513. In so holding, the court observed that, although the two postings "called for someone to kill Richard Warman," neither "actually provided a threat from White that expressed an intent to kill Warman." Id. The court acknowledged that such a "direct threat" is not required and, indeed, that "a direction to others to kill Warman," could have been sufficient, "if White had some control over those other persons or if White's violent commands in the past had predictably been carried out." Id. However, the court found no evidence of such context before it. Id. Accordingly, White's call to others was protected as political hyperbole, like the speech in Watts, because it was not directed to members of White's organization, but was instead "posted to neo-Nazi websites" directed to the public generally. Id. In the same vein, although there was evidence that White had previously contacted him, the court emphasized that neither of the charged communications were sent directly to Warman. Id. The court summarized its view of the relevant postings as follows: "[T]he communications that formed the basis of Count [Six] were expressions not directed to Warman but to the public generally and did not communicate an intent to take any action

131

whatsoever." Id. Accordingly, they "fell short of being true threats." Id.

After so holding, the court addressed several of the government's arguments in support of their position that White's postings about Warman were not protected under the First Amendment. The court first observed that:

> While the government is correct that neither direct communication nor personal or group involvement in the threat is an essential component to finding a true threat, the lack of both, along with the fact that White's language was clearly directed to others in the form of advocacy, makes it impossible for us to conclude that a reasonable recipient would understand White's communications to be serious expression of intent to commit harm.

Id. (emphasis in original). The court next rejected the government's contention that "the context in which White's statements were made elevates the[m] and makes up for the lack of a direct threat to commit harm." Id. Although the government had offered numerous examples of White's "communications directly and indirectly to Richard Warman"[73] as evidence of his "protracted campaign to oppose Warman's work in Canada, fighting neo-Nazi and white supremacy groups," the court concluded that such context was not enough to transform White's statements into "true threats." Id. at 513, 514. "The

---

[73] These included "White's earlier references to actual violence, such as firebombing an activist's house, and the violent edge that accompanied all of White's statements," which the government argued were "public statements . . . made relevant to Warman and . . . specifically designed to threaten Warman." White, 670 F.3d at 514.

principal message expressed in [his] communications was that
someone else should kill Warman." Id. at 514. Although such
statements and the context in which they were made "may have
undoubtedly frightened Warman, those communications at most
conveyed a serious desire that Warman be harmed by others but
did not convey a serious expression of intent to do harm from
the perspective of a reasonable recipient." Id. Based on its
review of the language and context of White's Warman postings,
the Fourth Circuit affirmed the district court's judgment of
acquittal on Count Six. Id.

Guided by the general principles identified and reviewed
above, as well as by the Fourth Circuit's application of those
principles, the Court considers whether White's postings in this
matter amount to unprotected "true threats."

### (c) Analysis

As reviewed in detail above, White authored a number of
communications in the early months of 2008—which he publicly
posted or otherwise distributed on the Internet—that Intervening
Plaintiffs contend support an award of sanctions against him
under the Court's inherent power. See supra Part II.F. The
Court need not repeat these postings in full here, but instead,
discusses them in light of the contextual factors, established
in Watts and consistently applied in the Fourth Circuit (and

133

elsewhere), to determine whether such communications are "true threats" outside the scope of First Amendment protection.

### (i)  Language

The Court looks first to the language of White's various communications.  <u>See, e.g.</u>, <u>Watts</u>, 394 U.S. at 707-08; <u>White</u>, 670 F.3d at 512; <u>Carmichael</u>, 326 F. Supp. 2d at 1281.  Despite White's repeated and extensive commentary on the underlying litigation, generally, and on counsel, specifically, the Court finds little in the language of the postings themselves to support a finding that they are proscribable "true threats."

None of the relevant postings expressly threatens unlawful harm to Mottley.  Indeed, the only directly threatening language expresses White's desire and intent to file suit against Mottley based on what White considered his unlawful issuance of the disputed subpoenas during the underlying litigation.  <u>E.g.</u>, Pre-Hr'g Reply Br. Ex. B, ECF No. 67-3 ("[I]f I have anything to say about, we're going to sue [Mottley] and his law firm under a precedent he established for filing subpoenas without cause and recoup all of this money in the end."); Pre-Hr'g Br. in Opp'n Ex. A, ECF No. 59-2 ("I know [Mottley and his firm] are wasting thousands of dollars of our money, but we can be patient and deal with them legally."); Pre-Hr'g Supplemental Br. Ex. A, ECF No. 55-2 ("I actively hope that this concludes with them being sued into oblivion, paying me a large judgment, and never having

134

anything happen to them upon which they hang a legitimate complaint."). The threat to instigate litigation, and thereby invoke constitutionally prescribed powers and processes, is not akin to any "true threat" of which this Court is aware. Cf. Black, 538 U.S. at 359 (defining a "true threat" as a statement including "a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals" (emphasis added)).

On this question, White's postings are clearly distinguishable from those communications that the Fourth Circuit has previously categorized as "true threats." Nowhere did White expressly threaten injury to Mottley, conditional or otherwise. Thus, his postings are not akin to the statements considered in Cooper, Lockhart, and Bly, in which each of the speakers expressed his or her intention to shoot the object of the threat. Bly, 510 F.3d at 456; Lockhart, 382 F.3d at 449; Cooper, 865 F.2d at 84. Nor are they comparable to White's statements to Petsche, in which he "specifically threatened" to act if she did not promptly respond to his request, suggesting through his comparison of Petsche to Judge Lefkow that such action would necessarily be violent. White, 670 F.3d at 512. Although White similarly referenced Judge Lefkow in his lengthy February 28, 2008 email to counsel, such reference was not made in connection with an express threat of action, as it was in his

135

email to Petsche.[74]  See Pre-Hr'g Supplemental Br. Ex. A, ECF No. 55-2 (referencing Judge Lefkow in a discussion of tactics and practices specifically and repeatedly disclaimed throughout the email).  Furthermore, despite Intervening Plaintiffs' contention that White's use of words like "noose" and "open game" in his February 22, 2008 postings demonstrate his expression of a threat to inflict bodily harm on Mottley, White's language in that posting is clearly distinguishable from his "true threat" to Kerr, in which he stated that "people who thought the way that Kerr thought were hunted down and shot."  White, 670 F.3d at 513 (emphasis in original).  Whatever the cited terms connote in this case, they do not express a direct and specific threat of physical violence.

As the Magistrate Judge observed, "any arguably threatening language used by White was indirect, at best."  Mag. Judge Order 47, ECF No. 98.  Reviewing White's various postings in light of the relevant benchmarks, and particularly with reference to the Fourth Circuit's decision respecting his convictions in the Western District of Virginia, the Court finds that White's statements do not suggest an indirect or implied "true threat" of unlawful violence.  See Black, 538 U.S. at 359.

---

[74] White's reference to Judge Lefkow in this email is considered further below in the Court's analysis of whether such reference constitutes an implied or indirect threat of bodily harm to Mottley.

In reaching this conclusion, the Court looks primarily to the Fourth Circuit's discussion of White's postings about Richard Warman, in which he expressly called for someone to "Kill Richard Warman," included Warman's home address, and directed readers to "[f]ind him at home and let him know you agree." White, 670 F.3d at 505-06. The Court finds this analysis particularly instructive in light of the similarities between Warman and Mottley. Both are attorneys who, to varying degrees, have assisted civil rights litigants in obtaining relief through the mechanisms provided by their respective legal systems and, in doing so, became targets of White's ire. See id. at 505. Indeed, White's expression of his views regarding both men is strikingly similar, although, in Warman's case, much more menacing. See id. As he apparently did with respect to Warman, White repeatedly and publicly criticized Mottley for his involvement in the underlying litigation, his conduct toward White, and his reactions to White's online commentary of the same. See White, 670 F.3d at 505-06. Unlike the majority of White's postings about Warman (which "repeatedly call[ed] for his assassination and post[ed] his home address"), White's criticisms of Mottley rarely expressed even a veiled desire that action be taken against him and seldom included his personal contact information. Id. at 505. Indeed, only one communication of which this Court is aware paired any suggestion

137

of potentially unlawful action with Mottley's personal, identifying information, that is, the February 22, 2008 posting upon which Intervening Plaintiffs' Motion for Sanctions was initially based. See Pre-Hr'g Br. in Opp'n Ex. A, ECF No. 59-2.

That posting directed readers "not"[75] to take a series of nonviolent actions against Mottley, such as draining his bank account or misusing his Social Security number, and suggested that Mottley and his wife were "open game" after the subpoena dispute concluded. Id. Most troublingly, the post included Mottley's home address and his telephone number. Id. Although certainly ill-advised, inappropriate, and reprehensible, the Court concludes that the language used in this communication does not rise to the level of a "true threat." If repeated demands for Warman's murder made in the same manner and to the same websites as White's posting about Mottley, do not constitute a "true threat," White's veiled encouragement of the actions specified in his February 22, 2008 postings cannot be

---

[75] As did the Magistrate Judge, this Court gives little weight to White's negative framing of such numerous and specific suggestions. Indeed, the Court declines to rigidly adhere to the literal meaning of White's communications without regard to the reasonable connotations discernable from the surrounding context. See Turner, 720 F.3d at 422. That said, although White's statements arguably encouraged a series of undesirable and, in some cases, illegal actions, they did not contain expressly threatening language nor any expression of White's intent to injure Mottley. See Mag. Judge Order 66, ECF No. 98. Accordingly, although deeply concerning, the language of White's various postings does not express a "true threat" under the relevant case law.

viewed as such a proscribable threat, even though the posting included references to "nooses" and "open game." Id. at 513-14. While such terms, in the proper context might connote a threat of violence, they do not do so here, in light of the language of the entire posting, especially as compared to White's similar writings about Warman. Accordingly, the language of this initial posting suggests that it is not a "true threat" beyond the ambit of constitutional protection.

For the same reasons, the Court finds that White's August 16, 2008 "Funny Games" posting to Overthrow.com is not indicative of a "true threat." Indeed, although this posting certainly connoted some suggestion of violence through its comparison of Mottley and his wife to the family depicted in the movie, like White's Warman postings, it "at most conveyed a serious desire that [Mottley] be harmed by others" and not "a serious expression of [White's] intent to do harm from the perspective of a reasonable recipient." Id. at 514 (emphases in original). White's language, although troubling, is again strikingly similar to his protected Warman postings. Compare Br. in Supp. of Obj. Ex. A, ECF No. 104-2 (drawing the above noted comparison and asking, "Anyone think I'm off base with that?") with White, 670 F.3d at 505 (stating that Warman "must be killed" and suggesting readers "[f]ind him at home and let him know you agree"). Unlike his statements about Warman,

139

however, White's "Funny Games" posting did not include any personal, identifying information for Mottley or his wife. In light of the protected status of White's Warman postings, which contained such information and more express demands for violence, the Court finds that the language of White's final posting to Overthrow.com does not indicate a "true threat."

Reviewing the remaining postings at issue, the Court finds that none contain a serious expression of either an intent to harm Mottley or even a desire that others harm him. See White, 670 F.3d at 514. However, because the various postings include several troubling statements, the Court explains why such statements do not suggest a "true threat" in this case.

First, and perhaps most disconcerting, is White's republication of Mottley's personal, identifying contact information in his substantively identical April 2008 postings to Overthrow.com. See Post-Hr'g Supplemental Br. in Supp. Ex. A, ECF No. 76-2; see also Mag. Judge Order 28 & n.34, ECF No. 98. As the Magistrate Judge rightly emphasized at the February 28, 2008 hearing, the publication of such information is potentially "dangerous and intimidating" and, when done in the context of litigation, is of great concern to the Court given "the possible effect on the safety" of counsel. Hr'g Tr. 75, Feb. 28, 2008. However, considering the language of the April 2008 postings that contained this information, the Court finds

140

nothing to suggest that they express an intent to harm Mottley or a desire that others harm him. Although White certainly disparaged Mottley for his reaction to White's prior writings, he did not recommend any "act[s] of unlawful violence." Black, 538 U.S. at 359. Indeed, he specifically and, in the Court's view, forcefully directed readers not to "threaten," "harass," or "commit crimes" against Mottley. Post-Hr'g Supplemental Br. in Supp. Ex. A, ECF No. 76-2. Thus, although the Court finds the republication of Mottley's personal, identifying information repugnant, based on the language of the postings it was not apparently unlawful. See Sheehan v. Gregoire, 272 F. Supp. 2d 1135, 1142 (W.D. Wash. 2003) (citing Bartnicki v. Vopper, 532 U.S. 514, 527 (2001)) ("Defendant cites no authority for the proposition that truthful lawfully-obtained, publicly-available personal identifying information constitutes a mode of constitutionally proscribable speech. Rather, disclosing and publishing information obtained elsewhere is precisely the kind of speech that the First Amendment protects.").[76] Compare Carmichael, 326 F. Supp. 2d at 1281 (concluding that the language of the defendant's website, which included the photographs and personal contact information for the

---

[76] As the Magistrate Judge noted, "[t]here have been no allegations that White obtained such information other than through publicly[] available sources" and "the Court is unaware of any circumstances to the contrary." Mag. Judge Order 73, ECF No. 98.

government's witnesses against him "d[id] not make out a threat" when read in full because "the site actually disclaim[ed] any intent to threaten," making it "appear to be just what [the defendant] maintained") with Turner, 720 F.3d 421-22 (concluding that the defendant's blog post was a "true threat" because in it he "not only wrote that . . . three judges should be killed" but also included detailed directions to the courthouse and a serious reference to the murders of Judge Lefkow's family, one that suggested a causal connection between such murders and his prior writings).

Although no other writings included Mottley's personal, identifying information, at least one included statements that, in the proper context could be viewed as unlawfully threatening. Specifically, in his lengthy February 28, 2008 email, which he copied to both Mottley and Brown, White included a reference to Judge Lefkow, whose family was tragically murdered in apparent retribution for her decision in a prior case. Pre-Hr'g Supplemental Br. Ex. A, ECF No. 55-2. In pertinent part, White wrote:

> As Mottley has gotten nastier and nastier, and sunk deeper into this delusionary alternate reality he's created around this case, I've seen his efforts could quickly balloon into the kind of nastiness that draws an Anonymous response. As we all know, from the Anonymous perspective, someone becomes "open game" the moment they stick their head up; a lot of people don't even stick their head up, but become targets just at random as people browse the web. I remember what

142

> happened to Joan Lefkow, for instance, and know what
> the segment of Anonymous which thinks its capable of
> "helping" is capable of doing.
>
> Particularly, I could see agitated ANSWP fans who are
> not members and not under my control in any way
> deciding to "help", [sic] as they have when they have
> mailed nooses to black leaders or kidnapped members of
> Jewish groups, going after this attorney with some
> Anonymous tactics that would do nothing but hurt our
> position. In response to that possibility, I posted
> my somewhat humorous and mostly serious admonition not
> to harass him. I think anyone familiar with my
> writings could understand what I meant when I made
> that post. I cannot imagine anyone interpreted it as
> a command to "kill him after the trial," kill him
> after a specific hearing, or commit any specific crime
> against him.

Id. It is true that, in the proper context, an invocation of

the tragedy that befell Judge Lefkow can constitute a true

threat. Indeed, the Fourth Circuit so held with respect to

White's inclusion of such a reference in his email to Petsche.

White, 670 F.3d at 512. That email, however, is distinguishable

from White's statements here because the reference was included

in a "specific threat" to harm Petsche if she did not respond to

White's demands. Id. No such specific threat appears anywhere

in White's February 28, 2008 communication.

In a more analogous case, the Second Circuit recently held

that an individual's blog post—in which he advocated the murder

of three Seventh Circuit judges and invoked the "actual acts of

violence carried out in apparent retribution for [Judge

Lefkow's] decision" in a prior case—"would clearly allow a

reasonable juror to conclude that [such] statements were a true threat." _Turner_, 720 F.3d at 421-22.  In so holding, the court emphasized the fact that the speaker not only referenced Judge Lefkow, but that he then "publicly implied a causal connection between" his blog posting calling for her death and the actual murders. _Id._ at 422.  Thus, the entire language of Turner's posting, when viewed in context, supplied "abundant evidence from which to conclude that [he] was threatening judges in retaliation for their ruling, rather than engaging in mere political hyperbole."  _Id._  Here, the full text of White's February 28, 2008 email does not compel the same conclusion. Unlike the blog post in _Turner_, White's discussion of Judge Lefkow is included in a larger description of actors and actions that he repeatedly and strongly disavows.  Pre-Hr'g Supplemental Br. Ex. A, ECF No. 55-2.  Indeed, far from implying a causal connection between his prior writings and the murders of Judge Lefkow's family, White specifically disclaims and condemns any association with those members of "Anonymous" he views as responsible for such acts.  When viewed in light of the surrounding language threatening to expel any ANSWP member who violates the law, White's email is clearly distinguishable from the proscribable blog post in _Turner_.

For the above reasons, the Court finds that the language of White's various postings and emails does not, alone, rise to the

144

level of a "true threat." The majority of such writings lack any discernible threats and, instead, are replete with criticisms of Mottley based on his involvement in the underlying litigation, which arguably "implicate[d] highly controversial social issues." Mag. Judge Order 59, ECF No. 98. Thus, the language of the postings themselves are indicative of White's intent to engage in political or social discourse. See Lockhart, 382 F.3d at 452. Such hyperbole would appear, under the relevant precedents, to fall within the scope of the First Amendment's stringent protections. See, e.g., Watts, 394 U.S. at 708 (noting the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open" even when that speech includes "vehement, caustic, and sometimes unpleasantly sharp attacks" (quoting Sullivan, 376 U.S. at 270) (internal quotation marks omitted)); Turner, 720 F.3d at 420 ("We have no doubt that Turner was constitutionally entitled to condemn and disparage the Seventh Circuit."); White, 670 F.3d at 513-14 (discussing White's Warman postings). However, to conclusively determine whether White's postings amount to proscribable "true threat," the Court must consider the context in which such statements were made.

Before considering the several, relevant contextual factors, the Court briefly addresses Intervening Plaintiffs' argument that "true threats" are not limited to threats of

145

physical violence, but also include threats intended to instill a fear of harm to the recipient's property.  Post-Remand Br. in Supp. of Obj. 33, ECF No. 152.  The Court finds this argument to be contrary to the Supreme Court's plain language in <u>Black</u>, which defined "true threats" as "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful <u>violence</u> to a particular individual or group of individuals."  <u>Black</u>, 538 U.S. at 359 (emphasis added).  Although the Supreme Court did, as Intervening Plaintiffs argue, observe that "[i]ntimidation . . . is a type of true threat" whereby the speaker communicates such a threat with the specific intent to instill "fear of bodily harm or death," <u>id.</u> at 360, such observation does not broaden the underlying definition of a "true threat" as Intervening Plaintiffs so contend.  Indeed, in specifically rejecting White's argument that <u>Black</u> requires the speaker to specifically intend to threaten the victim, the Fourth Circuit emphasized that the discussion of such intent (and, accordingly, of intimidation as a type of true threat) occurred in the context of a "Virginia statute making it a crime to burn a cross with the [specific] intent of intimidating a person." <u>White</u>, 670 F.3d at 508.  The Fourth Circuit did not view such language as instructive in its interpretation of <u>Black</u>'s threshold definition of "true threat;" nor does this Court.  The majority

146

of cases discussing this exception to the First Amendment have universally addressed "true threats" as threats of bodily harm or injury. See, e.g., White, 670 F.3d at 512-14; Turner, 720 F.3d at 421-22; Jeffries, 692 F.3d at 475-77. Although Intervening Plaintiffs have cited other cases for the proposition that a threat to property is sufficient to find a "true threat," several such cases address threats to bomb or burn buildings, which necessarily include the possibility of bodily harm and, for that reason, are distinguishable from the allegedly threatening suggestions at issue here. Post-Remand Br. in Supp. of Obj. 31-33, ECF No. 152 (collecting cases); see, e.g., United States v. Viefhaus, 168 F.3d 392, 394-96 (10th Cir. 1999) (defining "true threats" in a federal prosecution based on the defendant's recorded statement referring to the bombing of a federal building and threatening to activate bombs in "15 pre-selected major U.S. cities" one week from the date of the recording). Furthermore, in light of the Fourth Circuit's detailed consideration of White's Warman postings and the above-noted similarities between such postings and White's statements about Mottley, the Court finds no basis for concluding that the purported threats to Mottley's property are proscribable "true threats" while his repeated demand for Warman's murder is not. Accordingly, the Court declines to interpret "true threats" as expansively as Intervening Plaintiffs suggest.

### (ii) Context

Although the language of a purportedly threatening statement is critical to any "true threat" analysis, the context in which such statement was made is equally essential to the determination of its status under the First Amendment. Accordingly, as discussed in detail above, the Court must consider those contextual factors that inform how a "reasonable recipient familiar with the context" would understand White's postings in this matter. White, 670 F.3d at 509 (emphasis omitted). These factors include the manner and forum in which the postings were communicated, the reaction of the audience to such postings, and any other circumstances corroborating the seriousness of the purported threat. See, e.g., Watts, 394 U.S. at 707-08; Bly, 510 U.S. at 459; Carmichael, 326 F. Supp. 2d at 1281.

The majority of the communications at issue are blog postings to various public websites, including the Vanguard News Network forum, Overthrow.com, and the ANSWP Yahoo! Groups page.[77]

---

[77] The Court notes, as it did at the July 17, 2013 hearing, that White apparently maintained ANSWP's Yahoo! Groups page for members of his organization. However, postings to the page were publicly available until sometime after Intervening Plaintiffs filed the Motion for Sanctions, with the record suggesting that such postings were read by nonmembers. See supra n.2 (noting that the Yahoo! Groups page is no longer publicly accessible); see also Hr'g Tr. 70, Feb. 28, 2008 (White's original counsel stating that White has "some crazy followers" and arguing that he was trying not "to encourage them to do things that are crazy"); Pre-Hr'g Supplemental Br. Ex. A, ECF No. 55-2

Although "the internet presents the problem of virtually unlimited and rapid proliferation of information in a fashion unlike any other media," Mag. Judge Order 68, ECF No. 98, the Supreme Court has held that there is "no basis for qualifying the level of First Amendment scrutiny that should be applied to" it as a medium of communication. Reno v. Am. Civil Liberties Union, 521 U.S. 844, 870 (1997); accord Carmichael, 326 F. Supp. 2d. at 1288-89 (interpreting the Supreme Court's holding in Reno to mean "that speech on the [I]nternet is subject to no greater or lesser constitutional protection than speech in more traditional media"). In so holding, the Supreme Court noted that the Internet is a "dynamic, multifaceted category of communication [that] includes not only traditional print and news services, but also audio, video, and still images, as well as interactive, real-time dialogue." Id. Indeed, the Supreme Court lauded the Internet's ability to turn "any person with a phone line [into] . . . a town crier with a voice that resonates farther than it could from any soapbox" and further observed that "[t]hrough the use of Web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer." Id. The end result is a forum in which "the content . . . is as diverse as human thought." Id. (quoting Am. Civil Liberties

---

(White's posting referring to "agitated ANSWP fans who are not members and not under [his] control").

149

Union v. Reno, 929 F. Supp. 824, 842 (E.D. Pa. 1996), aff'd, 521 U.S. 884 (1997)). Thus, the Internet, as a forum for speech, is more akin to the political rally in Watts than to the targeted mailings, emailings, and telephone calls at issue in Cooper, Lockhart, Bly, and White. Indeed, a review of the communications at issue in those cases supports this conclusion.

The Fourth Circuit has repeatedly and consistently considered the direct and private communication of an allegedly threatening statement to a specific individual as a significant contextual factor in determining whether such statement constitutes a "true threat." See, e.g., White, 670 F.3d at 512-14; Bly, 510 F.3d at 459; Lockhart, 382 F.3d at 452. Thus, in White, the court held that White's targeted phone calls and emails to Petsche and Kerr were "true threats" while concluding that his Internet postings about Warman were protected under the First Amendment.[78]   670 F.3d at 512-14.   Like the Warman

---

[78] The Court notes that White also published a post to Overthrow.com, entitled "University of Delaware's Marxist Thought Reform," which included "Kerr's full name, email address, date of birth, home telephone number listed as 'confirmed' and father's address in New Jersey mistakenly calling it her husband's address." White, 670 F.3d at 504. The posting "instructed readers to 'go to their homes" and, beneath Kerr's contact information, proclaimed, "We shot Marxists sixty years ago, we can shoot them again!" Id. Law enforcement also located "another web entry entitled 'Smash the University of Delaware,' which included the personal information of Kerr and the University President with the instruction, 'You know what to do. Get to work!'" Id. Neither of these postings formed the basis for White's conviction of Count Five. Rather, they were offered only as context for his telephone call to Kerr's office. Id. at 513.

150