postings, the majority of White's statements concerning Mottley were publicly posted to Internet forums promoting discussion of historically contentious issues such as white supremacy and neo-Nazi ideologies. Cf. Hardwick ex rel. Harwick v. Heyward, 711 F.3d 426, 436 (4th Cir. 2013) (collecting cases discussing the controversial nature of speech involving the Confederate flag, noting that it is both "a symbolic acknowledgement of pride in Southern heritage and ideals of independence," as well as "a symbol of racial separation and oppression" and a representation of approved white supremacy). Although the Court emphasizes the dangers inherent in White's inclusion of Mottley's contact information in his public postings, it nevertheless concludes that this contextual factor weighs in favor of protecting such postings.

Although the majority of the communications at issue were published to various Internet forums, White did send copies of two writings, via email, directly to Mottley and his own attorney, Brown. See Pre-Hr'g Supplemental Br. Ex. A, ECF No. 55-2; Post-Remand Br. in Supp. of Obj. J.A. 345, ECF No. 152-5. Intervening Plaintiffs argue that such direct communication demonstrates the threatening nature of the statements contained in those emails. Although the direct communication of a purported threat is a significant factor in the Court's analysis, the timing and contents of the two emails here do not

support the conclusion that White's emails amounted to "true threats." First, both emails were sent on the evening of February 28, 2008, the same day as the subpoena hearing before the Magistrate Judge at which Intervening Plaintiffs' Motion for Sanctions was preliminarily addressed. Second, the emails were directed to both Mottley and Brown. Third, and most significantly, both emails were apparently responsive to requests or suggestions made at the hearing. Specifically, as discussed above, counsel for Intervening Plaintiffs had suggested at the hearing that, to remedy the danger posed by his February 22, 2008 posting, "[W]hite can post something indicating he now understands the rule of law and that he denounces and rejects the suggestion that people are open game once litigation ceases," and had reiterated, "He can do that. Why doesn't he? What's going on?" Hr'g Tr. 65-66, Feb. 28, 2008. The first email, sent at 6:55 p.m. that evening, was entitled, "Norfolk Case Update" and stated that the following message had been "[s]ent today to our general membership, in case there was any doubt as to my intentions or my instructions regarding Mr. Mottley and company." Pre-Hr'g Supplemental Br. Ex. A, ECF No. 55-2. Thus, this email was, ostensibly, responsive to counsel's request that White clarify his prior posting.[79] Similarly, during the course of the subpoena hearing,

_____

[79] The Court is sensitive to counsel's arguments at the July 17,

152

the Magistrate Judge had asked if White could remove the February 22, 2008 posting from the Vanguard News Network forum pending the resolution of Intervening Plaintiffs' Motion for Sanctions. Hr'g Tr. 69, Feb. 28, 2008. White had indicated that he did not exercise control over the website, but that he would inquire about having the posting removed. White's second direct email to counsel, sent at 8:35 p.m., was entitled, "Thread Removed From Vanguard News Network" and said only, "The objectionable thread on Vanguard News Network was removed today."[80] Post-Remand Br. in Supp. of Obj. J.A. 345, ECF No. 152-5. This second email does not contain any threatening language. Nor does the first, for the reasons discussed in detail above.[81] Thus, the fact that White twice emailed Mottley

---

2013 hearing that his statements on February 28, 2008 did not invite White to directly threaten Mottley. The Court certainly does not construe counsel's remarks as encouraging direct threats. Rather, because the Court has already concluded that the language of White's emails did not threaten acts of unlawful violence against Mottley, the Court considers the timing and apparent responsiveness of the emails (White's only direct communications to Mottley) as mitigating what would otherwise be a significant factor in the Court's analysis.

[80] The Court acknowledges that White failed to disclose that the same posting remained publicly available on ANSWP's Yahoo! Groups page; however, this fact has no bearing on whether White's February 28, 2008 emails were "true threats" of injury to Mottley. Rather, it relates to the Court's determination that White acted in bad faith when he authored such emails, a question already resolved in the affirmative.

[81] The Court reemphasizes here that, despite the email's inclusion of a reference to Judge Lefkow, the full text of this lengthy communication distinguishes it from White's email to Petsche, in which he threatened similar violence against her if she did not promptly

directly, without more, does not compel the conclusion that the otherwise nonthreatening emails are nonetheless proscribable as "true threats."

Another important contextual factor in the Court's analysis of the relevant context is the audience reaction to White's statements concerning Mottley. Indeed, the Fourth Circuit has repeatedly considered this fact in determining the status of a purported threat under the First Amendment. See, e.g., White, 670 F.3d at 512-13 (noting that the serious reactions to White's communications with Petsche and Kerr "provid[ed] corroborating evidence of how the threat would be taken by a reasonable person"); Lockhart, 382 F.3d at 452 (comparing the crowd's laughter in Watts to the Pentagon officer's impression that the statements in Cooper were "made in a serious vein" before concluding that the applicant's statements were a "true threat" (quoting Cooper, 865 F.2d at 85)). Here, the record reveals that Mottley, his law firm, and local law enforcement took White's postings very seriously. Hr'g Tr. 126-29, Apr. 2, 2008 (discussing the various security precautions taken after White's February 22, 2008 postings, including additional patrols of Mottley's neighborhood by the Henrico County Police Department and the installation of a security system at Mottley's residence

comply with his demands. White, 670 F.3d at 512. Again, White's February 28, 2008 email, copied to Mottley and Brown, contained no such threat.

154

at his firm's expense). Thus, this factor weighs in favor of excluding White's postings from First Amendment protection. However, because such evidence is merely "corroborative" and not dispositive, the Court must consider whether anything else in context of White's postings indicate that they were a serious expression White's intent to harm Mottley, from the perspective of a reasonable recipient. See, e.g., Watts, 394 U.S. at 707-08; Bly, 510 U.S. at 459; Carmichael, 326 F. Supp. 2d at 1281.

The Court, therefore, next considers those surrounding circumstances bearing on the seriousness of White's purported threats. First, as noted above and in the Magistrate Judge Order, White's postings in this matter repeatedly express his discontent with the underlying litigation, with Mottley's issuance of the subpoenas against him and his various entities, with what he viewed as the Court's indulgence of such subpoenas, and with the resulting court process, generally. See Mag. Judge Order 66, ECF No. 98. In considering this context, the Magistrate Judge noted White's tendency "to use various internet websites and blogs to attack any group or individual who opposes [his] cause or who support causes that conflict with [his] viewpoint." Id. Intervening Plaintiffs object to the Magistrate Judge's discussion of this fact, arguing that, considering such context compels the conclusion that "the more people White threatens, the more constitutional protection his

threats receive." Post-Remand Br. in Supp. of Obj. 33, ECF No. 152.

The record before this Court reveals that White, indeed, is a prolific writer who regularly publishes to the Internet his criticisms of people and groups with whom he disagrees. This fact is relevant to the Court's determination of whether a subset of such writings constitute "true threats," because it speaks to White's intent in authoring the postings at issue here.[82] Specifically, the fact that White regularly publishes his social and political views on the Internet suggests that, when he expressed similar views concerning the underlying litigation, generally, and Mottley, specifically, he did so with the intent to engage in similar political or social discourse.[83]

---

[82] In considering this contextual factor, the Court does not suggest that White's statements cannot amount to "true threats" absent a subjective intent to threaten. Indeed the Fourth Circuit expressly rejected such a requirement in White. 670 F.3d at 508. However, in considering the surrounding context, the Court finds the fact that White regularly engages in social and political debate through postings similar in content, form, and location to the postings at issue to be relevant to the question of whether that context indicates a serious expression of intent to do harm or, instead, merely an intent to engage in similar discussion or debate. See Lockhart, 382 F.3d at 452 (considering whether the applicant's "actions suggest[ed] she intended to engage in political discourse with the Food Lion management").

[83] At the July 17, 2013 hearing, Intervening Plaintiffs argued that White's postings about Mottley were not made relevant to any larger political or social discourse. To this end, they sought to distinguish White's Warman posts, arguing that those writings were authored in the context of an extensive back and forth between Warman and White, one that Intervening Plaintiffs characterized as a dispute of "warring ideologies" through which White allegedly sought to instigate a revolution in Canada. As a threshold matter, the Court

See Lockhart, 382 F.3d at 452 (finding it a significant factor that nothing in the applicant's "actions suggest[ed] she intended to engage in political discourse with the Food Lion management"). White's manner of discourse—the criticism of specific individuals and groups for their opposing views or conduct—is certainly "a very crude offensive method of stating" his opinions, but when such discourse does not include a "serious expression of intent to harm," from the perspective of a reasonable recipient, it is not a "true threat" beyond the ambit of First Amendment protection. White, 670 F.3d at 509 (quoting Black, 670 F.3d at 359) (internal quotation marks omitted).

---

notes that nothing in the record before it or in the Fourth Circuit's discussion of the Warman postings suggests that Warman engaged in serious debate with White, as Intervening Plaintiffs suggest. Additionally, although perhaps not of the same magnitude as his statements about Warman, White's extensive commentary about the underlying litigation (as only partially reflected in the Court's above review of the postings directly at issue) similarly concerned matters of public importance and interest—that is, fair housing practices, civil rights, and the general processes of the federal court. As Warman has apparently done extensively in Canada, Mottley engaged with these serious and important issues through his pro bono representation of Intervening Plaintiffs. In recognizing this fact, the Court in no way means to suggest that Mottley's commendable and zealous efforts on behalf of his clients should expose him to retaliatory threats from White or anyone else. However, in determining whether any such "threats" were made against him, the Court necessarily considers the context surrounding White's statements, including the issues of significant social importance entailed in the underlying dispute, Mottley's role in advocating a certain position with respect to such issues, and White's expression of his strong opposition to the same. On this point, the Court agrees with White's counsel, that any difference between Warman and Mottley is one of degree, and not of kind.

In recognizing that constitutional protection extends even to such "vituperative, abusive, and inexact" speech, Watts, 294 U.S. at 708, the Court emphasizes that there is a line, one that, if crossed, exposes the speaker to lawful sanctions without regard to his otherwise robust First Amendment interest in expressing himself.  See, e.g., Black, 538 U.S. at 358-59 ("The First Amendment permits restrictions upon the content of speech in a few limited areas, which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." (quoting R.A.V., 505 U.S. at 382-83) (internal quotation marks omitted)).  Indeed, as the Court's detailed review of White's numerous and serious legal troubles makes clear, when the language and context of his speech has evinced a "true threat," he has been vigorously prosecuted in federal court.  The fact that White has repeatedly crossed the line—in his statements concerning Juror A and his communications with Petsche, Kerr, and Intervening Plaintiffs—has not, as Intervening Plaintiffs here suggest, shielded him from criminal sanctions. See White, 698 F.3d at 1014-15; White, 670 F.3d at 507.  Furthermore, as the Magistrate Judge emphasized, "even minute or subtle changes" to the language or context of White's postings in this case could have excluded them from constitutional protection, regardless of the fact that White

158

frequently expresses his social and political opinions on the Internet. Mag. Judge Order 64, ECF No. 98. Nevertheless, in light of the language and context of White's postings, the Court finds the fact that such postings are consistent with his general method of engaging in social and political discourse to be a relevant factor in determining White's First Amendment interest, if any, in his statements.

In addition to the context created by White's frequent postings, the Court considers the evidence—or lack thereof—concerning the general audience for such postings. This is a factor of some significance in light of the Fourth Circuit's discussion of White's Warman postings and this Court's determination that, like those postings, White's statements about Mottley do not express a "direct threat," or rather, a serious expression of White's "intent to commit an act of unlawful violence" against Mottley. Black, 538 U.S. at 359; see also White, 670 F.3d at 514 (concluding that White's "communications at most conveyed a serious desire that Warman be harmed by others" (emphasis in original)). This factor, however, is distinct from the audience reaction to White's communications, discussed above. Here, the Court considers, as did the Magistrate Judge, the evidence before it concerning the number and identity of White's readers and whether any such readers have predictably acted on his violent commands, such

that action against Mottley would have been a foreseeable consequence of the relevant postings. See White, 670 F.3d at 513.

There is very little evidence before the Court concerning this factor. Nothing in the record reveals the identity of White's readers nor the size of his following. The only information the Court can glean about White's general audience is derived from the content of White's writings. Specifically, his readers (for whatever reason) peruse editorials that express offensive and inflammatory white supremacist and neo-Nazi ideologies. In this respect, Intervening Plaintiffs have argued that White's readers are "members of the neo-Nazi movement—a movement notorious for using violence to promote its repugnant views," and, therefore, that White's public criticism of Mottley to such people necessarily constitutes a threat of bodily harm. Post-Remand Br. in Supp. of Obj. 28-29, ECF No. 152. Although this may be an accurate characterization of White's readers, there is little before the Court to support such a conclusion. Indeed, when presented with similar evidence concerning White's general audience,[84] the Fourth Circuit concluded that White's Warman postings were "directed . . . to the public generally" and not to a specifically dangerous group of individuals.

---

[84] In White, the Fourth Circuit acknowledged that White's statements "were posted to neo-Nazi websites." 670 F.3d at 513.

160

White, 670 F.3d at 513.   Thus, on the limited record before it, the Court cannot meaningfully distinguish White's readers from the public, generally.

Additionally, there is no evidence that White exercised control over his audience.   In fact, the only evidence suggestive of such control is White's publication of at least one posting to ANSWP's Yahoo! Group page.   However, the Court observes that, like his separate blog (Overthrow.com), the postings to ANSWP's group page were apparently publicly available until sometime after the Magistrate Judge issued his recommendations in this matter, as evidenced by the Magistrate Judge Order's citations directly to that website.   See, e.g., Mag. Judge Order 22 n.32, ECF No. 98.   Thus, whatever degree of control the Court might have been able to infer from White's postings to the ANSWP Yahoo! Groups page is mitigated by the general public's ability to access that page.   Although he wrote as the "Commander" of ANSWP, there is no evidence that White directed communications to individuals subject to his control or command.   Accordingly, the Court finds that White's publication to the ANSWP page does not show that he exercised any control over his readers.   Nor does any other evidence suggest the presence of such control.[85]

---

[85] The Court notes that, although White represented in his first email to counsel on February 28, 2008 that he had previously forwarded

Similarly lacking is any indication that "White's violent commands in the past had predictably been carried out." White, 670 F.3d at 513. As the Fourth Circuit observed, White's own writings (provided as context for the postings at issue) reference "earlier acts of violence," including the romanticized description of his physical altercation with an African American "crack dealer" and the "firebombing of an activist's house." White, 670 F.3d at 514; J.A. 384-90. The Court agrees that, in light of the record before it, there is clearly a "violent edge that accompanie[s] all of White's statements." White, 670 F.3d at 514. Despite such overtones, there is no evidence before the Court that White's calls to violence have ever been answered. The absence of such evidence distinguishes this case from the Ninth Circuit's decision in Planned Parenthood, 290 F.3d at 1079, which held, in pertinent part, that "WANTED" posters identifying specific targets by name, photograph, and address amounted to "true threats," in light of the fact that three individuals previously featured in such posters had been murdered. Id. Considering this context, the Ninth Circuit held that, even if "the first 'WANTED' poster[] was a purely political message when originally issued, and even if the

the included message to ANSWP's general membership, there is nothing in the email—such as a list of names or addresses—indicating who received the message or that it was even sent, as White represented. See Pre-Hr'g Supplemental Br. Ex. A, ECF No. 55-2.

162

[second] poster were too, by the time of the [third] poster, the poster format itself had acquired currency as a death threat for abortion providers." Id. No such context exists in this case.

Nor is there evidence that White, himself, has suggested in an allegedly threatening statement that a causal connection exists between his writings and acts of violence. Although White boasted in his editorial on Roanoke Times editor Chris Trejbal that his organization had "posted his home address and phone number online," and that "[b]omb threats followed, and his house had to be evacuated," J.A. 348, any connection suggested between White's online postings and such threats was not made in the context of a purported threat of harm or injury. Additionally, White testified at the April 2, 2008 evidentiary hearing that he was only one of a number of sources to post such information, Hr'g Tr. 30-31, Apr. 2, 2008. White conceded that he could not take credit for the "bomb threats" allegedly following his own publication of the information. Id. Thus, both the language and the context in this case are distinguishable from that presented in the Second Circuit's recent decision in Turner, 720 F.3d at 422, where the defendant authored a blog post calling for the murder of three federal judges in which he provided directions to the judges' chambers and "publicly implied a causal connection between [his] calls for judges' deaths and actual murders." Id. Although White

similarly suggested such a connection, such suggestion was not included in any allegedly threatening statement and his concessions at the evidentiary hearing before the Magistrate Judge significantly weaken the impact of his prior claim.

The only actions of which this Court is aware that are alleged to have resulted from White's postings are the two calls placed to Mottley's home telephone in the early morning hours of March 1, 2008.   Intervening Plaintiffs contend that the proximity of such calls to White's initial posting of Mottley's personal, identifying information and the caller's request to speak to Mottley's wife by the name included in those postings establish their connection to White's purported threats.   Post-Remand Br. in Supp. of Obj. 13-14, ECF No. 152.   The Magistrate Judge concluded differently, determining that "there is no way to relate the two late-night telephone calls . . . to White himself or to any reader of White's postings."   Mag. Judge Order 67-68, ECF No. 98.   This Court agrees.   Unlike in White, there is no evidence before this Court concerning the caller's identity.   See White, 670 F.3d at 504 (discussing White's phone call to Kerr and noting that the caller had "identified himself to Bedgar as 'Bill White,' and telephone records showed that a telephone call had been placed on that day from White's home to Kerr's office"); see also Hr'g Tr. 137-38, Apr. 2, 2008 (noting that efforts at identifying the caller revealed only that the

164

call was placed from an "unknown name, unknown number"). Although the circumstantial evidence suggests the possibility that the calls were connected to or inspired by White's postings, the record also reveals that the information contained in those postings, including the name given for Mottley's wife, was derived from other public sources. See Mag. Judge Order 73, ECF No. 98. Thus, while the circumstances surrounding the calls "may be suspicious, . . . there is no evidence that [White] had anything to do with [them]." Carmichael, 326 F. Supp. 2d at 1288 n.44 (discussing a purportedly retaliatory break-in at a witness's home, shortly after he agreed to become a witness against the defendant, and concluding that, despite the close proximity of the break-in and the publication of the witness's personal, identifying contact information on the defendant's website, the circumstances did not establish that the defendant had anything to do with it). Thus, despite the two telephone calls, the Court finds no evidence that White's postings have inspired action—violent or otherwise—in this case or at any other time previously. See Carmichael, 326 F. Supp. 2d at 1288 ("Here, while there is some evidence that Carmichael may have issued threats in the past, there is no evidence of actual retaliatory acts against witnesses or DEA agents involved in this case, and certainly no evidence linked to Carmichael or his supporters." (emphasis in original)).

As determined above, White's statements about Mottley, like his Warman postings, do not "actually provide[] a threat from White that expressed an intent to kill" or otherwise harm Mottley. White, 670 F.3d at 513. Although a "direct threat of that type" is not required to find a "true threat," a statement that merely bids others to injure its target does not amount to a proscribable threat when the evidence fails to establish that "White had some control over those other persons" or that "White's violent commands in the past had been predictably carried out." Id. As the Fourth Circuit has made clear:

> While neither direct communication nor personal or group involvement in the threat is an essential component to finding a true threat, the lack of both along with the fact that White's language was clearly directed to others in the form of advocacy, makes it impossible for [this Court] to conclude that a reasonable recipient would understand White's communications to be serious expressions of intent to commit harm.

Id. at 513-14 (emphasis in original). Like his Warman postings, the communications at issue here, "along with the context surrounding them, may have undoubtedly frightened" Mottley and his family, but "those communications at most conveyed a serious desire that [Mottley] be harmed by others" and not "a serious expression of intent to do harm from the perspective of a reasonable recipient." Id. at 514; see also Carmichael, 326 F. Supp. 2d at 1285 ("Context can help explain the website's meaning, but it is the website that is the focus of the court's

166

inquiry). Additionally, the majority of the contextual factors relevant to the Court's analysis do not suggest that a reasonable recipient familiar with the context would have understood White's postings to be serious expressions of his intent to "commit an act of unlawful violence" against Mottley. Black, 538 U.S. at 359; see also White, 670 F.3d at 505, 514 (rejecting the government's argument that the context surrounding White's Warman postings "elevates the statements and makes up for the lack of a direct threat to commit harm," even when the context included extensive postings during a three-year period "repeatedly calling for [Warman's] assassination and posting his home address"); Carmichael, 326 F. Supp. 2d at 1285 ("Although the broad social context makes the case closer, the background facts . . . are too general to make the Carmichael case site a 'true threat.'"). Considering the full context, including the language of White's postings and all of the relevant contextual factors, the Court finds that the postings at issue are not "true threats" excluded from First Amendment protection.

### ii.    Incitements

Although the Court has determined that White's statements are not proscribable "true threats," the fact that at least some of the postings at issue arguably express a desire that someone else take action against Mottley, requires the Court to briefly

consider, as did the Magistrate Judge, whether such postings might otherwise be excluded from First Amendment protection as incitements to imminent lawlessness. See Mag. Judge Order 69-70, ECF No. 98.

Like "true threats," incitement is a category of speech excluded from First Amendment protection. However, this exception is quite narrow. In defining its scope, the Supreme Court has repeatedly emphasized "that mere advocacy of the use of force or violence does not remove speech from the protection of the First Amendment." N.A.A.C.P. v. Claiborne Hardware Co., 458 U.S. 886, 927 (1982) (emphasis in original) (citing Brandenburg, 395 U.S. at 447). Rather, to constitute proscribable incitement, advocacy must be "directed to inciting or producing imminent lawless action and [be] likely to incite or produce such action." Brandenburg, 395 U.S. at 447 (emphasis added); accord id. at 448 ("[T]he mere abstract teaching of the moral propriety or even moral necessity for a resort to force and violence is not the same as preparing a group for violent action and steeling it to such action." (quoting Noto v. United States, 467 U.S. 290, 297-98 (1961) (internal quotation marks omitted)). Whether speech incites such imminent lawlessness is "evaluated by the objective facts surrounding the speech." White, 670 F.3d at 51 (collecting cases) (rejecting the dissent's argument that Brandenburg requires a court to consider

168

the "speaker's subjective purpose for speaking"); _accord_ _Johnson_, 491 U.S. at 409 (discussing the incitement exception and requiring "careful consideration of the actual circumstances surrounding such expression").

In concluding that the postings at issue "were not direct threats that White himself would inflict harm on Mottley or Mottley's family," the Magistrate Judge considered whether the postings were nevertheless directed to inciting others to inflict such harm. Mag. Judge Order 69, ECF No. 98. Quoting the district court's analysis in _Carmichael_, 326 F. Supp. 2d at 1287, the Magistrate Judge reasoned that this question necessarily "implicate[d] the Supreme Court's stringent 'incitment' doctrine." _Id._ After reviewing that doctrine, the Magistrate Judge determined that "[t]here simply is insufficient evidence that White's postings 'meet the imminency requirement of _Brandenburg_.'" Mag. Judge Order, ECF No. 98 (quoting _Carmichael_, 326 F. Supp. 2d at 1287).

Intervening Plaintiffs object to the Magistrate Judge's conclusion, arguing that _Brandenburg_ is distinguishable from the instant case because the speaker in that case "advocated the overthrow of the government, not harm against a specific individual." Post-Remand Br. in Supp. of Obj. 37, ECF No. 152. Intervening Plaintiffs further argue that, under the Magistrate Judge's analysis, "it would be perfectly lawful to encourage

169

others to kill a specific lawyer . . . so long as the
encouragement is qualified by some phrase that would make the
proposed murder appear less than "imminent."[86]  Id. at 38.

Reviewing White's postings, the Court agrees with the
Magistrate Judge that, like the website in Carmichael, there is
no evidence that White's statements "meet[] the imminency
requirement of Brandenburg."  Carmichael, 326 F. Supp. 2d at
1287; see also Planned Parenthood, 290 F. 3d at 1092 n.5
(Kozinski, J., dissenting) ("Under Brandenburg, advocacy can be
made illegal if it amounts to incitement.  But incitement
requires an immediacy of action that simply does not exist here,
which is doubtless why plaintiffs did not premise their claims
on an incitement theory.").  As discussed at length above, the
evidence fails to establish that White's postings have
previously inspired any action—imminent or otherwise.  In the
absence of such evidence, the fact that White published his
statements to the Internet, alone—although deeply troubling—is
not enough to show that the actions suggested therein were

---

[86] The Court acknowledges that, at the July 17, 2013 hearing,
Intervening Plaintiffs suggested that the incitement exception may not
apply to White's postings.  Indeed, in light of the Fourth Circuit's
decision concerning White's Warman postings, it appears that such
encouragement, in the proper context, is indeed protected under the
First Amendment.  See White, 670 F.3d at 513-14.  However, because
Intervening Plaintiffs did not entirely concede the inapplicability of
Brandenburg nor expressly waive their prior objection, the Court
briefly considers the status of White's postings under the incitement
theory articulated in Brandenburg.

likely to be immediately carried out by White's readers.   See
Planned Parenthood, 290 F.3d at 1092 n.5 (Kozinski, J.,
dissenting) (observing that the publication of "WANTED" posters
to a website did not establish the "immediacy of action"
required to support the exclusion of such posters under the
incitement theory); Carmichael, 326 F. Supp. 2d at 1287 (finding
"no evidence" that a website publishing the personal,
identifying information of government witnesses "meets the
imminency requirement of Brandenburg" and concluding that the
site was not proscribable "as constitutionally unprotected
advocacy of violence").   Thus, even if the objective
circumstances surrounding White's postings indicate that they
were "direct[ed] to inciting or producing imminent lawless
action,"[87] the lack of any evidence establishing that his

_____

[87] On this point, the Court acknowledges Intervening Plaintiffs'
argument that White's suggestion in his February 22, 2008 posting that
Mottley and his wife were "open game" after the subpoena dispute could
be read as advocating action in the near future, in light of the fact
that the Magistrate Judge had set a hearing on the disputed subpoenas
for February 28, 2008.   However, the language of White's email does
not suggest that it contains any directive to take action at the
conclusion of the dispute.   Nor is it clear that White's
communications, to the extent they suggested action at the conclusion
of the subpoena dispute, revealed when he expected the dispute to be
resolved.   Indeed, in the first posting of which the Court is aware,
White stated that he thought the subpoena dispute would "probably . .
. cost $5000-$6000 to win," which suggests that, at least in his mind,
the matter would take some time to resolve.   Pre-Hr'g Reply Br. Ex. B,
ECF No. 67-3.   Nothing else in White's postings suggests that the
subpoena dispute would conclude at the February 28, 2008 hearing, such
that White's suggestion that Mottley and his wife were "open game"
upon its resolution could reasonably be interpreted as a call to take
action against them on or after that date.   "At best . . . [White's]
statement could be taken as counsel for present moderation; at worst,

statements were "likely to incite or produce such action" distinguishes them from those incitements proscribable under Brandenburg.[88] 395 U.S. at 447. Therefore, White's postings are not excluded from First Amendment protection as incitements to imminent lawless action. See id.

The Court does observe, however, that Intervening Plaintiffs' proposed distinction, based on the specificity of White's statements, is well taken. Indeed, courts have distinguished statements directing or advocating harm to a

---

it amounted to nothing more than advocacy of illegal action at some indefinite future time." Hess v. Indiana, 414 U.S. 105, 108 (1973) (concluding that the defendant's statement at an antiwar demonstration that, "We'll take the fucking street later," could not be punished as an unlawful incitement because it was not directed to any person or group of persons and because "there was no evidence or rational inference from the import of the language, that his words were intended to produce, and likely to produce, imminent disorder"). However, even if White's statements were directed to inciting imminent lawlessness, the lack of evidence that they were likely to produce such action distinguishes them from constitutionally proscribable incitements.

[88] Intervening Plaintiffs argue that "imminent does not mean immediate." Post-Remand Reply Br. 9, ECF No. 189 (citing White, 698 F.3d at 1019). In support of this position, they cite to the Seventh Circuit's decision in White, affirming the district court's denial of an additional jury instruction emphasizing the imminency required under Brandenburg (after it had already incorporated White's proposed incitement instruction). White, 698 F.3d at 1019. The Seventh Circuit's discussion, however, concerned solicitations, which are a separate category of speech excluded from First Amendment protection. Id. Thus, the Seventh Circuit held that "any additional emphasis" on the imminency requirement "could have been misleading because it would have suggested that the solicitation of non-immediate crime was protected when it is not." White, 698 F.3d at 1019. This holding does not excuse the lack of imminency when speech is analyzed under the incitement theory, rather, it makes clear that solicitations are proscribable even if the subject crime is not likely to be performed immediately.

specific individual from proscribable advocacy of violence. See, e.g., Planned Parenthood, 290 F. 3d at 1073-74 (citing Claiborne, 458 U.S. at 929); Carmichael, 326 F. Supp. 2d at 1288 (citing Claiborne, 458 U.S. at 929). Such distinction, however, is not drawn to permit the proscription of speech that fails to satisfy Brandenburg's imminency requirement. Rather, courts have considered the fact that a speaker advocates violence against a specific individual to support their analysis of his speech as a "true threat," instead of as unlawful incitement. See, e.g., Planned Parenthood, 290 F.3d at 1073-74 (distinguishing the "WANTED" posters at issue from protected advocacy because, among other things, the posters targeted specific individuals and, therefore, were more analogous to a "true threat" than incitement); Carmichael, 326 F. Supp. 2d at 1287-88. Thus, the fact that White's statements specifically identified Mottley does not support their proscription under Brandenburg without regard to the absence of evidence suggesting that action against Mottley was imminent. Claiborne, 458 U.S. at 927 (citing Brandenburg, 395 U.S. at 447) ("[M]ere advocacy of the use of force or violence does not remove speech from the protection of the First Amendment."). Rather, such identification suggests that White's postings are more appropriately analyzed under the "true threats" exception, a question the Court has already considered at length.

173

Accordingly, the Court finds that the postings at issue are not excluded from First Amendment protection as either "true threats" or incitements to imminent lawless action. As no other exception apparently applies, White's postings constitute protected speech under the First Amendment.

### iii.    Conclusion

In concluding that White's speech is constitutionally protected, the Court does not minimize the real fear of harm and intimidation that Mottley and his family experienced as a result of his conduct. The Court strongly disapproves of the method by which White sought to express his views in this matter. Despite its protected status, the Court finds White's conduct to be reprehensible and, again, emphasizes that minute or subtle changes to the language or context may have resulted in the exclusion of his speech from First Amendment protection. The significance of this point should not be lost on White or on any other similarly situated person in light of the Court's ultimate ruling. See Mag. Judge Order 41 n.42, ECF No. 98. However, in our democratic society, when presented with even caustic or abusive protected speech, "we do not quash fear by increasing government power, by proscribing [our fundamental] constitutional principles, and silencing those speakers of whom the majority disapproves." Sheehan, 272 F. Supp. 2d at 1150. Indeed:

174

As Justice Harlan eloquently explained, the First Amendment demands that we confront those speakers with superior ideas:

The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours. It is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests. To many, the immediate consequence of this freedom may often appear to be only verbal tumult, discord, and even offensive utterance. These are, however, within established limits, in truth necessary side effects of the broader enduring values which the process of open debate permits us to achieve. That the air may at times seem filled with verbal cacophony is, in this sense[,] not a sign of weakness but of strength. We cannot lose sight of the fact that, in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated.

Id. (quoting Cohen v. California, 403 U.S. 15, 24-25 (1971)) (internal citations omitted).

c.  **Balancing of White's First Amendment Interests Against the Proffered Compelling Government Interests**

Having concluded that the Court's inherent Article III power to sanction extends to White's bad faith conduct, but also that such conduct falls within the scope of the First Amendment's robust protections, the Court must determine "where the individual's freedom ends and the State's power begins," Thomas, 323 U.S. at 529-30 (1945), that is, whether White's

175

constitutional interest in free expression should limit or yield to the Court's inherent power to sanction his bad faith conduct.

In determining not to recommend sanctions, the Magistrate Judge considered the relationship between the Court's power and White's protected speech.  Specifically, the Magistrate Judge concluded that White's conduct before the Court "ha[d] been beyond reproach" and that there was no evidence that White's postings significantly impacted the underlying litigation.  Mag. Judge Order 41, 73-75, ECF No. 98.  Based on the lack of any discernible disruption and the protected status of White's writings, the Magistrate Judge declined, in his discretion, to recommend sanctions against White pursuant to the Court's inherent authority.  Id. at 64.

Intervening Plaintiffs object to the Magistrate Judge's analysis.  First, they contend that he improperly considered whether White's conduct impacted the underlying litigation, arguing that this fact "is irrelevant to determining whether White's Internet posting is a true threat."  See Post-Remand Br. in Supp. of Obj. 39, ECF No. 152.  Next, they argue that the Magistrate Judge erred by failing to engage in strict scrutiny balancing of White's First Amendment interests against the Court's compelling interests in ensuring access to and the integrity of the judicial process.  Id. at 41-44.  Before considering Intervening Plaintiffs' specific objections, the

176

Court reiterates those general principles observed above concerning the scope of the constitutional powers and protections at issue.

First, this Court generally possesses broad inherent power under Article III to sanction bad faith or contemptuous conduct. See Roadway Express, 447 U.S. at 764. Indeed, upon the requisite finding of bad faith, the Court has wide discretion to fashion an appropriate sanction for conduct occurring before it or beyond its confines and such sanction can readily include attorneys' fees. See Chambers, 501 U.S. at 44-45. This broad power necessarily inheres to the court as a means of "protecting the due and orderly administration of justice and [of] maintaining the authority and dignity of the court. . . ." Roadway Express, 447 U.S. at 764 (quoting Cooke, 267 U.S. at 539) (internal quotation marks omitted) (citing 4 W. Blackstone, Commentaries *282-*285). However, the Supreme Court has repeatedly emphasized that courts acting pursuant to their inherent power must exercise "restraint and discretion." Roadway Express, 447 U.S. at 764; accord Chambers, 501 U.S. at 50 (citing Roadway Express, 447 U.S. at 767). The Court's inherent authority is, therefore "'not a broad reservoir of power, ready at an imperial hand, but a limited source'" that "springs from the well of necessity, and [only] sparingly so."

Natural Gas Pipeline, 2 F.3d at 1406-07 (quoting NASCO, 894 F.2d
at 702).

Second, the First Amendment fiercely guards an individual's
right to free speech. See, e.g., Knox, 132 S. Ct. at 2288
(noting "the close connection between our Nation's commitment to
self-government and the rights protected by the First
Amendment"); Cohen, 403 U.S. at 24 ("The constitutional right of
free expression is powerful medicine in a society as diverse and
populous as ours."); Watts, 394 U.S. at 708 (recognizing the
"profound national commitment to the principle that debate on
public issues should be uninhibited, robust, and wide open, and
that it may well include vehement, caustic, and sometimes
unpleasantly sharp attacks" (quoting Sullivan, 376 U.S. at 270)
(internal quotation marks omitted)). This "constitutional
protection does not turn upon 'the truth, popularity or social
utility of the ideas and beliefs which are offered.'" Sullivan,
376 U.S. at 271 (quoting N.A.A.C.P. v. Button, 371 U.S. 415, 445
(1963)). Additionally, the Supreme Court has emphasized that
"in [its] judgment, most situations where the State has a
justifiable interest in regulating speech will fall within one
or more of the various established exceptions . . . to the usual
rule that governmental bodies may not prescribe the form or
content of individual expression." Cohen, 403 U.S. at 24. At
the same time, there may be cases very near "the line between

178

speech unconditionally guaranteed and speech which may be regulated." Sullivan, 376 U.S. at 285 (quoting Speiser v. Randall, 357 U.S. 513, 525 (1958)) (internal quotation marks omitted). Accordingly, courts "must make an independent examination of the whole record, so as to assure [them]selves that the[ir] judgment does not constitute a forbidden intrusion on the field of free expression." Id. (internal citations omitted). For, "[c]ourts, too, are bound by the First Amendment." Citizens United, 558 U.S. at 326. And the application of "First Amendment standards . . . 'must give the benefit of any doubt to protecting rather than stifling speech.'" Id. (quoting Fed. Election Comm'n v. Wis. Right to Life, Inc., 551 U.S. 449, 469 (2007) (Roberts, C.J)); accord Button, 371 U.S. at 433 ("First Amendment freedoms need breathing space to survive.").

These underlying principles—counseling for the robust protection of speech under the First Amendment and the restrained exercise of the inherent powers accorded by Article III—give the Court great pause when considering the appropriateness of any discretionary sanctions award based solely on White's Internet postings.[89] See Bridges v. State of

___

[89] As noted above, White's postings are the only acts upon which Intervening Plaintiffs rely in support of their Motion for Sanctions. Although the Court has considered White's other conduct in determining that he authored the postings in bad faith, such conduct—including his failure to be disclose the availability of the February 22, 2008

Cal., 314 U.S. 252, 260 (1941) ("[F]ree speech and fair trials are two of the most cherished policies of our civilization, and it would be a trying task to choose between them."). Although the Court has concluded that White authored the postings in bad faith, their protected status under the First Amendment precipitates the vexing question of whether White's bad faith is sufficient to justify an exercise of the Court's inherent power to sanction over his otherwise protected speech. Because the inherent power to sanction bad faith conduct derives from the Court's interests in the due and orderly administration of justice and in maintaining its own authority, Roadway Express, 447 U.S. at 764, the Court views the degree to which those interests have been interfered with as a necessary part of its inquiry. Indeed, courts that have considered whether to subject a nonparty to sanctions under their inherent powers have consistently considered the degree to which the nonparty's conduct disrupted or interfered with their proceedings as a significant factor in their analysis. See, e.g., In re

---

posting on ANSWP's Yahoo! Group page and his continued postings throughout the pendency of the Motion for Sanctions—has not been offered as an independent basis for sanctions and the Court, therefore does not consider it as such. Accordingly, the only allegedly sanctionable conduct is White's numerous Internet postings. Additionally, the only justification offered for the sanctions sought is that the content of White's postings was aimed at disrupting the court's processes and Intervening Plaintiffs' access to the same.

Holloway, 884 F.2d at 477 & n.2; Helmac Prods., 150 F.R.D. at 568.

On this point, the Magistrate Judge concluded that White's postings did not interfere with any aspect of the instant or underlying proceedings. First, the Magistrate Judge observed that:

> With respect to the subpoenas at issue and the instant litigation of the Motion for Sanctions, White has participated fully and he does not appear to have interfered with the lawful processes of the Court. After lawfully objecting to the issued subpoenas and participating in a hearing on his motion to quash, the parties were able to negotiate a mutually-agreeable protective order and White ultimately submitted to a discovery deposition. There have been no allegations that White has failed to comply or disobey any order of the Court.

Mag. Judge Order 73-74, ECF No. 98. The Magistrate Judge emphasized that the only dispute in which White directly participated was that concerning the Yahoo! subpoena, which the parties resolved at the February 28, 2008 hearing. Id. at 74. "Significantly, it appears that the Yahoo! subpoena was never responded to by Yahoo!, and that no efforts [were] made by counsel for Intervening Plaintiffs to compel any response to that subpoena." Id.

The Magistrate Judge further concluded "that despite White's actions, there was ultimately no measurable impact on the underlying litigation." Id. at 74. On this point, he noted the "multiple hearings and related proceedings filed by all the

181

affected parties and the non-party." Id.  While observing that such "subpoena and other discovery-related matters are commonplace in federal court litigation," the Magistrate Judge also "recognized the arguments of Intervening Plaintiffs . . . that the ongoing dispute with White over the various postings ha[d] been an unwanted and unnecessary distraction that very well could have disrupted the underlying litigation." Id. at 74-75 (emphasis added).  Reviewing the record in light of this contention, the Magistrate Judge found no evidence, however, that counsel's representation of Intervening Plaintiffs was affected or that White's postings otherwise impacted the prosecution of the underlying action.  Id. at 75.  "To the contrary, Mottley was able to successfully negotiate a settlement on his client's behalf, the trial date remained in place during the entire process, and [there was] no apparent impact on the litigation." Id.

Reviewing the record, the Court agrees with the Magistrate Judge's conclusion that White's postings did not discernibly impact either the subpoena dispute in which he was directly involved or the prosecution of the underlying litigation. White's Motion to Quash and Intervening Plaintiffs' related motion (the only aspect of this litigation in which White directly participated) were resolved, as narrowed, at the February 28, 2008 hearing before the Magistrate Judge.  This

182

hearing was set on the same day that White made his initially objectionable postings and there is no evidence before the Court that those postings interfered with the proceedings. Furthermore, the majority of White's objectionable postings—including his two February 28, 2008 emails to counsel—were authored after the hearing and, therefore, could not have impacted the resolution of the subpoena dispute in which White was directly involved.

Concerning the underlying litigation, the Court agrees with the Magistrate Judge that, despite Mottley's testimony that he considered withdrawing from his representation of Intervening Plaintiffs, White's postings had no discernible impact on the prosecution of that dispute. Specifically, the first postings of which the Court is aware were published on February 22, 2008. Intervening Plaintiffs filed the Motion for Sanctions on February 27, 2008. The Magistrate Judge established a briefing schedule concerning that motion and set an evidentiary hearing for April 2, 2008. Meanwhile, the original trial date remained in place.[90] Despite being actively involved in briefing and

---

[90] The Court notes, as did the Magistrate Judge, that the parties mutually agreed on several occasions to revise the discovery deadlines of the underlying dispute. Although there was some suggestion at the April 2, 2008 hearing that such agreements were based, at least in part, on the subpoena dispute involving White, there is no evidence that his conduct necessitated such extensions. See Hr'g Tr. 184-85, Apr. 2, 2008. Furthermore, the Magistrate Judge understood that the agreed revisions "were sought to allow the parties to continue their efforts to settle the underlying litigation, while preserving their

preparing to argue the Motion for Sanctions, the record reveals that counsel for Intervening Plaintiffs were able to settle the underlying dispute by agreement executed on the same day as the evidentiary hearing. *See* Consent Order 1-2, ECF No. 90. Thus, the filing of the Motion for Sanctions, and the proceedings related to that motion, did not apparently significantly impair Intervening Plaintiffs' ability to satisfactorily resolve their dispute. Furthermore, the Court notes that at least three of the postings at issue—including the April 2008 postings in which White republished Mottley's personal, identifying information and his August 16, 2008 "Funny Games" posting—were authored after Intervening Plaintiffs had settled the underlying dispute and, therefore, could not have disrupted or otherwise affect its prosecution.

As did the Magistrate Judge, the Court commends Mottley "for successfully representing [his] clients' interests and for proceeding courageously in the face of adversity." Mag. Judge Order 64, ECF No. 98. Indeed, his ability to do so is a testament to his fortitude.[91] In commending Mottley's dedication

---

rights to complete litigation through trial if those efforts were unsuccessful." Mag. Judge Order 75 n.63, ECF No. 98.

[91] At the July 17, 2013 hearing, Intervening Plaintiffs argued that this analysis sets a precedent that turns on the resilience of the individual attorney, that is, they urged that, if Mottley had been more sensitive, White would be sanctioned under such analysis, despite the protected status of his speech. The Court is certainly sensitive to and mindful of this argument, as well as Intervening Plaintiffs'

to his clients, the Court does not mean to suggest that such resilience should be punished through the denial of relief to which Intervening Plaintiffs would otherwise be entitled. However, in determining whether Intervening Plaintiffs are entitled to such relief, the Court views the degree to which the allegedly sanctionable conduct interfered with this and the underlying litigation as a significant factor, especially when such conduct occurred outside of the Court's presence and is otherwise protected by the First Amendment. See Chambers, 501 U.S. at 54 (affirming sanctions against petitioner for bad faith conduct occurring outside of the court's presence when that conduct perpetrated a fraud upon the court); see also Helmac Prods., 158 F.R.D. at 568 (considering the degree of a nonparty's interest and participation "in the proceedings in

---

contention that there must be a remedy for conduct as repugnant as White's bad faith postings in this matter. However, the Court observes that an order of sanctions pursuant to its inherent power is not the sole remedy available. Indeed, the Government could have prosecuted White for his conduct, to the extent it viewed such conduct as proscribable under any relevant statutory provision. Similarly, Intervening Plaintiffs could have sought further relief against White under the Fair Housing Act, 42 U.S.C. § 3601 et seq., for "coerc[ing], intimidate[ing], threaten[ing] or interfere[ing] with" Mottley "on account of his having aided or encouraged" Intervening Plaintiffs "in the exercise or enjoyment" of their fair housing rights. 42 U.S.C. § 3617. In making this observation, the Court expresses no view as to the merits of such a private action, but merely notes its availability as an alternative remedy, one that Intervening Plaintiffs have apparently pursued successfully against White in the past. See Post-Remand Br. in Supp. of Obj. 2, ECF No. 152. That neither the Government nor Intervening Plaintiffs chose to pursue such alternative remedies does not require this Court to provide such relief when doing so would constitute an abuse of its discretion or otherwise run afowl of fundamental constitutional principles.

which he _interfered_" in determining whether sanctions under the court's inherent power were appropriate (emphasis added)); City of Detroit, 2010 WL 5326953, at *3 (observing the absence of a clear rule concerning the scope of the court's inherent authority vis-à-vis a nonparty "who did not violate any specific court order").

The only evidence of potential disruption that the Court can discern from the record is the prolonged litigation of the instant Motion for Sanctions, including the time and resources expended in its prosecution, as established through Mottley's testimony at the April 2, 2008 evidentiary hearing.  Hr'g Tr. 130, Apr. 2, 2008.  The instant motion outlived the underlying dispute and has continued for several years, due largely, however, to White's involvement in the unrelated criminal prosecutions reviewed above.  While certainly an "unwanted and unnecessary distraction," the Motion for Sanctions did not apparently disrupt any aspect of the underlying dispute. Indeed, although Mottley testified that he spent approximately 80-100 hours responding to White's postings and that this was "time that [he] otherwise would be billing to another matter," including the underlying litigation, the Court can discern no impact to the underlying case resulting from this diversion. The record reveals that during the approximately one-month period in which the Intervening Plaintiffs' Motion for Sanctions

186

was briefed and argued, the original trial date remained in place and counsel settled the underlying dispute with Defendants.

Thus, the interests from which the Court derives its inherent power to sanction bad faith or contemptuous conduct do not appear to have been affected by White's numerous postings in this matter. The lack of an impact on any aspect of the underlying litigation reveals that White's conduct, even if performed in bad faith, did not undermine the "due and orderly administration of justice." Roadway Express, 447 U.S. at 764. The fact that he was under no court order to remove or refrain from authoring postings similarly suggests that—although repugnant—his conduct did not undermine "the authority and dignity of the court." Id. Further, none of the permissible bases for sanctioning bad faith conduct is implicated in this dispute. White's postings—the only conduct for which relief is sought—did not constitute a fraud on the Court. Chambers, 501 U.S. at 45 (quoting Universal Oil Prods., 328 U.S. at 580)). Nor does the record reveal that his conduct "delay[ed] or disrupt[ed] the litigation," or that it "hamper[ed] enforcement of a court order." Id. (quoting Hutto, 437 U.S. at 689 n.14) (internal quotation marks omitted). In the absence of any such interference and in light of the context in which White's protected statements were made, the Court cannot conclude that

187

"the very temple of justice has been defiled" by White's out-of-court commentary.  Id. (quoting Universal Oil Prods., 328 U.S. at 580).   Thus, neither the interests from which the Court derives its inherent power to sanction, nor the bases supporting an exercise of that power, are implicated in the instant case.  These findings persuade the Court that an award of sanctions against White, based on the content of his various Internet postings, is not an appropriate exercise of its discretion under Article III, especially in light of White's First Amendment interest in the relevant postings.

In so holding, the Court observes that there are certainly circumstances under which an individual's First Amendment rights yield to the Court's interests in the fair and orderly administration of justice.   Indeed, it is well-established that "disruptive, contemptuous behavior in a courtroom is not protected by the Constitution."  In re Contempt of Warriner, 317 N.W.2d 681, 684 (Mich. Ct. App. 1982) (citing Cox v. Louisiana, 379 U.S. 559 (1965)) (rejecting a defendant's argument that his conduct as an observer during a bond hearing—raising his fist and shouting at the conclusion of that hearing—was protected as symbolic speech); accord Norris v. Risley, 918 F.2d 828, 832 (9th Cir. 1990) (citing Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 564 (1980) (discussing trial attendees' display of "Women Against Rape" buttons at the criminal prosecution of a

sex crime and observing that, "[w]here fair trial rights are at a significant risk, however, the first amendment rights of trial attendees can and must be curtailed at the courthouse door"); cf. Fairey v. Tucker, 132 S. Ct. 2218, 2200 (2012) (recognizing that "a defendant can lose his right to be present at trial if, after being warned that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom" (quoting Illinois v. Allen, 397 U.S. 337, 343 (1970) (internal quotation marks omitted)). Additionally, in several cases of which this Court is aware, the Supreme Court has considered courts' ability to punish contempt based on statements made outside of the courtroom that are subsequently deemed prejudicial to the administration of justice. See, e.g., Gentile v. State Bar of Nev., 501 U.S. 1030, 1075 (1991) (addressing attorney statements made to the press concerning a pending case); Wood v. Georgia, 370 U.S. 375 (1962) (considering a county sheriff's press release criticizing a local judge's handling of a case); Bridges v. State of Cal., 314 U.S. 252 (1941) (reviewing statements concerning pending cases published in a newspaper); Craig v. Harney, 331 U.S. 367, 369 (1947) (same). In all such cases, the Supreme Court has analyzed the purportedly contemptuous commentary under a "clear and present

189

danger" standard, which authorizes the punishment of speech if it constitutes "a serious and imminent threat to the administration of justice." <u>Craig</u>, 331 U.S. at 373. Under this standard, "the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished." <u>Bridges</u>, 314 U.S. at 263. "In the borderline instances where it is difficult to say upon which side the alleged offense falls, . . . the specific freedom of public comment should weigh heavily against a possible tendency to influence pending cases." <u>Id.</u> The Supreme Court has made clear that, in a "clear and present danger" analysis, "[f]reedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice." <u>Id.</u>

Although there is some indication that <u>Brandenburg</u>'s more stringent standard—incitement to imminent lawlessness—has displaced the "clear and present danger" test articulated in these earlier cases,[92] the Court observes that some post-<u>Brandenburg</u> cases continue to apply the "clear and present

---

[92] <u>See, e.g.</u>, <u>Denver Area Educ. Telecomm. Consortium, Inc. v. F.C.C.</u>, 518 U.S. 727, 778 (1996) (observing that "the clear and present danger test . . . evolved into the modern incitement rule of <u>Brandenburg</u>"); <u>Turney v. Pugh</u>, 400 F.3d 1197, 1202 (9th Cir. 2005) (describing <u>Brandenburg</u> as "setting forth the successor to the clear and present danger test applied in its various incarnations in the <u>Bridges-Wood</u> line of cases"); <u>Viefhaus</u>, 168 F.3d at 397 n.3 ("The 'clear and present danger' test . . . has been replaced by the 'incitement' test developed in <u>Brandenburg</u>).

danger" test to court restrictions of speech threatening the due and orderly administration of justice, see, e.g., In re Contempt of Dudzinski, 667 N.W.2d 68, 75 (Mich. Ct. App. 2003) (concluding that a trial spectator's shirt displaying the statement, "Kourts Kops Krooks," which apparently sought "to compare courts and police officers to the Klu Klux Klan" did not "present a serious and imminent threat to the fair administration of justice" when the appellant sat quietly in the courtroom during a pretrial hearing outside the presence of any jury, did not disturb the proceedings, and was not part of a large group); Matter of Frankel v. Roberts, 165 A.D.2d 382, 385 (N.Y. App. Div. 1991) (concluding that "Ready to Strike" buttons donned by attorneys in a nonjury courtroom, expressing a political message, "clearly presented no 'serious and imminent threat to the administration of justice'" (quoting Craig, 331 U.S. at 373)).

The Court does not, here, attempt to elucidate the precise state of the law concerning the "clear and present danger" standard and its application to court action potentially violative of an individual's right to free speech. Rather, the Court concludes that, to the extent a finding of "clear and present danger" to the administration of justice may still appropriately inform its analysis of the constitutional interests involved in this case, the application of such

191

standard would not support an award of sanctions against White based on his Internet postings.  Here, White expressed his views in written statements published to Internet websites and there is no indication that such statements disrupted or interfered with a Court proceeding, nor that his commentary was imminently likely to so interfere with the Court's process.  See Warriner, 317 N.W.2d at 684 (sanctioning verbal outbursts and aggressive movements in the courtroom); see also Dudzinski, 667 N.W.2d at 73-74 (distinguishing cases permitting the restriction of trial attendees' expression, at least in part, on the presence or absence of a jury).  Although the Court's inherent power to sanction can reach conduct occurring outside of its presence, Chambers, 501 U.S. at 44, the strength of such power "diminish[e]s . . . as the expressions and associations sought to be controlled move from the courtroom to the outside world." Bernard v. Gulf Oil Co., 619 F.2d 459, 466 n.8 (5th Cir. 1980). Additionally, White's postings were largely directed to expressing his views of the underlying litigation and the significant issues—fair housing and civil rights—involved therein.  See Frankel, 165 A.D.2d at 387 (granting relief from a court order requiring removal of a political button from attorney lapels).  Although White's interest in including Mottley's personal, identifying information in such expression may be "further from the core of the First Amendment,"

192

_Carmichael_, 326 F. Supp. 2d at 1290, the inclusion of such information does not except White's online commentary from constitutional protection. Indeed, in light of the fact that White engaged in protected speech, beyond the confines of the Court, that did not apparently interfere with the administration of justice, the Court finds little from which to conclude that his speech presented "a serious and imminent threat to the administration of justice" when it was made. _Craig_, 331 U.S. at 373. Accordingly, under a "clear and present danger" analysis, sanctions against White based on the relevant postings would be improper.

In light of the numerous cases applying the "clear and present danger" standard to speech that purportedly threatens the due administration of justice, the Court expresses some doubt that strict scrutiny balancing is the proper legal standard, as Intervening Plaintiffs contend. However, the Court observes that the result would be the same under such an analysis.

Generally, government regulation of speech based on the content of that speech "can stand only if it satisfies strict scrutiny." _United States v. Playboy Entm't Grp., Inc._, 529 U.S. 803, 813 (2000). For such action to survive strict scrutiny analysis, it must be "narrowly tailored to promote a compelling [government] interest." _Ostergren v. Cuccinelli_, 615 F.3d 263,

271 (4th Cir. 2010) (citing Payboy Entm't Group, 529 U.S. at 813).   This   exacting   standard   applies   to   content-based restrictions "to ensure that communication is not prohibited 'merely because public officials disapprove [of] the speaker's view.'"   U.S. Postal Serv. v. Council of Greenburgh Civic Assocs., 453 U.S. 114, 132 (1981) (quoting Consol. Edison Co. v. Pub. Serv. Comm'n, 447 U.S. 530, 536 (1980)).

Intervening Plaintiffs have proffered two compelling government interests they contend would be served by an award of sanctions against White.   First, they argue that "there is a compelling government interest in ensuring that civil rights litigants, their attorneys, and others who assist them, are able to access the courts and pursue their claims without being subjected to bad-faith conduct designed to interfere with the lawful pursuit of civil rights."   Post-Remand Br. in Supp. of Obj. 42, ECF No. 152.   Second, they contend that "there is a compelling government interest in preserving the integrity of judicial proceedings, including 'the orderly and expeditious disposition of cases.'"   Id. (quoting Chambers, 501 U.S. at 44). White concedes, and the Court agrees, that preserving litigants' access to the courts and the integrity of judicial proceedings are compelling government interests.   See Br. in Opp. to Intervening Pls.' Objections to Mag. Judge Order 12, ECF No. 185;   cf. Bill Johnson's Rests., Inc. v. N.L.R.B., 461 U.S. 731,

194

741 (1983) (citing Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972) (recognizing "that the right of access to courts is an aspect of the First Amendment right to petition the Government for redress of grievances"). Indeed, these interests are analogous to the interests from which the Court derives its inherent power to sanction bad faith or contemptuous conduct. See Roadway Express, 447 U.S. at 764 (identifying such interests as "protecting the due and orderly administration of justice and maintaining the authority and dignity of the court").

The primary focus of strict scrutiny balancing in this instance would, therefore, be whether the award of sanctions sought against White is narrowly tailored to serve these compelling interests. On this point, the Court would again consider the degree to which White's postings interfered with such interests. As explained above, the Court can discern no evidence that White's postings—even though authored in bad faith—interfered with its own interest in the orderly and expeditious resolution of the underlying dispute. This same analysis similarly reveals no interference with Intervening Plaintiffs' ability to access the Court. Indeed, Intervening Plaintiffs were zealously represented in the underlying dispute, which they settled favorably during the pendency of the instant Motion for Sanctions. Further, as counsel informed the Court,

195

Intervening Plaintiffs "successfully pursued civil claims against White for threats and intimidation in violation of the Fair Housing act together with various Virginia statutes, resulting in a jury verdict of $265,000 and an award of attorney's fees and costs in the amount of $592,532." Post-Remand Br. in Supp. of Obj. 2, ECF No. 152. Thus, the record reveals that Intervening Plaintiffs have enjoyed apparently unfettered access to this Court and other courts, to quite favorable ends.[93] Accordingly, the Court finds that White's repugnant postings, although made in bad faith, did not interfere with the identified compelling interests. Absent evidence of such interference, the Court cannot conclude that an award of sanctions against White would be narrowly tailored to serve either interest. See Frisby v. Schultz, 487 U.S. 474, 485 (1988) (citing City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 808-10 (1984) ("A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy.").

Intervening Plaintiffs contend that a finding that White "engaged in bad faith acts designed to interfere with the two compelling interests at stake" is sufficient to conclude that

---

[93] Although White's conduct toward Intervening Plaintiffs—that is, his May 23, 2007 mailings to their residences—arguably interfered with their rights, he has been subject to criminal and civil sanctions for the same and such conduct is offered only as context for the postings upon which the Motion for Sanctions is based.

the sanctions they seek are narrowly tailored to serve those interests. Post-Remand Br. in Supp. of Obj. 43, ECF No. 152 (emphasis added). However, when government action is undertaken as "a means to redress past harms or to prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.'" Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 664 (1994) (quoting Quincy Cable TV Inc. v. FCC, 768 F.2d 1434, 1455 (D.C. Cir. 1985)). The recited harms must be "real, not merely conjectural." Id. Indeed, in Chambers, the Supreme Court observed that the petitioner's "entire course of conduct throughout the lawsuit evidenced bad faith and an attempt to perpetrate a fraud on the court." 501 U.S. at 51. In light of such evidence, the district court's decision to sanction him "for the fraud he perpetrated on the court and the bad faith he displayed toward both his adversary and the court throughout the course of the litigation" was affirmed. Id. at 55. Thus, the sanctions awarded in Chambers were based on both the petitioner's bad faith attempt to perpetrate a fraud on the Court and the fact that he succeeded in such efforts. Id. Here, even if White's conduct was designed to interfere with the underlying litigation, that it did not do so counsels against an award of sanctions under the Court's inherent power, especially in light of the fact that such conduct is otherwise protected under the First Amendment.

Regardless of how the Court weighs the constitutional interests implicated by Intervening Plaintiffs' Motion for Sanctions, it concludes that granting the relief sought would not be an appropriate exercise of its discretion and inherent Article III powers.  The background constitutional principles counsel the Court to practice restraint in invoking such powers, while simultaneously demanding that speech falling within the ambit of the First Amendment be robustly protected.  Further, none of the bases enumerated in <u>Chambers</u> for exercising the inherent power to sanction bad faith conduct were implicated by White's conduct.  Finally, because the record fails to reveal any disruption to the underlying litigation, nor the imminent likelihood of such disruption or interference, no clear and present danger supports the award sought, nor would such award be narrowly tailored to serve compelling government interests. Although the Court is sympathetic to Mottley's plight and the very real fear that White's postings inflicted on him and his family, it does not, based on the record before it, view an award of sanctions against White for his protected (though bad faith) speech as an appropriate exercise of its discretion. Although White's repugnant conduct toward Mottley may indeed demand a remedy, that remedy is not properly an award of sanctions under the Court's inherent Article III powers.

**V. CONCLUSION**

For the foregoing reasons, Intervening Plaintiffs' Motion for Sanctions is **DENIED**.  The Clerk is **DIRECTED** to send a copy of this Opinion and Order to counsel for all parties.

**IT IS SO ORDERED.**

_____ /s/

Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
September 13, 2013

199